**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF CHAIN DRUG STORES *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:07cv02017 (RCL) |
| v. | ) ) | |
| MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES *et al.*, | ) ) ) | |
| Defendants. | ) | |

_____

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED HEARING**
_____

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

   I.    THE MEDICAID PAYMENT FRAMEWORK PRIOR TO THE DEFICIT
        REDUCTION ACT OF 2005 ............................................................................ 4

   II.   THE DEFICIT REDUCTION ACT OF 2005 .................................................. 7

ARGUMENT .................................................................................................................. 9

   I.    LEGAL STANDARDS ...................................................................................... 9

       A.   Preliminary Injunction Standard ........................................................... 9

       B.   Standard of Review of Agency Action ................................................. 10

   II.   PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS. ............... 11

       A.   Plaintiffs Lack Standing. ...................................................................... 12

            1.   *Article III Standing* ........................................................ 12

                a.   *State Use of AMP Data* ............................................. 12

                b.   *AMP-Based FULs* .................................................... 15

            2.   *Prudential Standing* ........................................................ 17

       B.   Plaintiffs' Claims Are Not Ripe for Adjudication. ............................... 19

       C.   The AMP Definition Is Consistent with the DRA. ............................... 20

            1.   *"Price Paid to the Manufacturer"* .................................. 22

            2.   *Definition of "Wholesaler"* ........................................... 25

            3.   *Definition of "Retail Pharmacy Class of Trade"* ............. 28

            4.   *"Covered Outpatient Drugs"* ....................................... 33

       D.   The CMS Definition of "Multiple Source Drug" Is Consistent With the DRA..... 34

       E.   The Final Rule Properly Applies Federal Upper Limits to All Formulations of a
           Multiple Source Drug ........................................................................... 37

III.    THERE IS NO SUBSTANTIAL THREAT OF IRREPARABLE INJURY TO PLAINTIFFS IN THE ABSENCE OF THE REQUESTED INJUNCTION. .................. 39

      A.    The "Irreparable Harm" Plaintiffs Have Asserted Is Either Speculative or the Result Not of the AMP Rule but of the DRA Itself. ............................................ 40

      B.    Plaintiffs' Inexcusable Delay Proves That Any Harm They Might Suffer Is Not "Irreparable." .................................................................................................. 42

IV.    A PRELIMINARY INJUNCTION WOULD SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES, INCLUDING MEDICAID BENEFICIARIES, AND IS ADVERSE TO THE PUBLIC INTEREST ................................................................. 44

# TABLE OF AUTHORITIES

## Federal Cases

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)............................................................ 19,20,34,35

*Am. Coastal Line Joint Venture, Inc. v. U.S. Lines, Inc.*, 580 F. Supp. 932 (D.D.C. 1983)..................... 39

*Amgen Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) ........................................................................18,19

*Arent v. Shalala*, 70 F.3d 610 (D.C. Cir. 1995) ................................................................................... 10

*Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236 (D.D.C. 2001) ........................................................ 10

*Biovail Corp. v. U.S. Food & Drug Admin.*, -- F. Supp. 2d --, 2007 WL 891365 (D.D.C. Mar. 22, 2007) .................................................................................................................................................. 41

*Califano v. Sanders*, 430 U.S. 99 (1977).............................................................................................. 19

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ................................. 39

*Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005).............................................. 15

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)............................10,11,27

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987)................................................................................ 17

*County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999)...................................................... 42

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ......................................................................... 44

*Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991)................................................................................. 14

*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975)............................................................... 43

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993) ...................................................................... 11

*GrassRoots Recycling Network, Inc. v. U.S. Envtl. Prot. Agency*, 429 F.3d 1109 (D.C. Cir. 2005)........ 12

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005)..................................................................... 11

*Hazardous Waste Treatment Council v. U.S. Envtl. Prot. Agency*, 861 F.2d 277 (D.C. Cir. 1988) ......... 18

*Katz v. Georgetown Univ.*, 246 F.3d 685 (D.C. Cir. 2001) .................................................................9,11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).....................................................................12,14,34

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).............................................................................. 17

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .................................................................................................. 9

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub[l]ic Welfare*, 602 F. 2d 150 (8th Cir. 1979) ....................................................................................................................................................... 18

*Motor Vehicles Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................... 11

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................ 43

*Nat'l Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003) ....................................................... 20

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267 (1974) .................................................... 23

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................................ 43

*Penn. Pharm. Ass'n v. Dep't of Public Welfare of Penn.*, 542 F. Supp. 1349 (W.D. Pa. 1982) .............. 18

*Pharm. Research & Mfrs. Ass'n of Am. v. Thompson*, 259 F. Supp. 2d 39 (D.D.C. 2003) ...................... 45

*Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081 (10th Cir. 2003) ........................................ 39

*Schweiker v. Gray Panthers*, 453 U.S. 34 (1981) ....................................................................................... 21

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952) .......................................................... 35

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................................................... 11

*Wash. Area Metro. Transit Comm'n v. Holiday Tours*, 559 F.2d 841 (D.C. Cir. 1977) ........................... 10

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ....................... 39,40,41

**Federal Statutes**

5 U.S.C. § 702 ............................................................................................................................................... 17

5 U.S.C. § 706 ............................................................................................................................................... 11

42 U.S.C. § 1396 ............................................................................................................................................. 4

42 U.S.C. § 1396a ................................................................................................................................. 4,14,40

42 U.S.C. § 1396b ........................................................................................................................................... 4

42 U.S.C. § 1396c ........................................................................................................................................... 4

42 U.S.C. § 1396r-8(a) ................................................................................................................................... 5

42 U.S.C. § 1396r-8(b) ............................................................................................................................ passim

42 U.S.C. § 1396r-8(c) ................................................................................................................................... 6

42 U.S.C. § 1396r-8(e) ................................................................................5,7,37,38

42 U.S.C. § 1396r-8(f) .........................................................................................37

42 U.S.C. § 1396r-8(k) ...................................................................................passim

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 § 6001 (2006). ...........................passim

## Federal Regulations

21 C.F.R. § 203.3 ................................................................................................24

42 C.F.R. § 447.304 .............................................................................................15

42 C.F.R. § 447.502 .............................................................................................36

42 C.F.R. § 447.504 .......................................................................................passim

42 C.F.R. § 447.514 ..........................................................................................5,15

56 Fed. Reg. 7,049-02 (Feb. 21, 1991)................................................................22,25,26

72 Fed. Reg. 39,142 (July 17, 2007).................................................................passim

## Other Authorities

H.R. Rep. No. 109-276 (Nov. 7, 2005).............................................................8,14,18,45

S. 1932, 109th Cong. § 6001 (1990)....................................................................................

Statement by George W. Bush Upon Signing S. 1932, *reprinted in* 2006 U.S.C.C.A.N. S3, S5 (Feb. 8, 2006). ....................................................................................... 8

GAO, "Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns About Rebates Paid to States" (June 22, 2005)................................................................... 6

GAO, "Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs" (Dec. 22, 2006) .................... 17

HHS, OIG, "Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program" (June 2007) ................................................................ 17

HHS, OIG, "Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005" (May 2006) .....................................................passim

HHS, OIG, "Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices" (June 2005) ..............................................................................5,7,16,21

HHS, OIG, "Medicaid Drug Rebates:  The Health Care Financing Administration Needs to Provide Additional Guidance to Drug Manufacturers to Better Implement the Program" (Nov. 1992)............ 6

Medicaid Drug Rebate Program Release No. 29 (rev. June 2, 1997)........................................................ 31

## INTRODUCTION

In the Deficit Reduction Act of 2005 (DRA), Congress substantially revised the manner in which the Centers for Medicare & Medicaid Services (CMS) calculates the upper limit at which the federal government will pay a portion of states' expenditures for certain Medicaid-covered drugs. Congress did so in part based on a report of the Office of Inspector General (OIG) that the amount state governments had been paying pharmacies for Medicaid-covered drugs far exceeded pharmacies' actual acquisition costs. It has been estimated that this aspect of the DRA will, over the course of the next five years, save the federal government nearly $5 billion in federal financial participation (FFP) provided to the states under the Medicaid program.

In the DRA, Congress also instructed CMS to issue a regulation establishing the manner in which manufacturers should calculate the "average manufacturer price" (AMP) upon which the federal upper payment limit (FUL) for certain drugs would now be based. That final rule, known as the "AMP rule," was published on July 17, 2007, and became effective on October 1, 2007. Manufacturers have already transitioned their sales tracking and data reporting systems to comply with the new rule and have been required to submit their first set of AMP data to CMS pursuant to that rule. The DRA also requires that CMS publish the data on a website accessible to the public. CMS is now processing the first set of AMP data submitted by manufacturers and is preparing to publish those data on or after December 17, 2007.

Four months after the publication of the final regulation and one month after its implementation date, Plaintiffs – two associations representing traditional retail pharmacies – filed this lawsuit and motion for preliminary injunction to stop CMS from continuing to implement the regulation. They claim in principal part that the AMP calculation criteria established by CMS in the July 17, 2007, AMP rule are inconsistent with the statutory definition of AMP, and they claim imminent injury as a result of

CMS's intended publication of AMPs calculated by manufacturers pursuant to the new rule. Plaintiffs have failed to satisfy the criteria for issuance of a preliminary injunction.

Plaintiffs have demonstrated no likelihood of success on the merits. They cannot even establish a basis for this Court's subject matter jurisdiction. Because states, not the federal government, determine the rate at which they will pay pharmacies for providing Medicaid-covered drugs, and because it is entirely speculative at this point how, if at all, states might change their own payment systems in response to the AMP data, Plaintiffs lack standing and their claims are not ripe. Plaintiffs' claims of injury on their face lack credibility, and Plaintiffs have also failed to demonstrate that they will suffer their claimed injury as a result of the challenged conduct (CMS's final rule) instead of Congress's decision to convert to an AMP-based payment system, mandated for the express purpose of dramatically reducing federal expenditures for Medicaid-covered drugs. Finally, Plaintiffs' claimed interest (maximizing revenue from the Medicaid program) is incongruous with the purpose of the DRA pursuant to which this final rule was promulgated (to reduce federal expenditures for Medicaid-covered drugs), and Plaintiffs therefore fall outside the "zone of interests" protected by the statute.

Plaintiffs' claims will also fail on the merits. In 1990, Congress established a definition of the term "AMP" that has, in the ensuing seventeen years, resulted in inconsistencies among drug manufacturers required to apply that definition. Because of this inconsistency, in the DRA Congress expressly delegated to the agency the authority to define components of the AMP definition such as "wholesaler" and "retail pharmacy class of trade." The agency exercised this broad delegation of authority in a manner that is consistent with the agency's longstanding interpretations of relevant statutory terminology and with the congressional intent to establish an AMP that reflects an average of actual drug prices so that the federal government does not continue to pay artificial, inflated prices for drugs provided to Medicaid beneficiaries.

Plaintiffs also argue that CMS will, contrary to the Medicaid statute, establish federal upper limits for drugs that do not qualify as "multiple source drugs," as the Medicaid statute requires. But Plaintiffs have failed to demonstrate that this claim is ripe for review, that they have standing to assert it, or that CMS's interpretation of the term "multiple source drug" is inconsistent with the statute. And, although Plaintiffs argue that CMS improperly applies FULs to all formulations of "multiple source drugs," application of FULs to all formulations of multiple source drugs is mandated by the Medicaid statute.

Finally, Plaintiffs' claims of imminent harm are substantially weakened, if not wholly eliminated, by the fact that they waited *four months* after publication of the rule to challenge it. Importantly, Plaintiffs do not challenge the manner in which CMS has *applied* the rule since its effective date on October 1; instead, Plaintiffs have launched a *facial* challenge to the rule. This challenge was just as ripe on July 17 as it is now. Nonetheless, Plaintiffs waited to file this lawsuit until now and, in so doing, created their own purported emergency. Plaintiffs should not be permitted to benefit from their own inexcusable delay.

Furthermore, Plaintiffs have failed to allege any harm redressible by the relief they seek. Because Plaintiffs can point to no instance of a state reducing its Medicaid payment for prescription drugs as a result of the AMP rule, and, *a fortiori*, cannot quantify any such reduction, their "doom and gloom" forecasts of imminent closure of their members' businesses is, on its face, not credible and, in any event, based on "evidence" of harm caused by the DRA itself, not by the challenged rule. While Plaintiffs will not be harmed if this Court declines to issue the requested injunction, Defendants, the States, Medicaid beneficiaries, and the taxpaying public, among others, will be harmed by a preliminary injunction that disrupts the status quo by requiring manufacturers to revert their systems back to the former manner of calculating AMPs, by requiring manufacturers to recalculate and resubmit

their AMP data pursuant to that former system, by requiring CMS to publish AMPs calculated in an inconsistent manner, and by requiring CMS to calculate and apply federal payment limits using these unreliable data. These harms substantially outweigh the harms Plaintiffs have asserted, which are undermined in any event by their own unreasonable delay.

For these reasons, this Court should deny Plaintiffs' request for a preliminary injunction.

## BACKGROUND

I.    THE MEDICAID PAYMENT FRAMEWORK PRIOR TO THE DEFICIT
      REDUCTION ACT OF 2005

Established by the Social Security Act of 1965, Medicaid is a federal/state cooperative program designed to furnish medical assistance to persons "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. The program is administered by the states but jointly financed by the federal and state governments. *See id.* Each state is required to establish a medical assistance plan (known as the "State Plan") that is approved by CMS and which describes, *inter alia*, eligibility standards, the scope of benefits, and payment methodologies of that state's Medicaid program. *Id.* § 1396a(a). CMS reviews the various State Plans and subsequent plan amendments to ensure compliance with federal requirements. *See id.* §§ 1396a(b), 1396c. For example, the states' payment levels must be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." *Id.* § 1396a(a)(30)(A). States – not the federal government – set the rate at which they pay pharmacies and other healthcare providers for Medicaid-covered products and services, and the federal government provides federal financial participation (FFP) to states to cover a portion of those costs. *Id.* § 1396b.

Most states currently pay pharmacies for prescription drugs at the lower of estimated acquisition cost (EAC) plus a dispensing fee or the pharmacy's usual and customary charge to the

4

public.  *See* Department of Health and Human Services (HHS), Office of Inspector General (OIG),

"Medicaid Drug Price Comparisons:  Average Manufacturer Price to Published Prices" (June 2005)

("June 2005 OIG Report") at 2, attached as Ex. A.  CMS does not prescribe a particular method for

calculating EAC; instead, each state establishes and specifies its own EAC formula in its State Plan. *Id.*

Prior to the DRA, however, states generally lacked access to drug pricing data based on actual sales

prices and instead would estimate pharmacy acquisition costs using published prices – *e.g.*, "average

wholesale prices" ("AWPs") or "wholesale acquisition costs" ("WACs").  *Id.*  Neither AWPs nor WACs

are based on *actual* sales data and, in enacting the DRA, Congress recognized that they are unreliable.

*See id.*

　　　　For certain "multiple source" drugs – *i.e.*, drugs with different formulations of which at least

two are therapeutically and pharmaceutically equivalent (loosely referred to as "generics"), 42 U.S.C.

§ 1396r-8(k)(7)(i) – the Medicaid statute sets aggregate limits on the amount the federal government

will pay the states in federal financial participation (FFP).  These limits are called "Federal Upper

Limits" (FULs).  *See id.* § 1396r-8(e)(4), (5); 42 C.F.R. § 447.514(b).  If a state exceeds the aggregate

FUL for all Medicaid-covered drugs dispensed in that state in a particular year, the state must pay 100

percent of the overage.  Prior to the DRA, the Medicaid statute set the FUL for a multiple source drug

at 150 percent of the lowest published price, plus a reasonable dispensing fee established by the state

agency.  *See* 42 U.S.C. § 1396r-8(e)(5); 42 C.F.R. § 447.514(b).

　　　　Since 1990, for FFP to be made available to the states for coverage of a particular drug, the

manufacturer of that drug must have entered into a "Rebate Agreement" with CMS.  42 U.S.C.

§ 1396r-8(a)(1).  Pursuant to the Rebate Agreement, the manufacturer pays a rebate directly to each

state based on all of the manufacturer's drugs paid by that state under the state's Medicaid plan during a

period.  *Id.* § 1396r-8(b)(1)(A).  Rebate amounts for each drug are calculated based on the "average

manufacturer price" ("AMP") for that drug. *Id.* § 1396r-8(c). Prior to the DRA, AMP was defined to mean:

> [W]ith respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.

*Id.* § 1396r-8(k)(1) (pre-DRA). Unlike AWPs and WACs, which are highly subjective and unreliable, AMPs are based on *actual* sales price data. Drug manufacturers must calculate AMPs for each of their drugs and report them to CMS periodically so that CMS may determine rebate amounts. *Id.* § 1396r-8(b)(3)(A)(i). Prior to the DRA, any information provided by a manufacturer to CMS for purposes of calculating the rebate was to remain confidential subject to limited exceptions.

The broad definition of AMP Congress established for purposes of the Medicaid rebate program has created substantial confusion among manufacturers required to apply that definition. As a result, significant inconsistencies have existed in the AMP calculation process. *See, e.g.*, HHS, OIG, "Medicaid Drug Rebates: The Health Care Financing Administration Needs to Provide Additional Guidance to Drug Manufacturers to Better Implement the Program (Nov. 1992) at 2, attached as Ex. B ("The [OBRA] and rebate agreements defined AMP in very broad terms but did not provide a specific methodology which ensured uniform and accurate calculations of AMP by the manufacturers. . . . [T]he AMP definition is subject to considerable interpretation and [CMS] needs to establish specific written policies for computing AMP."); Government Accountability Office (GAO), "Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns About Rebates Paid to States" (June 22, 2005) at i, attached as Ex. C ("GAO also found considerable variation in the methods that manufacturers used to determine . . . AMP."); HHS, OIG, "Determining Average Manufacturer Prices for Prescription Drugs Under the [DRA]" (May 2006) ("May 2006 OIG Report") at i, attached as Ex. D ("Existing

6

requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent.").

## II.     THE DEFICIT REDUCTION ACT OF 2005

In June 2005, the OIG reported that "Medicaid expenditures for prescription drugs continue to be a major concern to the Administration, Congress, and States" and that "Congress ha[s] expressed interest in changing Medicaid drug reimbursement to align more closely with pharmacy acquisition cost by using prices based on actual sales rather than the published prices currently used." Ex. A, June 2005 OIG Report, at 1, 15. In its report, the OIG evaluated the difference between the published prices upon which the federal government's payment rates had long been based and prices calculated based on actual sales transactions. *Id.* at 1. The OIG concluded, in relevant part, that the actual prices for generic drugs were *seventy percent* lower than the published prices for the same drugs. *Id.* at 11. Because federal upper payment limits to states, and state payments to pharmacies, had been based on these artificial and inflated AWP data, rather than on the AMP data that reflects an average of the actual prices paid to the manufacturer, states were paying pharmacies for generic drugs at rates that far exceeded pharmacies' actual acquisition costs. *Id.* at 1. OIG therefore recommended that federal payments to states (FFP) be based on averages of actual sales data (*i.e.*, AMPs) rather than on published price listings (*i.e.*, AWPs). *Id.*

Congress implemented this recommendation as part of the Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, 120 Stat. 4, § 6001 (2006). Effective January 1, 2007, the DRA set the FUL at 250 percent of the AMP for the least costly equivalent formulation of the drug, plus a reasonable dispensing fee. *Id.* § 6001(a)(2), *codified at* 42 U.S.C. § 1396r-8(e)(5). Congress contemplated substantial savings as a result of this and other changes to the Medicaid program. A report of the House Committee on the Budget stated that the House version of this DRA, "by limit[ing]

payments for outpatient prescription drugs," "would reduce Medicaid spending by $1.9 billion over the

2006 [to] 2010 period and by $7.2 billion over the 2006 [to] 2015 period."  H.R. Rep. No. 109-276

(Nov. 7, 2005).  Those savings would be realized, *inter alia*, "by lowering payments for outpatient

prescription drugs."  *Id.*  The Presidential signing statement anticipated that the relevant provision of

the DRA would realize federal Medicaid savings of $5 billion over the next five years by "reducing

Federal overpayment for prescription drugs."  Statement by President George W. Bush Upon Signing

S. 1932, *reprinted in* 2006 U.S.C.C.A.N. S3, S5 (Feb. 8, 2006).  The President noted that "[t]axpayers

should not have to pay inflated markups for the medicine that the people on Medicaid depend."  *Id.*

The DRA modified the existing statutory definition of AMP to specifically exclude from its

calculation the "customary prompt pay discounts" that had previously been included in AMP

calculations.[1]  *See* DRA § 6001(c)(1), *codified at* 42 U.S.C. § 1396r-8(k)(1).  The AMP definition

remained essentially the same and reads, in relevant part:

> The term 'average manufacturer price' means, with respect to a covered outpatient drug of a
> manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the
> United States by wholesalers for drugs distributed to the retail pharmacy class of trade.

42 U.S.C. § 1396r-8(k)(1)(A).  Because AMPs would now be used not only to set manufacturers'

rebate amounts but also to set the federal government's upper payment limits, Congress instructed the

OIG to "review the requirements for, and manner in which, average manufacturer prices are determined

under section 1927 of the Social Security Act, as amended by this section" and to "submit to the

Secretary of [HHS] and Congress such recommendations for changes in such requirements or manner

as the [OIG] determines to be appropriate."  DRA § 6001(c)(3)(A).  Congress also mandated that the

HHS Secretary "promulgate a regulation that clarifies the requirements for, and manner in which,

average manufacturer prices are determined under section 1927 of the Social Security Act, taking into

---

[1] This limited change would tend to increase the AMPs when compared to AMPs calculated prior to this
modification.

consideration the [OIG] recommendations." *Id.* § 6001(c)(3)(B). Thus, Congress explicitly directed the Secretary to clarify the ambiguous statutory definition of AMP through a regulation.

The OIG published its report on May 30, 2006. *See* Ex. D, May 2006 OIG Report. In that report, the OIG concurred that "[e]xisting requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent." *Id.* at 4. On July 17, 2007, after considering the OIG's recommendations, as Congress instructed, issuing a proposed rule, and considering the 1,600 sets of filed public comments, CMS promulgated a final rule detailing the manner in which AMPs will be calculated. 72 Fed. Reg. 39,142, 39,145-46, 39,157 (July 17, 2007).

The DRA also required CMS to provide AMP data to the states on a monthly basis beginning July 1, 2006, 42 U.S.C. § 1396r-8(b)(3)(A)(iii), and to make those data publicly available on a website, *id.* § 1396r-8(b)(3)(D)(v). CMS has been providing AMP data to states since July 1, 2006, 72 Fed. Reg. at 39,143, and will begin publishing AMP data on its website on or after December 17, 2007.

## <u>ARGUMENT</u>

## I.     **LEGAL STANDARDS**

### A.     <u>Preliminary Injunction Standard</u>

A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotations omitted). To prevail in a request for a preliminary injunction, the plaintiff "must demonstrate (1) a substantial likelihood of success on the merits, (2) that [it] would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *See Katz v. Georgetown Univ.*, 246 F.3d 685,

687-88 (D.C. Cir. 2001) (quotations omitted). These four factors are evaluated on a sliding scale. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843-44 (D.C. Cir. 1977). "It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001).

B.    Standard of Review of Agency Action

Plaintiffs' challenge to the AMP rule is analyzed under the Administrative Procedure Act (APA) and the standard of review established by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the central question for the reviewing court "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843). If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Where Congress has left a gap for the agency, "the court does not simply impose its own construction on the statute" and "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 & n.11. Accordingly,

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the *wisdom* of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, *the challenge must fail.* In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: Our Constitution vests such responsibilities in the political branches.

*Id.* at 866 (quotations omitted).  *Chevron* deference is at its highest in the context of "express

congressional authorizations to engage in the process of rulemaking . . . that produces regulations . . .

for which deference is claimed."  *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001).

  *Chevron* interprets the review standard set forth in the APA, under which a court may set aside

agency actions, findings, or conclusions only when they are arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and

capricious only if the agency has "relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise."  *Motor Vehicle Mfrs.' Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In applying this standard, a reviewing judge need not agree that

the agency's choice is optimal or even preferable; so long as the decision is rational and has support in

the record, the court may not substitute its own judgment for that of the agency.  *See Good Samaritan*

*Hosp. v. Shalala*, 508 U.S. 402, 418-419 (1993).  "Especially in complex, technical areas, there is a

strong presumption in favor of upholding agency decisions."  *Hammond v. Norton*, 370 F. Supp. 2d

226, 238 (D.D.C. 2005).

## II. PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.

  To obtain a preliminary injunction, Plaintiffs must show, *inter alia*, "a substantial likelihood of

success on the merits."  *Katz*, 246 F.3d at 687.  Plaintiffs have demonstrated no likelihood of success on

the merits.  This Court does not have subject matter jurisdiction over their claims and, under the

applicable standard of review, the regulation Plaintiffs challenge must be sustained.

A.    Plaintiffs Lack Standing.

An association has standing to sue on behalf of its members only if, *inter alia*, at least one of its members would have standing to sue in its own right.  *GrassRoots Recycling Network, Inc. v. U.S. Envtl. Prot. Agency*, 429 F.3d 1109, 1111 (D.C. Cir. 2005).  Because none of Plaintiffs' members would have standing to sue in their own right, Plaintiffs also lack standing.

1.    *Article III Standing*

To establish standing under Article III of the Constitution, a plaintiff must first demonstrate an "injury in fact" – "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotations omitted).  Second, the plaintiff must demonstrate "a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* at 560-61 (quotations and alterations omitted).  Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (quotations omitted).

Plaintiffs seem to allege two "injuries" from the AMP rule:  (1) injury that *may* be caused by states who *may*, but are not required to, use the new AMPs to reformulate their rates for multiple source drugs; and (2) injury that *may* be caused by the new AMP-based FULs themselves.  Neither "injury" provides a basis for Article III standing.

a.    *State Use of AMP Data*

Plaintiffs argue that, because "reimbursement rates actually will be substantially below the costs that retail pharmacies pay for those drugs," 10,000 to 12,000 retail pharmacies will close.  Pls.' PI

Memo. at 38-39. This alleged injury, however, has not yet been realized, is not certain or even likely to be realized immediately (or ever), and is, in any event, not one caused by CMS.[2]

As discussed above, Medicaid is a cooperative program between the states and the federal government pursuant to which the federal government *helps* states provide covered services to Medicaid-eligible beneficiaries. The federal government pays *nothing to* pharmacies for the prescription drugs those pharmacies distribute to Medicaid patients, does not dictate the formulas states may use to determine the amount they will pay pharmacies, and does not prescribe limits on state payments to pharmacies.

In the DRA, Congress reduced the amount the *federal government* will contribute to *state* Medicaid programs, and the AMP rule defines those limits. Importantly, neither the DRA nor the AMP rule dictates, or even affects, the way that *states* determine the rates at which they pay pharmacies for providing Medicaid-covered drugs. The states, subject to CMS's approval, will continue to set their own pharmacy payment rates. Unless the states change their payment systems, Plaintiffs' Medicaid payments will not change.

To be sure, by requiring CMS to provide AMP data to states for the first time, the DRA facilitates the states' ability to revise their own payment methodologies to some form of AMP-based system. *See* 72 Fed. Reg. at 39,146 ("While there is no requirement that States use AMPs to set payment amounts, we believe the Congress intended that States have drug pricing data based on actual prices"). Even if states do eventually revise their systems, however, it is not likely, much less certain, that states will reduce their prescription drug rates to a point that Plaintiffs' asserted injury – a pervasive inability to purchase prescription drugs at the rate they are paid by the states – will occur.

---

[2] In an attempt to justify a preliminary injunction, Plaintiffs claim injury from CMS's mere publication of AMPs on a public website, as Congress requires CMS to do. 42 U.S.C. § 1396r-8(b)(3)(D)(v). Any alleged "injury" that may occur would never be caused by mere publication of the data and, for the reasons discussed in this section, is purely hypothetical.

First, one of the broad federal requirements for state payment rates is that State Plans must "assure that payments . . . are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population." 42 U.S.C. § 1396a(a)(30)(A). States will view any AMP data published by CMS with full knowledge of the manner in which those data were derived and exactly what those data represent, and they will set their own AMP-related payment rates, if at all, accordingly. If states do decide to base their payments on the AMP data, "that decision will be subject to [CMS's] review and approval through a State plan amendment approval process." 72 Fed. Reg. at 39,169. In addition, if states modify their plans to decrease the amount they pay pharmacies for the cost of the drug, the states could also decide to raise the dispensing fees they pay to pharmacies (which are not subject to a FUL). H.R. Rep. No. 109-276 (Nov. 7, 2005) ("Those savings reflect [the Congressional Budget Office's] expectation that states would raise dispensing fees to mitigate the effect of the new payment limits on pharmacies and preserve the widespread participation of pharmacies in Medicaid."). For these reasons, it is entirely speculative that the new AMPs will cause states to decrease overall payments to pharmacies to such a level that pharmacies will be unable to acquire drugs and will be forced out of business. The hypothetical injury Plaintiffs have asserted provides no basis for standing.

In addition, because states, not CMS, determine pharmacy payment rates, Plaintiffs have also failed to demonstrate that any injury they allege has been or will be caused by Defendants. The injury Plaintiffs assert must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. If CMS's action, even if a but-for cause of the harm, "is merely one in a chain of independent causal factors necessary to achieve th[e] injury," Plaintiffs have not established the causation requirement necessary for standing. *See Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991). Here, no harm will occur

unless the states take some independent, discretionary action that harms Plaintiffs. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160-61 (D.C. Cir. 2005) (no standing to challenge Department of Education regulation that permitted, but did not require, State of Illinois to take certain action that could harm plaintiffs). Plaintiffs' asserted injury is therefore one that could only be caused (and redressed) by the states.

In sum, the injury Plaintiffs assert – reduction in payment rates – cannot possibly occur unless those who actually pay the pharmacies (*i.e.*, the states) decide to change their payment rates. And even then, if Plaintiffs believe the states' payment rates are insufficient, Plaintiffs' "injury" would be a matter between Plaintiffs and the state and is not a basis for this lawsuit against CMS.[3]

### b.    *AMP-Based FULs*

Nor have Plaintiffs demonstrated that CMS's application of FULs based on the new (and allegedly improper) AMP data will cause them a concrete injury sufficient to confer standing.

First, states may pay pharmacies a rate that exceeds both the AMPs and the FUL. The FUL merely establishes the rate above which states will no longer receive federal matching funds. *See, e.g.*, 42 C.F.R. §§ 447.304(a), 447.514(b). As such, the FUL cannot affect Plaintiffs unless states change their payment systems.

Second, FULs are *aggregate* limits. In other words, a state may pay a pharmacy for an individual drug at a rate that exceeds the FUL for that drug, and still receive FFP for the entire amount, so long as the states' *aggregate* expenditures for all Medicaid-covered multiple source drugs in a

---

[3] Plaintiffs also claim that third-party payers will base their reimbursement rates on CMS's AMPs. *See* Pls.' Memo. in Supp. of Their Mot. for Prelim. Inj. & Req. for Expedited Hrg. (Nov. 15, 2007) ("Pls.' PI Memo.") at 29. This claim, too, is speculative. First, insurers have long established their reimbursement rates without any knowledge of AMPs, and it is speculative that they will reformulate their reimbursement systems based on AMP data. More importantly, insurers (like states) are fully aware of the manner in which manufacturers have arrived at the new AMPs. If in their judgment they do not believe the AMP, as CMS has defined it, is a sound basis for calculating reimbursement rates because it is not an accurate measure of manufacturer sale prices, then they will not use it or will apply it accordingly. Like the states, if and how insurers may choose to use the AMPs published by CMS, and whether such use will result in any injury to Plaintiffs, is entirely unknown at this time.

particular year do not exceed the *aggregate* FULs for all of those drugs for that year. *Id.* § 447.514(b).

The state may allocate its aggregate FUL (which is *2.5 times greater* than the aggregate AMPs for the

least expensive equivalent) for participating pharmacies in payment for covered drugs however it

deems appropriate. Plaintiffs suggest that their members – traditional walk-in pharmacies – cannot

purchase drugs at some of the low rates available to other types of pharmacies (*e.g.*, mail order

pharmacies) and therefore cannot purchase drugs at or below the new FULs. A state could, however,

develop a plan that pays pharmacies with higher acquisition costs at higher rates than pharmacies with

lower acquisition costs, and Plaintiffs' members would in that event never suffer the harm they allege.

In short, the new FULs (in addition to the fact that they do not affect pharmacies because they are used

simply to determine federal payments to states) may never harm Plaintiffs for the additional reason that

FULs are not limits on individual drug sales but are aggregate limits.

Finally, to the extent Plaintiffs base their injury on reduced FULs, the facts they have asserted

in support of that injury demonstrate, at most, an injury caused by Congress, not CMS. The relevant

part of the DRA was intended to reduce federal payments for Medicaid-covered generic drugs. One of

the reports leading up to the DRA concluded that actual prices paid by states to pharmacies for generic

drugs were *seventy percent* lower than the published prices upon which federal payment limits had

previously been based. Ex. A, June 2005 OIG Report, at 11. To the extent the DRA drastically reduces

federal payments to states for general drugs, and to the extent this reduction causes states to reduce their

payments to pharmacies for covered drugs, that was the purpose of the DRA. The evidence Plaintiffs

cite for the proposition that they will not be able to purchase drugs at or below the FUL is either based

on these presumed effects of the DRA alone or fails to distinguish between the effects of the DRA and

the effects of CMS's allegedly improper AMP definition.[4] Again, Plaintiffs have failed to demonstrate

---

[4] Specifically, Plaintiffs' evidence of harm is based on a GAO report comparing the Congress's new AMP-based
FUL system to actual retail pharmacy acquisition costs, *see* GAO, "Medicaid Outpatient Prescription Drugs:

that the "injury" they fear – namely, imminent reduction in state payments to the point that their

member pharmacies will not be able to acquire drugs for Medicaid patients – will happen at all, much

less that it is imminent, will be caused by Defendants, or can be redressed by enjoining the AMP rule.

### 2. Prudential Standing

In addition to Article III standing requirements, the APA imposes prudential standing

requirements. Under the APA "[a] person suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial

review thereof." 5 U.S.C. § 702. The Supreme Court has held that to qualify as "adversely affected or

aggrieved within the meaning of a statute, a plaintiff must establish that the injury he complains of . . .

falls within the 'zone of interests' sought to be protected by the statutory provision whose violation

forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)

(quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396-97 (1987)) (additional quotations and

alterations omitted).

A plaintiff's claimed injury from administrative action falls within the so-called "zone of

interests" test if the plaintiff is itself the "subject of the contested regulatory action" or if the plaintiff's

interests are not "so . . . inconsistent with the purposes implicit in the statute that it cannot reasonably be

assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. The "zone of interests"

test serves to exclude those parties whose interests are not consistent with the purposes of the statute

because lawsuits by such plaintiffs "carr[y] a considerable potential for judicial intervention that would

---

Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs" (Dec. 22, 2006), attached as Ex. E, and an OIG report that conducted a similar analysis, *see* HHS, OIG, "Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program" (June 2007), attached as Ex. F. *See* Report of Stephen W. Schondelmeyer, attached as Ex. D to Pls.' PI Memo., ¶¶ 211-34.

Both studies were designed to evaluate the effects of the DRA *itself* on Medicaid reimbursement rates, not the effects of the AMP Rule on Medicaid reimbursement rates. The AMPs upon which the FULs were calculated in these studies were calculated according to methods that existed and had been utilized long before implementation of the AMP rule, not AMPs calculated under the new rule. Similarly, the summary of "Effects on Retail Pharmacies" CMS included in its final rule explains that the "savings" to the federal government "reflect the *statutory* change," not the manner in which AMPs are calculated pursuant to the new rule. 72 Fed. Reg. at 39,233 (emphasis added).

distort the regulatory process." *Hazardous Waste Treatment Council v. U.S. Envtl. Prot. Agency*, 861

F.2d 277, 282-86 (D.C. Cir. 1988). The D.C. Circuit has offered this particularly apt example of an

entity that would not fall within the "zone of interests" of a particular statute:

> If Congress authorized bank regulators to mandate physical security measures for banks, for
> example, a shoal of security services firms might enjoy a profit potential – detective and guard
> agencies, manufacturers of safes, detection devices and small arms, experts on entrance control,
> etc. But in the absence of either some explicit evidence of an intent to benefit such firms, or
> some reason to believe that such firms would be unusually suitable champions of Congress's
> ultimate goals, no one would suppose them to have standing to attack regulatory laxity. And of
> course a rule that gave any such plaintiff standing merely because it happened to be
> disadvantaged by a particular agency decision would destroy the requirement of prudential
> standing; any party with constitutional standing could sue.

*Id.* at 283.

Plaintiffs do not meet this standard. Plaintiffs are, just like the security services firms in the

D.C. Circuit's example, merely incidental beneficiaries of the federal Medicaid program. State

pharmacy payment rates are not regulated by the federal government under Medicaid, and there is

certainly no explicit congressional intent to ensure that pharmacies profit from Medicaid.[5]

Furthermore, there is no reason to believe that such pharmacies would be "unusually suitable

champions of Congress's ultimate goals" because the interest of pharmacies, achieving the maximum

possible payment for the Medicaid drugs they distribute, while understandable, is at odds with the

objective of the DRA, which was to reduce federal spending on Medicaid-covered drugs in an effort to

save the federal/state Medicaid program. H.R. Rep. No. 109-276 (Nov. 7, 2005) ("Unreformed,

analysts predict Medicaid will bankrupt every state in as little as 20 years absorbing 80 [to] 100% of all

state dollars."). This case is distinguishable from *Amgen Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir.

---

[5] Courts have recognized that the Medicaid program was not designed to ensure profits for providers of products and
services. *See, e.g., Penn. Pharm. Ass'n v. Dep't of Public Welfare of Penn.*, 542 F. Supp. 1349, 1356 (W.D. Pa.
1982) ("Congress enacted [Medicaid] to provide health care of the poor and aged, not to subsidize or otherwise
benefit health care providers."). "Participation . . . as a provider of health care services to Medicaid recipients is
voluntary. If . . . the reimbursement rates are insufficient, then they may . . . terminate their relationship with
Medicaid . . . ." *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub[l]ic Welfare*, 602 F.2d 150, 154
(8th Cir. 1979).

2004), on this basis.  In *Amgen*, the court held that Amgen was within the "zone of interests" of the

Medicare provision it challenged because Amgen's commercial interest in selling the drug was

congruous with the specific congressional objective of the provision at issue. – *i.e.*, to encourage

research and development of new drugs. *Id.* at 110.  Here, the opposite is true.  Plaintiffs' commercial

interest in continuing to profit from the Medicaid program is directly contrary to the cost-saving

purpose of the DRA and, therefore, they are not within the "zone of interests" protected by the DRA.

      B.     <u>Plaintiffs' Claims Are Not Ripe for Adjudication.</u>

      Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over administrative

policies, and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*

*v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.

99 (1977).  In *Abbott Laboratories*, the Supreme Court set forth a two-part test for determining whether

administrative action is ripe for judicial review, which requires a court to evaluate:  (1) the fitness of the

issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.  *Id.* at

149.

      First, Plaintiffs' claims are not yet fit for judicial decision.  Plaintiffs argue that the new AMPs

will cause states to change their payment methods to AMP-based systems that will not allow them to

purchase drugs below the payment rate.  As discussed above, however, no state has changed its

payment methodology to an AMP-based system in response to the DRA (much less the challenged

rule) and, before it could do so, it must ensure that the payment system it chooses will provide adequate

access to prescription drugs for Medicaid beneficiaries and is approved by CMS.  To the extent

pharmacies are ultimately harmed, that harm cannot occur as a result of CMS's actions alone but

necessarily rests on some future (but unknown) action of a third party. This Court would be in a substantially better position to evaluate Plaintiffs' claims if and when Plaintiffs' hypothetical injury occurs.

Second, Plaintiffs will not be harmed if consideration is withheld. Again, Plaintiffs' Medicaid payment rates will not change unless and until states amend their State Plans and obtain CMS approval of those Plan amendments. Plaintiffs therefore cannot demonstrate any hardship if review is withheld at this time. Where "no irremediably adverse consequences [will] flow[] from requiring a later challenge," the hardship factor is not satisfied. *See Nat'l Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 810 (2003) (holding final agency regulation not ripe for review where party would suffer no immediate hardship) (alterations omitted).

If a state seeks approval to change its system, and if Plaintiffs could demonstrate that they would be injured under the particular (as yet unknown) details of that proposed system, Plaintiffs might be able to demonstrate that their claims are ripe for review (although they would still be directed at the wrong party). Until then, however, their disagreement is merely an "abstract disagreement[] over administrative polic[y]" that has not yet had "its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148-49.

> C.     The AMP Definition Is Consistent with the DRA.

Plaintiffs state: "The statutory definition of AMP is clear and simple. AMP is the average price paid to manufacturers by wholesalers for drugs distributed to retail pharmacies." Pls.' PI Memo. at 9. The definition Plaintiffs call "clear and simple," however, has resulted in repeated recommendations from the GAO and the OIG advising CMS to clarify the calculation criteria for AMPs because manufacturers' calculation criteria were inconsistent. *See, e.g.*, Ex. D, May 2006 OIG Report, at 5 (noting inconsistent treatment of PBMs as part of "retail pharmacy class of trade"); *see also* discussion

20

*supra* Background I.  For this reason, Congress mandated that OIG evaluate the manner in which manufacturers calculate AMPs and that CMS issue a regulation clarifying the elements of that calculation.  DRA §§ 6001(c)(3)(A), (B).  It would have made no sense for Congress to impose a duty to clarify if the statutory terms were "clear and simple," as Plaintiffs claim.  In light of this express delegation of authority to fill a gap left by Congress, the agency's interpretation should be accorded substantial deference.  *See Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981).

Before addressing the details of Plaintiffs' challenge, that challenge must be placed in context.  Plaintiffs' basic argument is that CMS has required the inclusion of too many sales transactions in its AMP calculation.  Congress enacted the relevant positions of the DRA, however, for the express purpose of providing an FUL that reflects *actual drug prices*.  *See* Ex. A, June 2005 OIG Report, at iii ("Congress ha[s] expressed interest in aligning Medicaid drug reimbursement more closely with pharmacy acquisition cost by using prices based on actual sales rather than published prices.").  There is simply no reason to believe that Congress would have intended the AMP, upon which the FUL is based, to exclude pricing data for substantial segments of the retail market for prescription drugs.  Furthermore, the AMP is, by definition, intended to represent an *average* price.  The AMP-based FULs will apply not only to the limited sales Plaintiffs advocate should be included in the AMP, but to *every* Medicaid-covered sale of that drug in this country.  As such, there is no reason to believe that Congress would have intended the AMP, upon which those universal FULs are based, to represent a wholly *unrepresentative* fraction of prescription drug sales.  CMS approached its development of the AMP rule – which adopts inclusive definitions of the statutory terms and phrases – with this understanding of congressional intent.

1.    *"Price Paid to the Manufacturer"*

Plaintiffs first object to CMS's interpretation of the phrase "price paid to the manufacturer" to include direct and indirect price discounts provided by the manufacturer.  *See* Pls.' PI Memo. at 10-11. In particular, they claim that indirect discounts – *i.e.*, discounts by manufacturers to non-purchasers such as group purchasing organizations ("GPOs") – are improperly included in the AMP calculation. *Id.*

Except for prompt pay discounts (which Congress expressly excluded from the AMP calculation), the statute does not specify to what extent discounts should be included in determining the "price paid to the manufacturer."  *See* 42 U.S.C. § 1396r-8(k)(1).  Congress did not legislate on a blank slate, however.  Congress had, in 1990, broadly defined the term "AMP" for purposes of the manufacturer rebate program.  As discussed above, the pre-DRA AMP definition is, in relevant part, identical to the current AMP definition that Plaintiffs challenge.  In implementing the manufacturer rebate program in 1991, CMS drafted the "Rebate Agreement" into which all manufacturers of covered drugs would be required to enter.  The Rebate Agreement provides additional direction to manufacturers with respect to calculating the AMPs for their drugs.  *See* 56 Fed. Reg. 7,049-02 (Feb. 21, 1991).  In relevant part, the Rebate Agreement broadly interprets AMP to include "cash discounts allowed and *all other price reductions* (other than rebates under section 1927 of the Act), which reduce the actual price paid."  *Id.* at 7,050 (emphasis added).  Under the Rebate Agreement, manufacturers are required to adjust the AMP "if cumulative discounts or other arrangements subsequently adjust the prices actually realized."  *Id.*  This definition is effectively the same as the principal portion of the rule about which Plaintiffs complain here, which specifies inclusion of "[r]ebates, discounts, or other price concessions (other than rebates under section 1927 of the Act or as otherwise specified in the statute or

22

regulations) associated with sales of drugs provided to the retail pharmacy class of trade." 42 C.F.R. § 447.504(g)(14).

In enacting the DRA, Congress is presumed to have known how CMS had previously treated discounts and rebates for purposes of the statutory AMP definition. Congress extensively considered the definition of AMP when it amended the Medicaid statute with the DRA and determined (with the exception of excluding prompt pay discounts) not to change it but instead to instruct CMS to clarify it. *See, e.g.*, S. 1932, 109th Cong. § 6001(a)(1)(C) (2005) (proposing inclusion of AMP calculation details that were not ultimately adopted). Courts accord great persuasive value to an agency's longstanding interpretation of a statute that has been re-enacted without change to the agency's interpretation:

> [A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974). Because the agency's broad inclusion of essentially *all price concessions* (with the exception of prompt pay discounts) in the AMP calculation is consistent with longstanding agency practice and was unchanged by the DRA, this Court should accord great weight to the agency's interpretation.

Plaintiffs complain in particular of the following rebates and discounts that CMS determined should be included in the AMP calculation. None of Plaintiffs' complaints has merit.

(1) *Rebates to pharmacy benefit managers ("PBMs").*[6] Plaintiffs complain that rebates paid to PBMs are not part of the price paid to the manufacturer because rebates are paid for PBM services, not for price discounts. Pls.' PI Memo. at 24. First, the AMP rule expressly *excludes* any rebates paid to PBMs except rebates paid for their mail order pharmacy purchases, 42 C.F.R. §§ 447.504(g)(6),

---

[6] Health plans and third-party payers may hire PBMs to help manage the drug benefits paid by those plans. *See, e.g.*, Ex. D, May 2006 OIG Report, at 5.

(h)(22), which CMS reasonably determined should be included because, "in their role as mail order pharmacies . . . PBMs participate directly in the purchase or delivery of prescription drugs." 72 Fed. Reg. at 39,192. Second, the regulation expressly excludes any fee paid for bona fide services. 42 C.F.R. § 447.504(h)(19). Plaintiffs' concern that manufacturers will include payments to PBMs that represent service fees instead of price concessions is therefore misguided. Finally, the OIG has long recognized inconsistencies in the treatment of PBMs for the purposes of calculating AMPs. *See* Ex. D, May 2006 OIG Report, at 5 (concluding that two of four manufacturers included all PBM rebates in their AMP calculations, one included those it considered "retail," and one included none). Any suggestion that PBM rebates have never been included in AMP calculations, and that Congress (which instructed the Secretary to consider the OIG's findings) legislated with that faulty knowledge, is therefore meritless. CMS reasonably resolved pre-existing ambiguity by concluding that rebates paid to a PBM's mail order pharmacy that impact the price paid to the manufacturer for the drug should be included in the AMP calculation. *See* 72 Fed. Reg. at 39,146-47, 39,192 (considering whether PBM sales/rebates should be included in AMP calculation).

(2) *Group Purchasing Organization ("GPO")[7] Fees.* Plaintiffs complain that GPO fees are actually service fees and should not be included in the price calculation. Pls.' PI Memo. at 25. In response to similar comments, CMS clarified the rule to ensure that fees paid to any entity that meet the definition of bona fide services, which do not reduce the price paid to the manufacturer for drugs, are excluded from the AMP calculation. 72 Fed. Reg. at 39,183; *see also* 42 C.F.R. § 447.504(i)(1) (including only those fees that "reduce the price received by the manufacturer"). Some GPO fees paid by manufacturers, however, are passed on to GPO members or customers. 72 Fed. Reg. at 39,183.

---

[7] A GPO is an entity that purchases prescription drugs for distribution exclusively to its members, typically hospitals and health care entities bound by written contract with the GPO. *E.g.*, 21 C.F.R. § 203.3(o) (FDA definition).

Because these "fees" are tantamount to drug price concessions, CMS determined that the AMP should include them. *See id.*

(3) *Rebates and Discounts Associated with Sales*. Plaintiffs also object that "[r]ebates, discounts, and other price concessions . . . associated with sales of drugs," 42 C.F.R. § 447.504(g)(14), also do not fall within the statutory AMP definition because they, too, represent fees for services. Pls.' PI Memo. at 26. First, as with GPOs, nothing in this regulatory provision requires inclusion of payment for services. 42 C.F.R. § 447.504(g)(14). Indeed, another provision requires that for discounts and rebates to be included in the AMP calculation, they must "reduce the price received by the manufacturer for the drug." *Id.* § 447.504(i)(1). And, as with GPOs, another provision specifically excludes from the AMP calculation any fee paid by a manufacturer for bona fide services. *Id.* § 447.504(h)(19). Finally, as discussed above, this provision closely tracks the definition of AMP prices that has long existed in the Rebate Agreement, *see* 56 Fed. Reg. at 7,050, and Congress did not indicate that CMS's longstanding direction to manufacturers to include these discounts and rebates was improper.

## 2. *Definition of "Wholesaler"*

Plaintiffs also complain that CMS's definition of "wholesaler" is too broad. *See* Pls.' PI Mot. at 11-14. In particular, Plaintiffs would incorporate a state licensing requirement into the definition. *Id.* at 11. The Medicaid statute does not define the term "wholesaler," imposes no licensing requirement, and provides no other indication how that term should be understood. *See* 42 U.S.C. § 1396r-8(k)(1). Because Congress expressly delegated to CMS the authority to define this term, and because CMS's definition is reasonable and consistent with its longstanding interpretation of the term for purposes of Medicaid AMP calculations, the agency's interpretation must be accorded deference.

In implementing the manufacturer rebate program in 1991, CMS defined the term "wholesaler" so that manufacturers could more accurately determine their AMPs. 56 Fed. Reg. at 7,052. In the Rebate Agreement, CMS defined the term "wholesaler" as follows: "'Wholesaler' means any entity (including a pharmacy or chain of pharmacies) to which the manufacturer sells the Covered Outpatient Drug, but that does not relabel or repackage the Covered Outpatient Drug." *Id.* That definition – which, like the Medicaid statute itself, has never referenced state licensure – has remained unchanged over the course of the last sixteen years, and the definition of "wholesaler" in the AMP rule is virtually identical in all relevant respects to CMS's longstanding definition of "wholesaler" in the Rebate Agreement. The AMP Rule provides: "*Wholesaler* means any entity (including those entities in the retail pharmacy class of trade) to which the manufacturer sells the covered outpatient drugs, but that does not relabel or repackage the covered outpatient drugs." 42 C.F.R. § 447.504(f). CMS adopted this definition as the one most consistent with current law and with the recommendations of the OIG. 72 Fed. Reg. at 39,164-65.

Again, Congress is presumed to have known how CMS had been defining the term "wholesaler" since 1991 for purposes of the statutory AMP definition, and courts accord great persuasive value to an agency's longstanding interpretation of a statute that has been re-enacted without change to the agency's interpretation. *See* discussion *supra* Section II.C.1. Given the absence of any other expression of congressional intent with respect to the term "wholesaler," this longstanding agency interpretation should be accorded deference.

Consistent with many of the comments that CMS considered and rejected, *see* 72 Fed. Reg. at 39,164-66, Plaintiffs and their *amicus* argue that CMS's definition of the term "wholesaler" is flawed because it differs from other HHS definitions of the term. *See* Pls.' PI Memo. at 11-12. Their argument is meritless because, as just explained, CMS has long defined the term "wholesaler" in precisely the

26

same way *for the very purpose of AMP calculations under the Medicaid Act* since 1991. In light of this longstanding and directly relevant agency definition of the term, that this definition may conflict with other substantially less relevant definitions of the term is not helpful to Plaintiffs. CMS's decision to maintain its longstanding definition rather than change it to parallel its definition of the term for purposes of the Food, Drug, and Cosmetic Act, administered by the Food and Drug Administration, or some other statute was not only a *reasonable* interpretation but the *best* interpretation of the Medicaid statute.

Nor are Plaintiffs helped by the fact that another HHS component has defined the term "wholesaler" differently than CMS in the context of a different program. *See* Pls.' PI Memo. at 12-13. An agency may attribute different meanings to the same statutory language when applied in different contexts. *See, e.g.*, *Chevron*, 467 U.S. at 863-64 (approving agency adoption of different definitions of same statutory term in different contexts). That is particularly the case where, as here, the agency has long applied an effectively identical definition of the term "wholesaler" in the Medicaid context and where the agency was attempting, in clarifying the AMP definition, to effect the congressional intent to establish an AMP that would accurately reflect actual sales prices. A definition of wholesaler (*e.g.*, one that imposes a state licensing requirement as Plaintiffs suggest) could arbitrarily remove a substantial number of transactions from the price calculation and result in an artificial AMP.[8]

All of the entities Plaintiffs claim should not be considered "wholesalers," *see* Pls.' PI Memo. at 18-26, indisputably fall within CMS's definition ("entit[ies] . . . to which the manufacturer sells the covered outpatient drugs, but that does not relabel or repackage [the drug]"). Because the agency's definition of the term "wholesaler" is consistent with the longstanding agency definition of the term in

---

[8] In any event, the Health Resources and Services Administration (HRSA) has instructed manufacturers to calculate their AMPs for purposes of the "340B program" according to CMS requirements. *See* Letter from Jimmy R. Mitchell (HHS) to Manufacturers (May 9, 2007), attached as Ex. G. The AMP definition employed in the two programs are therefore congruent.

the context of Medicaid AMP calculations, and because its inclusive definition of the term serves the congressional purpose to calculate an AMP that accurately reflects actual drug prices, CMS's definition of that term is reasonable.

### 3. *Definition of "Retail Pharmacy Class of Trade"*

Plaintiffs argue that CMS has improperly defined "retail pharmacy class of trade" as "any independent pharmacy, chain pharmacy, mail order pharmacy, or other outlet that purchases drugs from a manufacturer, wholesaler, distributor, or other licensed entity and subsequently sells or provides the drugs to the general public." 42 C.F.R. § 447.504(e). They argue specifically that CMS improperly failed to impose a state licensure requirement and a requirement that a licensed pharmacist work at the "retail pharmacy." Pls.' PI Memo. at 15.

The Medicaid statute does not define the phrase "retail pharmacy class of trade." *See* 42 U.S.C. § 1396r-8(k)(1)(A). It certainly includes no licensure or pharmacist requirement, as Plaintiffs claim. And, unlike CMS's longstanding definition of "wholesaler," prior to the AMP rule, CMS had not established a precise definition of the term "retail pharmacy class of trade" for purposes of manufacturers' AMP calculations. Based on its May 2006 review of the manner in which manufacturers had been defining the statutory term "retail pharmacy class of trade," the OIG said that "our findings demonstrate the need to clarify the definition of retail class of trade." Ex. D, May 2006 OIG Report, at i.

In promulgating the final rule, CMS considered various possible approaches to its definition of "retail pharmacy class of trade." 72 Fed. Reg. at 39,146. It noted that certain pharmacies may benefit from a narrow definition, which would limit the AMP to certain higher-priced pharmacy sales and therefore raise the FUL, while manufacturers would benefit from a broad definition which would reduce their rebate payments. *Id.* Broadly speaking, CMS's ultimate approach to the term "retail

pharmacy class of trade" reflects its determination that a manufacturers' sale of drugs intended for purposes of ultimate distribution to the public (instead of, for example, for institutional use in serving specific admitted patients) should be considered part of the "retail pharmacy class of trade."

Importantly, the AMP rule contains an express exclusion for any sales of drugs distributed to the "non-retail pharmacy class of trade." 42 C.F.R. § 447.504(h)(13). Accordingly, if certain sales to entities listed in § 447.504(g) are not for distribution to the general public, then they should not be included in the AMP calculation. Many of Plaintiffs' arguments, as discussed in more detail below, are predicated on the fact that *some* sales to those entities may not be for purposes of distribution to the general public. However, the exclusion in § 447.504(h)(13) is intended to resolve that issue. Only those sales for public distribution, as opposed to inpatient or some other "non-retail" use, are included in the AMP calculation.

CMS specifically considered whether sales to every entity Plaintiffs claim are not part of the "retail pharmacy class of trade" should be included in the AMP calculation:

(1) *Sales to physicians.* Pls.' Memo at 18-19. CMS determined that, to the extent that physicians are providing drugs to the general public, they should be considered part of the "retail pharmacy class of trade" because they function in the same manner as a retail pharmacy. 72 Fed. Reg. at 39,172.

(2) *Sales to patients.* Pls.' Memo. at 19. In response to comments, CMS clarified that so-called "direct" sales to patients generally occur through a distributor which is acting like a wholesaler. 72 Fed. Reg. at 39,185. The patient pays the distributor for the drug, and the distributor pays that amount to the manufacturer, less a service fee. *See id.* Plaintiffs would exclude these sales from the AMP calculation because the manufacturer provides the drug to the distributor without technically transferring ownership to the distributor. Because such an exclusion would elevate form over substance, CMS

29

defined the term "wholesaler" to encompass these distributors and, because the manufacturer/distributor transaction is for the purpose of providing drugs to the general public, that transaction is part of the "retail pharmacy class of trade." *See id.*

(3) *Sales to medical outpatient facilities*. Pls.' Memo. at 19-20. CMS clarified that sales to these centers should be included in the AMP calculation because they provide drugs to the general public and therefore function like a retail pharmacy. 72 Fed. Reg. at 39,173.

(4) *Sales to hospital pharmacies, clinics, and "affiliated entities."* Pls.' PI Memo. at 20. CMS determined that outpatient hospital pharmacies distribute drugs to the general public and, in that respect, function like retail pharmacies. *See* 72 Fed. Reg. at 39,172-73. CMS clarified, however, that to the extent a manufacturer cannot distinguish between sales for inpatient and outpatient use, the manufacturer should exclude all sales from the calculation. *Id.* at 39,173. To the extent sales to hospitals have previously been excluded in their entirety, CMS has provided a reasoned explanation of the more nuanced approach it has taken in the AMP rule.

(5) *Sales to manufacturers*. Pls.' PI Memo. at 21. Under the rule, sales to other manufacturers are included in the AMP *only* if those manufacturers act like wholesalers and distribute drugs to the retail pharmacy class of trade. 42 C.F.R. § 447.504(g)(2). If "manufacturers" are acting not as manufacturers (*i.e.*, those who repackage or relabel the drug) but as wholesalers, and are distributing products to the retail pharmacy class of trade, those sales are properly included in the AMP definition.

(6) *Sales to home infusion providers, home health providers, and specialty pharmacies*. Pls.' PI Memo. at 22-23. CMS determined that the fact that each of these entities serves specific patient populations does not take them out of the "retail" class of trade. *See* 72 Fed. Reg. at 39,176 ("[T]he drugs from these [home infusion therapy] pharmacies are sold in the retail marketplace and are available to the general public."); *id.* at 39,172 ("[U]nlike nursing facilities, home health care providers

operate to provide drugs to the general public."); *id.* at 39,176 ("[D]rugs supplied through specialty pharmacies are within the regular retail marketplace. The fact that the pharmacies serve a client population characterized by specific medical conditions does not mean that their drugs are not sold to the general public, nor does it take them out of the retail pharmacy class of trade."). The statute, of course, contains no requirement that, to be part of the "retail pharmacy class of trade," an entity must offer products serving the *entire* public.

(7) *Mail order pharmacies.* Pls.' PI Memo. at 23. CMS extensively considered comments that mail order pharmacies should not be included in the definition of "retail pharmacy class of trade." 72 Fed. Reg. at 39,173-76. Because mail order pharmacies indisputably sell drugs to the general public, however, they easily fall within the definition of "retail" sale. *Id.* at 39,173 ("[W]e continue to believe that mail order pharmacies are part of the retail pharmacy class of trade inasmuch as they are accessible and dispense prescriptions to the general public."). In addition, CMS determined that removal of mail order pharmacies from the calculation would be inconsistent with past policy, as reflected in Manufacturers Releases 28 and 29. *Id.* at 39,146. Manufacturer Release 29, for example, confirms longstanding agency policy to require manufacturers to include sales to mail order pharmacies in their AMP calculations. *See* Medicaid Drug Rebate Program Release No. 29 (rev. June 2, 1997) (in chart on final page, indicating that sales to mail order pharmacies are included in AMP calculation), attached as Ex. H. Congress's decision not to change this aspect of the AMP definition is highly persuasive evidence that inclusion of such pharmacies was consistent with congressional intent. *See* discussion *supra* Section II.C.1.

(8) *Sales at nominal prices.* Pls.' PI Memo. at 25. Plaintiffs' apparent dispute with CMS's inclusion of nominal price sales is that their inclusion will reduce the AMP. The Medicaid statute, of course, is designed to represent an *average* price paid for the drug and in no way indicates that

"nominal" prices (or, for that matter, extremely high prices) should be excluded from that "average." To the extent the entities who pay these "nominal" prices are not wholesalers that distribute to the retail pharmacy class of trade, then those prices are not included in the AMP calculation. 42 C.F.R. § 447.504(h)(13) (excluding "[s]ales to wholesalers where the drug is distributed to the non-retail pharmacy class of trade"). There is certainly no statutory basis, however, for Plaintiffs' argument that all nominal sales should be excluded from the definition simply because in some cases those prices may not be paid by wholesalers that distribute to the retail pharmacy class of trade.

(9) *Low income patient programs.* Pls.' PI Memo. at 25-26. To the extent drugs are provided to low-income individuals free of charge, they are not included in the AMP. *See* 42 C.F.R. § 447.504(h)(18). Coupons for "free" products, however, may come with purchase requirements. *See* 72 Fed. Reg. at 39,187-89. In that context, the drug is not provided free of charge and is instead a sale that should properly be accounted for in the AMP calculation. *Id.*

In short, in light of the gap Congress left in the Medicaid statute with respect to the definition of "retail pharmacy class of trade" and the presumed congressional acquiescence to longstanding agency policy including entities such as mail order pharmacies within the calculation, Plaintiffs' arguments fail. There is no relevant "licensure" or "pharmacist" requirement anywhere in the Medicaid statute. *See* Pls.' PI Memo. at 14-15. Instead, Congress left it to the agency with the expertise in Medicaid to decide what definition of "retail pharmacy class of trade" best serves the purposes of that program and will result in the most accurate AMP. CMS's careful consideration of this issue reflects a consistent approach to distinguish between those entities that serve the general public, and are therefore part of the same market as traditional walk-in pharmacies, and those entities that serve only institutionalized patients, and therefore are part of a separate market. In so doing, the agency sought to achieve an AMP

that most accurately reflects the actual price of drugs distributed in the retail market, which was precisely the intent of Congress.

4.    *"Covered Outpatient Drugs"*

Plaintiffs argue that the AMP rule improperly includes in the AMP calculation sales of drugs that are not "covered outpatient drugs." Pls.' PI Memo. at 17-18. Plaintiffs have misinterpreted the statute and/or the rule.

Broadly speaking, the Medicaid statute defines the term "covered outpatient drug" based on the drug's status as an FDA-approved prescription drug. *See* 42 U.S.C. § 1396r-8(k)(2). It then excludes from that definition certain uses of that drug – *i.e.*, use in conjunction with a covered service and paid as part of that service. *See id.* § 1396r-8(k)(3). Importantly, the same drug that is paid for as part of a covered service (and therefore not within the definition of "covered outpatient drugs") is in other circumstances paid for directly (and therefore within the definition of "covered outpatient drugs"). Neither the identity of the entity to which the drug is sold (*e.g.*, to a hospital, a physician, or a dialysis center) nor the method of administration (*e.g.*, "incident to" a service) ultimately determines whether that drug is a "covered outpatient drug." Instead, its *payment* methodology dictates whether it is a "covered outpatient drug." *See id.* (exclusion applies only to drugs for which payment is made as part of payment for a service). Plaintiffs' argument that sales to those entities should be wholly excluded – based solely on the identity of the entity and/or the method of administration – is therefore meritless.

Furthermore, the AMP is intended to reflect the average price of "the drug" as a whole, not the average price of drugs ultimately paid for by Medicaid, which is the approach Plaintiffs suggest. *See* Pls.' PI Memo. at 17 (arguing that "'[c]overed' means paid by the Medicaid program"). Plaintiffs' interpretation would exclude most drug sales from the AMP calculation to the extent those sales are not made to Medicaid beneficiaries.

33

D.    The CMS Definition of "Multiple Source Drug" Is Consistent With the DRA.

Plaintiffs also challenge CMS's definition of "multiple source drug" and the various components of the "availability" requirement incorporated in that definition. Pls.' PI Memo. at 29-35. In particular, they argue that some of the drugs for which CMS might establish an FUL might not be "multiple source drugs," as that term is defined in the Medicaid statute, because they are not "sold or marketed in the State." *See id.*

1.    *Plaintiffs Have Failed to Establish That These Claims Are Ripe or That They Have Standing to Assert Them.*

As discussed above, to establish standing, Plaintiffs must demonstrate that they have suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. And, pursuant to the ripeness doctrine, courts may not "entangl[e] themselves in abstract disagreements over administrative policies" but should wait to interfere "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148-49.

In addition to the jurisdictional defects that apply to the whole of Plaintiffs' lawsuit, Plaintiffs have also failed to establish an injury resulting from CMS's allegedly improper definition of the term "multiple source drug." They have not identified any drug for which CMS has established an FUL but that is not "sold or marketed in the State." *See* 42 U.S.C. § 1396r-8(k)(7)(A)(i)(III). Plaintiffs instead offer unsupported speculation that some generic drugs *might* not be sold or marketed in some states in two or more formulations and are therefore not "multiple source drugs." *See* Pls.' PI Memo. at 34.

Putting the standing/ripeness defects unique to this challenge together with those applicable to Plaintiffs' broader argument, the events that must transpire before Plaintiffs will be injured are: (1) the pharmacies in a particular state sell only one formulation of a multiple source drug; (2) one of the unavailable formulations has a lower AMP than the available formulation, and therefore will serve as

the basis for CMS's AMP-based FUL; (3) instead of basing its payment on the dispensing pharmacy's actual acquisition costs (plus reasonable dispensing fee) or on the published price for that drug, as states do now, the state submits a plan amendment capping its payment for each drug at the new AMP or at the AMP-based FUL for that drug; (4) CMS approves that plan; and (5) the drug is not available to the retail pharmacy at the FUL (which is 2.5 times higher than the AMP for the "unavailable" variety), causing the pharmacy to lose money on that drug. Plaintiffs have failed to establish that a single one (much less all) of these five steps necessary for realization of an actual injury will occur.

Plaintiffs have therefore failed to demonstrate that they will ever suffer an injury as a result of CMS's interpretation of "multiple source drug" in the Medicaid statute. For the same reason, Plaintiffs have failed to demonstrate that they have felt adverse effects from CMS's policy "in a concrete way," as required for challenges to administrative action to be considered ripe for review. *Abbott Laboratories*, 387 U.S. at 148-49.[9]

### 2. *Plaintiffs' Claims Fail on the Merits.*

Even if Plaintiffs had alleged facts that would establish the necessary judicial prerequisites for this Court's jurisdiction over their Complaint, the claim would nonetheless fail on the merits. The three sub-parts of Plaintiffs' argument all address the statutory definition of "multiple source drug" to require the existence of at least two equivalent formulations of that drug that are "sold or marketed in the State." 42 U.S.C. § 1396r-8(k)(7)(A)(i)(III). The statute defines "sold or marketed in the State" to mean that the drug is included in a published national listing and is "generally available" to the public in retail pharmacies in the state. *Id.* § 1396r-8(k)(7)(C)(iii).

---

[9]    Furthermore, Defendants' preliminary review of the record indicates that this issue was not raised for public comment, suggesting possible administrative waiver. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

Plaintiffs argue that CMS has ignored this statutory "state availability" requirement. It has not done so. Instead, CMS made a determination that generic drug products, when they become FDA-approved as therapeutically equivalent and are available for sale in the United States, are "generally available" in retail pharmacies in the states. *See* 42 C.F.R. § 447.502 (defining multiple source drug to require FDA approval of therapeutic equivalence and sale in the United States). The Medicaid statute does not require this *absolute* or *universal* availability. It requires *general* availability. 42 U.S.C. § 1396r-8(k)(7)(C). CMS reasonably determined that drugs the FDA has approved as therapeutically and pharmaceutically equivalent and which are sold in the United States are "generally available" in retail pharmacies in the various states, particularly given that CMS has defined the term "retail pharmacy class of trade" to include more than traditional walk-in pharmacies. *See* 42 C.F.R. § 447.504(e). A mail order pharmacy serving the patients of a particular state, for example, is a retail pharmacy in that state. *See id.*

Plaintiffs' reading of the Medicaid statute would conflict with another provision of the drug rebate statutory provisions. Under the Medicaid statute, CMS must establish and apply an FUL upon determining that a drug is a "multiple source drug" based on AMP which, in accordance with the statute, must be calculated based on prices paid "in the United States." 42 U.S.C. § 1396r-8(e)(4), (k)(1)(A). This statutory directive assumes that a drug either is or is not a multiple source drug. Plaintiffs' argument, however, would render drugs "multiple source drugs" in some states but not in others. This result cannot be reconciled with this statutory provision which (because it assumes a drug either is or is not a "multiple source drug") does not indicate whether CMS should establish and apply a FUL to a drug that both is and is not a "multiple source drug." Relatedly, the statute dictates the establishment of *one* FUL per multiple source drug, not one FUL per multiple source drug per state.,

based presumably on CMS's continuous examination of all the pharmacies in each state.[10] *See id.*

(instructing CMS to establish "*a* federal upper reimbursement limit for each multiple source drug").

Consistent with this statutory mandate, CMS has consistently calculated a single national FUL for each

multiple source drug.[11] Plaintiffs' argument, on the contrary, could result in 50 different FULs, a result

that is neither consistent with the Medicaid statute nor with CMS's longstanding application of that

statute.

In sum, if Plaintiffs had presented evidence that even one of its member pharmacies had been –

or is about to be – injured by this portion of the CMS regulation because that pharmacy operates in a

state in which a FUL will be established for a multiple source drug for which only one formulation is

"generally available" in the state or for which only one formulation is included in a published national

listing, then perhaps Plaintiffs could challenge this CMS determination. But Plaintiffs have failed to do

so, and (in CMS's experience) they would not be able to make such a showing.

E.    The Final Rule Properly Applies Federal Upper Limits to All Formulations of a
      Multiple Source Drug.

Plaintiffs also argue that the Medicaid statute allows CMS to apply the FUL only to

therapeutically equivalent formulations of a multiple source drug. *See* Pls.' PI Memo at 35-38.

Plaintiffs have misconstrued the Medicaid statute.

Under the Medicaid statute, "the Secretary shall establish a Federal upper reimbursement limit

for each multiple source drug for which the FDA has rated . . . two or more[] products therapeutically

and pharmaceutically equivalent, regardless of whether all such additional formulations are rated as

such and shall use only such formulations when determining any such upper limit." 42 U.S.C. § 1396r-

8(e)(4). A "multiple source drug" is one with multiple formulations, so long as at least two of its

---

[10] Also, in the specific section of the Medicaid statute discussing the establishment of FULs, Congress refers only to
a requirement of "general availability." *See id.* §§ 1396r-8(f)(1)(A)(ii), (B) (suggesting that different formulations
of multiple source drugs should be "generally available" before applying a FUL).

[11] This calculation was explicitly referenced by Congress when it established the FUL mandate. *Id.* § 1396r-8(e)(5).

formulations are therapeutically, pharmaceutically, and biologically equivalent.  *See id*; *see also id.* §

1396r-8(k)(7)(A)(i).  While § 1396r-8(e)(4) precludes CMS from *calculating* the FUL for a multiple

source drug based on non-equivalent formulations of that drug (which CMS has not done), that

provision plainly directs CMS to *apply* the FUL to the "multiple source drug," which includes all

formulations of that drug.

   Not only is CMS's interpretation consistent with (and probably mandated by) the plain

language of § 1396r-8(e)(4), but its interpretation is also consistent with longstanding agency policy.

CMS has, since the 1990 amendments to the Medicaid statute, *calculated* a multiple source drug's FUL

based on the therapeutically equivalent formulations of that drug but *applied* that FUL to all

formulations of the multiple source drug.  *See* 72 Fed. Reg. at 39,155 (noting that rule simply continues

CMS's current practice of applying the FUL to all drug formulations).  In the DRA, Congress

substantially changed the manner in which FULs are calculated for multiple source drugs, but it did

nothing to change the relevant language of § 1396r-8(e)(4) to specify that the FUL should apply only to

those formulations of the drug whose AMPs are used to calculate the FUL.

   The agency's interpretation also represents good policy.  Non-equivalent (or "B-rated")

formulations of drugs have not yet satisfied FDA equivalence standards.[12]  As such, they may not be an

effective substitute for the innovator drug.  CMS determined that failure to establish an FUL that would

cover these formulations could encourage improper substitution of B-rated drugs when their A-rated

counterparts have been prescribed.  72 Fed. Reg. at 39,155.  That such substitution is "almost always

illegal under state law," as Plaintiffs argue, certainly does not preclude Congress and CMS from

discouraging such behavior by removing the financial incentives.  There is simply no policy reason to

---

[12] For an overview of the A- and B-rating system, see Food & Drug Administration, Centers for Drug Evaluation and Research, "Approved Drug Products with Therapeutic Equivalence Evaluations," *available online at* http://www.fda.gov/cder/ob/docs/preface/ecpreface.htm.

exclude from application of the FUL formulations of multiple source drugs that have not been proven

by the FDA to be as effective as their A-rated counterparts.

In sum, the agency's decision to continue to apply FULs to multiple source drugs, regardless of

formulation, is not only consistent with, but is mandated by, the Medicaid statute.

## III.    THERE IS NO IMMINENT THREAT OF IRREPARABLE INJURY TO PLAINTIFFS IN THE ABSENCE OF THE REQUESTED INJUNCTION.

"Irreparability of injury is a very high standard." *Am. Coastal Line Joint Venture, Inc. v. U.S.*

*Lines, Inc.*, 580 F. Supp. 932, 936 (D.D.C. 1983). To establish a substantial threat of irreparable injury,

a plaintiff must meet two requirements. First, the injury "must be both certain and great; it must be

actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.

Cir. 2006) (quotations omitted). To that end, a plaintiff seeking injunctive and declaratory relief must

demonstrate "that the injury complained of is of such *imminence* that there is a clear and present need

for equitable relief to prevent irreparable harm." *Id.* (quotations omitted, emphasis in original). In

order to show that the harm is "certain," a party may not rely on "bare allegations of what is likely to

occur." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)

(quotations omitted). "The movant must provide proof that the harm has occurred in the past and is

likely to occur again, or proof indicating that the harm *is certain to occur* in the near future." *Id.*

(emphasis added). Second, the injury must be "beyond remediation." *Chaplaincy*, 454 F.3d at 297.

Insofar as the injury alleged is self-inflicted, it cannot be irreparable. *Salt Lake Tribune Publ'g Co. v.*

*AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003). Plaintiffs have satisfied neither requirement for

showing a substantial threat of irreparable injury.

A.     The "Irreparable Harm" Plaintiffs Have Asserted Is Either Speculative or the Result Not of the AMP Rule but of the DRA Itself.

To justify their request for a preliminary injunction, Plaintiffs claim imminent injury as a result of the publication of these AMPs on a public website, as the DRA requires CMS to do, 42 U.S.C. § 1396r-8(b)(3)(D)(v).  *See* Pls.' PI Memo. at 29.  Plaintiffs argue that "States and other payers will use the Defendants' website as a basis for establishing reimbursement rates for retail pharmacies."  *Id.* More specifically, they argue that because "reimbursement rates actually will be substantially below the costs that retail pharmacies pay for those drugs," 10,000 to 12,000 of their member pharmacies will close unless the AMP rule is immediately enjoined. *Id.* at 38-39.

For the same reasons that Plaintiffs lack standing, however, they have failed to establish imminent harm justifying the entry of a preliminary injunction.  The Medicaid payments rates to pharmacies *cannot* change, and Plaintiffs therefore cannot suffer an injury as a result of reduced Medicaid payments, unless the states submit State Plan amendments to CMS and CMS approves those amendments.  How states may decide to change their State Plans in response to the AMP data, and whether those changes will affect Plaintiffs at all, is entirely speculative.  Plaintiffs have no sure-fire crystal ball.  Given that states must always ensure adequate access to Medicaid-covered drugs, 42 U.S.C. § 1396a(a)(30)(A), the "imminent injury" Plaintiffs assert – immediate closure of 10,000 to 12,000 pharmacies as a result of their inability to acquire drugs at or below the state reimbursement rate – is unlikely to occur.  *See* discussion *supra* Section II.A.1.; *see also Wis. Gas Co.*, 758 F.2d at 674 (plaintiffs must show that harm "is certain to occur" and may not rely on "bare allegations of what is likely to occur").[13]

---

[13] How a third party payer might decide to use the AMP data published by CMS is also speculative, and any payer viewing the published AMP data will do so with full knowledge of what that data represents.  If, based on these data, third party payers set their reimbursement rates at levels that ultimately harm Plaintiffs, that harm was caused not by CMS but by the independent judgment of these third party payers.

Plaintiffs have also failed to demonstrate that the irreparable harm they allege – *i.e.*, closure of 10,000 to 12,000 pharmacies – would occur as a result of the AMP rule rather than a result of the DRA itself.  At most, Plaintiffs' evidence demonstrates that they might be harmed by implementation of the DRA's mandate to set FULs based on the AMP – a congressional mandate that Plaintiffs do not claim is unlawful and whose implementation Plaintiffs have not sought to enjoin.  *See* discussion *supra* Section II.A.1.b.  Any "harm" allegedly caused by Congress – whose actions are not challenged here – cannot support the preliminary injunction Plaintiffs seek.  *See Wis. Gas Co.*, 758 F.2d at 674 (movant must prove that "the alleged harm will directly result from the action *which the movant seeks to enjoin*") (emphasis added).  And, even if Plaintiffs could sue for harm caused by the DRA itself, that harm is expected to result in pharmacy revenue losses of less than one percent.  72 Fed. Reg. at 39,233.

In sum, Plaintiffs have failed to offer any evidence that pharmacies will suffer losses so great as to cause pharmacy closure at all – which is the irreparable harm Plaintiffs have claimed – much less that the predicted closures will be a result of the allegedly improper AMP rule instead of as a result of some as yet unknown, independent decision of the states to reduce their payment rates to pharmacies and/or as a result of the congressional decision to set FULs at 250% of the AMPs.[14]

In addition, it remains entirely unclear what Plaintiffs seek to gain through a preliminary injunction or how they expect this Court to afford them any meaningful relief.  CMS must calculate and apply AMP-based FULs under the DRA, and it must continue to administer the AMP-based rebate program.  It must therefore have *some* basis for calculating the AMP, even if this Court enjoins the particular AMP calculation outlined in the AMP rule.  Plaintiffs are apparently asking this Court either

---

[14] Plaintiffs also claim that they have demonstrated irreparable harm because sovereign immunity will bar subsequent collection of money damages against the federal government.  Pls.' PI Memo. at 39-40.  To the extent their harm is monetary, however, Plaintiffs' asserted injury does not qualify for injunctive relief despite the government's sovereign immunity, *see Biovail Corp. v. U.S. Food & Drug Admin.*, -- F. Supp. 2d --, 2007 WL 891365, at *8 (D.D.C. Mar. 22, 2007), and in any event Plaintiffs would, at most, have a claim against the states and not against the federal government.

to require reversion to former methods of calculating AMPs or are asking this Court to establish its own interim AMP calculation procedures pending resolution of this action on the merits.  It is unknown, however, whether AMPs calculated pursuant to the former method are higher than the ones that will be calculated under the new AMP rule (and therefore unknown how Plaintiffs would be affected by a reversion to the former system), and it would be inappropriate for this Court (either here or on the merits) to mandate its own set of inclusion and exclusion criteria for the AMP.  *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022-1023 (D.C. Cir. 1999) (requiring remand to agency after concluding that record did not support agency action).

       B.     <u>Plaintiffs' Inexcusable Delay Proves That Any Harm They Might Suffer Is Not "Irreparable."</u>

As discussed above, Plaintiffs' claimed need for a preliminary injunction stems from CMS's stated intent to publish in mid-December the AMP it calculates for each drug pursuant to the procedures set forth in the final rule.  *See* Decl. of Mary Ann Wagner (Nov. 13, 2007) ("Wagner Decl.") ¶ 4, attached as Ex. 1 to Pls.' PI Memo.

Plaintiffs, however, have known since July 17, 2007 – when the final rule was published – exactly how CMS intended to calculate the AMPs.  Plaintiffs' lawsuit does not challenge CMS's *application* of those procedures (which still has not occurred); rather, it challenges the procedures on their face.  Since the DRA became effective on February 8, 2006, CMS has been required to publish its AMP calculations on a public website.  42 U.S.C. § 1396r-8(b)(3)(D)(v).  Plaintiffs were therefore on notice as of July 17, 2007, that the AMPs would be (and have been) calculated pursuant to the procedures they now challenge and that those AMPs would be posted to a public website.  Nonetheless, they waited *four months* to bring this lawsuit.

Plaintiffs' proffered justification for delay is that, until October 15, 2007, CMS had represented that it did not intend to publish any AMP data until January 2008.  Wagner Decl. ¶ 3.  Even if CMS had

intended to wait until January 2008 to publish these data, however, Plaintiffs still should not have waited until November 15 – only six weeks before the new year – to file this motion seeking to enjoin further implementation of a rule that was published in July and that became effective in October. Plaintiffs' proffered justification for delay only reveals that, regardless of when CMS intended to publish the AMP data, Plaintiffs' plan was to wait until the last possible moment to challenge the rule, thereby creating a needless judicial emergency.

Inexcusable delay militates heavily against denial of a motion for a preliminary injunction. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (plaintiffs had waited 44 days until after final regulations were issued although they had notice of a public comment period; "We find this delay to be inexcusable."); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (drug company's eight-month delay in seeking preliminary relief undercut claim of irreparable harm).

Furthermore, Plaintiffs' latter two challenges – namely, that CMS should establish state-by-state FULs instead of a single national FUL, *see* Pls.' PI Memo. at 29-35, and that CMS should apply FULs only to certain drug formulations of a multiple source drug, *see id.* at 35-38, are challenges to policies that were not established by the AMP rule but extend as far back as 1991. *See* discussion *supra* Sections II.D., II.E. Plaintiffs cannot claim irreparable harm warranting a preliminary injunction based on policies they have waited years to challenge.

This Court should not reward Plaintiffs with preliminary relief in an action that was just as cognizable four months (or sixteen years) ago as it is now and that could have been resolved, if

cognizable at all, before the rule's effective date. As a result of their delay, Plaintiffs' purported need for emergency action is wholly self-inflicted. For this reason, their motion should be denied.

## IV. A PRELIMINARY INJUNCTION WOULD SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES, INCLUDING MEDICAID BENEFICIARIES, AND IS ADVERSE TO THE PUBLIC INTEREST

"[E]ven where denial of a preliminary injunction will harm the plaintiff, the injunction should not be issued where it would work a great and potentially irreparable harm to the party enjoined." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969). Plaintiffs have failed to meet their burden to show that this injunction will not harm other interested parties or the public.

First, CMS intends to publish the AMP data in mid-December because the comment period for a related portion of the AMP rule closes on January 2, 2008. *See* 72 Fed. Reg. at 39,142. CMS had left open for comment the provisions of the rule relating to outlier drug prices, and it seeks to give prospective commenters access to the new AMP data before the close of the comment period. *Id.* at 39,216-17. The publication delay Plaintiffs seek would deprive commenters of that opportunity.

Second, a preliminary injunction would harm Defendants and the public by preventing CMS from implementing a congressionally-mandated program designed both to reduce the federal deficit beginning January 1, 2007, and to improve the clarity of the AMP calculation. If this injunction were issued, manufacturers would presumably begin submitting AMPs calculated pursuant to their old inconsistent methodologies, and CMS would presumably set FULs based on AMPs calculated pursuant to those methodologies. A preliminary injunction, then, would only restore the confusion that Congress had attempted to eliminate with the DRA. In addition, that Plaintiffs do not agree with CMS's AMP inclusion criteria does not render the resulting data "misleading and confusing," as they claim. *See* Pls.' PI Memo. at 41. States, third party payers, and any other interested persons who may view the AMPs

will do so with full knowledge of the criteria that, at CMS's direction, manufacturers now use to compute those AMPs.

Finally, and perhaps most importantly, Plaintiffs argue that they will be harmed monetarily by the implementation of the AMP rule. *See* Pls.' PI Memo. at 38-40. If Plaintiffs are correct, however, the additional money afforded them with this preliminary injunction will come at the expense of the Medicaid program itself. The injunction would simply reallocate money from the Medicaid program to Plaintiffs, and the Medicaid program will be equally unable to recover its costs. States have long been confronting budget crises leading them to consider cutbacks in their Medicaid programs. *See, e.g.*, *Pharm. Research & Mfrs. Ass'n of Am. v. Thompson*, 259 F. Supp. 2d 39, 84 (D.D.C. 2003) ("Michigan . . . is facing a budget crisis and possible cut-backs in its budget for Medicaid and other health care services."); *see also* H.R. Rep. No. 109-276 (Nov. 7, 2005) ("Unreformed, analysts predict Medicaid will bankrupt every state in as little as 20 years absorbing 80 [to] 100% of all state dollars."). If this injunction saves Plaintiffs substantial sums of money, as they claim, it would do so at the expense of an already-struggling Medicaid system and, ultimately, its beneficiaries.

Because Plaintiffs assert only monetary harm, because the taxpaying public would suffer at least the same harm, and because Medicaid beneficiaries could suffer an even greater harm, the balance of harms tips decidedly against Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

SHEILA M. LIEBER

Deputy Director
Federal Programs Branch

s/ Wendy M. Ertmer
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

Dated:  December 6, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2007, a copy of the foregoing pleading, together with

proposed order, was filed electronically via the Court's ECF system, through which a notice of the

filing will be sent to:

Christopher W. Mahoney       cmahoney@duanemorris.com

and was sent by electronic mail to:

Frederick R. Ball       frball@duanemorris.com
Don L. Bell II       dbell@nacds.org
Mary Ellen Kleiman       mkleiman@nacds.org
Nicholas J. Lynn       njlynn@duanemorris.com
John M. Rector       john.rector@ncpanet.org

      s/ Wendy M. Ertmer
      WENDY M. ERTMER

# EXHIBIT A

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices



Daniel R. Levinson
Inspector General

June 2005
OEI-05-05-00240

# Office of Inspector General

### http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## Office of Audit Services

The OIG's Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations in order to reduce waste, abuse, and mismanagement and to promote economy and efficiency throughout the department.

## Office of Evaluation and Inspections

The OIG's Office of Evaluation and Inspections (OEI) conducts management and program evaluations (called inspections) that focus on issues of concern to the department, the Congress, and the public. The findings and recommendations contained in the inspections reports generate rapid, accurate, and up-to-date information on the efficiency, vulnerability, and effectiveness of departmental programs. The OEI also oversees State Medicaid fraud control units, which investigate and prosecute fraud and patient abuse in the Medicaid program.

## Office of Investigations

The OIG's Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## Office of Counsel to the Inspector General

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. The OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within the department. The OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

 E X E C U T I V E   S U M M A R Y

## OBJECTIVE

To examine the differences between the published prices States use to set Medicaid reimbursement rates (i.e., average wholesale price and wholesale acquisition cost) and a statutorily defined price calculated from actual sales transactions (i.e., average manufacturer price) for drugs reimbursed by Medicaid.

## BACKGROUND

Medicaid expenditures for prescription drugs continue to be a major concern to the Administration, Congress, and States; and Medicaid drug reimbursement changes are being considered. Most prescription drugs reimbursed by Medicaid are dispensed by pharmacies. The Office of Inspector General (OIG) has found evidence that Medicaid drug reimbursements exceed pharmacies' actual acquisition costs.

In general, States reimburse pharmacies for drugs at the lower of estimated acquisition cost (EAC) plus a dispensing fee or the pharmacy's usual and customary charge to the public. The EAC is the State's best estimate of the price generally and currently paid by providers for the drug.

States often lack access to drug pricing data based on actual sales and instead estimate pharmacy acquisition costs using published prices, namely, average wholesale price (AWP) and wholesale acquisition cost (WAC). Neither AWP nor WAC are necessarily based on actual sales transactions. The AWP is not defined in statute or regulations, and until recently, the same was true for WAC. OIG has recommended that Medicaid should base reimbursement on pricing data that more accurately reflects actual acquisition costs.

The Average manufacturer price (AMP) is the average price paid by wholesalers for drugs distributed to the retail class of trade, net of customary prompt pay discounts. The AMP is statutorily defined and its calculation is based on actual sales transactions. Drug manufacturers must report AMP data for all Medicaid-covered drugs to the Centers for Medicare & Medicaid Services (CMS) quarterly as a requirement of the Medicaid drug rebate program. Most State Medicaid agencies do not have access to AMP data, which is proprietary.

To explore the potential impact of moving to a sales-based price to estimate pharmacy acquisition cost, this inspection compares AMP to

AWP and WAC for national drug codes (NDC) reimbursed by Medicaid. We compared AMP to AWP for 24,101 NDCs and AMP to WAC for 19,475 of those NDCs (4,626 NDCs had an AWP but no WAC value). We compared the per unit prices in place on January 1, 2005. We calculated median comparisons for all of the NDCs, as well as for each drug category: single source ("single source brands"), innovator multisource ("multisource brands"), and non-innovator multisource ("generics"). This analysis focuses on the comparison of a sales-based price to the published prices associated with the drug itself (i.e., the "ingredient cost") and does not address the professional costs associated with dispensing the drug or the dispensing fees.

A companion report, "Medicaid Drug Price Comparison: Average Sales Price to Average Wholesale Price" (OEI-03-05-00200), examines the differences between average sales price (a statutorily defined price based on actual sales and used for Medicare Part B drug reimbursement) and AWP. That analysis includes approximately 2,100 NDCs that are covered by both Medicaid and Medicare Part B.

## FINDINGS

**Average manufacturer price is substantially lower than both average wholesale price and wholesale acquisition cost.** At the median, AMP is 59 percent lower than AWP. Forty-nine States use AWP to estimate pharmacy acquisition costs. The median State EAC formula is AWP minus 12 percent. For 98 percent of Medicaid-reimbursed NDCs, this median State EAC formula would reimburse at a price higher than AMP.

At the median, AMP is 25 percent lower than WAC. Among the eight States that use WAC in their EAC, the median State EAC formula is WAC plus 8.5 percent. For 96 percent of NDCs, this median EAC would reimburse at a price higher than AMP.

**Generic drugs exhibit the largest differences between average manufacturer price and the published prices.** For generic drugs, AMP is 70 percent lower than AWP at the median. In comparison, AMP is 23 percent lower than AWP at the median for single source brands and 28 percent lower for multisource brands.

State estimates of pharmacy acquisition cost exceed AMP even among States with additional discounts for generics. Seven States use EAC formulas that specify a greater discount off AWP for generic drugs than brand name drugs. However, these formulas range from AWP minus

20 percent to AWP minus 50 percent, resulting in estimates of pharmacy acquisition cost that are higher than the median AMP for generics, which is equal to AWP minus 70 percent.

For generic drugs, AMP is 40 percent lower than WAC at the median. In comparison, AMP is 4 percent lower than WAC for single source brands and 8 percent lower than WAC for multisource brands at the median.

No States use a WAC-based EAC formula with additional discounts taken for generics. State EAC formulas that use WAC range from WAC plus 5 percent to WAC plus 12 percent. The median AMP is lower than these formulas in all drug categories, but the largest difference is for generics where AMP is 40 percent lower than WAC.

## CONCLUSION

The Administration and Congress have expressed interest in aligning Medicaid drug reimbursement more closely with pharmacy acquisition cost by using prices based on actual sales rather than published prices. OIG has also recommended that Medicaid should base reimbursement on pricing data that more accurately reflects actual acquisition costs.

This inspection provides additional evidence that published prices used as a basis for reimbursement are higher than prices based on actual sales. AMP, which is calculated based on statute and actual sales transactions, is substantially lower than either of the published prices (i.e., AWP and WAC). As a result, States' estimates of pharmacy acquisition costs, which are based on AWP and/or WAC, are also substantially higher than AMP. These differences are greatest for generic drugs.

Comparing a statutorily defined, sales-based price to published prices provides valuable information to those considering the implications of changing Medicaid's drug reimbursement methodology. The substantial disparities between AMP and the published prices currently being used indicate that changing the basis of Medicaid reimbursement could have a significant impact on Medicaid expenditures.

### Agency Comments

CMS commented that these companion reports make clear that current Medicaid payment rules result in overpayments for drugs and emphasize the need for reform. CMS stated that Congress should enact legislation similar to the reform of Medicare Part B (i.e., switch to ASP

as the basis of reimbursement) to ensure that Medicaid payment for drugs is related to actual prices paid by pharmacies.

# ► T A B L E   O F   C O N T E N T S

E X E C U T I V E   S U M M A R Y ........................................... i

I N T R O D U C T I O N ................................................. 1

F I N D I N G S ..................................................... 9

    AMP is substantially lower than AWP and WAC ............. 9

    Generic drugs exhibit the greatest percent differences ......... 11

C O N C L U S I O N ................................................. 15

E N D   N O T E S ................................................... 17

A P P E N D I X E S ................................................. 20

    A.  Key Terms and Acronyms, Distribution Chart ............. 20

    B.  Additional Data Populations:  Medicaid-covered Drugs ..... 22

    C.  Additional Measures:  Ranges and Interquartile Ranges .... 23

    D.  Agency Comments .................................... 24

A C K N O W L E D G M E N T S ........................................ 27

 I N T R O D U C T I O N

## OBJECTIVE

To examine the differences between the published prices States use to set Medicaid reimbursement rates (i.e., average wholesale price and wholesale acquisition cost) and a statutorily defined price based on actual sales transactions (i.e., average manufacturer price) for drugs reimbursed by Medicaid.

## BACKGROUND

All State Medicaid programs include outpatient prescription drug coverage, an optional benefit. Nationally, Medicaid spent over $34 billion on prescription drugs in 2003.[1] Over 41 million beneficiaries were enrolled in Medicaid in 2003.[2]

Approximately 6 million of these beneficiaries are dually eligible for Medicaid and Medicare (dual eligibles).[3] Currently, Medicaid provides drug coverage for these dual eligibles, but in 2006, coverage for these beneficiaries will be transferred from Medicaid to Medicare.[4]

**Concerns about Medicaid Drug Reimbursement**
Medicaid expenditures for prescription drugs continue to be a major concern to the Administration, Congress, and States. The President's 2006 budget proposes restructuring Medicaid pharmacy reimbursement to save an estimated $542 million in fiscal year (FY) 2006 and $15.1 billion over 10 years.[5] The House Energy and Commerce Subcommittee on Oversight and Investigations held a hearing in December 2004 on "Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much" and explored potential reforms.[6] Congress has established a Medicaid commission to provide recommendations to achieve $10 billion in overall Medicaid savings over the next 5 years and to consider longer-term performance goals and recommendations.[7] The National Governors Association and National Conference of State Legislatures are also working on proposals to reduce Medicaid spending, including spending on prescription drugs.[8]

The Office of Inspector General (OIG) has found evidence that because States lack accurate drug pricing data, Medicaid drug reimbursements exceed pharmacies' actual acquisition costs. OIG has also found that Medicaid drug reimbursements exceed the prices paid by other Federal programs. OIG has recommended that Medicaid should base reimbursement on pricing data that more accurately reflects actual acquisition costs.[9]

**Medicaid Drug Reimbursement**

*Drug Cost Reimbursement.*

Most prescription drugs reimbursed by Medicaid are dispensed by pharmacies. Within Federal parameters intended to ensure that Medicaid acts as a prudent buyer, each State determines its own pharmacy reimbursement formula(s).[10] In general, States reimburse pharmacies for drug costs at the lower of estimated acquisition cost (EAC) plus a dispensing fee or the pharmacy's usual and customary charge to the public. Some multiple source drugs (i.e., drugs with equivalent generic versions) have a Federal upper limit (FUL) or a State maximum allowable cost (MAC).

The EAC is the State Medicaid agency's "best estimate" of the price generally and currently paid by providers for the drug.[11] The Centers for Medicare & Medicaid Services (CMS) does not prescribe a method for calculating EAC; instead, each State establishes and specifies its own EAC formula in its Medicaid State plan.

Estimating pharmacy acquisition cost presents a challenge for States because States lack access to drug pricing information calculated from actual drug sales. Instead, States rely on the published prices available in drug pricing compendia, despite the previously identified flaws of these published prices.

Forty-nine States (including the District of Columbia) use average wholesale price (AWP) minus a discount percentage in their EAC formulas. Eight States use wholesale acquisition cost (WAC) plus a markup percentage in their EAC formulas. Six of these eight States use both AWP and WAC, e.g., "the lesser of AWP minus 12 percent or WAC plus 8 percent." Some States use more complex EAC formulas. For example, seven States specify different formulas for brand name drugs versus generic drugs. Other States vary their formulas based on the pharmacy's characteristics (e.g., chain versus non-chain pharmacies).

For certain multiple source drugs that meet specified criteria, CMS sets specific Federal upper limit amounts based on the published prices. The FUL amount equals 150 percent of the lowest published price of any therapeutically equivalent version of the drug published in the national pricing compendia.[12] Additionally, some States establish MAC reimbursement levels at a rate below an established FUL or for drugs for which CMS has not set an FUL amount. Thirty-nine States had MAC programs as of January 1, 2005.[13]

I N T R O D U C T I O N

*Dispensing Fees.*

In addition to reimbursing pharmacies for the cost of the drug (also known as the ingredient cost), States are required to determine "reasonable" dispensing fees.[14]  This fee represents the charge for the professional services provided by a pharmacist when dispensing a prescription.  States' dispensing fees to retail pharmacies range from $2.00 to $12.50.[15]

**Drug Pricing Data**

Currently, three types of drug pricing data are readily available and relevant to the Medicaid program:  AWP, WAC, and AMP.  A fourth price, average sales price (ASP), is used by the Medicare program to calculate reimbursement amounts for the subset of drugs that are covered by Medicare Part B.  See Appendix A for a list of key drug pricing terms and acronyms and a chart depicting an example of a Medicaid drug distribution chain.

*Published prices:  AWP and WAC.*

Average wholesale price and wholesale acquisition cost are prices that are published in commercial drug pricing compendia by private companies, such as First Databank and Medi-Span, based on pricing information reported by manufacturers.[16]  Neither AWP nor WAC are necessarily based on actual sales transactions.  The AWP is not defined in statute or regulations, and until recently, the same was true for WAC.  The AWP is often considered a price for wholesalers to charge retailers.  As currently defined in statute, WAC is:

> . . . the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data.[17]

As mentioned earlier, State Medicaid agencies generally use AWP and/or WAC to estimate pharmacy acquisition costs for drug reimbursement.  However, studies, investigations, and audits by OIG, the Department of Justice, and others have found that these published prices, particularly AWP, substantially overstate the actual prices pharmacies pay for drugs.

Recognizing the flaws of AWP, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Public Law 108-173, changed the basis of Medicare Part B drug reimbursement from AWP to

ASP, a statutorily defined price calculated from actual sales transactions. The Administration has proposed similar reforms for Medicaid.[18]

_Prices based on actual sales: AMP and ASP._

Average manufacturer price is the average price paid to the manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade minus customary prompt pay discounts. Its calculation is statutorily defined and based on actual sales transactions.[19] Because AMP is calculated from sales that have already occurred, it is a retrospective price.

Drug manufacturers are required to report AMP data for all Medicaid-covered drugs to CMS quarterly as a requirement of the Medicaid drug rebate program.[20] State Medicaid agencies do not currently have access to AMP data, which is proprietary.

While AMP is statutorily defined, there are some weaknesses associated with it. CMS has not issued final regulations regarding AMP calculation. The Government Accountability Office (GAO) recently released a report on the Medicaid rebate program that found inadequate oversight of manufacturers' AMP calculations and variation across manufacturers in how AMP was calculated.[21]

Average sales price is also statutorily defined and is based on actual sales transactions. It is defined as the manufacturer's unit sales to all purchasers (with certain exceptions) in a calendar quarter divided by the total number of units sold by the manufacturer during that same quarter, net any price concessions (such as volume, prompt pay, and cash discounts), free goods contingent on purchase requirements, chargebacks, and rebates (other than Medicaid rebates).[22] The ASP must be calculated and reported to CMS quarterly for drugs covered by Medicare Part B. Most drugs reimbursed by Medicaid are not covered by Medicare Part B and do not have an ASP value reported to CMS.

**Companion Report: Average Sales Price to Average Wholesale Price**

OIG is issuing a companion report entitled, "Medicaid Drug Price Comparison: Average Sales Price to Average Wholesale Price" (OEI-03-05-00200), concurrent with this report. This companion report shares a similar objective, i.e., to compare statutorily defined drug prices based on actual sales to published prices. The primary difference is scope. The companion report analyzes drugs that are covered by both Medicaid and Medicare Part B (approximately 2,100 national drug codes [NDC]) and focuses on comparing ASP to AWP. In contrast, this

report includes Medicaid-reimbursed drugs (approximately 24,000 NDCs) and compares AMP to the published prices (AWP and WAC). The AMP is the only statutorily defined, sales-based price reported to CMS for all drugs in the Medicaid program.

## METHODOLOGY

### National Drug Codes Reviewed

We focused our analysis on pricing data for Medicaid-reimbursed drugs, i.e., the population of NDCs reimbursed by Medicaid during the first two quarters of calendar year 2004 (January 1 through June 30, 2004), the most recent reimbursement data available. This population includes all drugs with an AMP value and at least one other price (AWP and/or WAC) in place on January 1, 2005. We used the 11-digit NDCs that Medicaid uses to identify unique formulations of each drug, including the manufacturer, strength, and package size. This population includes 25,560 NDCs.

In addition, we analyzed pricing data for Medicaid-covered drugs with an AMP value and at least one other price (AWP and/or WAC) in place January 1, 2005. This population includes additional drugs that Medicaid covers but that had no reimbursement from January 1 through June 30, 2004. This analysis is presented in Appendix B and includes 28,557 NDCs.

### *Excluded NDCs.*

From our total population of Medicaid-reimbursed NDCs, we excluded 3 percent of NDCs at both ends of the distribution of AMP to AWP ratios. As explained below, this provides a conservative estimate of the differences between these prices. Our population for analysis of Medicaid-reimbursed drugs includes 24,101 NDCs for the AMP to AWP comparisons. Only 19,475 of these NDCs had WAC values and are therefore included in the AMP to WAC comparisons.

At the low end, we excluded all NDCs for which the AWP values were less than the AMP values. Approximately 3 percent of Medicaid-reimbursed NDCs had AWP values below AMP. In principle, it seems unlikely for AWP to be below AMP because AWP is used to represent a transaction further down the distribution chain than AMP (see Appendix A for an example of the distribution chain). The AMP is an average of actual sales from manufacturers to wholesalers. The AWP is a published price that is generally used to represent a price for wholesalers to charge retailers. While there are known incentives for a

manufacturer to increase an AWP relative to actual sales prices, there are no similar known incentives for a manufacturer to decrease an AWP below actual sales prices. It is likely that where AWP is lower than AMP, it is the result of a technical error such as a unit definition inconsistency, a data timing issue, or a reporting error.

We also excluded the NDCs at the high end where AWP values exceeded AMP by the greatest percentages. Unlike the NDCs where AWP is less than AMP, there is no apparent reason to assume that an extremely high AWP (relative to AMP) is incorrect and therefore the result of a unit definition inconsistency, a data timing issue, or a reporting error. However, it is plausible that errors occur with the same frequency at the high end of the distribution as at the low end. Therefore, we used a 3 percent threshold to parallel the exclusion of 3 percent of NDCs at the low end. We did this by drug category; i.e., single source ("single source brands"), innovator multisource ("multisource brands"), and non-innovator multisource ("generics"); because the distribution of AMP to AWP ratios differed substantially by category. CMS designates each NDC as single source, innovator multisource, or non-innovator multisource in the Medicaid Drug Rebate Initiative files.

As a result, our calculations may underestimate the extent to which AWP exceeds AMP by excluding these NDCs at the high end.

**Data Sources**

*AMP.*
We used the AMP per unit values that were reported by manufacturers to CMS and were in place on January 1, 2005. We obtained this data from the Medicaid Drug Rebate Initiative files that CMS uses to administer the Medicaid drug rebate program. The AMP values that are in place on January 1, 2005, are based on sales from July 1 through September 30, 2004, which are reported to CMS by manufacturers by October 30, 2004.

*AWP and WAC.*
We used the AWP per unit and the WAC per unit values that were in effect on January 1, 2005, as published in First Databank's National Drug Data File. First Databank is the source from which State Medicaid agencies typically obtain AWP and WAC data for pharmacy reimbursement.[23]

I N T R O D U C T I O N

*State EAC Formulas.*
We obtained the State EAC formulas that were in effect on January 1, 2005, from the CMS Web site. CMS compiles this information from approved State plans.

*Medicaid Reimbursement Data.*
Overall, we used the Medicaid reimbursement data available on the CMS Web site from the State Drug Utilization Files. At the time of our analysis, this data had been last updated in February 2005. The most recent national data included reimbursement by NDC for the first two quarters of calendar year 2004 (i.e., January 1 through June 30, 2004). We used this data to define our population of Medicaid-reimbursed drugs, to calculate weighted averages, and to identify the top 200 drugs based on Medicaid expenditures. We recognize that CMS's State Drug Utilization Files may not contain complete drug reimbursement data, but we believe that they are sufficient for purposes of this analysis.

In addition, we used data from the Medicaid Statistical Information System (MSIS) to identify drug reimbursement amounts for Medicaid beneficiaries who are not eligible for Medicare (non-dual eligibles). While total reimbursement amounts were available through June 2004, the most recent MSIS eligibility data to identify non-dual eligibles was from FY 2003 for 38 States with MSIS data. We used this data to calculate weighted averages based on reimbursement for the non-dual eligible population to determine whether the weighted averages would differ when limited to this beneficiary subpopulation compared to the entire Medicaid beneficiary population.

**Analysis**
For our population of Medicaid-reimbursed drugs, we calculated the following ratios by unit prices for all NDCs: (1) AMP to AWP, (2) AMP to WAC, and (3) WAC to AWP. For each set of price comparison ratios, we calculated the median, average, weighted average, range, and interquartile range. The weighted average "weights" each NDC according to Medicaid expenditures, i.e., the differences between prices for NDCs with higher Medicaid expenditures count more in the weighted average than NDCs with lower Medicaid expenditures. The interquartile range measures the difference between the 25th and 75th percentile of the distribution, i.e., the middle 50 percent of the distribution. Appendix C provides the ranges and interquartile ranges. We made these comparisons for the overall population of Medicaid-

reimbursed drugs as well as for each drug category, i.e., single source brands, multisource brands, and generic drugs.

We also conducted this analysis for a subset of drugs with the highest Medicaid expenditures. Specifically, we analyzed pricing data for the top 200 NDCs by Medicaid expenditures in 2004 for each of 3 categories.

For State EAC formulas, we calculated the median, mode, and range of percent discounts for the 49 States that use AWP in their formula. We made calculations specific to brand name drugs and generic drugs because seven States have separate formulas for each. We also calculated the median, mode, and range of percent markups of WAC for the eight States that use WAC in their formulas. These States do not distinguish brand name versus generic drugs in their WAC-based formulas.

This analysis focuses on the comparison of a sales-based price to the published prices associated with the drug itself (i.e., the "ingredient cost"). It does not address the professional costs associated with dispensing the drug nor the dispensing fees paid by State Medicaid agencies in addition to their estimates of pharmacy acquisition cost.

**Limitations**

We intend this inspection to provide information that is useful to those who are considering changing the basis of Medicaid reimbursement from a published price to a price based on actual sales. However, our analysis compares price points and not actual reimbursements. It is a theoretical analysis that is useful to estimate the impact of such a reimbursement change, but it does not measure the actual impact of such a change for three main reasons. First, States do not always reimburse at the amount that their EAC formulas would predict.[24] Second, our analysis does not capture the full complexity of Medicaid reimbursement, which can include tiered EAC formulas as well as other price points (i.e., usual and customary charge, FUL amounts, and State MAC amounts). Third, we are comparing published prices and State EAC formulas to AMP. However, if the basis of Medicaid reimbursement were changed to AMP, it would likely be AMP plus a markup percentage. For example, Medicare Part B moved to a sales-based price (i.e., ASP) and reimburses at ASP plus 6 percent.

**Standards**

This inspection was conducted in accordance with the "Quality Standards for Inspections" issued by the President's Council on Integrity and Efficiency.

 **F I N D I N G S**

**Average manufacturer price is substantially lower than both average wholesale price and wholesale acquisition cost**

For Medicaid-reimbursed drugs, AMP is substantially lower than either of the published prices, namely, AWP and WAC. The AMP is also lower than State estimates of pharmacy acquisition costs, which incorporate AWP and WAC.

**At the median, AMP is equal to AWP minus 59 percent; in contrast, States' median estimated acquisition cost formula is AWP minus 12 percent.**
At the median of over 24,000 Medicaid-reimbursed NDCs, AMP is 59 percent lower than AWP. To illustrate this 59 percent difference, for one NDC the AMP is $1.07 per pill, while the AWP is $2.61 per pill for the same drug. The median AWP-based State EAC formula is AWP minus 12 percent. This median State EAC formula would estimate pharmacy acquisition cost at $2.30 per pill for this same NDC.

Forty-nine States estimate pharmacy acquisition cost using AWP minus a discount percentage. However, even with the discount percentage, AMP is still lower than these States' estimates of pharmacy acquisition cost. The AWP minus 12 percent is the median and is also the most common EAC formula based on AWP.

For 98 percent of Medicaid-reimbursed NDCs, the median State EAC formula based on AWP results in reimbursement amounts higher than AMP. In other words, AMP is less than AWP minus 12 percent for these NDCs. Conversely, for 2 percent of NDCs, the median State EAC formula would reimburse at a price below AMP.

_The relationship between AMP and AWP does not change when claims for dual eligibles are excluded._ In 2006, the drug coverage for beneficiaries who are eligible for both Medicare and Medicaid (i.e., dual eligibles) will be transferred from Medicaid to Medicare Part D. Thus, we explored whether this shift would impact the relationship between AMP and AWP. We compared the average difference between AMP and AWP accounting for Medicaid reimbursement for all beneficiaries to the average difference accounting for reimbursement claims for non-dual eligibles only. Despite differences in drug utilization patterns between dual eligibles and non-dual eligibles, the relationship between AMP and AWP did not change when we excluded claims for dual eligibles.[25]

**At the median, AMP is equal to WAC minus 25 percent; in contrast, States' median WAC-based EAC formula is WAC plus 8.5 percent.**
At the median of over 19,000 NDCs, average manufacturer price is equal to WAC minus 25 percent.[26] To illustrate this 25 percent

difference, for one NDC, the AMP is $1.59 per pill, while the WAC is $2.11 per pill. The median State EAC formula (WAC plus 8.5 percent) would estimate pharmacy acquisition cost at $2.29 per pill for this NDC.

Eight States use WAC to estimate pharmacy acquisition cost.[27] All of these States add a percentage markup to the WAC price, ranging from 5 percent to 12 percent. WAC plus 8.5 percent is the median.

For 96 percent of Medicaid-reimbursed NDCs, the median WAC-based State EAC formula results in reimbursement amounts higher than AMP. In other words, AMP is less than WAC plus 8.5 percent for these NDCs. Conversely, for 4 percent of NDCs, the median State EAC formula based on WAC would reimburse at a price below AMP.

*At the median, WAC is 22 percent lower than AWP.* While AMP is considerably lower than both WAC and AWP, the comparisons make it clear that WAC is the lower of the two published prices. This is logical if WAC is meant to represent an earlier point in the distribution chain (prices paid by wholesalers) than AWP (prices paid by retailers). We compared WAC to AWP directly to determine how these published prices relate to one another. For over 99 percent of NDCs, WAC is lower than AWP. At the median, WAC is 22 percent lower than AWP.

**At the median, the AWP and WAC values in the pricing compendium for January 1, 2005, had not been updated in more than 2 years.** At the median, AWP values were last updated 33 months ago, and WAC values were last updated 29 months ago according to First Databank's National Drug Data File.[28] Overall, NDCs with higher Medicaid expenditures were updated more recently. When weighted by Medicaid expenditures, the average timespan since the last AWP update is 14 months; the unweighted average is 43 months.

In comparison, AMP is calculated and reported to CMS each quarter and reflects sales that occurred 6 months prior. As of January 1, 2005, only 8 percent of NDCs had AWP values that were updated within the prior 6 months. However, these 8 percent of NDCs account for almost 37 percent of expenditures because the published prices for higher expenditure NDCs tend to be updated more frequently than the published prices for lower expenditure NDCs. Ten percent of WAC values had been updated within the prior 6 months. Similarly, this 10 percent of NDCs accounted for 37 percent of expenditures.

F I N D I N G S

**Generic drugs exhibit the largest differences between average manufacturer price and the published prices**

When we analyzed the Medicaid-reimbursed NDCs by the three drug categories (single source brands, multisource brands, and generics), we found dramatic differences across the categories.  Generics demonstrated substantially larger differences between AMP and the published prices (AWP and WAC) than either of the brand name drug categories.  Generic drugs comprise 76 percent of the Medicaid-reimbursed NDCs.

**For generic drugs, AMP is 70 percent lower than AWP at the median.**
For generic drugs, AMP is 70 percent lower than AWP at the median.  In comparison, AMP is 23 percent lower than AWP at the median for single source brands and 28 percent lower than AWP for multisource brands.  Table 1 presents the comparisons of AMP to AWP overall and for each drug category.  The values indicate the percentage by which AMP is lower than AWP.

| Table 1.   AMP to AWP Comparisons by Drug Category:  AMP = AWP – X% | | | |
|---|---|---|---|
| | **Median** | **Average** | **Weighted Average*** |
| Single Source Brands 3,527 NDCs | 23% | 25% | 24% |
| Multisource Brands 2,356 NDCs | 28% | 40% | 36% |
| Generics 18,218 NDCs | 70% | 65% | 74% |

Source:  Office of Inspector General, Analysis of Medicaid drug pricing data, 2005.

*Weighted by Medicaid expenditures.

The weighted average indicates that, for generic drugs, the disparity between AMP and AWP is greater for drugs with higher Medicaid expenditures than for drugs with lower Medicaid expenditures.  The weighted average is weighted by Medicaid expenditures (i.e., NDCs with higher Medicaid expenditures count more than those with lower expenditures) and thereby links the price differences with Medicaid reimbursement.   Price and utilization are two important factors that may contribute to this pattern for generics.  On the one hand, as the AWP of a drug increases the reimbursement price based on AWP also

increases, which could drive expenditures higher.  On the other hand, high utilization of a drug can lead to both high expenditures on that drug and increased incentives to inflate AWP for that drug.

Notably, brand name drugs do not exhibit this same pattern.  For brands, the weighted averages are slightly lower than the unweighted averages.  This indicates that overall the disparities between AMP and AWP are not larger for brand name drugs with higher expenditures compared to brand name drugs with lower expenditures.

This is especially true for the top 200 generic drugs by Medicaid expenditures.  In this subset, AMP is 78 percent lower than AWP at the median.  In comparison, AMP is 23 percent less than AWP for the top 200 single source brands, and 28 percent less than AWP for the top 200 multisource brands.  Table 2 displays these comparisons.  The values indicate the percentage by which AMP is lower than AWP.

| Table 2.  AMP to AWP Comparisons for Top 200 NDCs by Medicaid Expenditures:  AMP = AWP – X% | |
| --- | --- |
|  | **Median** |
| Top 200 NDCs:  Single Source Brands | 23% |
| Top 200 NDCs:  Multisource Brands | 28% |
| Top 200 NDCs:  Generics | 78% |

Source:  Office of Inspector General, Analysis of Medicaid drug pricing data, 2005.

*State estimates of pharmacy acquistion cost exceed AMP even among States with additional discounts for generics.*  Of the 49 States that use EAC formulas based on AWP, 7 States specify a greater discount off of AWP for generic drugs than for brand name drugs.  Among these seven States, the EAC formulas for generic drugs range from AWP minus 20 percent to AWP minus 50 percent.  Even with these greater discounts, the median AMP (equal to AWP minus 70 percent) remains lower than States' estimated acquisition costs for generic drugs.  Table 3 (on the next page) provides a summary of State EAC formulas for all 49 States that use AWP as well as the separate generic EAC formulas specified by 7 of these States.

F I N D I N G S

| Table 3.  State Estimated Acquisition Cost Formulas Based on AWP | | | |
|---|---|---|---|
| **State EAC Formula** | **Median** | **Mode** | **Range** |
| All States' formulas (49 States) | AWP - 12% | AWP - 12% | AWP - 5% to AWP - 50% |
| Generic-specific formulas (7 States) | AWP - 27% | AWP - 20% | AWP – 20% to AWP - 50% |

Source:  Office of Inspector General, Analysis of State estimated acquisition cost formulas, 2005.

**For generic drugs, AMP is 40 percent lower than WAC at the median.**
The differences between AMP and WAC are also much greater for generic drugs than either of the two brand name drug categories.  For generics, AMP is equal to WAC minus 40 percent at the median.  In comparison, AMP equals WAC minus 4 percent at the median for single source brands and WAC minus 8 percent for multisource brands.  Table 4 presents the comparisons of AMP to WAC overall and for each drug category.  The values indicate the percentage by which AMP is lower than WAC.

| Table 4.  AMP to WAC Comparisons by Drug Category:  AMP = WAC – X% | | | |
|---|---|---|---|
| | **Median** | **Average** | **Weighted Average*** |
| Single Source Brands 3,502 NDCs | 4% | 7% | 6% |
| Multisource Brands 2,116 NDCs | 8% | 19% | 20% |
| Generics 13,857 NDCs | 40% | 39% | 59% |

Source:  Office of Inspector General, Analysis of Medicaid drug pricing data, 2005.

* Weighted by Medicaid expenditures.

Again, generic drugs with higher Medicaid expenditures demonstrate larger differences between AMP and WAC than generics with lower expenditures.  The weighted average difference between AMP and WAC is greater than the unweighted average (59 percent compared to 39 percent) for generics.  In contrast, for brand name drugs the

F I N D I N G S

disparity between AMP and AWP is not larger for the drugs with higher expenditures compared to the drugs with lower expenditures.

The top 200 generic drugs by Medicaid expenditures illustrate this point, as this subset shows a greater disparity between AMP and WAC than the full population of Medicaid-reimbursed generic NDCs.  For the top 200 generics, AMP is equal to WAC minus 59 percent at the median, compared to WAC minus 40 percent at the median for all Medicaid-reimbursed generics.

*AMP is much lower than WAC-based State EAC formulas for generic drugs compared to brand name drugs.*  Eight States use WAC to estimate pharmacy acquisition cost.  None specify a lower WAC-based formula for generic drugs compared to brand name drugs.  These State EAC formulas all include a percentage markup of WAC, ranging from WAC plus 5 percent to WAC plus 12 percent.  Table 5 summarizes these formulas.

| Table 5.  State Estimated Acquisition Cost Formulas Based on WAC | | | |
|---|---|---|---|
| **State EAC formula** | **Median** | **Mode** | **Range** |
| All Drugs (8 States) | WAC + 8.5% | WAC + 5% | WAC + 5% to WAC + 12% |

Source:  Office of Inspector General, Analysis of State estimated acquisition cost formulas, 2005.

The median AMP is lower than these EAC formulas for all three drug categories.  However, this difference is greatest among the generic drugs.  For generics, AMP is equal to WAC minus 40 percent at the median, while State estimated acquisition costs equal WAC plus a markup of 5 to 12 percent.

 C O N C L U S I O N

The Administration and Congress have expressed interest in changing Medicaid drug reimbursement to align more closely with pharmacy acquisition cost by using prices based on actual sales rather than the published prices currently used.  OIG has conducted numerous reviews of Medicaid drug reimbursement and has found that Medicaid drug reimbursements exceed pharmacies' actual acquisition costs and exceed prices paid by other Federal programs.  OIG has recommended that Medicaid should base reimbursement on pricing data that more accurately reflects actual acquisition costs.

This inspection provides additional evidence that published prices are higher than prices based on actual sales transactions.  We found that AMP, which is calculated based on statute and actual sales transactions, is substantially lower than either of the published prices (i.e., AWP and WAC).  As a result, States' estimates of pharmacy acquisition costs, which are based on AWP and/or WAC, are also substantially higher than AMP.  The differences between AMP and the published prices were especially large for generic drugs.

Our companion report, "Medicaid Drug Price Comparison:  Average Sales Price to Average Wholesale Price" (OEI-03-05-00200), found similar results when comparing ASP, the statutorily defined price used for Medicare reimbursement, to AWP.  That analysis demonstrated that ASP is substantially lower than AWP for the drugs covered by both Medicaid and Medicare Part B.

We intend this inspection to provide useful information to those considering the implications of changing Medicaid's drug reimbursement methodology.  The substantial disparities between prices based on actual sales (AMP and ASP) and the published prices currently being used indicate that changing the basis of Medicaid reimbursement could have a significant impact on Medicaid expenditures.

### Agency Comments

CMS commented that these companion reports make clear that current Medicaid payment rules result in overpayments for drugs and emphasize the need for reform.  Similar problems with overpayments for Medicare drugs led to passage of the MMA provisions that changed the basis of reimbursement for drugs from AWP to ASP.  CMS reiterated that the President's 2006 budget proposes to solve this problem by the use of ASP so Medicaid drug prices will reflect actual

costs.  CMS stated that Congress should enact legislation to ensure that Medicaid payment for drugs is related to actual prices paid by pharmacies.  The full text of CMS's comments is provided in Appendix D.

 E N D   N O T E S

[1] Testimony of Dennis Smith, Director of the Center for Medicaid and State Operations, Centers for Medicare & Medicaid Services, on Medicaid Prescription Drug Reimbursement before the House Energy and Commerce Subcommittee on Oversight and Investigations, December 7, 2004.

[2] Centers for Medicare & Medicaid Services. "2003 CMS Statistics." Available online at www.cms.hhs.gov/researchers/pubs/03cmsstats.pdf.

[3] Centers for Medicare & Medicaid Services. "A Strategy for Transitioning Dual Eligibles from Medicaid to Medicare Drug Coverage." May 2, 2005. Available online at http://www.cms.hhs.gov/medicarereform/strategyforduals.pdf.

[4] Ibid.

[5] United States House of Representatives Committee on the Budget. "Analysis of the President's Budget for FY 2006." Available online at http://www.house.gov/budget/analysisprez021105.pdf.

[6] Testimony transcript available online at http://www.oig.hhs.gov/testimony/docs/2004/reeb120704.pdf.

[7] Federal Register Notice. Medicaid Program; Establishment of the Medicaid Commission and Request for Nominations for Members. CMS-2214-N.

[8] Available online at www.ncsl.org and www.nga.org.

[9] Office of Inspector General reports: "Variations in State Medicaid Drug Prices," OEI-05-02-00681, issued September 2004; "Medicaid Pharmacy—Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products," A-06-02-00041, issued September 2002; "Cost Containment of Medicaid HIV/AIDS Drug Expenditures," OEI-05-99-00611, issued July 2001.

[10] Centers for Medicare & Medicaid Services State Medicaid Manual, Part 6.  Available online at http://63.241.27.79/manuals/45_smm/sm_06_6000_to_6400.3.asp.

[11] Centers for Medicare & Medicaid Services State Medicaid Manual, Part 6.  Available online at http://63.241.27.79/manuals/45_smm/sm_06_6000_to_6400.3.asp.

[12]  42 CFR § 447.332.

[13] Centers for Medicare & Medicaid Services.  "Medicaid Prescription Reimbursement by State, Quarter Ending March 2005."  Available at: http://www.cms.hhs.gov/medicaid/drugs/pre0305.pdf.

[14] Centers for Medicare & Medicaid Services State Medicaid Manual, Part 6.

[15] Centers for Medicare & Medicaid Services. "Medicaid Prescription Reimbursement by State, Quarter Ending March 2005."

[16] Three other drug price compendia are Multim, Gold Standard, and Red Book.

[17] Public Law 108-173, Section 303(c)6(B).

[18] Budget of the United State Government, Fiscal Year 2006.  Available online at http://www.whitehouse.gov/omb/budget/fy2006.

[19] 42 U.S.C. § 1396r-8(k)(1).

[20] Ibid.

[21] Government Accountability Office.  "Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States."  GAO-05-102.  February, 2005.

[22] 42 CFR § 414.804(a).

[23] Office of Inspector General.  "Variation in State Medicaid Drug Prices."  OEI-05-02-00681.  September 2004.

[24] Ibid.

[25] We compared the weighted average price differences based on all claims to weighted averages based on claims for non-dual eligibles only and found no difference. Weighting by expenditures on non-dual eligibles only, AMP is 33 percent lower than AWP on average. Likewise, weighting by expenditures on the full Medicaid population, AMP is 33 percent lower than AWP on average.

[26] Only 19,475 of the 24,101 NDCs included in the AMP to AWP analysis had WAC values listed in the pricing compendium.

[27] Six of these States use WAC in combination with AWP, e.g., "the lesser of AWP minus 12 percent or WAC plus 8 percent."

[28] We rounded to the nearest full month increment. List prices can be updated at any time including multiple times within a month.



A P P E N D I X  ~  A

## KEY TERMS AND ACRONYMS, DRUG DISTRIBUTION CHART

---

**Box 1:  KEY TERMS AND ACRONYMS**

**Average manufacturer price (AMP)**:  The average unit price paid to manufacturers by wholesalers for drugs distributed to the retail class of trade minus customary promt pay discounts.  The AMP is statutorily defined and calculated from actual sales transactions. Manufacturers must report AMP to CMS quarterly for the Medicaid drug rebate program.

**Average wholesale price (AWP)**:  A price published in national drug pricing compendia issued by private companies such as First Databank and Medi-Span, based on pricing information provided by manufacturers.  Its calculation is not defined in statute or regulation.  It is generally considered a price for retailers.

**Estimated acquisition cost (EAC)**:  The State Medicaid agency's "best estimate" of the price generally and currently paid by providers for the drug.  Within Federal parameters, each State establishes its own EAC formula in its State plan.

**Multisource brand drugs**:  Innovator multisource drugs.  Brand name drugs that have generic equivalents.

**National drug code (NDC)**:  The 11-digit code that Medicaid uses to identify unique formulations of each drug, including the manufacturer, strength, and package size.

**Generic drugs**:  Non-innovator multisource drugs.

**Single source brand drugs**:  Single source drugs.  Brand name drugs that have no generic equivalents.

**Wholesale acquisition cost (WAC)**:  A price published in national drug pricing compendia issued by private companies such as First Databank and Medi-Span.  It is now statutorily defined as the manufacturer's list price for the drug to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, as reported in wholesale price guides or other publications of drug pricing data.

A P P E N D I X ~ A

The following chart is a simplified depiction of a typical Medicaid drug distribution chain meant to illustrate the relationships among the various drugs prices. It is not meant to capture the full complexity of the drug distribution chain.

**Chart 1.  Medicaid Drug Distribution Chain Example**





## A P P E N D I X ~ B

### ADDITIONAL DATA POPULATIONS: MEDICAID-COVERED DRUGS

In addition to Medicaid-reimbursed drugs, we analyzed the price comparisons for the population of Medicaid-covered drugs, including those with no reimbursement from January 1 through June 30, 2004. The population of Medicaid-covered drugs includes 28,557 NDCs, while Medicaid-reimbursed drugs includes 24,101 NDCs.

We found similar patterns of price differences between AMP and the published prices for Medicaid-covered drugs as compared to Medicaid-reimbursed drugs. For Medicaid-covered drugs, AMP is 57 percent lower than AWP at the median, compared to 59 percent for Medicaid-reimbursed drugs. The AMP is 24 percent lower than WAC for Medicaid-covered drugs and    25 percent lower than WAC for Medicaid-reimbursed drugs. Table 6 displays these results.

| Table 6. Medicaid-covered drugs vs. Medicaid-reimbursed drugs | | |
|---|---|---|
| | AMP = AWP – X%<br>Median | AMP = WAC – X%<br>Median |
| Medicaid-covered Drugs | 57% | 24% |
| Medicaid-reimbursed Drugs | 59% | 25% |

Source: Office of Inspector General, Analysis of Medicaid drug pricing data, 2005.



### A P P E N D I X  ~  C

## ADDITIONAL MEASURES:  RANGES AND INTERQUARTILE RANGES

In addition to the median, average, and weighted average, we calculated the range and interquartile range for each price comparison.  While the range measures the difference between the two ends of a distribution, the interquartile range measures the difference between the 25th and 75th percentile of the distribution, i.e., the middle 50 percent of the distribution.  Table 7 displays these measures for the AMP to AWP comparsions, and Table 8 displays results of comparing AMP to WAC.

| Table 7.  AMP to AWP Comparisons:  AMP = AWP – X% | | |
|---|---|---|
| | **Range\*** | **Interquartile Range** |
| All Medicaid-reimbursed Drugs<br>24,101 NDCs | 0% to 98% | 28% to 83% |
| Single Source Brands<br>3,527 NDCs | 0% to 65% | 22% to 27% |
| Multisource Brands<br>2,356 NDCs | 0% to 96% | 22% to 56% |
| Generics<br>18,218 NDCs | 0% to 98% | 47% to 87% |

Source:  Office of Inspector General, Analysis of Medicaid drug pricing data, 2005.

\* We excluded 3 percent of NDCs at the high and low ends of the distribution.  See methodology for details.

| Table 8.  AMP to WAC Comparisons:  AMP = WAC – X% | | |
|---|---|---|
| | **Range\*** | **Interquartile Range** |
| All Medicaid-reimbursed Drugs<br>19,475 NDCs | (-869%) to 98% | 4% to 57% |
| Single Source Brands<br>3,502 NDCs | (-28%) to 57% | 2% to 9% |
| Multisource Brands<br>2,116 NDCs | (-86%) to 95% | 2% to 29% |
| Generics<br>13,857 NDCs | (-869%) to 98% | 14% to 64% |

Source:  Office of Inspector General, Analysis of Medicaid drug pricing data, 2005.

\* A negative difference indicates an AMP value greater than WAC.  This occurred for 9 percent of NDCs.

▶ A P P E N D I X  ~  D

## AGENCY COMMENTS



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

**DATE:**      JUN 21 2005

**TO:**        Daniel R. Levinson
              Acting Inspector General

**FROM:**      Mark B. McClellan, M.D., Ph.D.
              Administrator
              Centers for Medicare & Medicaid Services

**SUBJECT:**   OIG Draft Reports: *"Comparison of Medicaid Federal Upper Limit
              Amounts to Average Manufacturer Prices,"* (OEI-03-05-00110);

              *"Medicaid Drug Price Comparison: Average Sales Price to Average
              Wholesale Price,"* (OEI 03-05-00200); and

              *"Medicaid Drug Price Comparison: Average Manufacturer Price to
              Average Wholesale Price,"* (OEI-05-05-00240)

Thank you for the opportunity to review and comment on the Office of Inspector
General's (OIG) draft reports entitled *"Comparison of Medicaid Federal Upper Limit
Amounts to Average Manufacturer Prices,"* *"Medicaid Drug Price Comparison:
Average Sales Price to Average Wholesale Price,"* and *"Medicaid Drug Price
Comparison: Average Manufacturer Price to Average Wholesale Price."* The first OIG
report addresses how prices for drugs set under the Medicaid Federal Upper Limit (FUL)
program compare to reported average manufacturer prices (AMP), and estimates
potential savings if FUL amounts were based on reported AMPs. The latter two reports
compare how prices that most states currently use to set Medicaid reimbursement,
average wholesale price (AWP), and wholesale acquisition cost (WAC), compare to
statutorily defined prices based on actual sales transactions, i.e., average sales price
(ASP) and AMP.

The OIG reports make clear that the current payment rules result in overpayments for
drugs and emphasize the need for reform. The President's 2006 budget proposes to solve
this problem by the use of average sales prices (ASP) so Medicaid drug prices will reflect
actual costs.

### OIG Recommendation
CMS should work with Congress to set Medicaid drug reimbursement amounts that more
closely approximate pharmacy acquisition cost.

A P P E N D I X ~ D

Page 2 – Daniel R. Levinson

**CMS Response**

We concur with the OIG that the Congress needs to address drug prices paid by Medicaid to more closely relate Medicaid reimbursement to actual transaction prices.

Federal regulation (42 CFR 447.332) requires the FUL amount to be 150 percent of the published price for the least costly therapeutic equivalent using data from all available national compendia. The FUL system selects the lowest price of AWP, WAC, or direct price (DP), as reported by the national compendia to arrive at the FUL price.

States reimburse pharmacies for single source drugs at the lower of Estimated Acquisition Cost (EAC), or the pharmacy's usual and customary charge (UCC) to the general public. EAC is based on the state's reimbursement formula, generally AWP minus a percentage or WAC plus a percentage.

Neither AWP nor WAC is related to the market price of drugs. Rather, they are prices based on reports by manufacturers. Manufacturers often report inflated prices in order to increase the profit for pharmacies and, thereby, encourage pharmacies to dispense their product. State Medicaid Agencies need information on market prices in order to set appropriate payment rates. The President has proposed in the fiscal year 2006 budget to require drug manufacturers to report ASP for drugs and to cap Federal matching for drug expenditures, in the aggregate, to ASP plus 6 percent.

**OIG Findings**

Overall, FUL prices were five times higher than the average AMPs for generic drug products in the third quarter of 2004. If Medicaid based FUL amounts on 150 percent of the average AMP instead of the compendia prices, the program could have saved an estimated $161 million in the third quarter of 2004.

For the comparison of AMP to compendia price, AMP is substantially lower than both AWP and WAC for all National Drug Codes (NDCs) reviewed. The median price comparison for all evaluated drugs was that AMP is equal to AWP – 59 percent and AMP is equal to WAC - 25 Percent. Generic drugs exhibited the largest differences between AMP and the list prices – The median price comparison for generic drugs was AMP is equal to AWP - 70 percent and AMP is equal to WAC – 40 percent. States' median AWP based estimated acquisition cost is AWP – 12 Percent. States' median WAC based estimated acquisition cost is WAC plus 8.5 percent.

For the comparison of ASP to compendia price, ASP is substantially lower than AWP and WAC for all NDCs reviewed. For 2,077 NDCs with ASP and AWP data, ASP is equal to AWP – 49 percent. The difference between ASP and AWP was greatest for generic drugs. For 1,152 generic NDCs, ASP is equal to AWP – 68 Percent.

A P P E N D I X ~ D

Page 3 – Daniel R. Levinson

## CMS Response/Conclusion

These reports provide additional supportive evidence that when published compendia prices are used as a basis for Medicaid drug reimbursement, Medicaid payment greatly exceeds actual acquisition cost. Legislation would be needed to define a price that manufacturers must report that can be used as a basis for state Medicaid agencies to set pharmacy payment.

In the fiscal year 2006 budget, the President proposed to require drug manufacturers to report the ASP for each drug and to cap Federal payment at an aggregate level to ASP plus 6 percent. As long as states must rely on prices that are not based on true prices paid to manufacturers, states have no means to set appropriate payment amounts. Current WACs and AWPs are greatly inflated and this inflation is encouraged by setting Medicaid payment in relation to these inflated prices. Requiring manufacturers to report true prices and to limit Medicaid payment to a reasonable amount above these prices will eliminate the opportunity for manufacturers and pharmacies to gain through the reporting of inflated prices, yield substantial state and Federal government savings, and retain flexibility for states to set prices for individual drugs as they find appropriate within the overall cap.

Prior to 2005, Medicare also used AWP as the basis for Part B drug reimbursement. However, numerous studies by the OIG and the Government Accountability Office, (GAO), indicated that Medicare's reimbursement rate was significantly higher than the prices that drug manufacturers and wholesalers actually charged physicians and suppliers who purchased these drugs. Consequently, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) changed the basis of reimbursement for prescription drugs from AWP to ASP. Congress should now enact similar legislation to ensure that Medicaid payment for drugs is related to actual prices paid by pharmacies.

► A C K N O W L E D G M E N T S

This report was prepared under the direction of William C. Moran, Regional Inspector General for Evaluation and Inspections in the Chicago regional office, and Ann Maxwell, Assistant Regional Inspector General.  Other principal Office of Evaluation and Inspections staff who contributed include:

Erin Lemire, *Project Leader*

Tom Komaniecki, *Senior Program Analyst*

Louise Schoggen, *Intern*

Linda Boone Abbott, *Program Specialist*

Tricia Davis, *Director, Medicare and Medicaid Branch*

Technical Assistance

Scott Horning, *Program Analyst*

# EXHIBIT B

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of Inspector General

# Memorandum

Date        NOV 16 1992

From        Bryan B. Mitchell   *Bryan Mitchell*
            Principal Deputy Inspector General

Subject     Medicaid Drug Rebates:  The Health Care Financing Administration Needs to
            Provide Additional Guidance to Drug Manufacturers to Better Implement the
To          Program (A-06-91-00092)

            William Toby, Jr.
            Acting Administrator
            Health Care Financing Administration


            The attached final management advisory report is to provide you with the results of
            our review of the need for the Health Care Financing Administration (HCFA) to
            provide additional guidance to drug manufacturers to better implement the rebate
            program.  This report is part of a series of reviews we have underway concerning
            the Medicaid drug rebate program.

            We reviewed the average manufacturer price (AMP) and best price calculation
            policies of four major U.S. drug manufacturers.  Although we found that best price
            determinations were acceptable, manufacturers' calculations of AMP were
            inconsistent.  We found major variations in the methods used by manufacturers to
            determine AMP.  The variations occurred because HCFA has not provided
            instructions in sufficient detail to manufacturers on acceptable methods for
            calculating AMP.  Accordingly, we were unable to evaluate the acceptability of the
            AMP calculations.

            The calculation method used impacts on the AMPs, the resulting rebates, and the
            accuracy of the pricing information provided to HCFA.  Additionally, the
            manufacturers can be adversely impacted because of the lack of specific
            instructions for computing AMP.  Those manufacturers that attain a high degree of
            accuracy in computing AMPs will incur higher administrative costs than those that
            do not.  This is not equitable to the manufacturers and affects the reliability,
            consistency, and integrity of the AMP data.

            We also found major differences in the manufacturers' policies on the Office of
            Inspector General's (OIG) right of access to company records and the length of
            time records relating to drug rebates are retained.  Again, these differences
            occurred because HCFA has not provided specific instructions to manufacturers
            regarding access to or retention of rebate records.

Page 2 - William Toby, Jr.

We are recommending that HCFA: (1) survey drug manufacturers to identify the various calculation methods being used to develop the AMP and (2) provide more specific policies based on the survey results for calculating AMP which would protect the interests of the Government and which would be equitable and the least burdensome to the manufacturers. We are also recommending that HCFA establish records access and retention requirements for the drug manufacturers.

The HCFA did not concur with our recommendations regarding manufacturers' AMP calculations. However, HCFA was not responsive to the issues raised in our report. The HCFA took the position that the drug rebate law and the rebate agreements have already established a methodology for computing AMP. We disagree. The law and rebate agreements define AMP in very broad terms but do not provide a specific methodology for ensuring uniform and accurate calculations of AMP by the manufacturers. Although HCFA stated that it has responded to many written requests on AMP calculations, there is nothing in writing that further defines how AMP should be computed. The variations we found at the manufacturers showed that the AMP definition is subject to considerable interpretation and that HCFA needs to establish specific written policies for computing AMP.

The HCFA stated that it has undertaken numerous activities since the enactment of the law to assure uniform and correct AMP calculations. For example, HCFA believes that with its guidance, manufacturers have increasingly been able to correctly compute AMP. However, HCFA's comments did not specify how AMP should be calculated or how the variations we found at the manufacturers should be handled.

The HCFA concurred, in part, with our recommendation for the OIG and other oversight authorities to have unrestricted access to manufacturers' records but stated that it must consider the confidentiality provisions of the manufacturers. We believe that current law and OIG policy protects the rights of the manufacturers.

The HCFA is proposing a 3-year record retention period which is in agreement with the recommendation in our final report.

If you have any questions, please call me or have your staff contact George M. Reeb, Assistant Inspector General for Health Care Financing Audits at (410) 966-7104. We would appreciate receiving your comments within 60 days from the date of this memorandum.

Attachment

# Department of Health and Human Services

# OFFICE OF INSPECTOR GENERAL

## MEDICAID DRUG REBATES:
## THE HEALTH CARE FINANCING ADMINISTRATION NEEDS TO PROVIDE ADDITIONAL GUIDANCE TO DRUG MANUFACTURERS TO BETTER IMPLEMENT THE PROGRAM



NOVEMBER 1992    A-06-91-00092



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of Inspector General

# Memorandum

Date    NOV 1 6 1992

From    Bryan B. Mitchell
        Principal Deputy Inspector General

Subject
        Medicaid Drug Rebates:  The Health Care Financing Administration Needs to Provide
        Additional Guidance to Drug Manufacturers to Better Implement the Program
To      (A-06-91-00092)

        William Toby, Jr.
        Acting Administrator
        Health Care Financing Administration


This final management advisory report provides you with the results of our review of
selected drug manufacturers' methods used to determine average manufacturer prices
(AMP) and best prices under the Medicaid drug rebate program.  The AMP
calculations and best price are critical components of the rebate program.  This report is
one of a series of reports on the Medicaid drug rebate program that we have issued or
will be issuing to you in the near future.

The objectives of our review were to evaluate the methods used by selected
manufacturers to determine AMP and best price and verify the accuracy of pricing
information supplied to the Health Care Financing Administration (HCFA) for use in
calculating manufacturer rebates.  We will also be issuing, under separate cover, an
audit guide to HCFA for use in having audits of manufacturers performed.

Although we found that best price determinations were acceptable, manufacturers'
calculations of AMP were inconsistent.  We
found major variations in the methods used by
manufacturers to determine AMP.  For
example:  (1) one manufacturer based the
calculations on gross sales to wholesalers,
(2) two manufacturers based the calculations
on net sales to wholesalers, and (3) one
manufacturer specifically identified sales at the retail level for its calculations.  These
variations occurred because HCFA has not provided sufficiently detailed instructions to
manufacturers on acceptable methods for calculating AMP for drugs distributed to
retail pharmacies.  Accordingly, we were unable to evaluate the acceptability of the
AMP calculations.

> **MANUFACTURERS NEED MORE
> SPECIFIC INSTRUCTIONS FOR
> CALCULATING AMP**

The calculation method used impacts on the AMPs, the resulting rebates, and the
accuracy of the pricing information provided to HCFA.  Additionally, the manufacturers
can be adversely impacted because of the lack of specific instructions for computing

Page 2 - William Toby, Jr.

AMP. Those manufacturers that attain a high degree of accuracy in computing AMPs will incur higher administrative costs than those that do not. This is not equitable to the manufacturers and affects the reliability, consistency, and integrity of the AMP data provided to HCFA for computing rebate amounts.

We also found major differences in the manufacturers' policies as to the Office of Inspector General's (OIG) right of access to company records and the length of time records relating to drug rebates should be retained. These differences occurred because HCFA has not provided specific instructions to manufacturers regarding access to or retention of rebate records. These policy differences could impact on the ability to conduct future audits of drug manufacturers.

We are recommending that HCFA: (1) survey other manufacturers to identify the various calculation methods used to determine AMP, (2) develop and disseminate to interested parties a more specific policy based on the survey results for calculating AMP which would protect the interests of the Government and which would be equitable to the manufacturers, (3) establish requirements which provide for unrestricted access by Federal oversight agencies to manufacturers' records which pertain to the drug rebate program, and (4) establish requirements which direct drug manufacturers to retain rebate records for a period of 3 years which is consistent with other record retention requirements of Medicaid.

In its September 3, 1992 reply to our draft report, HCFA stated that it did not concur with our recommendations regarding manufacturers' AMP calculations. However, HCFA was not responsive to the issues raised in our report. The HCFA contended that the drug rebate law and the rebate agreements had already established a methodology for computing AMP. We disagree. The law and rebate agreements defined AMP in very broad terms but did not provide a specific methodology which ensured uniform and accurate calculations of AMP by the manufacturers. Although HCFA stated that it has responded to many written requests on AMP calculations, HCFA did not provide anything in writing to us that further defines how AMP should be computed. The variations we found at the manufacturers showed that the AMP definition is subject to considerable interpretation and that HCFA needs to establish specific written policies for computing AMP.

The HCFA stated that it has undertaken numerous activities since the enactment of the law to assure uniform and correct AMP calculations. For example, HCFA believes that with its guidance manufacturers have increasingly been able to correctly compute AMP. However, HCFA's comments did not specify how AMP should be calculated or how the variations we found at the manufacturers should be handled.

Page 3 - William Toby, Jr.

The HCFA concurred, in part, with our recommendation for the OIG and other oversight authorities to have unrestricted access to manufacturers' records but stated that it must consider the confidentiality provisions of the manufacturers. We believe that current law and OIG policy protects the rights of the manufacturers.

The HCFA is proposing a 3-year record retention period which is in agreement with the recommendation in our final report. See page 12 of this report for a more complete discussion of HCFA's comments and the OIG's response to the comments. The complete text of the Acting Administrator's comments is included as Appendix A.

## BACKGROUND

On November 5, 1990, the Congress enacted legislation (effective January 1, 1991) to require drug manufacturers to pay States rebates for outpatient prescription drugs through a drug rebate program. This legislation, section 4401 of the Omnibus Budget Reconciliation Act of 1990 (OBRA '90), added a new section 1927 to the Social Security Act which requires drug manufacturers to enter into and comply with rebate agreements with the Secretary in order for States to receive Federal financial participation for a manufacturer's covered outpatient drugs. Responsibility for the rebate program is shared among the drug manufacturers, HCFA, and the States.

Drug manufacturers are required to provide a listing to HCFA of all covered outpatient drugs. In addition, the manufacturers are required to report their AMP to HCFA for each covered outpatient drug for a base period. Then, on a quarterly basis, the manufacturers report the AMP and the best price for each covered outpatient drug to HCFA.

The HCFA calculates a unit rebate amount for each drug based on the AMP and best price data from the manufacturers and the applicable Consumer Price Index-Urban (CPI-U). The unit rebate amount is the per unit (i.e. per pill) dollar value that should be paid by the manufacturer to the States for each unit of a specifically dispensed drug. It consists of two elements: (1) a basic rebate amount (payable on all covered outpatient drugs) and (2) an additional rebate amount applicable to single source or innovator drugs (the amount by which the increase in the AMP exceeds the increase in the CPI-U from the base period to the month before the calendar quarter of the rebate).

The unit rebate amounts are provided by HCFA to the States to be used to calculate the actual rebate amounts owed by each manufacturer. The States are responsible for maintaining the number of units of each drug that is dispensed (drug utilization data) by manufacturer for each covered drug. The States multiply the unit rebate amounts by the number of units dispensed to determine the actual rebate amounts due from a manufacturer.

Page 4 - William Toby, Jr.

## METHODOLOGY

The objectives of our review were to: (1) evaluate the methods used by selected manufacturers to determine AMP and best price and (2) verify the accuracy of pricing information supplied to HCFA by the drug manufacturers.

We conducted on-site reviews at three major drug manufacturers which elected to participate in the Medicaid drug rebate program. We selected the first manufacturer because it supplied innovator brand name products. We selected the second manufacturer because it supplied generic or multiple source products and the third was selected because it supplied both brand name and generic products and marketed a number of products in cream, ointment, and liquid forms. Our selection of manufacturers was based on our analysis of HCFA's "Combined Baseline and Quarterly Pricing Reports." We also obtained information on another major manufacturer that voluntarily supplied us with information on its pricing policies for the drug rebate program. We did not perform an on-site review or independently verify the information obtained from the fourth manufacturer.

Section 1927 (b)(3)(D) of the Social Security Act, as added by OBRA '90, prohibits the Secretary from disclosing prices charged by the manufacturer or the identity of the manufacturers reviewed. Therefore, we are not disclosing the names or locations of the manufacturers reviewed.

To accomplish our objectives, we:

- reviewed the provisions of OBRA '90 pertaining to Medicaid covered outpatient drugs under drug rebate agreements with manufacturers.

- reviewed HCFA's Medicaid drug rebate program releases to State Medicaid agencies and participating drug manufacturers.

- reviewed other drug data used in the pricing computation such as HCFA's "Combined Baseline and Quarterly Pricing Reports," drug manufacturers' pricing data including sales journal entries and transactions/trade codes used in calculating base quarter AMP and best price, contracts with buying groups/government agencies, chargeback invoices, and State Medicaid drug rebate billing invoices.

- contacted HCFA personnel, interviewed drug manufacturer officials responsible for administering the prescription drug rebate program, and interviewed State pharmacy consultants involved with the prescription drug program.

Page 5 - William Toby, Jr.

Our review was performed from August to December 1991 at three drug manufacturers and HCFA central office in Baltimore, Maryland.

## RESULTS OF REVIEW

Although we found that best price determinations were acceptable, manufacturers' calculations of AMP were inconsistent. The four drug manufacturers reviewed used three different methods to determine AMP. For example, one manufacturer based its calculations on gross sales to wholesalers, two manufacturers based their calculations on net sales to wholesalers, and one manufacturer specifically identified sales at the retail level for its calculations. These variations occurred because HCFA has not provided sufficiently detailed instructions to manufacturers on acceptable methods for calculating AMP. Accordingly, we were unable to evaluate the acceptability of the AMP calculations. The method used impacts on the AMPs, the resulting rebates, and the accuracy of the pricing information provided to HCFA. Additionally, the manufacturers can be adversely impacted because of the lack of specific instructions for computing AMP. Those manufacturers that attain a high degree of accuracy in computing AMPs will incur higher administrative costs than those that do not. This is not equitable to the manufacturers and affects the reliability, consistency, and integrity of the AMP data.

We also found significant differences among manufacturers' policies on the OIG's right of access to company records and the length of time records relating to drug rebates are retained. These differences occurred because HCFA has not provided specific instructions to manufacturers regarding access to or retention of rebate records. These policy differences could impact on the ability of oversight agencies to conduct future audits of drug manufacturers.

### GUIDANCE NEEDED FOR CALCULATING MANUFACTURERS' AMP

The OBRA '90 legislation defines AMP as the average price which wholesalers pay to manufacturers for drugs distributed to retailers in the United States. Additionally, the rebate agreements between the Secretary of Health and Human Services and individual manufacturers instruct manufacturers to consider the following in computing AMP:

- Exclude direct sales to hospitals, health maintenance organizations, and drug relabelers.

- Exclude Federal supply schedule prices.

- Use cash discounts and all other price reductions.

Page 6 - William Toby, Jr.

### Retail Sales

We interpret OBRA '90 and HCFA's rebate agreements to mean that manufacturers must determine AMP based on the drugs actually distributed to retail pharmacies. However, OBRA '90 and HCFA's rebate agreements do not specify the extent to which a manufacturer should go to identify these drugs. Manufacturers normally sell to wholesalers and are unaware of how many of their products wholesalers actually distribute to retailers.

### Chargebacks

The rebate agreements and HCFA instructions also do not address how "chargebacks" are to be handled in determining AMP. Manufacturers often enter into arrangements with buyers such as hospital groups; whereby, the groups purchase drugs under contract from the manufacturers at prices that are lower than wholesalers' prices. Although a contract is between a manufacturer and a buying group, the buyer actually takes delivery from a wholesaler. Accordingly, the purchase and sale of the drugs go through the wholesaler's books and records. Since the wholesaler's sales price to a buying group is less than the wholesaler actually paid the manufacturer, the wholesaler receives a monetary credit from the manufacturer known as a chargeback. Chargebacks are very common and their treatment impacts the AMP calculations.

### Returns

We believe that the rebate agreements suggest that returns should be considered but do not specify how these should be handled. For example, the price (original or current) at which returns should be valued is not specified. Sales returns are common and can impact on the computation of AMP.

### Different AMP Calculations

In the absence of specific guidance from HCFA, the manufacturers we reviewed have used at least three different methods to determine AMP. The following is a description of each method.

**Gross Sales To Wholesalers.** One manufacturer used its gross selling price to wholesalers with no adjustments to sales in determining its AMPs. We were told that since the manufacturer sells each type of product at the same price to everyone, it did not have to go through mathematical computations in order to arrive at its AMPs. Its AMP would be the same for all classes of trade. In the interest of simplicity, this manufacturer apparently did not attempt to identify its products actually distributed to the retail pharmacy class of trade or adjust for chargebacks.

Page 7 - William Toby, Jr.

The HCFA is opposed to this method for identifying AMPs. A policy directive issued by HCFA on March 21, 1991 contained questions and answers regarding the rebate program. This directive contained the following question and answer:

**Question:** *Can I (manufacturer) send HCFA as the "AMP" my catalogue price for some products? That price would always be higher than my real AMP, so giving you catalogue prices means I'll pay a bigger rebate. But its simply not worth the bother of calculating the "real" AMP for every such product.*

**Answer:** *No. You have to calculate the AMP for every product. The law (at 1927 (k) (1)) specifies how AMP is to be calculated, so HCFA doesn't have latitude to accept other approaches. Anyway, we have to ensure that AMP is computed consistently across the board.*

Section 1927 (k) of the Social Security Act, as added by OBRA '90, provides definition of terms only. It states the following in subsection (1) regarding AMP:

> *The term 'average manufacturer price' means, with respect to a covered outpatient drug of a manufacturer for a calendar quarter, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade.*

We disagree that this requires every manufacturer to calculate AMP on every drug in the same manner. A manufacturer who is willing to provide AMPs, based upon catalog prices as a concession against the burden and costs of calculating actual AMPs, is in effect providing the Medicaid program with the highest AMPs and rebate payments possible. Additionally, the manufacturer who provided the AMPs based on a gross price which is the same for all wholesalers, before considering adjustment for chargeback sales, is providing the Medicaid program with AMPs which seem to be accurate even though it did not specifically identify the sales to the retail class of trade. We believe that HCFA should reevaluate its position.

Although the gross sales approach did not affect the AMPs provided to the Medicaid program for the manufacturer in our review, the gross sales approach could affect the AMPs provided to the Medicaid program if the manufacturers' gross sales figures included sales at varying prices. For illustration purposes, assume that this manufacturer sold 10,000 units of a given product: 3,000 units to wholesaler A at $10 per unit, 3,000 units to wholesaler B at $8 per unit, and 4,000 units to wholesaler C at $6 per unit. The gross AMP should be $7.80 computed as follows:

Page 8 - William Toby, Jr.

| | UNITS SOLD | UNIT PRICE | SALES | |
|---|---|---|---|---|
| WHOLESALER A | 3,000 | $10.00 | $30,000 | $10.00 |
| WHOLESALER B | 3,000 | $8.00 | $24,000 | $8.00 |
| WHOLESALER C | 4,000 | $6.00 | $24,000 | $6.00 |
| Gross Sales | 10,000 | | $78,000 | $7.80 |

For this manufacturer the gross AMP would be $7.80. If we assume that retail sales were made by only one of the three wholesalers, the AMP for actual sales to retailers could range from $6 per unit (all retail sales made by wholesaler C) to $10 per unit (all retail sales made by wholesaler A). The gross sales AMP would be accurate only if retail sales were proportionately distributed by all wholesalers.

**Net Sales To Wholesalers.** Two of the four manufacturers "estimated" the amount of drugs sold to the retail pharmacy class of trade. These manufacturers adjusted their wholesaler sales figures for the nonretail sales by subtracting the chargeback sales and sales returns. The chargeback sales were included and removed from the wholesaler sales figures at net selling prices. Sales returns were valued at the selling price that was in effect when the products were returned. The wholesalers' net sales figure was then combined with any direct sales made by the manufacturer to retail pharmacies to determine total sales to the retail pharmacy class of trade. This method assumes that all sales by the wholesaler, after adjustments for charge-backs, would be for the retail pharmacy class of trade. Under the system used by the manufacturer to determine nonretail drug sales, only those specific drugs sold to buying groups under contract with the manufacturer would be considered.



One of these manufacturers did not have detailed records available to support: (1) merchandise issued to wholesalers for replacement of old merchandise at retailers and (2) credits for outdated merchandise returned by retailers through the wholesaler. As a result, we could not reconcile the net sales units sold. The net sales units are used by the manufacturer to calculate

Page 9 - William Toby, Jr.

Base AMP, AMP, and best price. Officials of this manufacturer believed that these items would be offsetting over a period of time and suggested that these be eliminated from the pricing calculations.

Our concern with the net sales method is that not all nonretail sales by the wholesalers are necessarily made through chargebacks. Some nonretail sales may be made outside of the chargeback arrangements. Additionally, not all drugs sold to wholesalers are distributed to retailers, but may remain in wholesaler inventory. In our discussions with representatives of these two manufacturers, they advised us that they receive no feedback from their wholesalers on what portion of the drugs are actually sold to the retail pharmacy class of trade.

This methodology increased the AMPs and rebate payments for these manufacturers because they have removed from the total product sales universe the chargeback sales which are made at prices that are normally lower than retail prices. However, we have no assurance that the AMPs are representative of those for the retail class of trade. Additionally, the manufacturers have incurred higher administrative costs in capturing the chargeback sales figures by product to use in computing the AMPs.

     **Specific Identification Of Retail Sales.** The fourth manufacturer identified the sales of its products to the retail pharmacy class of trade. This manufacturer could not, however, provide us with adequate documentation to support the retail sales figures. Retail pharmacy sales at this manufacturer are made through both wholesalers and its own direct sales. The sales by wholesalers to retailers is reported monthly to the manufacturer by product on magnetic tape. The manufacturer does not receive a copy of the wholesalers' sales invoices. We consider the sales invoice to be the basic record of sale and should be required as proof of sale for audit purposes. Approximately 94 percent of this particular manufacturer's sales of our sampled drugs is to wholesalers who, in turn, sell to retailers (pharmacies). The manufacturer combines the wholesalers' retail sales information with its own direct sales to retailers to calculate its quarterly retail pharmacy class of trade AMP.



Drug Manufacturer — Sales / Payment for Reports → Wholesaler — Sales → Retailer

Reports of Wholesalers Retail Sales
(Invoices remain with wholesalers)

Page 10 - William Toby, Jr.

Officials at this manufacturer agreed with our interpretation that the sales invoice was needed for proof of the sale. The manufacturer requested that its wholesalers provide invoices on a sample of 185 sales transactions made through the wholesalers, but the wholesalers declined to provide the invoices. Because of the problem in obtaining sales invoices, we have no assurance that the sales transactions we tested were accurate. The manufacturer did provide sales invoices supporting each transaction sampled from their direct sales to the retail pharmacy class of trade.

This specific identification method provides the more accurate AMP of the four manufacturers for sales to the retail class of trade. While this manufacturer incurred significant administrative costs in capturing the specific sales data from wholesalers on the retail class of trade, it was advantageous for this manufacturer to use this method. This manufacturer will have the lowest AMP because about 94 percent of the wholesalers' sales of its products for our sampled items are to retail buying groups at reduced prices. (This may be an anomaly; we would assume that chargeback sales are not normally made for the retail class of trade.)

### Overall Impact of Various Methods

As shown throughout this report, AMPs, rebate payments, and manufacturers' costs can be affected by the various calculation methods. Generally, the use of a gross sales price, which is the same for all wholesalers or catalog price for AMP, will be beneficial to the Federal Government and the States because it will result in a higher rebate payment. It will also be easier and less costly for the manufacturers. Conversely, specific identification of sales to the retail pharmacy class of trade is more accurate but more costly for the manufacturers.

The manufacturers' use of various methods for computing AMP has occurred because HCFA has not provided adequate instructions to the manufacturers. The HCFA has expressed its intent to have a uniform computation method as shown by the March 21, 1991 directive in which HCFA stated that it should ensure that AMP is computed consistently across the board. However, we believe that HCFA should further study this matter.

## GUIDANCE NEEDED ON ACCESS AND RETENTION OF RECORDS

Our on-site review at the three drug manufacturers disclosed varying policies regarding access to their records and with their record retention policies. One manufacturer did not provide us with free and unrestricted access to its records supporting AMP and best price calculations. The second manufacturer provided us access to records, but did not retain records in support of its calculations of sales units returned. This manufacturer also advised us of its intention to retain records for only five quarters. The third manufacturer did not have invoices in support of the sale of its drug products to

Page 11 - William Toby, Jr.

retailers. As a result, we believe that uniform records access and retention policies are needed in order to ensure the proper provision of records for those agencies with oversight responsibilities for the rebate program.

### Restricted Access To Records

One manufacturer restricted our access to the records which supported its AMP and best price calculations. The manufacturer interpreted the access provisions of OBRA '90 to mean that we could only view its records. We were not allowed to obtain, remove or photocopy records because of the manufacturer's concerns regarding the proprietary nature of its AMP and best price calculations. At the conclusion of our site work at this manufacturer, and after a negotiation process, we were given copies of vendor invoices for sales transactions selected for our sample. The manufacturer, however, deleted its name, the wholesalers' (customers') names, the product names, and the national drug code references. As a result, these records were of no value to us for purposes of an audit since we have no assurance that they support the sales transactions we tested.

### Records Retention Period

The records retention policy was different at each of the three manufacturers we visited. For example, the records retention policy at one manufacturer required that all records supporting the Base AMP, AMP, and best price calculations be maintained in a controlled access on-site area for a 3-year period. After 3 years, the records would be transferred to a warehouse for storage until destroyed.

Another manufacturer did not have a policy for the retention of pricing data used to compute Medicaid drug rebate amounts. Officials at this manufacturer expressed concern regarding the cost of maintaining documents either in paper form or on magnetic tape for each transaction. These officials suggested that a reasonable retention period would be five calendar quarters.

The third manufacturer had no established policy for retaining records supporting its computations of drug prices used to calculate rebates made under the Medicaid drug rebate program. The retention policy at this manufacturer for its basic business records is 7 years. With regard to the records needed for our review of Medicaid drug rebates for the quarter ended March 31, 1991, we found that in some instances the manufacturer had to create these records from its "live" customer data files but with great difficulty because the data changes on a daily basis.

The issues concerning access to and retention of records required to audit drug rebate pricing calculations at the manufacturers were discussed with HCFA's policy staff. Currently, HCFA is considering a proposal to change the Medicaid drug rebate

Page 12 - William Toby, Jr.

regulations by requiring a record retention period of 5 years. The sales by large drug manufacturers result in the creation of millions of records over a 5-year period. As a result, we believe that HCFA's proposed change in the regulations would be a tremendous financial burden for the drug manufacturers.

We believe that a 3-year period is a reasonable period to require manufacturers to retain rebate records, unless they are specifically instructed by a Federal oversight agency to retain them for a longer period. This is consistent with other Medicaid retention requirements.

## RECOMMENDATIONS

We recommend that HCFA: (1) survey other manufacturers to identify the various calculation methods used to determine AMP, (2) develop and disseminate to interested parties a more specific policy based on the survey results for calculating AMP which would protect the interests of the Government and which would be equitable to the manufacturers, (3) establish requirements which provide for unrestricted access by Federal oversight agencies to manufacturers' records which pertain to the drug rebate program, and (4) establish requirements which direct drug manufacturers to retain rebate records for a period of 3 years.

## HCFA'S COMMENTS

In a memorandum, dated September 3, 1992, HCFA commented on the findings contained in our draft report. The HCFA did not concur with our recommendations regarding the calculation of AMP and took the position that the drug rebate law and the rebate agreement have already established a methodology for computing AMP. The HCFA stated that it has undertaken numerous activities to assure uniform and correct AMP calculations and that:

- HCFA staff have responded to many requests for the proper method of computing AMP;

- with this guidance, manufacturers have submitted hundreds of corrections to earlier data, and as a result, manufacturers have been able to correctly compute AMP;

- HCFA intends to clarify the AMP definition in the drug rebate regulation; and

- HCFA encourages the OIG to reexamine the accuracy of AMP data.

Page 13 - William Toby, Jr.

The HCFA agreed that the OIG and other oversight authorities should not only have access to drug manufacturers' records, but should also be allowed to photocopy the appropriate records as necessary to conduct audits. However, HCFA added that it must consider the very stringent confidentiality provisions regarding the protection of manufacturers' pricing information.

The HCFA also stated that it is in the process of proposing a regulatory requirement for a 3-year retention period for rebate records.

See Appendix A for the complete text of the Acting Administrator's comments.

## OIG'S RESPONSE

The HCFA's comments were generally not responsive to our recommendations concerning manufacturers' AMP calculations. The HCFA disagreed with our recommendations for developing a more specific policy for calculating AMP because it stated that the drug rebate law and the rebate agreement have already established a methodology for computing AMP. We disagree. The rebate law and agreement defined AMP but did not provide a specific written methodology for computing AMP.

Although HCFA stated that it has given manufacturers guidance on the proper method for calculating AMP which has resulted in many corrections, it did not provide us with any written documentation which further defines how AMP should be computed.

The thrust of our report was that HCFA, at a minimum, did not: (1) specify how to identify retail sales, (2) address chargebacks, and (3) specify how to handle sales returns. As a result, HCFA's comments were not responsive to these three important areas. The HCFA's statement that it intends to clarify its description of AMP in a future regulation is contradictory because this indicates that HCFA recognizes that a problem continues to exist. Further, HCFA did not specify what clarification it intended to describe in the regulation.

Concerning access to manufacturers' records by oversight agencies, we could not determine HCFA's position. The HCFA stated that it concurs in part, with our recommendation but stated that it must consider the very stringent confidentiality provisions regarding protection of manufacturers' pricing information. Since both OBRA '90 legislation and internal OIG policy require the safeguarding of proprietary data, we believe HCFA must specify that manufacturers provide oversight agencies with unrestricted access to manufacturers' rebate records.

We are in full agreement with HCFA's intentions to require a 3-year retention period. Our final report was revised to recommend a 3-year retention period.

Page 14 - William Toby, Jr.

The HCFA suggested that we reexamine the accuracy of AMP data. However, the OIG plans no future audits of drug manufacturers' AMP data, at least until such time as the HCFA develops more specific written policies for calculating AMP and for providing unrestricted access to records. When this is done, the OIG will have criteria needed to effectively audit AMP and manufacturers will be aware that they must provide unrestricted access to their records.

## OTHER MATTERS

During the course of our review, all of the manufacturers advised us that there were significant rebate amounts in dispute between the manufacturers and the States. Section V of the rebate agreements permit the manufacturers to withhold payments to States in instances where the manufacturers believe the State Medicaid agencies' utilization information is erroneous.

Our review has shown that the amounts and percentages of rebate billings that are in dispute are significant for three of the four manufacturers reviewed. Also, the manufacturers advised us that the disputed amounts were unlikely to be resolved because there was no formal resolution process established by HCFA. The following schedule shows the amounts in dispute by manufacturer.

| TOTAL AMOUNT MANUFACTURER | TOTAL AMOUNT BILLED | IN DISPUTE | PERCENTAGE IN DISPUTE |
|---|---|---|---|
| A | Amounts are not available | | |
| B | $8,691,750 | $1,683,691 | 19%[1] |
| C | $1,639,942 | $ 721,968 | 44% |
| D | $8,759,697 | $2,795,483 | 32% |

[1] The amounts and percentages for this manufacturer do not consider those instances where rebates were paid to a State which did not bill a specific dollar amount but provided units of drugs sold. Additionally, these figures cover only 14 States.

We believe that this condition could seriously impair the rebate program. It appears that the manufacturers and States may be at an impasse regarding the disputes. We will be conducting audits to identify the extent, cause, and ways to reduce the amounts in dispute.

# APPENDIX

**HCFA's Comments to Draft Report**

DEPARTMENT OF HEALTH & HUMAN SERVICES

Health Care
Financing Administration

**Memorandum**

SEP 3 1992

Date

From

William Toby, Jr.
Acting Administrator

Subject     Office of the Inspector General (OIG) Draft Management Advisory Report:
"Medicaid Drug Rebates: The Health Care Financing Administration Needs

To     to Provide Additional Guidance to Drug Manufacturers to Better Implement
the Program," A-06-91-00092

Byran B. Mitchell
Principal Deputy Inspector General

We have reviewed the subject draft management advisory report which
concerns drug manufacturers' calculation of the average manufacturer price
(AMP). The Health Care Financing Administration (HCFA) uses the AMP,
the best price drug data, and the Consumer Price Index-Urban (CPI-U) to
determine the unit rebate amount for each drug which is payable to States by
drug manufacturers.

OIG found major variations in the methods used by drug manufacturers
to calculate the AMP, in the drug manufacturers' policies with regard to
OIG's right of access to company records, and in the length of time Medicaid
drug rebate records are retained. OIG recommends that HCFA:

o survey drug manufacturers to identify the various calculation methods
used to determine AMP;

o develop and disseminate to interested parties a more specific policy,
based on that survey;

o establish requirements which provide for unrestricted access by Federal
oversight agencies to manufacturers' records which pertain to the drug
rebate program; and

o establish requirements which direct drug manufacturers to retain rebate
records for a period of 2 years.

HCFA does not concur with the first two recommendations. We partially
concur with the third and fourth recommendations. Our specific comments
are attached for your consideration.

HCFA's Comments to Draft Report

Page 2 - Inspector General

Thank you for the opportunity to review and comment on this draft management advisory report. Please advise us if you agree with our position on the report's recommendations at your earliest convenience.

Attachment

**HCFA's Comments to Draft Report**

<u>Comments of the Health Care Financing Administration
(HCFA) on the Office of the Inspector General (OIG)
Draft Management Advisory Report - "Medicaid Drug Rebates:
The Health Care Financing Administration Needs to Provide
Additional Guidance to Drug Manufacturers to Better
Implement the Program." A-06-91-00092</u>

<u>Recommendation 1</u>

HCFA should survey other drug manufacturers to identify the various
calculation methods used to determine the average manufacturer price
(AMP).

<u>HCFA Response</u>

HCFA does not concur with this recommendation. The drug rebate law and
the rebate agreement have already established a methodology for computing
the AMP. We believe that it would be inappropriate to use a survey of drug
manufacturers to identify various calculation methods since HCFA has
undertaken numerous activities since the enactment of this legislation to
assure uniform and correct AMP calculations.

As we expected, there were numerous questions on the correct calculation of
AMP in the early stages of the implementation of the Medicaid drug rebate
program and, as expected, some manufacturers incorrectly computed AMP.
In fact, this was part of our reasoning in asking OIG to look at these
calculations by manufacturers.

In conjunction with the HCFA-requested OIG review, HCFA staff have spent
many hours calling manufacturers and answering questions on the proper
calculation of AMP. In addition, HCFA staff have responded to many written
requests for the proper method of computing AMP. With this guidance,
manufacturers have submitted hundreds of corrections to earlier data. As a
result of these efforts, manufacturers have increasingly been able to correctly
compute AMP.

Further, we intend to clarify the AMP definition in the drug rebate regulation.
We encourage OIG to reexamine the accuracy of the AMP data.

<u>Recommendation 2</u>

HCFA should develop and disseminate to interested parties a more specific
policy based on the survey results for calculating AMP which would protect
the interests of the Government and which would be equitable to the
manufacturers.

**HCFA's Comments to Draft Report**

Page 2

HCFA Response

HCFA does not concur with the recommendation. Since we do not believe HCFA should survey manufacturers to develop legislatively-required policy, we do not concur with developing policy on the results of such a survey. HCFA will further clarify our description of AMP in a future regulation. We believe our current policies on the calculation of AMP protect the interests of the Government since in no instance did OIG find an AMP that was lower than that which should have been properly calculated.

Recommendation 3

HCFA should establish requirements which provide for unrestricted access by Federal oversight agencies to drug manufacturers' records which pertain to the drug rebate program.

HCFA Response

HCFA concurs, in part, with this recommendation. We agree that OIG and other oversight authorities should not only have access to drug manufacturers' records, but should also be allowed to photocopy the appropriate records as necessary to conduct audits. We believe that it was the intent of the legislation to allow access to those records in order to verify the pricing data used by the drug manufacturers. However, we must consider the very stringent confidentiality provisions regarding the protection of manufacturers' pricing information. We will carefully consider these issues as we develop revisions to the Medicaid drug rebate agreement.

Recommendation 4

HCFA should establish requirements which direct drug manufacturers to retain rebate records for a period of 2 years.

HCFA Response

HCFA partially concurs with this recommendation. We are in the process of proposing regulations which include a requirement that drug manufacturers maintain Medicaid drug rebate records for 3 years. We believe that a 3-year period is preferable to the 2-year period proposed by OIG, because it is more consistent with the requirements for retention of other State Medicaid records.

**HCFA's Comments to Draft Report**

**Page 3**

<u>Additional Comments</u>

HCFA has taken steps to better disseminate information to manufacturers, States, and other interested parties involved in the Medicaid drug rebate program.  Recently, it was decided during a resolution conference between OIG and HCFA, that HCFA will provide professional pharmacy organizations with the same informational releases we provide to States.

# EXHIBIT C

**United States Government Accountability Office**

# GAO

Testimony

Before the Subcommittee on Health,
Committee on Energy and Commerce,
House of Representatives

For Release on Delivery
Expected at 2:00 p.m. EDT
Wednesday, June 22, 2005

# MEDICAID DRUG REBATE PROGRAM

## Inadequate Oversight Raises Concerns about Rebates Paid to States

Statement of Kathleen King
Director, Health Care



GAO
Accountability * Integrity * Reliability



Highlights of GAO-05-850T, a testimony before the Subcommittee on Health, Committee on Energy and Commerce, House of Representatives

**June 22, 2005**

# MEDICAID DRUG REBATE PROGRAM

## Inadequate Oversight Raises Concerns about Rebates Paid to States

## Why GAO Did This Study

To help control Medicaid spending on drugs, states receive rebates from pharmaceutical manufacturers through the Medicaid drug rebate program. Rebates are based on two prices–best price and average manufacturer price (AMP)–reported by manufacturers. GAO was asked to discuss issues relating to the rebate program and in February 2005 issued a report, *Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States* (GAO-05-102). For that report, GAO reviewed program guidance and OIG reports and conducted an analysis of rebates for brand name drugs. This testimony is based on the February 2005 report.

## What GAO Recommends

In its February 2005 report, GAO recommended that CMS issue clear, updated guidance on manufacturer price determination methods and price definitions. It also recommended that CMS implement systematic oversight of manufacturer methods and a plan to ensure the accuracy of reported prices and rebates to states. HHS agreed with the importance of guidance to manufacturers but did not agree that the program had received inadequate oversight. GAO acknowledged HHS oversight actions but did not believe they ensured accurate rebates to states.

www.gao.gov/cgi-bin/getrpt?GAO-05-850T.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Kathleen King at (202) 512-7118.

## What GAO Found

As noted in the February 2005 report, GAO found that rebate program oversight does not ensure that manufacturer-reported prices or price determination methods are consistent with program criteria specified in the rebate statute, rebate agreement, and Centers for Medicare & Medicaid Services (CMS) program memoranda. In administering the program, CMS conducts only limited checks for reporting errors in manufacturer-reported drug prices and only reviews price determination methods when manufacturers request recalculations of prior rebates. In several reports, the Department of Health and Human Services' (HHS) Office of Inspector General (OIG) identified several factors that limited its ability to verify the accuracy of manufacturer-reported prices, including a lack of clear guidance on how AMP should be calculated. GAO noted that although in some cases OIG found problems with manufacturers' price determination methods and prices, CMS had not followed up with manufacturers to make sure that problems had been resolved.

GAO also found considerable variation in the methods that manufacturers used to determine best price and AMP. In some cases, manufacturers' assumptions could have lowered rebates; in other cases, their assumptions could have raised rebates. Manufacturers are allowed to make assumptions when determining best price and AMP, as long as they are consistent with the law and the rebate agreement. GAO found that manufacturers made varying assumptions about which sales and prices to include and exclude from their determinations of best price and AMP. Manufacturers also differed in how they accounted for certain price reductions, fees, and other transactions when determining best price and AMP.

The rebates that manufacturers pay to states are based on prices and financial concessions manufacturers make available to entities that purchase their drugs but may not reflect certain financial concessions they offer to other entities. In particular, the rebate program does not clearly address certain manufacturer payments negotiated by pharmacy benefit managers (PBM) on behalf of third-party payers. These types of financial arrangements are relatively new to the market. CMS's guidance to manufacturers has not clearly stated how manufacturers should treat these payments when determining best price and AMP. Additional guidance on how to account for these payments could affect rebates, although whether rebates would increase or decrease as a result, and by how much, is uncertain.

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today to discuss our report entitled *Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States*, which we issued in February 2005.[1] Prescription drug spending accounts for a substantial and growing share of state Medicaid program outlays. The Omnibus Budget Reconciliation Act of 1990 established the Medicaid drug rebate program[2] to help control Medicaid drug spending. Under the rebate program, pharmaceutical manufacturers pay rebates to states as a condition for the federal contribution to Medicaid spending for the manufacturers' outpatient prescription drugs. In recent years, the importance of Medicaid rebates to states has grown as Medicaid spending on prescription drugs has risen. From fiscal year 2000 to 2003, Medicaid drug spending increased at an annual average rate of 18 percent, while Medicaid spending as a whole grew 10 percent annually during that period. In fiscal year 2003, Medicaid drug expenditures were $33.8 billion out of $273.6 billion in total Medicaid spending; under the rebate program, manufacturers paid rebates to states of about $6.5 billion for covered outpatient drugs.[3,4]

Medicaid rebates for brand name outpatient drugs are calculated with two prices that participating manufacturers must report to the federal government for each drug: the "best price" and the "average manufacturer price" (AMP). Best price and AMP represent prices that are available from manufacturers to entities that purchase their drugs. Best price for a drug is the lowest price available from the manufacturer to any purchaser, with some exceptions. AMP for a drug is the average price paid to a manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade. Both best price and AMP must reflect certain financial

---

[1]See GAO, *Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States*, GAO-05-102 (Washington, D.C.: Feb. 4, 2005).

[2]Pub. L. No. 101-508, § 4401, 104 Stat. 1388, 1388-143-161 (codified at 42 U.S.C. §1396r-8 (2000)). All states and the District of Columbia participate in the Medicaid drug rebate program, except for Arizona.

[3]State Medicaid programs do not purchase drugs directly but rather reimburse pharmacies when they dispense covered outpatient drugs to Medicaid beneficiaries. These payments, which include an amount to cover the cost of acquiring the drug as well as a dispensing fee, are calculated using state-specific payment formulas.

[4]This rebate amount includes the three types of rebates included in the Medicaid drug rebate program: the "basic" rebate for brand name drugs, the "additional" rebate for brand name drugs, and the rebate for generic drugs.

concessions, such as discounts, that are available to drug purchasers. The basic Medicaid rebate for a brand name drug equals the number of units of the drug paid for by the state Medicaid program multiplied by the basic "unit rebate amount" for the drug, which is either the difference between best price and AMP, or 15.1 percent of AMP, whichever is greater.[5] The closer best price is to AMP, the more likely the rebate will be based on 15.1 percent of AMP—the minimum rebate amount.

The Centers for Medicare & Medicaid Services (CMS) administers and oversees the rebate program, entering into rebate agreements with manufacturers,[6] collecting and reviewing manufacturer-reported best prices and AMPs, and providing ongoing guidance to manufacturers and states on the program. The Secretary of Health and Human Services, by law, may verify manufacturer-reported prices and has delegated that authority to the Department of Health and Human Services' (HHS) Office of Inspector General (OIG).

In this testimony, I will discuss our February 2005 report, in which we addressed (1) federal oversight of manufacturer-reported best prices and AMPs and the methods manufacturers used to determine those prices, (2) how manufacturers' methods of determining best price and AMP could have affected the rebates they paid to state Medicaid programs, and (3) how the rebate program reflects financial concessions available in the private market.

In carrying out our work, we reviewed the rebate statute, the standard rebate agreement between CMS and participating manufacturers, CMS program memoranda, OIG reports on the rebate program, and market literature; interviewed officials from CMS and OIG; and conducted an analysis of rebates for brand name drugs, for which we reviewed the pricing methodologies for the 13 manufacturers that accounted for the highest Medicaid expenditures in the last two quarters of 2000. We compared manufacturers' methods of determining best price and AMP to

---

[5]This testimony focuses on the basic rebate for brand name drugs, not the additional rebate for brand name drugs—which occurs when a brand name drug's AMP rises faster than inflation, as measured by changes in the consumer price index—or the rebate for generics. The total unit rebate amount for a brand name drug includes the basic rebate and any additional rebate.

[6]The rebate agreement is a standard contract between CMS and each manufacturer that governs manufacturers' participation in the rebate program, providing, among other things, definitions of key terms.

the rebate statute, rebate agreement, and relevant CMS program memoranda. In addition, we examined sales transaction data provided by these manufacturers. We received data for the 10 brand name drugs that produced the highest Medicaid expenditures for the last two quarters of 2000 for each manufacturer, as well as data for 5 additional frequently prescribed brand name drugs—135 drugs in total. We examined the sales transaction data to understand how manufacturers implemented their price determination methods and to calculate the impact of manufacturer practices on rebates. Because we purposely selected manufacturers and drugs that accounted for a large share of Medicaid drug spending, the results of our analysis cannot be generalized. We performed our work from December 2003 through January 2005 in accordance with generally accepted government auditing standards.

In brief, we reported in February 2005 that rebate program oversight does not ensure that manufacturer-reported prices or price determination methods are consistent with program criteria as specified in the rebate statute, rebate agreement, and CMS program memoranda. We found that CMS conducts only limited checks for reporting errors in manufacturer-reported drug prices and only reviews price determination methods when manufacturers request recalculations of prior rebates. In addition, OIG reported that its review efforts were hampered by unclear CMS guidance on how manufacturers are to determine AMP and by a lack of manufacturer documentation. Although OIG in some cases identified problems with manufacturers' price determination methods and reported prices, CMS had not followed up with manufacturers to make sure that those problems had been resolved. We also found considerable variation in the methods that the manufacturers we reviewed used to determine best price and AMP. In some cases, manufacturers' assumptions could have lowered rebates; in other cases, their assumptions could have raised rebates. Manufacturers are allowed to make reasonable assumptions when determining best price and AMP, as long as those assumptions are consistent with the law and the rebate agreement. We found that manufacturers made varying assumptions about which sales and prices to include and exclude from their determinations of best price and AMP. We also found that manufacturers differed in how they accounted for certain price reductions, fees, and other transactions when determining best price and AMP. Finally, we found that the rebates that manufacturers pay to states are based on prices and financial concessions that manufacturers make available to entities that purchase their drugs but may not reflect certain financial concessions they offer to other entities in today's complex market. In particular, the rebate program does not clearly address certain concessions that are negotiated by pharmacy benefit

managers (PBM) on behalf of third-party payers—concessions that are a relatively new development in the market.

We concluded that although the rebate program relies on manufacturer-reported prices to determine the level of rebates that manufacturers pay to states, CMS has not provided clear program guidance for manufacturers to follow when determining those prices; in addition, oversight by CMS and OIG has been inadequate to ensure that manufacturer-reported prices and methods are consistent with the law, rebate agreement, and CMS program memoranda. We recommended that CMS take several steps to improve program guidance and oversight, namely, to issue clear guidance on manufacturer price determination methods and the definitions of best price and AMP; update such guidance as additional issues arise; and implement, in consultation with OIG, systematic oversight of the price determination methods employed by pharmaceutical manufacturers and a plan to ensure the accuracy of manufacturer-reported prices and rebates to states. HHS agreed with the importance of guidance to manufacturers, but disagreed with our conclusion that there has been inadequate program oversight. We acknowledged HHS's oversight actions, but stated that HHS oversight does not adequately ensure the accuracy of manufacturer-reported prices and rebates paid to states. Some of the manufacturers that supplied data for the report raised concerns about our discussion of certain methods they used to determine rebates, and we clarified our discussion of manufacturers' price determination methods.

## Background

The Medicaid drug rebate program provides savings to state Medicaid programs through rebates for outpatient prescription drugs that are based on two prices per drug that manufacturers report to CMS: best price and AMP. These manufacturer-reported prices are based on the prices that manufacturers receive for their drugs in the private market and are required to reflect certain financial concessions such as discounts.

Pharmaceutical manufacturers sell their products directly to a variety of purchasers, including wholesalers, retailers such as chain pharmacies, and health care providers such as hospitals that dispense drugs directly to patients. The prices that manufacturers charge vary across purchasers. The amount a manufacturer actually realizes for a drug is not always the same as the price that is paid to the manufacturer at the time of sale. Manufacturers may offer purchasers rebates or discounts that may be realized after the initial sale, such as those based on the volume of drugs the purchasers buy during a specified period or the timeliness of their payment. The private market also includes PBMs, which manage

prescription drug benefits for third-party payers and may also operate mail-order pharmacies.[7]

The statute governing the Medicaid drug rebate program and the standard rebate agreement that CMS signs with each manufacturer define best price and AMP and specify how those prices are to be used to determine the rebates due to states. In the absence of program regulations,[8] CMS has issued program memoranda[9] in order to provide further guidance to manufacturers regarding how to determine best price and AMP.[10] The rebate agreement states that in the absence of specific guidance on the determination of best price and AMP, manufacturers may make "reasonable assumptions" as long as those assumptions are consistent with the "intent" of the law, regulations, and the rebate agreement.[11] As a result, price determination methods may vary across manufacturers, particularly with respect to which transactions they consider when determining best price and AMP.

Under the rebate statute, best price is the lowest price available from the manufacturer to any wholesaler, retailer, provider, health maintenance organization (HMO), or nonprofit or government entity, with some exceptions.[12] Best price is required to be reduced to account for cash

---

[7]See GAO, *Federal Employees' Health Benefits: Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies*, GAO-03-196 (Washington, D.C.: Jan. 10, 2003).

[8]In 1995, CMS issued a proposed rule for implementation of the drug rebate program, which included provisions regarding best price, AMP, and manufacturer reporting requirements. *See* 60 *Fed. Reg.* 48442 (1995). Only a portion of that rule—concerning the length of time manufacturers are able to report price adjustments to CMS and how long they must retain documentation of their reported prices—has been issued in final form. *See* 69 *Fed. Reg.* 68815 (2004), 68 *Fed. Reg.* 51912 (2003).

[9]As of October 2004, CMS had issued a total of 65 program memoranda—also called "program releases"—to manufacturers to provide guidance on a range of issues relating to the rebate program.

[10]CMS also responds to questions from individual manufacturers on a case-by-case basis. In addition, the agency provides an operational training guide and training for manufacturers and states on resolving disputes over state-reported drug utilization information used to calculate rebate amounts.

[11]The rebate agreement also requires manufacturers to maintain records of their assumptions.

[12]*See* 42 U.S.C. §1396r-8(c)(1)(C). The rebate agreement further defines best price as the lowest price at which the manufacturer sells the drug to any purchaser in any pricing structure, including capitated payments, with some exceptions.

discounts, free goods that are contingent on purchase requirements, volume discounts and rebates (other than rebates under this program), as well as—according to the rebate agreement and a CMS program memorandum—cumulative discounts and any other arrangements that subsequently adjust the price actually realized. Prices charged to certain federal purchasers,[13] eligible state pharmaceutical assistance programs and state-run nursing homes for veterans, and certain health care facilities—including those in underserved areas or serving poorer populations—are not considered when determining best price. Prices available under endorsed Medicare discount card programs, as well as those negotiated by Medicare prescription drug plans or certain retiree prescription drug plans, are similarly excluded from best price. Nominal prices—prices that are less than 10 percent of AMP—also are excluded from best price.

AMP is defined by statute as the average price paid to a manufacturer for the drug by wholesalers for drugs distributed to the retail pharmacy class of trade.[14] The transactions used to calculate AMP are to reflect cash discounts and other reductions in the actual price paid, as well as any other price adjustments that affect the price actually realized, according to the rebate agreement and a CMS program memorandum.[15] Under the rebate agreement, AMP does not include prices to government purchasers based on the Federal Supply Schedule, prices from direct sales to hospitals or HMOs, or prices to wholesalers when they relabel drugs they purchase under their own label.

The relationship between best price and AMP determines the unit rebate amount and thus the size of the rebate that states receive for a brand name drug. The basic unit rebate amount is the larger of two values: the difference between best price and AMP, or 15.1 percent of AMP.[16] The

---

[13]Sales made through the Federal Supply Schedule are not considered in determining best price, nor are single-award contract prices of any federal agency, federal depot prices, and prices charged to the Department of Defense, Department of Veterans Affairs, Indian Health Service, and Public Health Service.

[14]*See* 42 U.S.C. §1396r-8(k)(1). The statute states that customary prompt payment discounts are to be subtracted from prices used to calculate AMP. There is no definition in the statute for "retail pharmacy class of trade."

[15]Under the rebate agreement, AMP is calculated as net sales divided by units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements).

[16]*See* 42 U.S.C. §1396r-8(c)(1).

closer best price is to AMP, the more likely the rebate for a drug will be based on the minimum amount—15.1 percent of AMP—rather than the difference between the two values. A state's rebate for a drug is the product of the unit rebate amount and the number of units of the drug paid for by the state's Medicaid program.

Manufacturers pay rebates to states on a quarterly basis. They are required to report best price and AMP for each drug to CMS within 30 days of the end of each calendar quarter. Once CMS receives this information, the agency uses the rebate formula to calculate the unit rebate amount for the smallest unit of each drug, such as a tablet, capsule, or ounce of liquid. CMS then provides the unit rebate amount to the states. Each state determines its Medicaid utilization for each covered drug—as measured by the total number of the smallest units of each dosage form, strength, and package size the state paid for in the quarter—and reports this information to the manufacturer within 60 days of the end of the quarter. The manufacturer then must compute and pay the rebate amount to each state within 30 days of receiving the utilization information.

Manufacturers are required to report price adjustments to CMS when there is a change in the prices they reported for a prior quarter. These adjustments may result from rebates, discounts, or other price changes that occur after the manufacturers submit prices to CMS. Manufacturers also may request that CMS recalculate the unit rebate amounts using revised prices if they determine that their initially reported prices were incorrect because of, for example, improper inclusion or exclusion of certain transactions. In 2003, CMS issued a final rule that, effective January 1, 2004, limits the time for manufacturers to report any price adjustments to 3 years after the quarter for which the original price was reported.[17]

---

[17]The 2003 final rule addressed the time frame for reporting price adjustments to CMS and the time frame for retaining documentation of reported prices. *See* 68 *Fed. Reg.* 51912, 55527 (2003).

# Program Oversight Does Not Ensure That Manufacturer-Reported Prices or Price Determination Methods Are Consistent with Program Criteria

As we reported in February 2005, the minimal oversight by CMS and OIG of manufacturer-reported prices and price determination methods does not ensure that those prices or methods are consistent with program criteria, as specified in the rebate statute, rebate agreement, and CMS program memoranda. CMS conducts limited reviews of prices and only reviews price determination methods when manufacturers request recalculations of prior rebates. In addition, OIG reported that its review efforts had been hampered by unclear CMS guidance on how to determine AMP and by a lack of manufacturer documentation. Although OIG in some cases identified problems with manufacturers' price determination methods and reported prices, CMS had not followed up with manufacturers to make sure that those problems were resolved.

CMS reviews drug prices submitted by approximately 550 manufacturers that participate in the program. Each quarter, CMS conducts automated data edit checks on the best prices and AMPs for about 25,000 drugs to identify reporting errors. These checks are intended to allow CMS to ensure that, for example, prices are submitted in the correct format and that the reported prices are for drugs covered by Medicaid. When data checks indicate a potential reporting error, CMS asks the manufacturer for corrected drug prices, but CMS does not have a mechanism in place to track whether the manufacturer submits corrected prices. CMS sometimes identifies other price reporting errors when it calculates the unit rebate amount for a drug, but the agency does not follow up with manufacturers to verify that errors have been corrected. For example, CMS notifies a manufacturer if the unit rebate amount for a drug deviates from that of the prior quarter by more than 50 percent. It would be up to that manufacturer to indicate whether the underlying reported prices were correct. If the manufacturer determined that there were problems with the reported price—for example, typographical errors such as misplaced decimals—it would send corrected data to CMS.[18] If the manufacturer did not send revised pricing data to CMS, then the unit rebate amount would remain the same.

CMS does not generally review the methods and underlying assumptions that manufacturers use to determine best price and AMP, even though these methods and assumptions can have a substantial effect on rebates.

---

[18]In this situation, the manufacturer also would recalculate the unit rebate amount and, once invoiced by the states with total utilization for the drug paid for by Medicaid, would send the rebate payment to those states based on the recalculated unit rebate amount.

Furthermore, CMS does not generally check to ensure that manufacturers' methods are consistent with the rebate statute and rebate agreement, but rather reviews the methods only when manufacturers request recalculations of prior rebates. A manufacturer may request a recalculation of a prior rebate any time it changes the methods it uses to determine best price or AMP. CMS requires the manufacturer to submit both its original and its revised methods when requesting a recalculation of prior rebates so that the agency can evaluate whether the revised methods are consistent with the rebate statute, rebate agreement, and program memoranda. Recalculations can involve substantial amounts of money; for example, six approved recalculations we examined reduced prior rebates to states by a total of more than $220 million.

In reports on its audits of manufacturer-reported prices, OIG stated that its efforts were hampered by unclear CMS guidance on determining AMP and by a lack of manufacturer documentation. In its first review of manufacturer-reported prices in 1992, OIG found that it could not verify the AMPs reported by the four manufacturers it reviewed.[19] OIG could not evaluate manufacturers' methods for determining AMP because neither the rebate statute nor CMS had provided sufficiently detailed instructions on methods for calculating AMP. OIG therefore advised CMS that it planned no future AMP data audits until CMS developed a specific written policy on how AMP was to be calculated. CMS disagreed, saying that the rebate statute and rebate agreement had already established a methodology for computing AMP and stressed that this methodology was clarified, at manufacturer request, on an as-needed basis through conversations with individual manufacturers.[20]

In its second review of manufacturer-reported prices, in 1995 OIG attempted to verify one manufacturer's recalculation request. While OIG reported that it could not complete its analysis because of inadequate

---

[19]See HHS OIG, *Medicaid Drug Rebates: The Health Care Financing Administration Needs to Provide Additional Guidance to Drug Manufacturers to Better Implement the Program,* A-06-91-00092 (Washington, D.C.: November 1992).

[20]Although CMS disagreed with OIG, it said it would further clarify AMP calculation in a forthcoming drug rebate program regulation. As of October 2004, the regulation had not been issued; as we reported, CMS officials told us that the agency had no plans to promulgate any such regulation in the near future. Instead, CMS has issued several program memoranda intended to provide guidance on how manufacturers should calculate AMP.

manufacturer documentation,[21] it was able to identify some manufacturer errors in determining AMP. In its review, OIG found that the manufacturer had miscalculated its revised AMP because it included "free goods" specifically excluded in the rebate agreement, miscalculated cash discounts, and improperly included sales rebates applicable to a period other than the quarter being audited. OIG recommended that CMS have the manufacturer revise its AMP data. Although CMS agreed with OIG's recommendations, as of October 2004, it had not required any such revision of the audited manufacturer's AMP determinations.

In its third review, conducted in 1997, OIG attempted to review a manufacturer's recalculation request but again reported that it was unable to complete its evaluation because of a lack of specific guidance on determining AMP and a lack of manufacturer documentation supporting its revised AMP. In the absence of guidance from CMS, OIG defined retail pharmacy class of trade for this audit to include only independent and chain pharmacies that sold drugs directly to the public. Therefore, OIG recommended that CMS ask the manufacturer to exclude from the calculation of AMP transactions that OIG determined were to nonretail entities such as mail-order pharmacies, nursing home pharmacies, independent practice associations, and clinics. OIG also found that the manufacturer used a certain flawed methodology to identify sales that it had included in the retail class of trade and thus AMP. As a result, OIG recommended that CMS ask the manufacturer to exclude those sales from AMP unless the manufacturer could provide additional documentation to support the inclusion of those sales in AMP. Although CMS did not agree with OIG's definition of retail pharmacy class of trade, CMS concurred with OIG's recommendation to ask the manufacturer to recalculate AMP.[22] As of October 2004, CMS had not required any revision of this manufacturer's AMP determinations.

In its fourth review of manufacturer-reported prices, issued in 2001, OIG investigated how manufacturers were treating repackagers—entities like HMOs that repackage or relabel drugs under their own names—in their

---

[21]OIG reports on individual manufacturers are not publicly available.

[22]In response to OIG recommendations, CMS said it would provide the manufacturer with a copy of recent guidance on AMP: Medicaid Drug Rebate Program Release No. 29, June 1997. This document, released to all manufacturers at the time OIG was conducting the 1997 review, in some cases differed from OIG's definition of retail pharmacy class of trade. It stated, for example, that sales to nursing home and mail-order pharmacies are to be included in AMP, while OIG's definition excluded these entities.

best price determinations. The work followed up on previous work OIG conducted in response to a congressional inquiry in 1999. The rebate statute states that HMO sales are required to be included in best price determinations. CMS's June 1997 program memorandum stated that sales to other manufacturers that repackage the drugs are to be excluded from best price determinations. However, the rebate statute, rebate agreement, and CMS program memoranda did not address how HMOs should be treated when they act as repackagers. In a letter issued in response to the 1999 congressional request, OIG reported that excluding drug sales to two HMOs that acted as repackagers from best price determinations lowered state rebate amounts by $27.8 million in fiscal year 1998.[23] In July 2000, CMS issued an additional program memorandum to manufacturers stating that sales to an HMO should be considered in best price determinations regardless of whether the HMO was a repackager.[24] In 2001, OIG reported that states lost $80.7 million in rebates in fiscal year 1999 because of improperly excluded drug sales to HMO repackagers.[25] In September 2004, a CMS official told us that CMS planned to release a program memorandum instructing manufacturers to revise prior rebates for which they had excluded sales to HMOs from best price. However, CMS does not have a mechanism in place to track that manufacturers have made these rebate adjustments and therefore cannot verify that manufacturers have made or will make these adjustments.

As we reported, OIG officials told us that, despite the program releases issued by CMS, they remain unable to evaluate AMP because of the lack of clear CMS guidance, particularly related to the retail pharmacy class of trade and treatment of PBM transactions.

---

[23]Letter from HHS OIG to Ranking Minority Member, Committee on Government Reform, House of Representatives, November 22, 1999.

[24]Medicaid Drug Rebate Program Release No. 47, July 2000.

[25]See HHS OIG, *Medicaid Drug Rebates: Sales to Repackagers Excluded from Best Price Determinations*, A-06-00-00056 (Washington, D.C.: March 2001).

# Manufacturer Price Determination Methods Varied: Some Could Have Led to Lower Rebates

As we reported, we found considerable variation in the methods that the manufacturers we reviewed used to determine best price and AMP. Manufacturers are allowed to make reasonable assumptions when determining best price and AMP, as long as those assumptions are consistent with the law and the rebate agreement. The assumptions often pertain to the transactions, including discounts or other price reductions, that are considered in determining best price and AMP. We found that in some cases manufacturers' assumptions could have led to lower rebates and in other cases to higher rebates. Manufacturers can later revise their assumptions and request recalculations of previously paid rebates, which can result in states repaying any excess rebates.

We found that manufacturers made varying assumptions about which sales and prices to include and exclude from their determinations of best price and AMP. For example, some included sales to a broad range of facilities in AMP, excluding only transactions involving facilities explicitly excluded by the law, rebate agreement, or CMS program memoranda. In contrast, others included sales to a narrower range of purchasers—only those purchasers explicitly included in AMP by the law, rebate agreement, or CMS program memoranda. Manufacturers also differed in how they treated certain types of health care providers that are not explicitly addressed by the law, rebate agreement, or CMS program memoranda. For example, some manufacturers included sales to physician groups in AMP, while others did not. These assumptions can affect the reported prices and, in turn, the size of rebates paid to states.

We also found that manufacturers also differed in how they accounted for certain price reductions, fees, and other transactions when determining best price and AMP. For example, manufacturers differed in how they accounted for certain transactions involving prompt payment discounts. In some cases, manufacturers' assumptions could have reduced rebates below what they otherwise would have been. In other cases, manufacturers' methods could have raised rebates. For example, some manufacturers included in the determination of best price the contract prices they had negotiated with purchasers, even if they made no sales at those prices during the reporting quarter. This practice could have increased rebates to states.[26]

---

[26]One manufacturer, however, indicated that it later might revise this practice and request recalculations to recoup any excess rebates it had already paid. Manufacturers have up to 3 years to make such revisions.

# Rebate Program Does Not Clearly Address Certain Financial Concessions Negotiated by PBMs

As we reported, the rebates that manufacturers pay to states are based on a range of prices and financial concessions that manufacturers make available to entities that purchase their drugs, but they may not reflect certain financial concessions manufacturers offer to other entities in today's complex market. In particular, the rebate program does not clearly address certain concessions that are negotiated by PBMs on behalf of third-party payers, such as employer-sponsored health plans and other health insurers. The rebate program did not initially address these types of concessions, which are relatively new to the market. CMS's subsequent guidance to manufacturers has not clearly stated how manufacturers should treat these concessions in their determinations of best price and AMP. Within the current structure of the rebate formula, additional guidance on how to account for manufacturer payments to PBMs could affect the rebates paid to states, although whether rebates would increase or decrease as a result, and by how much, is uncertain.

Certain manufacturer financial concessions that are negotiated by PBMs on behalf of their third-party payer clients are not clearly reflected in best price or AMP. PBMs, in one of the roles they play in the market, may negotiate payments from manufacturers to help reduce their third-party payer clients' costs for prescription drugs.[27] (In these circumstances, the third-party payer does not purchase drugs directly from the manufacturer but instead covers a portion of the cost when its enrollees purchase drugs from pharmacies.) The basis of these PBM-negotiated manufacturer payments varies. For example, manufacturers may make a payment for each unit of a drug that is purchased by third-party payer enrollees or may vary payment depending on a PBM's ability to increase the utilization, or expand the market share, of a drug. The payment may be related to a specific drug or a range of drugs offered by the manufacturer. The amount of financial gain PBMs receive from these negotiated payments also varies. A PBM may pass on part or all of a manufacturer's payment to a client, depending on the terms of their contractual relationship. Manufacturers may not be parties to the contracts that PBMs have with their clients and so may not know the financial arrangements between the PBMs and their clients.

These types of financial arrangements between manufacturers and PBMs are a relatively new development in the market. When the program began in 1991, PBMs played a smaller role in the market, managing fewer

---

[27]GAO-03-196.

covered lives and providing a more limited range of services—such as claims processing—for their clients. Since then, PBMs' role has grown substantially, contributing to a market that is much more complex, particularly with respect to the types of financial arrangements involving manufacturers. PBMs now commonly negotiate with manufacturers for payments on behalf of their clients, in addition to providing other services. Although complete data on the prevalence and magnitude of PBM-negotiated manufacturer payments are not readily available, PBM officials and industry experts have said that these and other manufacturer payments to PBMs are a large portion of PBMs' earnings;[28] further, recent public financial information suggests that manufacturer payments to PBMs as a whole are substantial and key to PBMs' profitability.

CMS has acknowledged the complexity that arrangements between manufacturers and PBMs introduce into the rebate program but has not clearly addressed how these arrangements should be reflected in manufacturer-reported prices. In 1997, CMS issued program memoranda that noted new types of arrangements involving manufacturer payments to PBMs and attempted to clarify whether those arrangements should be reflected in best price and AMP.[29] However, in a program memorandum issued shortly thereafter, CMS stated that there had been confusion concerning the intent of the previous program memoranda and that the agency had "intended no change" to program requirements.[30] At the time, CMS said that staff were reexamining the issue and planned to shortly clarify the agency's position. As of January 2005, CMS had not issued such clarifying guidance on how PBM-negotiated manufacturer payments should be reflected in best price and AMP when PBMs have negotiated on behalf of third parties. CMS officials with responsibility for issuing program memoranda advised us that they could comment only on specific situations. They stated that financial arrangements among entities in the market are complex and always changing; in their view, the market is too complicated for them to issue general policy guidance that could cover all possible cases. Rather, these officials told us that they make determinations about PBM payments on a case-by-case basis, but only when manufacturers contact them regarding this issue.

---

[28]GAO-03-196.

[29]Medicaid Drug Rebate Program Release No. 28, April 1997, and Medicaid Drug Rebate Program Release No. 29, June 1997.

[30]Medicaid Drug Rebate Program Release No. 30, September 1997.

Within the current structure of the rebate formula, additional guidance on how to account for manufacturer payments to PBMs could affect the rebates paid to states, although whether rebates would increase or decrease as a result, and by how much, is uncertain. Because of the structure of the rebate formula, any change in the determination of best price and AMP could raise or lower rebates for any given drug, depending on how the change affects the relationship between those prices. Incorporating PBM-negotiated manufacturer payments into the rebate determination could decrease the unit rebate amount for a drug if, for example, it reduced AMP but had no effect on best price.[31] Alternatively, if such a change increased the difference between AMP and best price for a drug, the unit rebate amount could increase.[32]

## Concluding Observations

As we stated in our report, because the rebate program relies on manufacturer-reported prices, adequate program oversight is important to ensure that states receive the rebates to which they are entitled. However, CMS has not provided clear program guidance for manufacturers to follow when determining prices, and this has hampered OIG's efforts to audit manufacturers' methods and reported prices. In addition, oversight by CMS and OIG has been inadequate to ensure that manufacturer-reported prices and methods are consistent with the law, rebate agreement, and CMS program memoranda. As a result, we recommended that CMS take several steps to improve program guidance and oversight, namely, to issue clear guidance on manufacturer price determination methods and the definitions of best price and AMP; update such guidance as additional issues arise; and implement, in consultation with OIG, systematic oversight of the price determination methods employed by pharmaceutical manufacturers and a plan to ensure the accuracy of manufacturer-reported prices and rebates to states. We believe that these actions could help ensure that the Medicaid drug rebate program achieves its objective of controlling states' Medicaid drug spending. HHS agreed with the importance of guidance to manufacturers, but disagreed with our conclusion that there has been inadequate program oversight. We

---

[31]A change in guidance regarding how PBM payments should be reflected in best price would not necessarily affect the best price for every drug because best price can be determined by a transaction that is not related to PBM payments.

[32]A greater difference between best price and AMP would not always yield a larger rebate. For example, if the difference between the two prices increased but remained less than 15.1 percent of AMP, the unit rebate amount would still be based on the 15.1 percent of AMP minimum.

acknowledged HHS's oversight actions, but stated that HHS oversight does not adequately ensure the accuracy of manufacturer-reported prices and rebates paid to states. Some of the manufacturers that supplied data for the report raised concerns about our discussion of certain methods they used to determine rebates, and we clarified our discussion of manufacturers' price determination methods.

Mr. Chairman, this concludes my prepared statement. I would be happy to respond to any questions you or other Members of the Subcommittee may have.

## Contact and Staff Acknowledgments

For further information about this testimony, please contact Kathleen King at (202) 512-7118. Debra Draper, Robin Burke, and Ann Tynan also made key contributions to this statement.

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: <br><br> U.S. Government Accountability Office <br> 441 G Street NW, Room LM <br> Washington, D.C. 20548 <br><br> To order by Phone:  Voice:  (202) 512-6000 <br> TDD:  (202) 512-2537 <br> Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER

# EXHIBIT D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**



**MAY 3 0 2006**

| | |
|---|---|
| **TO:** | The Secretary |
| | Through:   DS _____ |
| | COS _____ |
| | ES _____ |

**FROM:**   Inspector General

**SUBJECT:**   Determining Average Manufacturer Prices for Prescription Drugs Under the
Deficit Reduction Act of 2005 (A-06-06-00063)

PURPOSE

As required by section 6001 of the Deficit Reduction Act (DRA) of 2005, which amended
section 1927 of the Social Security Act (the Act), we are providing you with our report on
determining average manufacturer prices (AMPs).  Our specific mandate was to (1) review the
requirements for, and manner in which, AMPs are determined under section 1927 of the Act and
(2) recommend appropriate changes by June 1, 2006.

INFORMATION TEXT

To summarize our report, existing requirements for determining certain aspects of AMPs are not
clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent.
Our previous and ongoing work has found that the manufacturers reviewed interpret AMP
requirements differently.  Specifically, our findings demonstrate the need to clarify the definition
of retail class of trade and the treatment of pharmacy benefit manager rebates and Medicaid sales
in AMP calculations.  Consistent with our findings, industry groups also emphasized the need to
clarify certain AMP requirements.  Further, they raised additional issues related to the
implementation of DRA provisions.

Because the DRA expands the use of AMPs and creates new reimbursement policy implications,
future errors or inconsistencies in manufacturers' AMP calculations could lead to inaccurate or
inappropriate reimbursement amounts as well as rebate errors.

Our report includes several recommendations for use in promulgating regulations and guidance
to clarify AMP requirements.

Page 2 – The Secretary

If you have any questions or comments about this report, please do not hesitate to call me, or your staff may contact George M. Reeb, Assistant Inspector General for the Centers for Medicare & Medicaid Audits, at (410) 786-7104.

Daniel R. Levinson

Attachment

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005



Daniel R. Levinson
Inspector General

May 2006
A-06-06-00063

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# EXECUTIVE SUMMARY

## BACKGROUND

### Medicaid Drug Rebate Program

Section 1927 of the Social Security Act (the Act) established the Medicaid drug rebate program. For a manufacturer's covered outpatient drugs to be eligible for Federal Medicaid funding under the program, the manufacturer must enter into a rebate agreement with the Centers for Medicare & Medicaid Services (CMS) and pay quarterly rebates to the States. Section 1927(b)(3) of the Act requires a participating manufacturer to report quarterly to CMS the average manufacturer price (AMP) for each covered outpatient drug. Section 1927(k)(1) defines AMP as the average price paid to the manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.

CMS uses AMP to calculate a unit rebate amount for each covered outpatient drug and provides the unit rebate amounts to the States. The States determine the total rebates that participating manufacturers owe by multiplying the unit rebate amount by the number of units of the drug dispensed to Medicaid beneficiaries.

### Deficit Reduction Act of 2005

The Deficit Reduction Act (DRA) of 2005 requires the Secretary of the Department of Health and Human Services to provide AMP data to the States on a monthly basis beginning July 1, 2006. These data will provide States with pricing information that was generally not available previously, and States may choose to use AMP in setting reimbursement amounts. In addition, the DRA establishes AMP as the new reimbursement basis for drugs subject to Federal upper limit requirements.

The DRA requires the Office of Inspector General (OIG) to (1) review the requirements for, and manner in which, AMPs are determined under section 1927 of the Act and (2) recommend appropriate changes by June 1, 2006. Pursuant to the DRA, CMS must promulgate, by July 1, 2007, a regulation that clarifies those requirements after considering OIG's recommendations.

## OBJECTIVE

Our objective was to review the requirements for, and manner in which, manufacturers determine AMPs under section 1927 of the Act.

## SUMMARY OF RESULTS

Existing requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent. OIG's previous and ongoing work, which has primarily focused on how manufacturers calculate AMP, has found that the manufacturers reviewed interpret AMP requirements differently. Specifically, our findings demonstrate the need to clarify the definition of retail class of trade and the treatment of

i

pharmacy benefit manager rebates and Medicaid sales in AMP calculations. In addition, work related to the use of AMP by CMS and other agencies highlights the need to consider the timeliness and accuracy of manufacturer-reported AMPs. Consistent with our findings, industry groups also emphasized the need to clarify certain AMP requirements. Further, they raised additional issues related to the implementation of DRA provisions.

Because the DRA expands the use of AMPs and creates new reimbursement policy implications, future errors or inconsistencies in manufacturers' AMP calculations could lead to inaccurate or inappropriate reimbursement amounts as well as rebate errors.

## RECOMMENDATIONS

We recommend that the Secretary direct CMS, in promulgating the AMP regulation, to:

- clarify requirements in regard to the definition of retail class of trade and the treatment of pharmacy benefit manager rebates and Medicaid sales and

- consider addressing issues raised by industry groups, such as:

  - administrative and service fees,
  - lagged price concessions and returned goods,
  - the frequency of AMP reporting,
  - AMP restatements, and
  - baseline AMP.

We also recommend that the Secretary direct CMS to:

- issue guidance in the near future that specifically addresses the implementation of the AMP-related reimbursement provisions of the DRA and

- encourage States to analyze the relationship between AMP and pharmacy acquisition cost to ensure that the Medicaid program appropriately reimburses pharmacies for estimated acquisition costs.

## CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS

In commenting on a draft of this report, CMS stated that it would address each of the recommended areas, as well as the areas raised by industry groups, in its proposed regulation. CMS also stated that it would evaluate the need for additional guidance. CMS's comments are included as Appendix G.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION..................................................................................................1

    BACKGROUND .............................................................................................1
        Medicaid Drug Rebate Program ..........................................................1
        Deficit Reduction Act of 2005 .............................................................1
        Centers for Medicare & Medicaid Services Guidance ...........................2
        Medicaid Reimbursement of Covered Outpatient Drugs.........................2

    OBJECTIVE, SCOPE, AND METHODOLOGY .............................................3
        Objective ..............................................................................................3
        Scope ...................................................................................................3
        Methodology ........................................................................................3

RESULTS OF REVIEW ........................................................................................4

    SUMMARY OF OFFICE OF INSPECTOR GENERAL WORK .......................4
        Calculating Average Manufacturer Price...............................................4
        Using Average Manufacturer Price in Reimbursement Calculations .....7

    SUMMARY OF INDUSTRY GROUP PERSPECTIVES....................................8
        Calculating Average Manufacturer Price...............................................8
        Using Average Manufacturer Price in Reimbursement Calculations ....10
        Deficit Reduction Act Implementation Issues .....................................11

    RECOMMENDATIONS ...............................................................................12

    CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS .......12

APPENDIXES

    A – COMMENTS FROM THE BIOTECHNOLOGY INDUSTRY ORGANIZATION

    B – COMMENTS FROM THE GENERIC PHARMACEUTICAL ASSOCIATION

    C – COMMENTS FROM THE HEALTHCARE DISTRIBUTION MANAGEMENT
        ASSOCIATION

    D – COMMENTS FROM THE NATIONAL ASSOCIATION OF CHAIN DRUG
        STORES

    E  – COMMENTS FROM THE NATIONAL COMMUNITY PHARMACISTS
        ASSOCIATION

F – COMMENTS FROM THE PHARMACEUTICAL RESEARCH AND
    MANUFACTURERS OF AMERICA

G – COMMENTS FROM THE CENTERS FOR MEDICARE & MEDICAID
    SERVICES

# INTRODUCTION

## BACKGROUND

### Medicaid Drug Rebate Program

Section 1927 of the Social Security Act (the Act) established the Medicaid drug rebate program. For a manufacturer's covered outpatient drugs to be eligible for Federal Medicaid funding under the program, the manufacturer must enter into a rebate agreement with the Centers for Medicare & Medicaid Services (CMS) and pay quarterly rebates to the States. Section 1927(b)(3) of the Act requires a participating manufacturer to report quarterly to CMS the average manufacturer price (AMP) for each covered outpatient drug. Section 1927(k)(1) defines AMP as the average price paid to the manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.

CMS uses AMP and, in some cases, best price data to calculate a per unit (e.g., per pill) rebate amount for each covered outpatient drug and provides the unit rebate amounts to the States.[1] The States determine the total rebates that participating manufacturers owe by multiplying the unit rebate amount for a specific drug by the number of units dispensed to Medicaid beneficiaries.

### Deficit Reduction Act of 2005

The Deficit Reduction Act (DRA) of 2005 contains several provisions affecting the Medicaid drug rebate program and Medicaid drug reimbursement. Sections 6001(c) and (g) of the DRA require the calculation of AMP without regard to customary prompt pay discounts effective January 1, 2007. Section 6001(b) requires the Secretary of the Department of Health and Human Services to provide AMP data to the States on a monthly basis beginning July 1, 2006. These data will provide States with pricing information that was generally not available previously, and States may choose to use AMP in setting reimbursement amounts. In addition, the DRA establishes AMP as the new reimbursement basis for drugs subject to Federal upper limit requirements. Section 6001(a) of the DRA requires that, effective January 1, 2007, Federal upper limits will be based on 250 percent of AMP for the drug with the lowest AMP rather than 150 percent of the lowest published price for therapeutically equivalent products.

Section 6001(c)(3)(A) of the DRA requires the Office of Inspector General (OIG) to (1) review the requirements for, and manner in which, AMPs are determined under section 1927 of the Act and (2) recommend appropriate changes by June 1, 2006. Section 6001(c)(3)(B) requires that CMS promulgate, by July 1, 2007, a regulation that clarifies those requirements after considering OIG's recommendations.

---

[1] Section 1927(c)(1)(C) defines best price as the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity, excluding certain sales.

**Centers for Medicare & Medicaid Services Guidance**

Since the Medicaid drug rebate program began in 1991, CMS has issued a regulation (42 CFR § 447.534) addressing only manufacturers' record retention requirements and time limits for submitting AMP recalculations. CMS has also issued guidance to manufacturers in the form of a standardized drug rebate agreement with manufacturers and memorandums called Medicaid drug program releases (releases).

The rebate agreement further defines AMP and provides a definition of wholesalers:

- AMP is defined as "the average unit price paid to the Manufacturer for the drug in the States by wholesalers for drugs distributed to the retail pharmacy class of trade (excluding direct sales to hospitals, health maintenance organizations and to wholesalers where the drug is relabeled under that distributor's national drug code number)." The rebate agreement further specifies that cash discounts and all other price reductions that reduce the actual price paid are included in AMP (section I(a) of the rebate agreement).

- A wholesaler is defined as "any entity (including a pharmacy or chain of pharmacies) to which the labeler [manufacturer] sells the Covered Outpatient Drug, but that does not relabel or repackage the Covered Outpatient Drug" (section I(ee) of the rebate agreement).

Section I(a) of the rebate agreement also provides that the AMP "for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized." Manufacturers can have payment arrangements with entities that do not take title to or possession of drugs. These arrangements can affect the price realized by the manufacturer without changing the price paid by the purchaser that takes title to or possession of the drugs.

To provide additional clarification on rebate issues, CMS sent 72 releases to drug manufacturers from 1991 through March 2006. These releases typically focused on specific definitional or calculation-related concerns.

**Medicaid Reimbursement of Covered Outpatient Drugs**

Each State is required to submit a Medicaid State plan to CMS describing its payment methodology for covered drugs. Federal regulations (42 CFR § 447.331(b)) require, with certain exceptions, that a State's reimbursement for drugs not exceed, in the aggregate, the lower of the estimated acquisition cost plus a reasonable dispensing fee or the provider's usual and customary charge to the public for the drugs. CMS allows States flexibility in defining estimated acquisition cost.

For certain drugs, States also use the Federal upper limit to determine reimbursement amounts. CMS has established Federal upper limit amounts for more than 400 drugs that meet specified criteria. Pursuant to 42 CFR § 447.332(b), Federal upper limit amounts are currently based on 150 percent of the lowest published price for therapeutically equivalent products.

States have generally based estimated acquisition cost on readily available published prices, typically the average wholesale price (AWP).  OIG has found that Medicaid drug reimbursement based on AWP often exceeds pharmacies' actual acquisition costs and the prices paid by other Federal programs.  AWP data have several critical flaws.  AWP is not defined in statute or regulation, is not necessarily linked to actual sales transactions, and is not easily verifiable.  While certain aspects of AMP need to be addressed, AMP has several advantages over AWP as a basis of reimbursement.  In contrast to AWP, AMP is statutorily defined, is calculated from actual sales transactions, and is subject to audit.

## OBJECTIVE, SCOPE, AND METHODOLOGY

### Objective

Our objective was to review the requirements for, and manner in which, manufacturers determine AMPs under section 1927 of the Act.

### Scope

We limited our review to information obtained through OIG work since 1991 and discussions with representatives of stakeholders in the Medicaid drug rebate program (manufacturers, pharmacies, distributors, and States).  The audit objective did not require that we identify or review any internal control systems.

We performed our fieldwork during March and April 2006.

### Methodology

To accomplish our objective, we:

- reviewed the appropriate sections of the DRA, section 1927 of the Act, the rebate agreements between CMS and drug manufacturers, and applicable CMS releases;

- met with congressional staff to discuss the OIG requirements in the DRA;

- interviewed CMS officials;

- analyzed and compiled past and ongoing OIG work related to drug manufacturers, AMP calculations, and the use of AMP;[2]

- met with three manufacturer groups, three pharmacy groups, one distributor group, and one State government group to discuss their concerns related to AMP calculations and the DRA; and

- analyzed written comments provided by six of these groups.

---

[2] Many of the OIG reports contain proprietary information and are therefore not available to the public.

We conducted our review in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

Existing requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent. OIG's previous and ongoing work has demonstrated that the manufacturers reviewed interpret AMP requirements differently. Consistent with our findings, industry groups also emphasized the need to clarify requirements. Further, they raised additional issues related to the implementation of DRA provisions. Because the DRA expands the use of AMPs and creates new reimbursement policy implications, future errors or inconsistencies in manufacturers' AMP calculations could lead to inaccurate or inappropriate reimbursement amounts as well as rebate errors.

### SUMMARY OF OFFICE OF INSPECTOR GENERAL WORK

Our work on Medicaid drug rebates has focused on how manufacturers calculate AMP and how CMS and other agencies use AMP. Findings in these areas demonstrate the need to clarify the definition of retail class of trade and the treatment of pharmacy benefit manager (PBM) rebates and Medicaid sales in AMP calculations. One issue fundamental to the proper treatment of PBM and other rebates is whether AMP should represent the net price realized by manufacturers or the price paid by purchasers that take possession of the drugs. Our findings also highlight the need to consider the implications of previously reported problems in the timeliness and accuracy of manufacturer-reported AMPs.

#### Calculating Average Manufacturer Price

Our first review, initiated in 1991, found that four drug manufacturers used three different methods to calculate AMP; they based the calculations on gross sales to wholesalers, net sales to wholesalers, or direct retail sales and retail sales reported by wholesalers. We recommended that CMS survey other manufacturers to identify the methods used to determine AMP and develop a more specific policy for calculating AMP that would protect the Government's interest and be equitable to manufacturers.

At CMS's request in the mid-1990s, we reviewed the AMP submissions of two manufacturers that had revised their AMP calculation methodologies. For the first manufacturer, we were unable to express an opinion on the revised methodology because the manufacturer lacked adequate documentation to support its changes. The second manufacturer's methodology revision primarily involved the inclusion of price concessions to customers that the manufacturer considered to be retail. For example, the manufacturer decided that price concessions to mail-order pharmacies, nursing home pharmacies, PBMs, independent practice associations, and clinics represented the retail class of trade. Based on our limited review, we disagreed with the manufacturer's designation of these customers as part of the retail class of trade; therefore, we believed that the price concessions should not have been included in AMP. However, at the time, no guidance addressed the retail class of trade issues that we reviewed. Subsequent to that review, CMS issued release 29, which provided guidance on the treatment of some of these customers.

In 2003, we initiated reviews of four manufacturers. We selected these manufacturers because they had reported to CMS that they had changed their AMP calculation methodologies and had, as a result, received State refunds of previously paid rebates. We once again found differences in the ways that manufacturers treated certain elements of their AMP calculations. As discussed below, these reviews identified significant issues related to the treatment of PBM rebates and Medicaid sales.

*Treatment of Pharmacy Benefit Manager Rebates*

A major factor contributing to inconsistencies in manufacturers' AMP calculations is the business relationship between a manufacturer and various groups involved in distributing drugs. PBMs, in particular, have assumed a prominent role in the drug distribution network.

Health plans and third-party payers often hire PBMs to help manage the drug benefits paid by those plans. PBMs may act on behalf of many types of customers, of which some could be considered a part of the retail class of trade. Unless a PBM has a mail-order component, it generally does not purchase drugs or take delivery of or title to the drugs.

PBMs may negotiate and receive rebates and other payments from manufacturers based on services provided (e.g., formulary development and communications to patients) and/or based on a drug's utilization or market share. PBMs may share or "pass through" to their customers some or none of the rebates or fees they receive from manufacturers. Manufacturers are generally not parties to the contracts between PBMs and their customers. Manufacturers have indicated that they may not know how much, if any, of the rebates received by a PBM are passed on to the PBM's customers. Retail pharmacy groups have indicated that PBM rebates do not get passed on to pharmacies.

Three of the four manufacturers audited as part of our ongoing work reduced their AMP values for rebates paid to PBMs. The inclusion of PBM rebates in an AMP calculation reduces AMP, resulting in lower Medicaid rebates to the States.

- Two manufacturers included all rebates paid to PBMs when calculating AMPs. One manufacturer believed that PBMs act like wholesalers because they manage the flow of drug products through their network of pharmacies. The other manufacturer indicated that, with the lack of formal guidance addressing how to handle PBM rebates, nothing precluded it from including payments to PBMs.

- The third manufacturer included a portion of its PBM rebates in the calculation of AMP based on an analysis of the health plans represented by PBMs. The manufacturer determined the percentage of health plans that it considered to be "retail," allocated rebates paid to PBMs for those plans, and included that percentage of the rebates in the AMP calculations.

Conversely, the fourth manufacturer did not include rebates paid to PBMs in its AMP calculations. This manufacturer decided not to characterize transactions with PBMs as "sales"

because PBMs do not take possession of drugs; therefore, this manufacturer believed that including the rebates in AMP would not be consistent with section 1927 of the Act.

Neither section 1927 of the Act nor the rebate agreement addresses the issue of how to treat rebates that manufacturers pay to PBMs. CMS issued three releases in 1997 that discussed PBMs. Releases 28 and 29 stated that "drug prices to PBMs" had no effect on AMP calculations unless the PBM acted as a wholesaler as defined in the rebate agreement. (CMS did not explain what it meant to act as a wholesaler in the context of PBMs, which do not typically take delivery of and title to drugs.) In release 30, CMS recognized existing confusion relating to the treatment of PBMs and stated that it intended to reexamine the PBM issue and hopefully clarify its position in the future. However, to date, CMS has not done so.

*Treatment of Medicaid Sales*

Another factor contributing to inconsistencies in manufacturers' AMP calculations is the different interpretation of what sales should be included/excluded in the calculations. For example, our recent reviews found that some manufacturers excluded from the calculations a portion of sales to pharmacies that dispense prescription drugs to Medicaid beneficiaries. Two manufacturers subtracted Medicaid sales from their AMP calculations. Removing Medicaid sales from gross sales generally lowered AMP for these manufacturers.

Medicaid does not directly purchase drugs from manufacturers or wholesalers but reimburses pharmacies after the drugs have been dispensed to Medicaid beneficiaries. Because a pharmacy that dispenses drugs to Medicaid beneficiaries likely dispenses drugs to non-Medicaid patients from the same containers of the product, it would be nearly impossible for a manufacturer to specifically identify a sale that would be considered a Medicaid sale. However, two manufacturers estimated Medicaid sales amounts to subtract from the AMP calculations by multiplying the number of units that States reported when billing the manufacturer for rebates by the price the wholesaler paid for the drug.

The two manufacturers justified removing Medicaid sales for different reasons. One manufacturer indicated that because the rebate agreement did not allow a reduction of gross sales by the value of Medicaid rebates paid in calculating AMP, the sales associated with the rebates should also be excluded. The other manufacturer likened Medicaid sales to State Pharmaceutical Assistance Programs, which provide drug coverage to certain qualified individuals. CMS's release 29 provides that sales under these programs should not be considered in AMP, so the manufacturer concluded that Medicaid sales should also not be considered.

Like Medicaid, State Pharmaceutical Assistance Programs do not purchase drugs from manufacturers or wholesalers but reimburse pharmacies for dispensing the drugs and may receive rebates from manufacturers. However, release 29 did not address the question of whether only the rebates paid to the programs should be excluded from AMP calculations (similar to the statutory requirement to exclude Medicaid rebates) or whether the underlying sales associated with the rebates should also be excluded.

We disagree with the reasoning of both manufacturers.  The exclusion of Medicaid sales is not addressed in section 1927 of the Act, the rebate agreement, or any of the releases.  In addition, retail pharmacies that very often dispense drugs to the Medicaid population would seem to fall squarely within the plain language of the "retail pharmacy class of trade" provision of the AMP definition.

**Using Average Manufacturer Price in Reimbursement Calculations**

Concerns related to AMP calculations take on additional significance given that the DRA has expanded the use of AMP.  Prior to the DRA, AMP was primarily used as the fundamental component in determining the amount of Medicaid drug rebates.  However, the DRA provides for the use of AMP as a basis for Medicaid reimbursement for the first time.  Issues arising from the use of AMP in connection with the 340B drug-pricing program provide useful lessons as CMS (and potentially the States) prepares to use AMP as a basis for Medicaid reimbursement.

The 340B program, established by the Veteran's Health Care Act of 1992, is a drug discount program for certain qualified covered entities (including Public Health Service and other safety-net providers) that serve vulnerable patient populations.  Under the 340B program, manufacturers agree to charge participating covered entities prices that are at or below a specified maximum price (known as the ceiling price) for purchases of outpatient drugs (42 U.S.C. § 256b(a)(1)).  The ceiling prices are based, in part, on the reported AMP and unit rebate amounts for covered drugs (42 U.S.C. § 256b(a)).

In our review of the 340B program, we found two primary issues that have implications for the use of AMP as the basis of Medicaid reimbursement:  the timely submission of AMP data by manufacturers and the accuracy of reported AMP data.

Our review found that manufacturers did not always report AMP in a timely manner or, in some cases, did not report AMP at all.[3]  For example, the 340B ceiling price file for the first quarter of 2005 was missing 28 percent of the prices necessary to calculate 340B ceiling prices.  For 70 percent of these missing prices, the file did not contain the AMP.

Manufacturers are required to report their drugs' AMPs and, where applicable, the best price within 30 days after a quarter's end so that CMS can calculate the drug's Medicaid unit rebate amount (section 1927(b) of the Act).  CMS staff reported that if the data were late, they typically contacted the manufacturers that submitted incomplete data and requested prompt submission.  According to CMS, most manufacturers were responsive to these contacts and typically provided the missing data with their next quarter's submission.

While timely submission of AMP data is important to the Medicaid rebate program, it will become even more critical when Medicaid uses AMP data as a basis for reimbursement.  Late submissions of AMP data may delay, rather than prevent, State Medicaid agencies' rebate collections.  However, late submissions may prevent CMS from calculating accurate Federal upper limit prices and hinder States' ability to accurately reimburse pharmacies.

---

[3]"Deficiencies in the Oversight of the 340B Drug Pricing Program" (OEI-05-02-00072, October 2005).

Our reviews have also found issues related to the accuracy of reported AMP data. CMS's edit of a manufacturer's AMP submission is designed to reject an AMP that is 50 percent higher or lower than the manufacturer's submission for the previous quarter. When the edit detects aberrant AMP values, CMS sends a report to the manufacturer requesting corrected information. While inaccuracies may ultimately be corrected, inaccurate AMP submissions also affect the timeliness of CMS's receipt of the correct AMPs and could affect reimbursement made before the data are corrected.

In our review of States' accountability and control over Medicaid rebate collections, we noted problems with unit rebate amounts of zero that resulted from inaccurate AMPs and the untimely reporting of AMPs.[4] This created accountability problems in some States' administration of their rebate programs and could also create problems for reimbursement based on AMP.

## SUMMARY OF INDUSTRY GROUP PERSPECTIVES

We met with eight groups that represented a cross-section of interested stakeholders, including manufacturers, pharmacies, distributors, and States, and invited the groups to provide written comments for our consideration. Six of the eight groups provided written comments. We have summarized some of their comments and suggestions below and have included their complete written comments in Appendixes A through F. We believe that the industry comments provide CMS with valuable information to use in clarifying requirements related to calculating AMP, using AMP in reimbursement calculations, and implementing provisions of the DRA.

### Calculating Average Manufacturer Price

*Definition of Retail Class of Trade*

Consistent with our own findings, industry groups emphasized the need for clarification of entities included in the retail class of trade for AMP calculations. The manufacturer groups commented that CMS had not fully addressed which classes of trade are to be considered "retail" for purposes of calculating AMP. Release 29 clarified the retail status of some classes of trade but not all. The manufacturer groups pointed out the lack of guidance for classes of trade such as physicians, clinics, and patients (i.e., coupons or other patient discount programs).

While they agreed on the need for clarification, respondents presented different suggestions for addressing this issue. One manufacturer group suggested that the retail class of trade be defined to include only entities that dispense drugs to the general public on a walk-in basis (e.g., retail, independent, and chain pharmacies) and mail-order pharmacies that dispense drugs to patients who do not receive other specialized or home care services from the entity. Another manufacturer group did not recommend a particular definition but encouraged a definition that stipulates the criteria or rationale used to determine whether classes of trade are retail or nonretail.

The pharmacy groups advocated that the retail class of trade be limited to traditional retail outlets such as chain and independent pharmacies. These groups also believed that manufacturer sales

---

[4]"Multistate Review of Medicaid Drug Rebate Programs" (A-06-03-00048, July 6, 2005).

to mail-order and nursing home pharmacies should not be considered retail for the purposes of calculating AMPs.

The decision to include or exclude certain entities has important implications for AMP. The entities in question, i.e., physicians, clinics, and mail-order and nursing home pharmacies, may not all purchase drugs at the same price, so including or excluding sales to these entities may have the effect of decreasing or increasing AMP.

*Treatment of Pharmacy Benefit Manager Rebates*

Also in keeping with our findings, respondents raised issues surrounding the treatment of PBM rebates. One manufacturer group commented that CMS's limited PBM guidance had caused confusion. This group did not want any requirement that obligates manufacturers to gather information from "downstream" entities (e.g., PBM customers). The group indicated that contracts between PBMs and their customers do not have uniform provisions on the sharing of manufacturer rebates, and the group was not sure whether manufacturers could contractually require the information. Additionally, the group noted that it would be difficult to incorporate such information into AMP calculations.

The pharmacy groups and the distributor group all favored excluding PBM rebates from the AMP calculation (i.e., not subtracting rebate payments from the sales dollars) because the rebates are not passed on to the retail pharmacies.

*Treatment of Administrative and Service Fees*

Industry groups also sought clarification of the treatment of administrative and service fees, and respondents raised some specific points for CMS to consider in determining how to treat these fees. One manufacturer group noted that release 14 was the only guidance addressing fees and that it did not provide needed specificity. Release 14 states that administrative fees should be included in AMP if they are paid to an entity whose sales are included in the AMP calculation and if the fees ultimately affect the price realized by the manufacturer.

Another manufacturer group suggested that if CMS were to apply the average sales price criteria to service and administrative fees, it should clarify whether the definition of bona fide service is satisfied in relation to traditional wholesaler functions (e.g., pick, pack, and ship services).[5] In addition, one manufacturer group did not want the decision to include or exclude fees to require a manufacturer to obtain information regarding transactions between downstream entities.

---

[5]The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 established the average sales price as the basis for determining reimbursement amounts for most Medicare Part B drugs. CMS guidance (question and answer 3318 on the CMS Web site at http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/) indicates that administrative fees are included in the average sales price if they are paid to an entity whose sales are included in the average sales price calculation and if they ultimately affect the price realized by the manufacturer. Additionally, question and answer 4136 indicates that "bona fide service fees that are paid by a manufacturer to an entity, that represent fair market value for a bona fide service, and that are not passed on" to the entity's clients or customers are not included in average sales price calculations because the fees would not ultimately affect the price realized by the manufacturer. Ongoing OIG audits have shown that manufacturers treat average sales price-related administrative and service fees inconsistently.

The pharmacy groups and the distributor group, however, did not believe that these fees should be used to reduce sales values included in AMP calculations.

Including these fees would generally result in lower AMPs and, therefore, lower rebates and reimbursement (for those drugs with reimbursement based on AMP).

*Lagged Price Concessions and Returned Goods*

The industry groups indicated that the timing of price concessions and returned goods could create inconsistent AMPs from one period to the next, thereby creating problems with using AMP as a basis for reimbursement.

One manufacturer group stated that a methodology should be prescribed to account for late-arriving discount and rebate data. Another manufacturer group did not specifically mention lagged price concessions but commented that AMP should be calculated in such a way that would avoid the need for retroactive adjustments. The group noted that returns should be addressed. Yet another manufacturer group recommended that CMS encourage "smoothing" to accommodate transaction timing.

One pharmacy group and the distributor group recommended that lagged rebates and discounts be smoothed over a rolling 12-month period, similar to the manner in which average sales price is calculated. They also recommended that returned goods not be considered in AMP calculations.

**Using Average Manufacturer Price in Reimbursement Calculations**

One manufacturer group stated that AMP should not be used to set reimbursement rates until a standardized methodology for calculating AMP has been established. The group noted that the use of AMP in setting the Federal upper limits is scheduled to start January 1, 2007, but CMS is not required to issue its regulation until July 1, 2007. Another manufacturer group commented that the regulations should ensure that AMPs used in reimbursement are calculated in a way that avoids the need for restatements and unnecessary quarter-to-quarter volatility. The group also recommended that OIG caution States about potential volatility in AMP that may occur as a result of this report and CMS's expected regulation. A third manufacturer group commented that large-volume purchasers such as large national chain drug stores could affect AMP and result in inadequate reimbursement for independent pharmacies.

The pharmacy groups expressed concern about using AMP, which was created for rebate purposes, as a benchmark for reimbursement.

**Deficit Reduction Act Implementation Issues**

*Frequency of Average Manufacturer Price Reporting*

The manufacturer groups noted that the DRA required monthly AMP reporting but did not change the quarterly rebate-reporting period in the Act.  Because of this discrepancy, the groups indicated that it was unclear whether manufacturers would be required to calculate and report:

- a monthly AMP using 1 month's data;

- a monthly AMP using the most recent 3 months' data (e.g., a rolling average methodology);

- a monthly AMP using a methodology different from that used for rebate purposes;

- a quarterly AMP separate from the monthly AMPs; or

- a quarterly AMP that is an average of the monthly AMPs.

*Average Manufacturer Price Restatements*

One manufacturer group wanted to know whether AMP calculations would be considered final when submitted or whether manufacturers would be able, or even required, to restate their AMP calculations when they recognize that a prior AMP calculation was incorrect.  Another manufacturer group asked whether AMP resubmissions would be permitted.  A third manufacturer group believed that manufacturers should be able to restate quarterly AMPs, but not the monthly AMP.

*Baseline Average Manufacturer Price*

Baseline AMP represents the AMP calculated for the first full quarter a drug is on the open market.  It is used to determine whether an additional rebate is owed to the Medicaid program.  Essentially, if an AMP rises in value faster than the baseline AMP (after adjusting for inflation) the manufacturer must pay an additional rebate.  Pursuant to the DRA, prompt pay discounts should no longer be considered in calculating the current quarter's AMP.  Previously, section 1927(k)(1) of the Act required that prompt pay discounts be used to reduce the sales values included in the baseline AMPs.  Excluding these discounts could potentially result in an increase in AMPs that exceeds the inflation adjustment, thereby triggering the additional rebate.  Two manufacturer groups expressed concern that manufacturers could be penalized if baseline AMPs were not adjusted to conform to the new AMP definition.  The groups indicated that manufacturers would pay an unfair amount of additional rebates related to the methodology change unless the baseline AMP is also adjusted.

One manufacturer group recommended that manufacturers be allowed, but not required, to adjust baseline AMPs.  The group was concerned that a requirement to adjust baseline AMPs would be impractical for some manufacturers due to data availability and operational burden issues.

Another manufacturer group recommended that CMS work with manufacturers to develop reasonable methodologies to adjust baseline AMPs.

As a related issue, two manufacturer groups commented that any changes in AMP methodology should be made only prospectively and not retrospectively.

**RECOMMENDATIONS**

We recommend that the Secretary direct CMS, in promulgating the AMP regulation, to:

- clarify requirements in regard to the definition of retail class of trade and the treatment of PBM rebates and Medicaid sales and

- consider addressing issues raised by industry groups, such as:

    o administrative and service fees,
    o lagged price concessions and returned goods,
    o the frequency of AMP reporting,
    o AMP restatements, and
    o baseline AMP.

We also recommend that the Secretary direct CMS to:

- issue guidance in the near future that specifically addresses the implementation of the AMP-related reimbursement provisions of the DRA and

- encourage States to analyze the relationship between AMP and pharmacy acquisition cost to ensure that the Medicaid program appropriately reimburses pharmacies for estimated acquisition costs.

**CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS**

In commenting on a draft of this report, CMS stated that it would address each of the recommended areas, as well as the areas raised by industry groups, in its proposed regulation. CMS also stated that it would evaluate the need for additional guidance.

CMS's comments are included as Appendix G. Attached to those comments were technical comments, which we addressed as appropriate.

# APPENDIXES



# BIO

BIOTECHNOLOGY
INDUSTRY
ORGANIZATION

March 31, 2006

Marcia Sayer
External Affairs
Office of the Inspector General
330 Independence Ave, SW
5th Floor, Room 5541
Washington, DC 20201

The Biotechnology Industry Organization (BIO) appreciates this opportunity to provide comments to the Department of Health and Human Services Office of Inspector General (OIG) regarding the content of its report to the Secretary and Congress, due June 1, 2006. That report is to contain recommendations regarding the calculation and reporting of Average Manufacturer Price (AMP) under section 1927 of the Social Security Act.

BIO is the largest trade organization to serve and represent the biotechnology industry in the United States and around the globe. BIO represents more than 1,100 biotechnology companies, academic institutions, state biotechnology centers, and related organizations in the United States. BIO members are involved in the research and development of health-care, agricultural, industrial and environmental biotechnology products.

BIO accepted the OIG's invitation to meet on March 15, 2006 to describe our views about the requirements for, and the manner in which, average manufacturer prices are determined. At that meeting, the OIG representatives requested that BIO supplement its discussion in the meeting with a written submission, by March 31, 2006. This letter responds to that request. As we noted in that meeting, the central principle of BIO's comments is that the OIG's recommendations should promote consistency, clarity, and economic fairness in the calculation and reporting of AMP.

## Monthly Reporting of AMP

The Deficit Reduction Act (DRA), at section 6001(b)(1), changes the current quarterly reporting timetable for Average Manufacturer Price (AMP) and Best Price (B) to a monthly period. This monthly reporting is meant to facilitate the use of AMP figures to set monthly Federal Upper Payment Limits, or FULs, under

DRA section 6001(a) for multiple source drugs. While the DRA did change the AMP and BP reporting timetable, the DRA did not change the statutory definition of "rebate period," i.e. the period for each state rebate claim, contained at 42 U.S.C. § 1396r-8(k)(8), which remains "a calendar quarter or other period specified by the Secretary." Given the intended use of AMPs to set reimbursement rates and the current inconsistency between the statutory reporting and rebate periods, BIO requests that the OIG's recommendations address the following issues:

1. **Monthly calculation of AMP figures.** The OIG recommendations should specify whether or not the new monthly timetable for reporting AMP figures also requires manufacturers to calculate AMP figures on a monthly basis, as opposed to requiring manufacturers to report a quarterly AMP figure on a monthly basis. This clarification is of paramount importance and necessary so that manufacturers can prepare for the 2007 implementation timetable.

2. **The calculation methodology for monthly AMP figures**. If the OIG recommends that the DRA be interpreted to require monthly calculation and reporting of AMP figures, then the OIG recommendations should also address the methodology for calculating AMP on a monthly basis. The use of monthly AMP figures to set reimbursement rates suggests that such figures, like Average Sales Price, should be final when submitted and not subject to manufacturer revisions during the three year restatement period currently permitted by regulation (42 C.F.R. § 447.534(h)(2)(i)). The OIG recommendations should address this issue. In doing so, the OIG recommendation should consider the significant added administrative burden and operational complexity that a requirement to restate monthly AMP figures would impose on manufacturers, CMS, and the States.

If the OIG recommendation is that monthly AMP figures should <u>not</u> be subject to subsequent revision by manufacturers, then the OIG recommendations should also address in specificity the methodology that manufacturers should use to estimate late-arriving data that is used to quantify AMP-eligible discounts and rebates and AMP-ineligible sales, the level of accuracy needed for such calculations, as well as the process for manufacturers to follow should they discover errors in previously submitted figures.[1] Whether the OIG recommends for or against the continued availability of the restatement period, given the prevalence in the industry of quarterly performance periods under discount and rebate contracts, the OIG recommendations also should address how such quarterly discount measurements should be accounted for in a monthly calculation.

---

[1] While the DRA does not direct the OIG to also provide recommendations regarding the calculation of Best Price, should the OIG recommend that AMP and BP figures not be subject to revision, BIO requests that the OIG also recommend a methodology for accounting for late-arriving data in the calculation of Best Price.

2

**3. The statutory rebate period**. The OIG recommendations should address whether the rebate period should continue to be a quarterly one, and if so, how the quarterly rebate amount will be derived from reported monthly AMP and BP figures.[2] For a quarterly rebate period, a possible solution is to require manufacturers to submit a quarterly weighted average AMP figure with its monthly submission for the third month of the quarter, with the quarterly weighted average AMP being derived from the AMPs reported for each of the months in the quarter and weighted based on AMP-eligible units for each month. Another approach would be to have manufacturers calculate monthly AMPs for the first two months of the quarter, but have the AMP for the third month of a quarter be calculated as a quarterly figure. Either approach would also provide a solution for calculating future base date AMP figures, which the Medicaid statute requires be determined based on the statute's quarterly rebate period, see 42 U.S.C. § 1396r-8(c)(2)(A), as well as for deriving Public Health Service Ceiling Prices, which federal law also requires to be derived from quarterly prices, see 42 U.S.C. § 256b(a)(2).

The OIG recommendations should also address whether manufacturers would be permitted to revise such quarterly AMP figures to reflect late-arriving data relating to AMP-eligible discounts and rebates and AMP-ineligible sales. Even if the OIG were to recommend against the availability of such revisions in relation to the AMP figures reported on a monthly basis and used to set reimbursement rates, the OIG recommendations should separately address the availability of such revisions for the AMP figures used to calculated Medicaid unit rebate amounts, and if the ability to make such revisions remains available, whether such revisions are mandatory. The continued availability of the 3-year restatement period would permit manufacturers to ensure that the AMP figures used to calculate rebate amounts are as accurate as possible and based on actual sales and discount data. However, given the added administrative burden of such revisions to both manufacturers and the States, should the OIG recommend against the availability of restatements for monthly AMP figures and direct the use of estimation methodologies for that reason, the OIG should permit manufacturers also to choose to rely on those monthly AMP figures for purposes of deriving an AMP for the rebate calculation. Manufacturers should be permitted to revise those AMP figures, to reflect late-arriving actual sales data, but not be required to do so.

**4. Effective date for monthly reporting**. The DRA, at section 6001(b)(1), requires CMS to begin its own monthly reporting of AMP figures to the States on July 1, 2006, using "the most recently reported average manufacturer prices." The DRA change to a monthly reporting timetable for manufacturers does not include its own effective date, and therefore appears to be governed by section 6001(g) of the DRA, which provides for an effective date of January 1, 2007

---

[2] BIO notes that any recommendation to change to a rebate period that is shorter than a quarter would require a significant implementation preparation period for manufacturers as well as the States.

where effective dates are not otherwise provided. Given the significance of this effective date to manufacturers, the OIG recommendations should confirm that that the monthly reporting obligation for manufacturers begins with the AMP and BP figures for January 2007.

**5. Use of AMPs for Reimbursement Rates Prior to Issuance of Methodology Guidance.** The DRA, at section 6001(a)(2), requires the use of AMP to set federal upper payment limits for multiple source drugs effective January 1, 2007, but, at section 6001(c)(3), does not require CMS to issue its rule regarding the AMP calculation until July 1, 2007. BIO believes that any AMPs used to set reimbursement rates should be calculated using a standardized methodology that is the result of input from all government and private-sector stakeholders, to ensure that the resulting reimbursement rates are fair and equitable as well as to ensure that patient access is not adversely impacted by variation in manufacturer methodology assumptions. The OIG therefore should recommend that CMS either postpone the use of AMPs to set reimbursement rates until the effective date of its rule regarding the AMP methodology, or that CMS in the short term issue interim guidance that will apply to the AMP calculation until the rule is issued and effective.

<u>Inflation Penalty Rebate Calculation and the Prompt Pay Discount</u>

The DRA, at section 6001(c )(1), directs that customary prompt payment discounts extended to wholesalers no longer be included as a reduction to AMP starting January 2007.[3] The inflation penalty component of the quarterly rebate calculation requires the comparison of an inflation-adjusted AMP for the first full quarter of sales (the base date AMP) with the current quarter's AMP. Where the current quarter AMP exceeds the inflation-adjusted base date AMP, the difference is added to the Medicaid rebate. If customary prompt payment discounts are excluded from AMP only for the current quarter's AMP, and not also for the base date AMP, this comparison will falsely conclude that an inflation penalty is due for that proportion of the increase in the current quarter's AMP caused by the exclusion of the prompt pay discount.

The OIG recommendations should include a proposed methodology for avoiding this result. One approach would be to permit, but not require, manufacturers to recalculate their base date AMP figures to exclude customary prompt payment discounts, and to use those recalculated base date AMP figures for rebate calculations effective in 2007. The OIG should not require such a recalculation because, for certain manufacturers, data availability and the operational burden of such recalculations may make such recalculations impractical. For example, this approach would require many manufacturers to access pricing data that is many years old, stored in legacy information technology systems, and possibly relating to quarters outside of the 10 year document retention period specified in

---

[3] The OIG recommendations should also confirm whether the definition of "wholesaler" in the Medicaid Agreement is the definition that should be used when interpreting this provision.

42 C.F.R. § 447.534(h). This approach also would require manufacturers and CMS to store and track two different base date AMP figures: one for rebate calculations relating to quarters prior to 2007 and one for quarters in 2007 and later years. As the recalculation of base date AMP would serve only to lower rebate liability, should the OIG choose this approach, manufacturers should be permitted to choose whether or not to recalculate their base date AMP figures.[4]

An alternative, and more streamlined, solution would be to revise the calculation methodology for the inflation penalty component of the rebate calculation so as to mathematically offset the impact of excluding prompt pay discounts for AMPs reported for January 2007 and later. One method for doing so would be to direct that the inflation penalty calculation include a standardized, formula-based upward adjustment to the base date AMP. For example, if the OIG were to conclude that the customary prompt payment discount percentage was 2%, then the OIG could recommend that the inflation penalty rebate calculation be adjusted to divide each reported base date AMP by .98, before applying the CPI-U based inflation factor, so as to upwardly adjust that base date AMP so that it no longer reflects customary prompt payment discounts. In this example, if the base date AMP is $98, where it would be $100 without inclusion of the prompt pay discounts, dividing that $98 base date AMP by .98 will result in a revised base date AMP of $100. This formula-based approach would have the advantage of avoiding the calculation and maintenance by CMS and manufacturers of separate base date AMP figures for rebate periods before and after 2007. This approach would also ensure that all manufacturers address this issue in the same manner.

## Classes of Trade

The definition of AMP remains "the average price paid to the manufacturer for the drug in the United States for drugs distributed to the retail pharmacy class of trade." 42 U.S.C. § 1396r-8(k)(1)A(). Very little written guidance exists from CMS regarding the definition of the retail pharmacy class of trade. The OIG recommendations should define the retail pharmacy class of trade with specificity. This definition should address particular classes of entities, examples of which are discussed below, but also include the general rule that the OIG recommends be used when evaluating entities not otherwise addressed by OIG or CMS guidance. Such a general rule will provide manufacturers with a crucial baseline for use in evaluating new entity types, and will promote the important goals of consistency, clarity, and economic fairness.

---

[4] If the OIG recommendation is to permit manufacturer recalculation of base date AMPs, the recommendation should also address whether the manufacturer must use the same AMP methodology the manufacturer had in place during the base date quarter. Many manufacturers have revised their AMP methodologies over time to address CMS guidance, and a legacy AMP methodology also may no longer be supported by a manufacturer's information technology. For these reasons, the OIG recommendation should permit manufacturers to use their current AMP methodology to recalculate the base date AMP.

**1. Classes of trade for which guidance is needed.** Current CMS guidance either does address, or does not address with sufficient specificity, the retail or non-retail status of: physicians, clinics, patients (including coupon arrangements for discounts or non-contingent free product), Part D utilization, Specialty Pharmacy, Competitive Acquisition Program or CAP sales, Pharmacy Benefit Manager mail order and retail pharmacy utilization, State Pharmacy Assistance Program (SPAP) and Medicaid program utilization, and health care plan utilization. The OIG recommendations should address each of these entity types, define each such class of trade in a manner specific enough to permit manufacturers to readily determine into which category any entity should be placed, and specify the OIG's rationale for the recommended retail or non-retail status of each class.

**2. Calculation treatment of discounts and units.** The OIG recommendations should specify for each class of trade the treatment of gross sales, discount dollars, net sales, if applicable, and the respective sales units associated with that class of trade. Specifically, the OIG recommendations for each class of trade should specify (1) whether gross sales, net sales, and/or discounts extended to that class of trade should be used to reduce the AMP numerator, and (2) whether the units associated with that class of trade, whether identified through sales or reimbursement transactions, should remain in the AMP denominator. This specificity is necessary to ensure clear guidance regarding treatment of a given class of trade in the AMP numerator (sales dollars) and denominator.

<u>Additional AMP Methodology Issues</u>

In addition to the issues identified above, BIO requests that the OIG recommendations also address the following issues:

**1. Prospective application only.** The OIG recommendations should specify that any clarifications and/or changes in CMS directions regarding the calculation of AMP are to be applied on a prospective basis only. The very nature of the OIG recommendations and CMS' implementation of them suggests that they are changes to existing practice, provided because of the absence of guidance in the past. These changes therefore should be prospective only. Moreover, given the complexity of the DRA changes to the AMP calculation and reporting timetable, and the operational complexity that implementing those changes presents to manufacturers, the OIG recommendations also should specify that CMS implement the DRA changes using a single, prospective implementation date that provides manufacturers with a minimum of six months lead time to make the necessary preparations.

The OIG recommendations should also include a recommendation that any and all CMS guidance in the future specify whether that guidance is to be applied prospectively and or retrospectively. Should the OIG recommend that

monthly AMP and BP figures not be open to revision by manufacturers during the three year regulatory period, and should CMS adopt that approach, it will be even more imperative that any future CMS guidance regarding calculation issues be prospective in application only.

**2. Service and administrative fees.**   The OIG recommendations should address the treatment of service and administrative fees paid to entities included in the calculation of AMP.  Such guidance does exist as to the calculation of ASP, in the form of two Q&As (numbered 3318 and 4136 at the FAQ link at http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/).  However, the existing guidance for AMP is limited to that contained in Release to Participating Manufacturers 14, and does not provide needed specificity regarding the circumstances under which such fees may and may not be included in the AMP calculation.  If the OIG recommends use of the same criteria in the AMP calculation as CMS has directed be used in the calculation of ASP, the OIG recommendations should clarify whether the definition of "bona fide service" is satisfied in relation to traditional wholesaler functions such as pick, pack, and ship services.

**3. Methodology change review and approval process.**  The OIG recommendations should also address a process and timeline for approval of manufacturer-proposed AMP methodology changes.  The current CMS process is described by CMS itself as one through which manufacturers submit requests for approval, and as to which CMS provides no response or resolution.  The OIG should recommend a process that details the information needed with a submission, the criteria for approval, and a deadline for CMS resolution.

In conclusion, BIO appreciates this opportunity to provide comments to the OIG regarding its recommendations to CMS as to the calculation and reporting of Average Manufacturer Price.  We hope our suggestions will help the OIG to identify and provide substantive recommendations that will help manufacturers submit the data needed to calculate appropriate Medicaid reimbursement and rebate amounts for drugs and biologicals.  Please contact me at 202-312-9273 if you have any questions regarding our comments.  Thank you for your attention to this very important matter.

Respectfully submitted,

Jayson Slotnik
Director, Medicare Reimbursement and
Economic Policy
Biotechnology Industry Organization



April 20, 2006


Office of the Inspector General
Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC

*Re: HHS OIG study of Average Manufacturer Price*

As discussed during our March 16 meeting, GPhA has concerns over the implementation
of the Medicaid reform legislation. These concerns are in the areas of reimbursement
methodology and program administration. We recognize that there is a need for the
Medicaid Program to realize savings through the continued and expanded use of generic
prescription medicines. To that end, we need to work together to ensure that all entities in
the supply chain retain incentives for the continued manufacturing and dispensing of
generic medicines.

Methodology for Calculating AMP:

In order to understand GPhA's concerns regarding the importance of a clearly defined
methodology for calculating Average Manufacturer Price (AMP), it is important to
understand the typical chain of distribution for the products of generic pharmaceutical
manufacturers. Generic pharmaceutical manufacturers currently distribute their products
directly to warehousing chain pharmacies, mail order pharmacies, various managed care
entities, wholesalers and distributors (who themselves resell to non-warehousing chain
pharmacies, independent pharmacies, hospitals, clinics, etc.). For reference, warehousing
chain pharmacies include, but are not limited to, Brooks / Eckerd, CVS, Rite Aid,
Walgreens, and Wal*Mart; mail order pharmacies include Caremark, Medco, and
Express Scripts; and wholesalers include AmerisourceBergen, Cardinal, and McKesson.
(Note: Some large chains like Walgreens and CVS also have mail order divisions.)

The legislation contemplates not only the publication of manufacturer AMP data, but also
changes to the methodology for calculating. As we understand it, the AMP is intended to
account for all recorded sales and discounts within the reported period; however, as you
are undoubtedly aware, fluctuating order patterns and erratic timing of transactions result

in unpredictable fluctuations in AMP from month to month, or quarter to quarter based on customer mix, discount payments, returns and other normal business transactions. Moreover, given the ambiguity in the current regulatory guidance for calculating AMP, different manufacturers may very well be employing different assumptions either on their own or in conjunction with regulatory counsel to calculate their respective AMPs, which results in a variability across AMPs that prevents a true apples-to-apples comparison of pricing data across manufacturers.

It is also important to note that a manufacturer's AMP is actually a weighted average price, heavily influenced by the purchasing power of large national chain drug stores, and mass merchants. The prices paid by these volume purchasers generally are not available to others in the pharmacy community, including the independent pharmacies that portions of the Medicaid population rely upon.[1,2] In areas where this is true, this inequity in pricing creates the potential for access to be a significant issue in the implementation of the proposed Medicaid reform. Whether sales to such volume purchasers should be included in AMP is just one of the questions raised by this legislation.

Another question concerns the legislation's current approach of using the lowest AMP reported for multi-source products upon which to base reimbursement. This model does not provide a means to measure:

1. De minimis sales volume associated with a given manufacturer's AMP,
2. A manufacturer's decision to sell a product to a single entity, regardless of volume, at a discounted price which would not represent a widely available price,
3. Discounts available to large volume purchasers based on the purchase of bulk package sizes; thereby creating a potential for reimbursement to be based on pricing that is not widely available, and in fact a statistical outlier,
4. The widespread availability to all pharmacy purchasers of certain manufacturers products,
5. The continued availability of a product for which an AMP is generated, and
6. Substantial wholesaler/distributor markup fees that apply to a majority of 30,000+ independent retailers/small chains (this subset represents almost 60% of U.S. retail pharmacy) that primarily purchase through wholesalers.

Whatever the answers to these questions, we ask only that your recommendations include a clear and concise methodology for calculating AMP that leaves no room for doubt as to the methodology that should be employed by each manufacturer in calculating AMP.

Program Administration:

In addition to the issues identified around the AMP calculation methodology, there are numerous procedural issues raised and many questions still surrounding the

---

[1] 2005 NCPA- Pfizer Digest
[2] 2005 NACDS Chain Pharmacy Industry Profile

administration of the program.  As an initial matter, despite the inherent ambiguity in the current AMP calculation methodology, the legislation appears to require CMS to make public the most recent manufacturer AMP data on or about July 1, 2006.  Not only does this raise the variability issues, set forth above, but publishing this data not just to the states, but to the public at large, raises serious concerns about the evisceration of the private sector reimbursement model by displaying data known to be flawed.  It is one thing to demand transparency under the guise of government accountability and provide this information to the states; it is quite another to eliminate certain pro-competitive advantages that one manufacturer may have over another in the public sector by publishing a baseline price as to each product of every manufacturer.  CMS has the responsibility to publish a price that accurately reflects the market, nothing more.

Moreover, as outlined above, fluctuations and timing within the generic market make AMP reporting erratic and unpredictable.  This currently occurs with the existing quarterly reporting requirements, and would only be exacerbated with monthly reporting. Products with low unit volume will have a disproportionate influence on the lowest AMP than potential higher AMP products with higher unit volume.  This again reflects concerns over a system not designed around a widely available price, as the current FUL. AMPs could result from pricing available only to a certain minority of providers, yet become the reimbursement standard for the total pharmacy community.  "Smoothing" will also have a huge impact on AMPs due to the large dollar value of chargebacks processed for wholesaler sales for generic products.  CMS has been silent on smoothing in the quarterly AMPs, although CMS does require smoothing for ASP pricing for Medicare Part B.  Generic manufacturers should be encouraged to smooth data in the AMP calculation for reimbursement to accommodate transaction timing.

GPhA and its member companies appreciate the opportunity to share our concerns and thoughts with the OIG and stand ready to provide additional assistance and input as this process moves forward.

Sincerely,

Kathleen D. Jaeger
President and CEO

Attachment:  Questions to Consider

**Additional questions for consideration by OIG**

Once more clarity exists around the AMP calculation methodology, we would like to reserve the opportunity to discuss issues identified, which may include, but are not limited to the following:

1) Will manufacturers be required to submit a monthly AMP for FUL and quarterly AMP for rebates?

2) Will the government provide class of trades for all reimbursable entities in the US, so that these codes are not subjectively assigned by manufacturers? This will ensure consistency across manufacturers when calculating AMPs.

3) Will AMP for FUL be calculated at the 9 or 11 digit NDC? The price would be more accurate if calculated at the 9-digit level.

4) Explain the exclusion of wholesaler cash discounts? Does this apply to all customers?

5) Explain the separate reporting requirement for cash discounts

6) How does a manufacturer report a negative AMP calculation for reimbursement? Comment: For the quarterly AMP for Medicaid rebates, CMS requires that the last quarterly positive AMP be reported.

7) Please explain how AMP and BP are to be calculated for brands/authorized generics? Will the AG give data to the brand for the brand's submission? If so, at what level of detail? Or will CMS calculate based on the Brand and AG's submission?

8) Similar to current AMPs/BPs, will the supplied monthly/quarterly AMP information for each manufacturer be kept confidential, not subject to the FOIA? It could have a negative effect on manufacturers if individual AMPs were posted.

9) Would a manufacturer be permitted to resubmit a monthly AMP for a prior submission?

10) Will there be an incentive to purchase generics via dispensing fees? Will the fees be a flat dollar amount or based on a percentage of AMP?



Healthcare Distribution
Management Association

# RECOMMENDATIONS FOR REGULATIONS DEFINING AMP

## EXCLUDE PROMPT PAY DISCOUNTS

RECOMMENDATION

**The regulations should affirmatively state that customary prompt pay discounts are not to be deducted when AMP is calculated.**

RATIONALE

The Deficit Reduction Act of 2005 (DRA) amended the statutory definition of Medicaid Average Manufacturer Price (AMP) in Social Security Act § 1927(k)(1) by deleting the requirement for "deducting customary prompt pay discounts" when AMP is calculated.  HDMA understands Congress took this action because prompt pay discounts are a common practice widely accepted across many industries and should be viewed as a financial transaction representing the time value of money and risk mitigation, not as a component of the cost of the product.

Regulations affirmatively addressing the proper handling of prompt pay discounts are needed to ensure that manufacturers are alert to the statutory change in the definition of AMP that Congress chose to make by deletion.   Such an alert is particularly important since the requirement to deduct prompt pay discounts from AMP has been in place since the Medicaid drug rebate program began in 1991.

The DRA includes a safeguard provision designed to ensure that the elimination of the deduction of customary prompt pay discounts from AMP is not abused in that it requires manufacturers to report on "customary prompt pay discounts extended to wholesalers" when they report AMP. This safeguard, coupled with the industry's longstanding use of prompt pay discounts, removes the need for implementing regulations that further define customary prompt pay discounts.

# EXCLUDE WHOLESALER SERVICE FEES

RECOMMENDATION

**The regulations should affirmatively state that fair-market-value (FMV) fees paid to pharmaceutical distributors for distribution services that are actually provided by the distributor are not to be deducted when AMP is calculated so long as there is no implicit or explicit agreement between the manufacturer and the distributor requiring the fees to be passed on, in whole or in part, to the distributors' customers.**

**Service fees, derived from manufacturer – distributor negotiations, are structured in a variety of ways. The preamble to the AMP regulation should discuss factors that manufacturers and distributors should consider in determining FMV.**

**The preamble also should recognize that manufacturers may treat service fees as a reduction from total revenues for purposes of financial accounting even though the AMP rule instructs them not to deduct the fees when they calculate AMP.**

RATIONALE

Both Finance Committee Chairman Grassley and Energy and Commerce Committee Chairman Barton stated in separate floor statements that, "It was not the intent of the conferees to suggest that by dropping bona fide service fees from the final agreement [Deficit Reduction Act of 2005] that those service fees should be included in the calculation of the Medicaid Average Manufacturer Price (AMP) reimbursement methodology as established in the pharmacy reimbursement provisions of the conference agreement."

CMS has provided guidance to the industry as a whole in the form of a Frequently Asked Question (FAQ) and directly to HDMA and Specialty Biotech and Distributors Association (SBDA) in a Dec. 9, 2004 letter, indicating that bona fide, FMV services fees should not be deducted when the Average Sales Price (ASP) is calculated. The stated rationale for the ASP instruct applies equally in the AMP context. Specifically, so long as service fees are not passed on to the distributors' customers, they "would not ultimately affect the price realized by the manufacturer."

In spite of the FAQ, manufacturers have not handled service fees consistently in their ASP calculations. Some manufacturers have elected to deduct service fees when ASP is calculated despite the FAQ instruction. These manufacturers have expressed concerns about how to determine whether fees are FMV. To avoid this same confusion in the AMP context, it is imperative for the AMP regulation itself or for the preamble to that rule to discuss how manufacturers can establish that service fees, including those set based on a percentage of associated drug costs and other services, are FMV.

2

Some manufactures have expressed concerns about the fraud and abuse risks associated with accounting for service fees differently for financial accounting and ASP purposes. They note that GAAP-accounting principals mandate treating fees as reductions to revenue when the fees are paid to a distributor that takes title to products and argue that failure to treat the fees as a price concession for ASP purposes creates an unacceptable disconnect between ASP reporting and financial reporting. They also note that accounting rules permit service fees to be treated as an expense on the income statement when a third-party logistics company is retained to distribute drugs without taking title to the products. As a result, these manufacturers argue that they must contract with such services rather than use traditional wholesalers to safely avoid having to deduct distribution costs from ASP, even if doing so is more costly or less efficient.

It is inappropriate and inequitable for the costs for very similar services, such as the distribution of drugs to providers, to be treated differently under a price reporting rule. There is already precedent for a similar disconnect between accounting and price reporting with respect to AMP. The IRS has ruled that Medicaid drug rebates should be treated as reductions to revenue even though the Rebate Agreement prohibits manufacturers from deducting the rebates when AMP is determined (Revenue Ruling 2005-28, published in Internal Revenue Bulletin 2005-19 (May 9, 2005)). OIG and CMS should anticipate such accounting concerns in the AMP context and address them either in the regulation or the rule's preamble, by stating that bona fide, FMV service fees are not to be deducted when AMP is calculated regardless of whether those fees are paid to wholesalers or distributors that take title or to third-party logistics companies that do not, or incurred internally by a manufacturer that self-distributes.

# MINIMIZE PERIOD-TO-PERIOD VARIABILITY IN AMP

RECOMMENDATION

**The regulation should specify a smoothing methodology for accounting for all price concessions in the AMP calculation in a manner like that specified for use with lagged discounts under the ASP rule. The methodology should be well-defined enough to ensure consistent treatment by all manufacturers.**

RATIONALE

The current instructions for calculating AMP are silent on whether chargebacks, rebates and other lagged discounts should be accounted for on an as-paid or an as-earned basis. As a result, different manufacturers have adopted different approaches. Some use the as-paid methodology for both chargebacks and rebates. Others use as-paid for chargebacks because the amount of chargebacks paid during a period is readily available within a few days after the period closes, but use an accrual approach for rebates. Still others accrue for both chargebacks and rebates.

Many large purchasers often buy pharmaceuticals in bulk and then sell from inventory for many months. The buying pattern can result in periods when a manufacturer's sales outstrip price concessions accounted for on an as-paid basis leading to an artificially high AMP, followed by one or more periods when discounts outstrip sales, leading to an artificially low AMP. Monthly reporting of AMP likely will exacerbate this problem. If a manufacturer elects to address this problem by accounting for lagged discounts on an accrual basis, it must periodically true-up AMP and Best Price reports to address accrual errors. Such true-ups can tax the capabilities of the rebate processing teams at the state Medicaid programs as well as the price reporting teams at the manufacturers. Moreover, the true-up approach, while it does allow for the eventual payment of the correct amount of Medicaid rebates, is inconsistent with the use of AMP prospectively as the reimbursement metric that will set the Federal Upper Limit (FUL) for multiple source drugs and, possibly, by some state Medicaid programs as a

4

reimbursement metric in formulas that determine the payment amounts that retail pharmacies will receive for drugs dispensed to Medicaid patients.

Because upfront discounts on large purchases meant to be sold out of inventory over an extended period of time can also distort pricing available to retail pharmacies in the market when they are factored into the AMP calculation on an as-paid basis, OIG/CMS should implement a well-defined smoothing methodology for handling all price concessions that must be considered in AMP that operates like the methodology specified for quantifying lagged discounts under the ASP rule. If OIG/CMS are not inclined to include upfront discounts in a smoothing methodology for AMP, it is imperative, particularly for multiple source products, that chargebacks be singled out for lagged treatment on a routine basis along with rebates despite the availability of as-paid chargeback data for a period within days after the period close because such chargebacks can often relate back to sales several periods prior.

# EXCLUDE RETURN GOODS

RECOMMENDATION

**The regulation should instruct manufacturers to disregard return goods when they calculate AMP.**

RATIONALE

Returns to a manufacturer during a period of slow sales can actually result in a negative AMP. This, of course, is inconsistent with the use of AMP as a reimbursement metric, even for the limited purpose of setting FULs. There are two approaches to address this issue. First, as is the current CMS practice for rebate purposes, the government could revert to the last positive AMP for reimbursement purposes. Alternatively, returns could be disregarded in the calculation of AMP as they are in the ASP calculation. Given that comparisons between ASP and AMP are one of the pricing safeguards built into the ASP system, we favor the adoption of parallel rules for treating various parameters where appropriate. This would seem to be one of those situations.

# PROVIDE FOR THE CALCULATION OF AMP AT 11-DIGIT LEVEL

RECOMMENDATION

**The regulation should stipulate that manufacturers must calculate and report AMP at the 11-digit NDC level.**

RATIONALE

Currently, in accordance with the terms of the Medicaid Rebate Agreement, manufacturers calculate and report AMP as a weighted average for a given drug, strength and dosage form across all package sizes. In other words AMP is tied to the first 9-digits of the National Drug Code (NDC) number and ignores the last two digits which represent package size.

The weighted average AMP reporting process can become problematic when the weighted average value is overshadowed by sales of one package that is significantly larger than other packages of the same drug name/strength/dosage form. The difficulty with applying the weighted average approach across all products is that physicians often dictate the package size a pharmacy must dispense. For example, a physician may prescribe a 15-gm tube of cream to treat a small rash. The price per gram for the larger 60-gm tube is typically less. Applying the 9-digit NDC price may cause an AMP-based reimbursement rate to be too low to fairly reimburse the pharmacy for the 15-gm tube.

Similarly, averaging the typically higher costs of products used extensively in long-term care (LTC) facilities (due to the added cost of packaging as unit doses) with the cost of the same product packaged for retail settings, artificially inflates the AMP of the product and simultaneously depresses the AMP for the LTC setting.

The definition of AMP in Social Security Act § 1927(k)(1), as amended by DRA, does *not* require AMP to be calculated as a weighted average across all package sizes. This approach was adopted by CMS when it

7

drafted the Rebate Agreement used in lieu of regulations to implement the Medicaid drug rebate program in 1991. Accordingly, CMS has the authority to change course and require 11-digit NDC-specific reporting of AMP, just like it has required 11-digit NDC-reporting of ASP. It is important to do so since States will be permitted to incorporate AMP into reimbursement formulas that will be applied to drugs dispensed to Medicaid patients by retail pharmacy.

8

# EXCLUDE REBATES PAID TO PBMs ON RETAIL NETWORK SALES

RECOMMENDATION

**The regulation should stipulate that rebates that do not reduce the effective price, such as those paid to PBMs on retail network sales, are not to be taken into consideration when AMP is calculated regardless of whether those rebates are linked to sales to Part D PDPs or MA-PD plans.**

RATIONALE

Brand manufacturers typically pay rebates to pharmacy benefit managers (PBMs) for prescriptions dispensed to enrollees at retail pharmacies that participate in the PBM's retail network. The rebate payments are made to PBMs, even though the PBM does not actually purchase or dispense drugs to which the rebates are attached. Those monies are not shared with the retailers and should not be treated as a price concession that reduces AMP now that AMP will be used to set FUL and may become an element in the formulas that some state Medicaid programs use to reimburse retail pharmacies.

CMS has never issued clear guidance on how manufacturers should treat rebates paid to PBMs for retail network sales for purposes of AMP and manufacturers have adopted differing approaches.

To encourage manufacturer discounting under Part D, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 excluded rebates paid to Part D PDPs and MA-PDs, or the PBMs that operate these plans, from the calculation of Best Price. The MMA did not, however, address how Part D rebates should be handled for purposes of AMP.

CMS has historically excluded price concessions carved out of the Best Price formula from consideration when AMP is calculated and it should take a consistent approach with respect to the Part D Best Price carve out. Doing so would be consistent with the need to carve PBM retail network rebates out of AMP when those rebates are on non-Part D sales.

March 16, 2005



NATIONAL ASSOCIATION OF
CHAIN DRUG STORES

March 21, 2006

The Honorable Daniel Levinson
Inspector General
U.S. Department of Health and Human Services
Wilbur J. Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201

**Subject: Chain Pharmacy Recommendations Relating to Definition of Average Manufacturers Price (AMP)**

Dear Inspector General Levinson:

The purpose of this letter is to supplement the comments that representatives of the National Association of Chain Drug Stores (NACDS) and the chain drug industry provided to staff of the HHS Office of the Inspector General (OIG) at our March 15, 2006 meeting regarding the calculation of the average manufacturers price (AMP).  As you know, OIG is directed by the Deficit Reduction Act (DRA) of 2005 (P.L. 109-171) to make recommendations to the Centers for Medicare and Medicaid Services (CMS) by June 1, 2006 regarding the factors and methods that should be included in the calculation of the AMP.

NACDS represents more than 200 companies that operate more than 35,000 community retail pharmacies.  Collectively, our membership base dispenses more than 70 percent of all retail prescriptions in the United States.  Our membership will be significantly impacted by the use of AMP as a reimbursement benchmark because it could result in significant underpayments for prescription medications if not accurately redefined.

In general, "AMP is the average price paid to manufacturers by wholesalers for drugs distributed to the retail pharmacy class of trade.  AMP was created specifically in OBRA 90 to approximate the amounts that states were paying retail pharmacies for prescription drugs."  In theory, the calculation of AMP is supposed to provide manufacturers with a credible value on which to base the rebates that they pay to states.

However, starting in January 2007, AMP will be used for the first time to set generic reimbursement rates for pharmacies.  In addition, AMP values for single source and multiple source drugs will be made public and provided to the states starting this July.  Therefore, accurate and consistent calculation of AMP is critical.  AMPs must be calculated such that they are reflective of the prices at which retail community pharmacies purchase medications, or pharmacies will be underpaid for these medications.

413 North Lee Street

P.O. Box 1417-D49

Alexandria, Virginia

22313-1480

(703) 549-3001

Fax (703) 836-4869

www.nacds.org

Although AMP has been calculated by manufacturers for over 15 years, clear direction and guidance has never been given to manufacturers by CMS. This has resulted in wide inconsistencies in these calculations. In addition, the definition of AMP has not kept pace with changes in the pharmaceutical marketplace since 1990. For example, when AMP was originally defined, there were few PBMs in the marketplace. However, rebates, discounts and price concessions given by manufacturers to PBMs and health plans have become an important component of today's pharmaceutical marketplace. In this letter, we reiterate the key points made at our meeting about the factors that we believe should be considered in the calculation of AMP.

- **Include Only Manufacturers' Sales to Wholesalers for Traditional Retail Pharmacies**: Only manufacturers' sales to wholesalers for products that are ultimately sold to traditional community retail pharmacies – traditional chain, independent, mass merchandise pharmacies, and supermarket pharmacies – should be included in the calculation of AMP. In our view, these are the only entities that should be considered the "retail class of trade." Past audit reports done by the OIG appear to agree with that interpretation of "retail class of trade." We also note that in CMS' final rule implementing the Medicare Part D prescription drug benefit program, the agency defines "retail pharmacy" as "any licensed pharmacy that is not a mail order pharmacy from which Part D enrollees could purchase a covered Part D drug without being required to receive medical services from a provider or institution affiliated with that pharmacy." Thus, it would be consistent with CMS' current Part D definition of "retail pharmacy" for the agency to indicate that only sales to true retail pharmacy establishments represent the "retail class of trade" for the purpose of calculating the AMP.

  Given this suggested definition, only incentive-based discounts, rebates or other price concessions that are ultimately received by retail pharmacies should be deducted by the manufacturer from total retail pharmacy sales in calculating the AMP. Manufacturers should deduct chargebacks only to the extent that they know that these were provided for products sold by wholesalers to retail pharmacies. It is fair and reasonable that only amounts paid by manufacturers that are actually passed through to retail pharmacies should be deducted from manufacturers' sales to retail pharmacies when calculating the AMP.

- **Omit Mail Order and Nursing Home Sales in AMP Calculation**: Including manufacturers' sales of pharmaceuticals to wholesalers that are eventually sold to mail order pharmacies and nursing home pharmacies is inappropriate, in our view, even though CMS has instructed manufacturers to include sales to these purchasers. That is because these purchasers receive discounts, rebates and price concessions that are not available to traditional retail pharmacies, such as market share movement and formulary placement discounts. These discounts are either retained by the PBM, or passed through in whole or part by the PBM to the payer. They are not made available to retail pharmacies. Thus, including these sales or rebates would lower the AMP for traditional retail pharmacies below their acquisition costs.

- **Omit Rebates paid by Manufacturers to PBMs**: When AMP was originally created in OBRA 90, PBMs had little prominence in the pharmaceutical marketplace. Now, most prescriptions are paid for through a third party entity – such as a PBM – that receives rebates and discounts from pharmaceutical companies.

Manufacturers should not deduct these amounts from their sales to retail pharmacies when calculating the AMP. That is because retail pharmacies do not receive these price concessions. Including PBMs' sales and discounts unfairly lowers the AMP, making it unreflective of sales to retail pharmacies. Medicaid also loses millions of dollars each year in manufacturer rebate revenues by including these non-retail sales in the definition of AMP.

- **Omit Customary Prompt Pay Cash Discounts Extended to Wholesalers**: As defined by law (and as amended by the Deficit Reduction Act of 2005), the AMP should be calculated without regard to prompt pay cash discounts extended by manufacturers to wholesalers. Cash discounts are provided to some retail pharmacies based on financing terms negotiated between the wholesaler and the pharmacy. These are not performance-based discounts. That is, a pharmacy may receive a small discount from the wholesalers or manufacturers for paying for the drugs in a shorter period of time than other purchasers. In addition, because not all pharmacies have the distribution infrastructure (i.e. warehousing and logistical capabilities) and cash flow to capitalize on these more favorable terms, the inclusion of prompt pay cash discounts in the calculation of AMP would be inappropriate. Given that the current rebate agreement defines wholesalers as "any entity (including a pharmacy or chain of pharmacies) to which the labeler sells covered outpatient drugs...", prompt pay discounts extended to chain warehouses that are also licensed as wholesalers should also be excluded from the AMP calculation.

- **Omit Payments made by Manufacturers for Bona Fide Service Fees**: Payments made by manufacturers to entities such as wholesalers and pharmacies for inventory management agreements or distribution service agreements should not be deducted from a manufacturer's retail pharmacy sales when calculating AMP. These payments reduce manufacturers' revenues from the sale of their drugs, but they do not lower the pharmacies' costs of purchasing prescription drugs. Moreover, not all pharmacies are able to participate in these agreements, so deducting them when calculating AMP would be unfair to many retail pharmacies. CMS has already determined that such fees should be omitted from the calculation of the "average sales price," the basis of payment for Medicare Part B drugs. Specifically, CMS has indicated that bona fide service fees are "expenses that are for an itemized service actually performed by an entity on behalf of the manufacturer, which would have been paid by the manufacturer at the same rate had these services been performed by other entities." OIG should recommend that a similar approach be adopted for AMP.

- **Omit Manufacturer Payments for Pharmaceutical Returns**: Each year, billions of dollars in expired and recalled pharmaceuticals must be returned by pharmacies and wholesalers to manufacturers. Manufacturers issue credit to wholesalers and pharmacies for these goods. Unfortunately, the level of credit provided is insufficient to cover the products' replacement value, the pharmacy's inventory cost of carrying the product to expiration, the reverse logistics cost of returning the expired and recalled product, as well as the administrative expense incurred by wholesalers and pharmacies to manage this process. A manufacturer's payment to a wholesaler or a pharmacy for expired and recalled merchandise as well as the fees for the associated services should be excluded from the manufacturer's AMP calculation.

If these payments and service fees are included in the AMP calculation, community pharmacies will actually incur not only the deficiency in the level of manufacturer's credit for the product and service, but also a reduction in reimbursement going forward for the associated products. Payments for expired and recalled pharmaceuticals and the associated services should not be interpreted as discounts or rebates and should be omitted from the AMP.

- **Omit Manufacturer Payments for Patient Care Programs**: Many pharmacies receive payments from manufacturers for performing certain patient care services, such as patient education and compliance and persistency programs. These payments should be omitted from the AMP calculation. These services provide valuable benefits to patients and overall the health care system because they improve patients' understanding of their medications and enhance patient compliance. Although they reduce the revenue that manufacturers receive on the sales of these drugs, they do not reduce the retail pharmacy's cost of purchasing the drugs. If these payments are included in AMP, pharmacies would lose incentive to offer these programs because it would reduce the value of the AMP, thus potentially reducing reimbursement. This could make it appear that the pharmacy's acquisition cost for the drug is lower than it actually is. Moreover, not all pharmacies participate in these programs so it would be unfair to many pharmacies to include these payments in the AMP.

Because of the wide inconsistencies in the way that manufacturers currently calculate AMP, we urge OIG to recommend that CMS not make the AMP data public this July until the agency publishes a final rule that defines AMP. We believe that a great disservice will be done to states, payers, consumers, and especially pharmacies by releasing data that have wide variability in their meaning, and are likely unreflective of the approximate prices paid by retail pharmacies for prescription medications. Only when the marketplace completely understands the methodology that is used to calculate AMP, as well as its relationship to the prices paid for pharmaceuticals by retail pharmacies, should the data be made public.

We also urge OIG to make several recommendations to CMS on how the agency applies the new Federal Upper Limit (FUL) for generic drugs which, beginning in January 2007, will be based on 250% of the lowest published AMP for a generic. In order to encourage continued generic drug dispensing in Medicaid, it is critical that the FUL be based on prices for products that are currently widely available in the marketplace. For example, we believe that only a generic product that is AB-rated in the FDA Orange Book, and is widely and nationally available to pharmacies for purchase in consistent supplies, should be used as the reference product to set the FUL.

In addition, the AMP used as the reference product to set the FUL should be weighted by sales across all the package sizes of the particular dosage form and strength of the drug. The sales included in this weighted calculation should be those to retail pharmacies only. This will assure that the AMP is weighted according to the package size most frequently purchased by pharmacies. As we discussed at our meeting, we also believe that OIG should recommend that CMS adopt a process that would allow manufacturers, when calculating AMP for a quarter, to "smooth" over a rolling 12-month period of time any discounts or rebates that are passed through to retail pharmacies. This will help reduce the potential for any significant fluctuations in AMP from quarter to quarter, and maintain some consistency in reimbursement levels. Such a process was developed by CMS for manufacturers' calculation of the Average Selling Price (ASP), which is used as the basis for Medicare Part B drug reimbursement.

Without this process, it is very possible that upper limits for generics could be based on AMPs that are simply not reflective of the current market prices for drugs, further reducing generic dispensing incentives.

Finally, to assure that generic drug dispensing in Medicaid can be maintained or even increased, we urge that the FUL amount be the <u>minimum</u> payment that states make for a particular dosage form and strength of a generic drug. We believe that State Maximum Allowable Cost (MAC) programs for generics should be discouraged because further reductions in state payment for generics can ultimately result in reduced generic dispensing. States should also be advised of the need to consider increases in generic drug dispensing fees for 2007 to assure that pharmacies have appropriate incentives to continue to dispense lower-cost generic drugs.

We appreciate the opportunity to meet with you and provide our views on these important issues. Please contact us if we can provide any additional insight on these specific recommendations. We look forward to reviewing OIG's recommendation and to discussing these matters further. Thank you.

Sincerely,

*Lee L. Verstandig*

Lee L. Verstandig
Senior Vice President, Governmental Affairs

# NCPA
NATIONAL COMMUNITY
PHARMACISTS ASSOCIATION

W W W . N C P A N E T . O R G

**To:**        **OIG, HHS**

**From:**      **Charlie Sewell, Vice President, Government Affairs**

**Date:**      **March 16, 2006**

**Re:**        **NCPA Comments on AMP provisions of Deficit Reduction Act of 2005**

The National Community Pharmacists Association (NCPA) appreciates your continued interest in community pharmacy and for taking the time to meet today to discuss the issues, challenges and problems arising from implementation of the Deficit Reduction Act of 2005 ("the Act").  Most specifically, we are providing you with this comment memorandum regarding implementation of the Act and how its problematic use of a nebulously defined benchmark could have significant, harmful effects on Medicaid recipients, community pharmacies, local economies and states.

**NCPA's Request:**
In sum, NCPA requests that: 1) you use your authority to ensure that the definition of AMP covers all of pharmacists' acquisition costs; 2) the study of pharmacy reimbursement called for in the Act include an analysis of state-determined dispensing fees to ensure that pharmacy operating costs are adequately covered under state reimbursement formulas; and 3) HHS promulgate the rules on implementing that Act no later than September 1, 2006 to provide adequate time for community pharmacies to prepare for the implementation of these major changes in the Medicaid program.[1]

**The Troubling Result From Using AMP:**
NCPA represents the nation's community pharmacists, including the owners of more than 24,000 pharmacies that dispense nearly half of the nation's retail prescription medicines.  Because many Medicaid recipients depend on their local community pharmacies to provide them with needed medication, NCPA is compelled to alert you to language in the Act that negatively affects the costs savings that could otherwise benefit drug purchasers, States and the federal government.

As you know, the Act greatly reduces pharmacy reimbursement on generic drugs for Medicaid prescription drug recipients.  The law ties reimbursement to a price index known as the Average Manufacturers Price (AMP).  Leading generic drug manufacturers estimate that, as currently defined by the Manufacturers Rebate Agreement, **AMP will, on average, only reflect 50% of actual ingredient**

---

[1] The new Medicaid law requires that CMS disclose, starting July of 2006, the AMP pricing data to state Medicaid programs and the public.  Unfortunately, the Secretary is not required to implement a regulation defining AMP until July 2007, one year after the AMP data are made public.

100 Daingerfield Road
Alexandria, VA 22314-2888
(703) 683-8200 PHONE
(703) 683-3619 FAX

**cost for generic drugs**. Considering the unknown reliability of AMP and insufficient dispensing fees, the planned Federal Upper Limit (FUL) as contained in **the Act will effectively gut the reimbursement for generic drugs** under the Medicaid program. In stark contrast, brand name drugs are unaffected, and will be the only drugs on which pharmacists will be able to recoup their costs.

The result of promoting the use of brand name drugs over generics would be very costly. For every one percent of market share filled with a brand name drug that could be filled with a generic, Medicaid – and thus needy beneficiaries and taxpayers – will lose hundreds of millions of dollars. The lowest generic fill rate among states failing to promote generic drugs is 42%. If AMP is not correctly defined, and if dispensing fees are not increased, the potential for savings from generic drug utilization will be lost. An inadequate reimbursement level and concomitant decrease in use of generics will drive many pharmacies from the Medicaid program. Access in rural areas of the country could be particularly harmed. This resulting lack of access to quality prescription care will drive state Medicaid expenses higher as more patients require emergency room or nursing home care.

This outline of resulting harm is realistic, yet difficult to quantify. Estimating the real financial impact on retail pharmacies is extremely difficult because CMS has not publicly released AMP or issued clear guidance on how manufacturers should calculate AMP.

Based on how AMP is currently reported by manufacturers, it is clear that harmful consequences would follow from using the current AMP. NCPA respectfully urges you to use the wide statutory authority granted HHS regarding the definition of AMP to ensure that it covers 100% of pharmacists' acquisition costs. Doing so would ensure adequate reimbursements for generic drugs, thus promoting savings to the government and the health care system.

**<u>Problems With Using AMP as the Bench Mark to Determine Reimbursement Amounts and Rates:</u>**
In theory, AMP data approximates the prices at which retail pharmacies purchase medications from manufacturers via wholesalers.[2]  For various reasons that are discussed below, however, AMP data is not at all likely to reflect the prices at which retail pharmacies purchase drugs. Because AMP was created, and is used, as a benchmark for rebate payments paid by manufacturers to state Medicaid programs, there is an inherent incentive on the part of the manufacturer to report the lowest price possible – a price that does not reflect true market costs for community pharmacy.

This fundamental problem in creating, using and monitoring the use of AMP is manifest in the following structural flaws:

- Currently, each manufacturer defines AMP differently, thus creating great inconsistencies in what is reported to CMS. In a February 2005 study (GAO-05-102), the Government Accounting Office reported that these inconsistencies are documented in the four Office of Inspector General (OIG) reports on audits of manufacturer-reported prices since the programs inception in 1991 (the reports were issued in 1992, 1995, 1997 and 2001). The GAO reported that the OIG reviews found "considerable variation in the methods that manufacturers use to determine AMP and some methods could have reduced the rebates state Medicaid programs received." (GAO-05-102

---

[2] AMP is defined by statute as the average price paid to a manufacturer for the drug by wholesalers for drugs distributed to the real pharmacy class of trade. *See* 42 U.S.C. §1396r-8(k)(1). There is no definition in the statute for "retail pharmacy class of trade."

at p.5). Furthermore, "in four reports issued from 1992 to 2001, OIG stated that its review efforts were hampered by unclear CMS guidance on how manufacturers were to determine AMP, by a lack of manufacturer documentation, or by both." (*Id.*, p.4).

- The GAO study found that **clear guidelines on how AMP is to be calculated have not been issued by CMS, nor has CMS resolved price determination problems.** "OIG found problems with manufacturers' price determination methods and reported prices. However, CMS has not followed up with manufacturers to make sure that the identified problems with prices and price determination methods have been resolved" (*Id.*).

  o Examples of some manufacturers taking advantage of the opportunity to alter AMP include:
      - Sales to mail order pharmacies and nursing homes when calculating AMP. Because mail order and nursing homes pay lower prices than retail pharmacies, including them in the calculation lowers the AMP below the price a traditional retail pharmacy pays.

      - Rebates paid to health plans and Pharmacy Benefit Managers (PBMs) when calculating AMP. These discounts are typically extended to bulk purchasers such as chain pharmacies, major wholesalers, and mail-order facilities that buy directly from the manufacturer. These discounts are simply not available to independent pharmacies, further widening the gap between AMP and market price.

      - These price concessions, however, are not available to retail pharmacies and therefore do not lower the pharmacies' costs of purchasing prescription drugs. Including PBMs' sales and discounts may lower the AMP to a level that does not reflect the cost to a retail pharmacy.

      - As the manufacturer must pay rebates based on AMP, the manufacturer then has an incentive to report the lowest numbers possible.

  o Wholesaler costs and margins will not be covered by AMP. Federal law also makes few provisions for state determined dispensing fees which will become critical in ensuring that the professional services of pharmacists remain available to Medicaid patients.

  o State MAC lists currently are lower than the FUL – significantly lower for some products and in some states. If states follow their current practice, often states will reimburse below the 250%. A study is needed to evaluate what currently happens and to find out how much below 250% of AMP states are reimbursing.

3

**Conclusion:**

Since all reimbursement cuts will come from generic prescription drugs, the AMP must be defined to cover acquisition costs or a perverse incentive will be created to dispense brands that could end up costing the program much more. To avoid the drastic consequences employing AMP in a situation for which it was not designed, NCPA respectfully requests that you recommend that: 1) HHS use its authority to ensure that the definition of AMP covers all of pharmacists' acquisition costs; 2) the study of pharmacy reimbursement called for in the Act include an analysis of state-determined dispensing fees to ensure that pharmacy operating costs are adequately covered under state reimbursement formulas; and 3) HHS promulgate the rules on implementing that Act no later than September 1, 2006 to provide adequate time for community pharmacies to prepare for the implementation of the major changes in the Medicaid program.

# PhRMA

April 7, 2006

**VIA HAND DELIVERY AND E-MAIL**

Daniel R. Levinson, Inspector General
Office of Inspector General
Department of Health and Human Services
Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201

**Re:  Average Manufacturer Price Recommendations**

Dear Mr. Levinson:

The Pharmaceutical Research and Manufacturers of America (PhRMA) is pleased to provide the following information on the determination of Average Manufacturer Price (AMP) in response to the Office of Inspector General's (OIG's) request for input on these issues.  PhRMA is a voluntary nonprofit organization representing the country's leading research-based pharmaceutical and biotechnology companies, which are devoted to inventing medicines that allow patients to lead longer, healthier, and more productive lives.  PhRMA companies are leading the way in the search for cures.

PhRMA has a long-standing interest in working with the government to develop clear and carefully-considered rules on the calculation of Medicaid rebates and the reimbursement of pharmaceutical products.  Given this interest, and the Government Accountability Office's (GAO's) finding that clearer guidance is needed regarding AMP calculations,[1] we were pleased that Congress recently charged the OIG with reviewing "the requirements for, and manner in which" AMP is determined and submitting any recommendations it considers appropriate "for changes in such requirements or manner" to the Centers for Medicare and Medicaid Services (CMS) and Congress.[2]  We believe this mandate provides an important vehicle for helping to improve the clarity and

---

[1]     GAO, Medicaid Drug Rebate Program, Inadequate Oversight Raises Concerns about Rebates Paid to States, GAO-05-102, 4 (Feb. 2005).
[2]     Deficit Reduction Act of 2005, P.L. 109-171, § 6001(c)(3) (2006).  Following its receipt of the OIG's recommendations, CMS must issue regulations clarifying AMP calculations, taking into consideration the OIG's recommendations, by July 1, 2007.

---

consistency of AMP calculations, which will now, in addition to affecting Medicaid rebates, affect pharmacies' Medicaid reimbursement rates for certain pharmaceuticals.

We appreciate the recent opportunity OIG provided to PhRMA to meet and discuss these issues, and we have focused our written comments on several of the issues raised by OIG during that meeting. Specifically, our comments address the following topics: the function of AMP, defining the "retail pharmacy class of trade," the ability to capture transactions between downstream entities in manufacturers' AMP calculations, the timing and application of changes in AMP, the issues associated with using AMP as a reimbursement metric, and the frequency of AMP reporting. These comments are preceded by general principles that PhRMA hopes the OIG will consider as it develops recommendations concerning the methodologies and manner in which AMP is calculated.

- As a general matter, AMP calculations should result in a calculated price that represents the amount realized by the manufacturer for product sold and distributed to wholesalers in the relevant period for purchasers who are in the retail pharmacy class of trade.

- Guidance concerning the calculation of AMP should be formalized in regulations that give stakeholders adequate opportunity for notice and comment.

- CMS should apply its regulations prospectively and give manufacturers ample time to operationalize systems, policies, and procedures to support the new AMP calculation.

- CMS should issue regulations to ensure that AMPs that now will be used in reimbursement formulas are calculated in a way that avoids: (1) the need for retroactive restatements; (2) zero or negative amounts; and (3) unnecessary quarter-to-quarter volatility, which needlessly creates instability for providers who submit reimbursement claims.

- Any procedures developed by CMS should recognize that there may be instances that call for restatements of AMP notwithstanding efforts to ensure the accuracy of reported data.

- Because the DRA changes the definition of AMP, CMS should develop a mechanism to conform baseline AMPs to the revised statutory definition of AMP for purposes of the additional rebate.

*   *   *

2

A.     **Retail Pharmacy Class of Trade**

AMP is defined by statute as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade."[3]  As Congress recognized in the Deficit Reduction Act of 2005 (the DRA) when it directed the OIG to develop recommendations, and CMS to issue regulations concerning AMP, there is a need for clear and consistent guidance concerning the definition and calculation of AMP.  This need for clarity is particularly critical given the use of AMP to establish Medicaid drug rebates.  Moreover, it will take on even greater significance because AMP also will be used to establish upper payment limits for State Medicaid prescription drug payments beginning in 2007.  Notably, the statute does not define AMP as a metric that approximates pharmacy acquisition costs.  As discussed above, AMP is defined as the "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade."[4]  The statute does not define AMP as retail pharmacy acquisition costs.  Moreover, Congress further demonstrated its understanding that AMP does not directly measure pharmacies' acquisition costs when it chose to apply a 2.50 multiplier to establish FULs for multiple source drug products.

CMS has issued guidance previously regarding the definition of AMP in the Medicaid Rebate Agreement, certain Medicaid Rebate Releases, and proposed rules, but it has not defined the term "retail pharmacy class of trade" or provided a comprehensive listing of which entities fall inside and outside the retail pharmacy class.  The language in the Rebate Agreement bearing on this issue provides that:

> [AMP] means . . . the average unit price paid to the Manufacturer for the drug in the States by wholesalers for drugs distributed to the retail pharmacy class of trade (excluding direct sales to hospitals, health maintenance organizations and to wholesalers where the drug is relabeled under that distributor's national drug code number).  Federal Supply Schedule prices are not included in the calculation of AMP.[5]

In the preamble to proposed (but never finalized) regulations published in 1995, CMS similarly stated that:

> [S]ales that a manufacturer makes to other than the retail class of trade must be excluded [from AMP].  Thus, sales where the buyer relabels or repackages the drug with another NDC number and sales through wholesalers where the manufacturer pays a chargeback for sales to an

---

[3]     42 U.S.C. § 1396r-8(k)(1).  Under the DRA section 6001, customary prompt pay discounts extended to wholesalers will be excluded from AMP calculations by 2007.

[4]     Id.

[5]     Medicaid Rebate Agreement, § I(a), *available at*, http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

excluded buyer, such as a hospital, would not be considered sales to the retail class of trade.

We would also exclude from this definition direct sales to hospitals, health maintenance organizations and to distributors where the drug is relabeled under that distributor's NDC number because these entities are not considered the retail pharmacy class of trade. We would also exclude Federal Supply Schedule (FSS) prices from the calculations of AMP since the statute does not include FSS and FSS does not represent a retail level of trade.[6]

Finally, in Medicaid Rebate Release 29 (1997), CMS listed certain categories of sales as either included in or excluded from AMP. Specifically, the release provided that: (1) AMP includes mail order and retail pharmacy sales, "nursing home primary/contract pharmacy sales," and "sales to other manufacturers who act as wholesalers and do not repackage/relabel under the purchaser's NDC"[7]; (2) AMP excludes direct sales to hospitals, HMO sales, Public Health Service (Section 340B) covered entity sales, "state-funded only-pharmacy assistance programs," "VA/DoD excluded sales," Federal Supply Schedule sales, and "sales to other manufacturers who repackage/relabel under the purchaser's NDC"; and (3) sales to wholesalers are included in AMP "except for sales to wholesalers which can be identified with adequate documentation as being subsequently sold to any of the excluded sales categories."[8] Although Release 29 clarified some issues, it did not address a variety of entities and arrangements that could affect the calculation of AMP. Moreover, Release 29 is likely outdated given the continuously evolving nature and functions of various entities in the pharmaceutical distribution chain.

For example, CMS has not specified whether other specific categories of sales are included in or excluded from AMP. Some of the customers not addressed in Release 29 include, for example, physician groups, clinics other than Section 340B covered entities, and patients (i.e., there is no guidance on whether patient coupons or other patient discount programs affect AMP calculations).[9] There has also been a lack of clear guidance regarding whether rebates to PBMs or payors (including Medicare Part D plans) should be excluded from AMP calculations, and (if so) whether manufacturers should simply exclude the rebates themselves from AMP calculations or should remove from the AMP numerator and denominator the underlying sales to wholesalers to which the rebates are attributed.

---

[6]     60 Fed. Reg. 48442, 48462 (Sept. 19, 1995).

[7]     The Rebate Agreement defines a "wholesaler" as "any entity (including a pharmacy or chain of pharmacies) to which the [manufacturer] sells the Covered Outpatient Drug, but that does not repackage or relabel the Covered Outpatient Drug." Rebate Agreement, § I(ee).

[8]     Rebate Release No. 11 (1994) also states that "sales of hemophilic drugs to home health care providers must be included in the calculation of AMP," indicating that home health care providers would be considered part of the retail pharmacy class of trade. (Emphasis omitted.)

[9]     CMS has issued guidance on this topic in the Best Price context.

As a result of the unaddressed questions regarding the "retail pharmacy class of trade," the GAO found that manufacturers made different assumptions about which entities were considered within the class.[10]  Consequently, to reduce manufacturers' uncertainties and increase the consistency of AMP calculations, it will be important for the OIG to make strong recommendations regarding the clarification of these definitional issues.

In an evolving marketplace, terms such as "wholesaler" and "retail" may be interpreted in different ways by different companies and entities.  Entities are more appropriately categorized for purposes of defining AMP by the actual functions they perform rather than by the names by which they generally are known at any given time.  Thus, PhRMA believes that an optimum approach is to use function-based analysis that recognizes that the function of an entity in the distribution chain may govern whether particular transactions should be included in the calculation of AMP.  We suggest the following function-based definitions for the key AMP terms: "wholesaler" and "retail class of trade."

    i.  **Wholesaler** shall mean those entities that purchase covered outpatient prescription drugs as defined in Section 1927(k) directly from the manufacturer, or its authorized agent, and that take legal title to the prescription drug product.

    ii.  **Retail Class of Trade** (a) shall mean, subject to subsection (b), those entities or such subdivisions, departments or lines of business that:

        1.  dispense covered outpatient drugs to patients, who are members of the general public on a walk-in basis, pursuant to a prescription, including for example, retail, independent, and chain pharmacy;

        2.  dispense covered outpatient drugs to patients through the mail (or other common carrier) pursuant to a prescription and the patient does not receive other specialized or home care services in addition to the dispensed drug;

and (b) shall not include such entities or such subdivisions, departments or lines of business that:

        1.  only dispense covered outpatient drugs to inpatients of the entity (e.g., inpatient hospitals);

---

[10]     GAO, Medicaid Drug Rebate Program:  Inadequate Oversight Raises Concern, at 16.

2. administer the drug "incident to" a physician or other licensed prescriber's services' (e.g., physician offices);

3. dispense only to a defined and exclusive group of patients who have access to dispensing services (e.g., closed pharmacy, staff model HMO, or correctional facility);

4. are federal, state, or local government purchasers and those purchasing under the federal supply schedule (e.g., VA);

5. are exempt from best price (e.g., 340B entity, SPAP, Part D Plans);

6. are other wholesalers or distributors that do not dispense to patients;

7. negotiate or arrange for pricing terms for third parties but that do not take possession of the drug product (e.g., GPO);

8. repackage or relabel under the entity's own NDC; or

9. are entities to which sales below 10% of AMP are considered to be nominal sales under Section 1927(c)(1)(D).

All parenthetical examples are for illustrative purposes and manufacturers may document that sales to such an entity should be included or excluded in the retail class of trade based on its function in a manner that differs from the illustrative example. Two areas where it would be helpful for the OIG to provide recommendations concern the application of these functional standards to long-term care facilities, PBMs, and other entities that reimburse for drugs but do not take title or possession of the drug product.

**B.     Taking Into Account Transactions Between Downstream Entities in AMP Calculations**

In PhRMA's recent meeting with the OIG, the OIG expressed interest in obtaining additional information on the pharmaceutical distribution chain and the flow of payments within the pharmaceutical system. The OIG also indicated that it was interested in this information on the pharmaceutical supply chain and payment system partly in order to gain an understanding of whether manufacturer payments were passed through by their recipients to other parties. In addition, the OIG asked whether it would be feasible for manufacturers to require contractually that recipients of

payments inform the manufacturer about whether the payments had been passed through to others.

As noted at the meeting, PhRMA does not obtain information on member companies' pricing practices due to antitrust concerns, and information on pricing and payment arrangements between many of the participants in the pharmaceutical system is closely held and generally unavailable to manufacturers in any case. However, we have included in the appendix a brief general overview of the pharmaceutical distribution chain and payment system, based on information from publicly available reports.[11] In addition, we address the question raised in the meeting about the feasibility of requiring contractual reporting of downstream payments.

In past guidance, CMS has sometimes suggested that whether a certain manufacturer payment should be taken into account in the manufacturer's pricing calculations may depend on whether the payment is passed through by its recipient to another party.[12] In recent Average Sales Price (ASP) guidance on service fees paid to buyers, CMS stated that "[b]ona fide service fees that are paid by a manufacturer to an entity, that represent fair market value for a bona fide service, and that are not passed on in whole or in part to a client or customer of an entity" should be excluded from ASP because "these fees would not ultimately affect the price realized by the manufacturer."[13] However, the ASP analysis may not adequately capture the fluid nature of certain transactions with and among downstream entities or the role of different entities in the distribution chain. Accordingly, PhRMA believes that OIG and CMS should clarify that there is no automatic requirement that manufacturers affirmatively obtain information concerning transactions between downstream entities.[14] We believe that such a requirement would create serious problems and urge the OIG not to recommend this approach. Manufacturers have no authority to demand that payment recipients disclose to the manufacturer whether they have shared the payment in question with their own customers or clients, and there is no guarantee that payment recipients would agree voluntarily to such disclosures. The payment recipient might reject such disclosure provisions due to, for example, concerns about its ability to

---

[11]    Our discussion is based exclusively on publicly available sources cited in the appendix. Principal among the sources are  (1) Federal Trade Commission, Pharmacy Benefit Managers:  Ownership of Mail Order Pharmacies, Aug. 2005 (FTC report); (2) Follow the Pill:  Understanding the U.S. Commercial Pharmaceutical Supply Chain, report prepared for The Kaiser Family Foundation by The Health Strategies Consultancy LLC, March 2005 (Follow the Pill); (3) Navigating the Pharmacy Benefits Marketplace, report prepared for the California HealthCare Foundation by Mercer Human Resource Consulting, Jan. 2003 (Navigating the Pharmacy Benefits Marketplace); (4) Study of Pharmaceutical Benefit Management, report by PricewaterhouseCoopers LLP for the Health Care Financing Administration, June 2001 (PricewaterhouseCoopers report); and (5) Department of Health and Human Services, Report to the President:  Prescription Drug Coverage, Spending, Utilization and Prices, April 2000 (HHS report).

[12]    CMS alluded to pass-through issues in its rebate guidance on PBMs (which has caused interpretive difficulties), stating in part that "where the effect on the manufacturer for using the PBM is to adjust actual drug prices at the wholesale or retail level of trade, such adjustments need to be recognized in best price calculations." Medicaid Rebate Release No. 29 (1997).

[13]    CMS Frequently Asked Question ID 4136 (last updated Feb. 14, 2006).

[14]    At the same time, OIG and CMS should recognize the need for clear guidance concerning these transactions and their role (if any) in AMP calculations.

preserve the confidentiality of this competitively sensitive information once it was routinely disclosed to manufacturers; concerns about the administrative burdens associated with such reporting obligations; or concerns about the potential liability risks associated with furnishing manufacturers with information that would be used in the manufacturer's AMP calculations, and that could thus result in incorrect rebate payments and Medicaid reimbursement rates if the information turned out to be inaccurate in some respect. Consequently, manufacturers simply might be unsuccessful in negotiating contractual provisions requiring disclosure of pass-through information, or they could experience prolonged delays in negotiating contracts important to their ability to sell products or to acquire needed services.

Moreover, even if manufacturers could negotiate and enforce pass-through reporting provisions, the resulting information could be difficult to incorporate into a manufacturer's systems for calculating and reporting AMP. As discussed in the appendix, for example, PBMs' contracts with their clients do not have uniform provisions on the sharing of manufacturer rebates. To report whether the rebates paid by a manufacturer for a specific quarter were passed through, the PBM might need to determine the clients to which those rebates were attributable and separately identify pass-through and non-pass-through rebates. In turn, the manufacturer could not rely on a standard protocol specifying that (say) PBM rebates are taken into account in AMP calculations; instead, each AMP-reporting period, manufacturer personnel would need to review each PBMs' disclosure report and make case-by-case decisions about the appropriate treatment of PBM rebates in the AMP calculation. These kinds of frequent manual interventions in the AMP-calculation process could substantially increase the complexity of these calculations and heighten the risk of error, thus making it difficult for manufacturers to provide CMS with accurate AMP data on a timely basis. Similarly, delayed pass-through reports from payment recipients could complicate AMP calculations and cause overly burdensome restatements in previously reported AMP figures.

Given the problems with requiring that manufacturers contract with customers to obtain information on pass-through issues and then incorporate that information into their AMP calculations, we urge the OIG to recommend that CMS not adopt such an approach.

## C.     <u>Other Issues</u>

During PhRMA's meeting with the OIG on March 16th, PhRMA raised a number of issues concerning implementation of the AMP provisions in the DRA and changes to the definition and methodology used to calculate AMP. PhRMA's written comments and recommendations concerning several of these issues are set forth below.

1.    Conforming Baseline AMPs to the New AMP Definition

The "additional rebate" for innovator drugs equals the current-period AMP minus the inflation-adjusted baseline AMP (usually the AMP from the first full quarter after launch).[15] Because the DRA changes the definition of AMP, it raises the question of what mechanism should be used to conform baseline AMPs (as of the quarter when the AMP definition changes to exclude prompt pay discounts) to the revised statutory definition of AMP.  The OIG may wish to recommend that CMS work with companies to develop reasonable methodologies to make this correction.[16]

2.    Prospective Application of Clarification of AMP Guidance

The OIG should recommend that CMS issue regulations and guidance that make only prospective changes in AMP calculations.  This recommendation would be consistent with the DRA, which calls for regulations that clarify "the requirements for, and manner in which, average manufacturer prices are determined," not were determined in the past, and would recognize GAO's finding that manufacturers have historically had to rely on reasonable assumptions in certain areas due to the absence of clear guidance.[17]  Prospective application of changes to AMP calculations would also avoid the difficulties and disruptions associated with industry-wide retrospective recalculations of past period AMPs.

3.    Timing Issues Associated With Changes in AMP

The DRA contains a number of AMP-related provisions that take effect (or have deadlines) at different dates, which could result in a series of sequential changes to AMP calculations unless CMS makes an effort to synchronize the changes.[18]

Recognizing that manufacturers need sufficient lead time to change their systems and collect any additional data that may become relevant to AMP calculations, OIG should issue a recommendation that CMS provide adequate phase-in periods for any changes in AMP.  The OIG also should recommend that CMS issue proposed and final AMP regulations as promptly as possible and seek to avoid a series of sequential changes in AMP calculations; frequent changes in AMPs due to a series of regulatory

---

[15]    See 42 U.S.C. § 1396r-8(c)(2).

[16]    We note that any changes in the existing requirements for calculating AMP that CMS adopts in its regulations on AMP calculations could raise similar questions regarding the baseline AMP.

[17]    DRA § 6001(c)(3).  (Emphasis added.)

[18]    Some of the relevant dates for DRA AMP provisions are: June 1, 2006 (deadline for OIG recommendations regarding the requirements and manner in which AMP is determined); July 1, 2006 (CMS must provide AMP data on a website accessible to the public); January 1, 2007 or earlier (AMP definition changes to exclude customary prompt pay discounts extended to wholesalers); January 1, 2007 (DRA section 6003 takes effect, which modifies the AMP definition "[i]n the case of a manufacturer that approves, allows, or otherwise permits any drug of the manufacturer to be sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act"); and July 1, 2007 (deadline for CMS to issue regulations on AMP).

changes could heighten instability for providers that receive AMP-based payments for multiple source drugs, confuse the public (which will soon have access to AMP data), and require repeated changes in manufacturers' data collection and reporting systems. Similarly, the OIG may wish to caution manufacturers that changing their AMP reporting systems in response to the OIG recommendations could exacerbate these problems, as the final AMP regulations issued by CMS could differ from the OIG recommendations, and require that manufacturers adopt a different set of changes in AMP calculations.

4.     Issues Associated With Using AMP as a Reimbursement Metric

Effective January 1, 2007, the DRA bases the Medicaid federal upper limit for multiple source drugs on AMP. Any recommendations or regulations should ensure that AMPs that are used in reimbursement formulas can be calculated in a way that avoids: (1) the need for retroactive restatements; (2) zero or negative amounts;[19] and (3) unnecessary quarter-to-quarter volatility, which needlessly creates instability for providers who submit reimbursement claims. This could raise issues regarding AMP similar to issues that have been raised in the context of ASP (the drug reimbursement metric generally used under Medicare Part B).[20] Notwithstanding efforts to ensure the accuracy of reported data, there may be instances that call for restatements of AMP. This raises a dilemma given AMP's new role as a reimbursement metric, because the restatement could occur after a state has set the AMP-based reimbursement rates for a particular period. The OIG may want to formulate recommendations on a method for resolving this dilemma.

Moreover, the OIG also may wish to caution the states about the potential volatility associated with using AMPs that may change substantially due to sequential changes that will occur as the OIG issues recommendations in June 2006, and CMS issues a regulation by July 2007, concerning the new definition and clarification of AMP.[21]

5.     AMP Reporting Frequency Issues

Section 6001 of the DRA appears to amend SSA § 1927(b)(3)(A)(i) to call for monthly reporting of AMP and Best Price.[22] However, section 6003 then strikes section

---

[19]     Zero or negative amounts should not be an issue under existing CMS guidance, which provides that if a zero or negative AMP occurs in a given quarter, the manufacturer should report the last calculated AMP with a value greater than zero. Medicaid Rebate Release No. 38 (1998).

[20]     As in the ASP context, returns should also be addressed.

[21]     The DRA requires the Secretary to make available to the states the AMPs for single source and multiple source drugs beginning in July 1, 2007. These AMPs may be substantially different from AMPs calculated after January 1, 2006 because of the newly promulgated definition of AMP which now directs manufacturers to exclude prompt pay discounts to wholesalers. Moreover, AMPs may change as a result of OIG's recommendations (due in June 2006) and CMS regulations (due July 1, 2007).

[22]     Section 6001(b)(1)(A) amends Social Security Act § 1927(b)(3)(A)(i) to state that manufacturers with rebate agreements shall report AMP and Best Price to the Secretary "not later than 30 days after the last day of each month of a rebate period under the agreement . . . ." (Emphasis added.)

1927(b)(3)(A)(i) and replaces it with new language that refers to AMP and Best Price being reported "not later than 30 days after the last day of each rebate period."[23]  Thus, it appears that the law did not effectively change the frequency of manufacturers' reporting obligations.  In the event that the DRA were to be interpreted to call for monthly reporting of AMP and Best Price, a number of issues would arise, and it may be helpful for OIG to develop recommendations on these points should they become relevant.  OIG should recommend how quarterly rebates should be calculated and should recommend against basing rebates on weighted averages of monthly AMPs.  In addition, OIG should recommend that restatements of quarterly AMPs continue to be permitted and that any monthly AMPs (should the statute ultimately be interpreted to require such calculations) not be restated.

*   *   *

PhRMA hopes that these comments will be helpful to the OIG as it formulates it recommendations to CMS and the Congress regarding AMP reporting and looks forward to providing additional input.  We appreciate the time taken by OIG staff to meet with us and consider our comments, and the substantial effort your office is making to develop recommendations that can lead to clearer ground rules for AMP reporting and an improved system.  Please do not hesitate to contact us with any questions or requests for additional information.

Sincerely,

Maya J. Bermingham
Assistant General Counsel

Ann Leopold Kaplan
Assistant General Counsel

---

[23]     DRA § 6003(a)(1).

## Appendix

## Overview of the Pharmaceutical Payment System [24]

While there is variation in the way that prescription drugs are distributed, the payment and pricing system is much more complex than the distribution system, and continually is evolving. Partly this increased complexity is because payment and pricing arrangements involve additional parties that generally do not play a role in the physical distribution of pharmaceuticals: in particular, PBMs and payors. As summarized in one report, "while the flow of products through the pharmaceutical chain is relatively straightforward, the flow of money involves a wider range of players and complex financial relationships."[25] The discussion below begins with a general summary of the payment arrangements between the key entities involved in the distribution chain — manufacturers, wholesalers, and pharmacies —and then briefly describes some of the other participants in the payment system and the roles they play.

As noted earlier, manufacturers most commonly sell to wholesalers that resell to pharmacies. Manufacturers' list prices to wholesalers are known as wholesale acquisition cost (WAC).[26] Wholesalers typically purchase at a discount off of WAC[27]; examples of discounts for branded products include prompt pay discounts, volume discounts, and "short-dated" product discounts (where the wholesaler assumes the risk that the product will expire before it can be resold).[28] In recent years, the major wholesalers have sought to move to a "fee-for-service" model in which they negotiate fees with manufacturers for activities such as distribution and inventory management.[29]

Pharmacies that purchase from wholesalers pay an amount negotiated with the wholesaler. According to one report, pharmacies typically pay wholesalers WAC plus some negotiated percentage.[30] In some cases, pharmacies or other "end-user" customers that purchase through wholesalers may negotiate rebate agreements with manufacturers, or they may negotiate a contracted price with the manufacturer. When

---

[24]      As noted earlier, this appendix provides a brief general overview of the pharmaceutical distribution chain and payment system based on information in publicly available reports. Particularly given the complexity of the payment system, there may be arrangements or practices not captured in these reports.

[25]      Navigating the Pharmacy Benefits Marketplace at 18.

[26]      As defined in the Medicare Modernization Act, WAC represents "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price . . . as reported in wholesale price guides or other publications of drug and biological pricing data." Social Security Act §1847A(c)(6)(B).

[27]      Follow the Pill at 18.

[28]      Id.

[29]      See, e.g., R. David Yost, New Economics of the Pharmaceutical Supply Chain, 62 Am. J. Health-System Pharm. 525 (March 2005).

[30]      Follow the Pill at 18.

wholesalers sell to customers that have a contract price with a manufacturer, they charge the contract price and then bill the manufacturer for a "chargeback"; the chargeback equals the differential between WAC and the contract price.[31]

Smaller pharmacies also may use group purchasing organizations (GPOs) in some cases to negotiate prices with wholesalers or manufacturers.[32] GPOs are entities that negotiate discounted prices on behalf of their members (which primarily are hospitals and other healthcare providers) from manufacturers and distributors of pharmaceuticals and other healthcare products. Pharmaceutical manufacturers and other vendors pay administrative fees to GPOs, which (at least in the case of six GPOs that were studied by the OIG) distribute a portion of their administrative fee revenues to their members.[33]

PBMs play a number of roles in the pharmaceutical payment system. Normally PBMs are not directly involved in the product supply chain, since they do not take physical possession or control of pharmaceuticals as part of their core pharmacy benefit management functions.[34] However, many PBMs own and operate mail order pharmacies and (in their capacity as mail order pharmacies) buy drugs from wholesalers or manufacturers and dispense them to patients.[35]

PBM clients can generally be described as "payors." That is, a PBM's clients usually are entities that provide prescription drug insurance to their enrollees or members, such as self-insured employers, insurers, and HMOs and other managed care organizations.[36] The specific services a PBM performs will vary depending on its contract with particular clients, but PBM functions generally include forming pharmacy networks and negotiating discounted reimbursement rates with network pharmacies; developing and administering formularies and related features of the plan design (e.g., formulary tiering structures, utilization management tools such as prior authorization); negotiating rebates with manufacturers; and processing claims.[37]

Payments that PBMs negotiate with manufacturers of brand-name drugs include rebates, and administrative fees that compensate the PBM for formulary-related administrative activities.[38] The effect of manufacturer rebates to PBMs on

---

[31]    Id. at 19.

[32]    Navigating the Pharmacy Benefits Marketplace at 25; Follow the Pill at 19-20.

[33]    See HHS OIG, Review of Revenue From Vendors at Three Group Purchasing Organization and Their Members, A-05-3-00074, Jan. 2005 (the GPOs studied collected $1.8 billion in administrative fee revenue during the audit period and distributed $898 million to members); HHS OIG, Review of Revenue From Vendors at Three Additional Group Purchasing Organizations and Their Members, A-05-04-00073, May 2005 (GPOs studied collected $513 million in administrative fee revenue during the audit period and distributed $217 million to members).

[34]    Follow the Pill at 14-15; FTC report at 7.

[35]    Follow the Pill at 14-15; FTC report at 5-6.

[36]    FTC report at v; PricewaterhouseCoopers report at 17. In some cases, these entities can be purchasers of drugs as well as payors; for example, some "staff model" HMOs operate on-site pharmacies at their facilities.

[37]    See, e.g., PricewaterhouseCoopers report at 50-58.

[38]    See, e.g., FTC report at 50-55. In some instances manufacturers also may pay PBMs fees for compliance, therapeutic interchange, and other programs related to particular drugs. Id. at 55. In addition to entering into

pharmaceutical prices has been described as follows: "This rebate does not affect the price paid by a wholesaler to a manufacturer for the drug, the price paid by a retail pharmacy to the wholesaler, or the price paid by the PBM to the pharmacy. It is a separate transaction between the PBM and the manufacturer and thus affects the total amount spent by the PBM. To the extent that a portion of the rebate is passed along, the insurer, employer, or beneficiary may realize a part of these savings."[39]

Both the FTC's recent study on PBMs and an earlier study by PricewaterhouseCoopers reported that PBMs commonly pass through a share of manufacturer rebates, but not administrative fees, to their clients.[40] In addition, both studies indicated that the share of rebates passed through to a PBM's clients varies considerably from contract to contract.[41] For example, the FTC examined the retention rates for all pharmaceutical manufacturer payments (including non-pass-through administrative fees) on 11 PBM contracts, and found that in 2003 the PBMs' retention rates on these contracts ranged from 25% to 91% (i.e., pass-through rates ranged from 75% to 9%).[42] The PricewaterhouseCoopers study reported that the percentage of rebates PBMs share with their clients can range from zero to 100%.[43]

The FTC also noted that the percentage of manufacturer rebates that a PBM passes through to a client cannot be viewed in isolation, because clients make payments to PBMs (e.g., administrative fees for claims processing and other services, and reimbursement for the drugs dispensed to plan beneficiaries) and a client could negotiate lower payments in exchange for receiving a lower percentage of manufacturer rebates. Thus, "PBMs could adjust any of a number of terms (e.g., dispensing fees, discounts off of ingredient costs) to make the contract more attractive to plan sponsors" and "in this way manufacturer payments to PBMs could be passed on to plan sponsor clients through a complex array of adjustments to contract provisions relating, for example, to the services that would be provided by the PBM and the prices and fees that would be paid by plan sponsor clients."[44]

---

agreements with PBMs providing for rebates and administrative fees, manufacturers may enter into similar agreements with insurers or other health plan sponsors that manage their own drug benefits, as well as with public programs that provide drug coverage.

[39]    HHS report at 104.

[40]    PricewaterhouseCoopers report at 9, 16, 52; FTC report at 59.

[41]    The FTC found that PBMs and their clients have agreements with three different types of rebate sharing models. In addition to contracting for a certain percentage of manufacturer rebates, PBM clients may also negotiate arrangements in which they receive a specific dollar amount per brand-name drug prescription from the PBM rather than receiving a share of the actual rebates paid to the PBM, or arrangements in which they receive a specified share of rebates subject to a guaranteed minimum rebate payment. FTC report at 57-58.

[42]    FTC report at 59.

[43]    PricewaterhouseCoopers report at 88. See also HHS report at 105 (noting that industry sources report that PBM clients typically receive 70-90% of rebates).

[44]    FTC report at 60. CMS made a similar point in a recent "call letter" to Medicare Part D plans; CMS stated there that "[w]e must assume that if a PBM retains a portion of the manufacturer rebates it negotiates on behalf of a Part D sponsor, the direct payment the sponsor pays the PBM for its services will be less, i.e., the sponsor receives a price concession from the PBM." CMS PDP Call Letter April 3, 2006, at 10.

As noted earlier, PBMs also establish networks of retail and mail-order pharmacies where patients with PBM-administered benefits can fill prescriptions, and negotiate the reimbursement rates network pharmacies receive (i.e., the total payment the pharmacy receives, including the PBM payment and the patient copayment or coinsurance amount). These negotiated reimbursement rates are lower than the rates that pharmacies charge to uninsured "cash-paying" patients, and usually vary depending on the restrictiveness of the pharmacy network (i.e., pharmacies can obtain more business by participating in a more exclusive network, and may thus be willing to accept lower reimbursement rates).[45] The drug ("ingredient cost") reimbursement rates negotiated between PBMs and network pharmacies reportedly are often based on a discount from Average Wholesale Price for brand-name drugs and a Maximum Allowable Cost limitation for generics;[46] pharmacies usually also receive a dispensing fee. The amount that the PBM itself is reimbursed by its clients may or may not equal the amount paid by the PBM to the pharmacy (i.e., ingredient cost plus dispensing fee minus patient copay/coinsurance); the PBM may be paid for pharmacy costs based on a contractually-specified pharmacy reimbursement rate, and could thus experience a profit or loss on pharmacy costs.[47]

The amount paid to the pharmacy by a patient depends on whether the patient is insured. Patients with insurance pay the copayment or coinsurance amount set by their insurer for the drug in question; uninsured patients usually would pay the "cash price."[48] By one estimate, the cash price is approximately 15% higher than the pharmacy's total payment (i.e., insurance payment plus patient copay) for an insured patient.[49] Of course, insured patients ordinarily pay a premium for their coverage as well as the payments they make on prescriptions.

Although this brief overview of the pharmaceutical payment system cannot catalogue all of the system's complexities, it suggests that the "price" of a pharmaceutical product is not easily captured and will depend on the perspective one wishes to examine. Rather than being a single number, the average "price" for a product at a particular time may vary depending on whether one examines the amount realized by the manufacturer; the amount paid by wholesalers; the amount paid by pharmacies; the amount paid by PBMs; the amount paid by PBM clients such as insurers or other health plan sponsors; or the amount paid by patients.

---

[45]   FTC report at 5; PricewaterhouseCoopers report at 57, 70.

[46]   PricewaterhouseCoopers report at 86-87; FTC report at 4-5; Follow the Pill at 19.

[47]   PricewaterhouseCoopers report at 71; FTC report at 9-10.

[48]   Patients with traditional indemnity insurance also may pay the cash price at the pharmacy counter and then submit a claim for reimbursement to their insurer.

[49]   HHS report at 96.

**APPENDIX G**
Page 1 of 2



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

R E C E I V E D          MAY 2 3 2006          200 Independence Avenue SW
Washington, DC 20201

2006 MAY 24 AM 9: 31

OFFICE OF INSPECTOR
GENERAL

**TO:**     Daniel R. Levinson
Inspector General

**FROM:**     Mark B. McClellan, M.D., Ph.D.
Administrator

**SUBJECT:**     Office of Inspector General (OIG) Draft Report: "Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005" (A-06-06-00063)

Thank you for the opportunity to comment on the above draft report. This report looks at the manner in which the Medicaid average manufacturer price (AMP) is determined for drugs under the Deficit Reduction Act of 2005 (DRA).

As discussed in this report, the provisions of the DRA affected not only the Medicaid drug rebate program, but Medicaid reimbursement for drugs, as well. The DRA revises the definition of AMP to exclude customary prompt pay discounts to wholesalers. The DRA requires the OIG to review the requirements for and manner in which AMP is determined and recommend changes to the Secretary by June 1, 2006. The DRA also requires the Secretary to clarify the requirements for and the manner in which AMPs are to be determined by publishing a regulation no later than July 1, 2007.

Prior to the enactment of the DRA, AMP under the Medicaid program has been used solely to calculate drug manufacturer rebates. The DRA allows AMP to be used as a basis for reimbursement. States may use the publicly available AMP in setting their payment methodologies for retail pharmacies. The Centers for Medicare & Medicaid Services (CMS) will use the information to set Federal upper limits (FULs) on payments for multi-source drugs.

The OIG based its recommendations on information gathered through prior investigations. It also met with staff from CMS, Congressional staff, and stakeholder groups and analyzed written comments from six of the stakeholder groups.

**OIG Findings and Recommendation**

The OIG found that existing requirements for determining certain aspects of AMPs are not clear and comprehensive and that manufacturers' methods of calculating AMPs are inconsistent. While the OIG notes the history of CMS actions in clarifying the definition of AMP and recommends that CMS should consider further modification, it does not recommend a specific definition of AMP.

Page 2- Daniel R. Levinson

**Recommendations:**  The OIG recommends that CMS clarify requirements related to retail class of trade, the treatment of rebates to pharmacy benefit managers (PBMs), and the treatment of Medicaid sales.  In addition, the OIG recommends that CMS consider addressing other issues that were raised by industry groups, specifically, administrative and service fees, lagged price concessions and returned goods, the frequency of AMP reporting, AMP restatements, and baseline AMP.  Finally, the report recommends that CMS issue guidance in the near future addressing the implementation of the AMP-related reimbursement provisions of the DRA and encourage States to analyze the relationship between AMP and pharmacy acquisition cost when using this data source to determine payment rates to pharmacies.

### CMS Response to Findings

The CMS acknowledges that the OIG has reported some confusion among drug manufacturers about what sales and price concessions must be included when calculating AMP.  This is an extremely complex and technical topic that has been made more difficult due to changes in the chain of sales and the evolution of new entities, especially PBMs.  For this reason, CMS had hoped that the OIG would have provided more specific recommendations for us to consider as we develop a proposed rule to address this topic.  However, we appreciate the efforts of the OIG in the past, as well as this report, and we look forward to continuing to work with the OIG on this important issue.

### CMS Response to Final Recommendation

In our proposed regulation to implement the AMP and reimbursement provisions of the DRA, CMS will take the opportunity to address each of the areas recommended by the OIG in this report as well as each of the areas raised by the stakeholders in the meetings with the OIG and subsequent written comments.  We will issue the Notice of Proposed Rulemaking as expeditiously as possible.  Likewise, we will review and respond quickly to public comments on the regulation, so that a final rule can be put in place as soon as possible.  CMS will evaluate the need for additional guidance and provide this as we believe it would be beneficial.

Attachment

# EXHIBIT E

# GAO
**Accountability • Integrity • Reliability**

**United States Government Accountability Office**
**Washington, DC 20548**

December 22, 2006

The Honorable Joe Barton
Chairman
Committee on Energy and Commerce
House of Representatives

Subject: *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs*

Dear Mr. Chairman:

Spending on outpatient prescription drugs in Medicaid—the joint federal-state program that finances medical services for certain low-income adults and children—has accounted for a substantial and growing share of Medicaid expenditures.[1] Medicaid's total spending on outpatient prescription drugs grew from $4.6 billion in fiscal year 1990 to $40 billion in fiscal year 2004—or from 7.0 to 14.2 percent of Medicaid's total expenditures for medical care. State Medicaid programs do not directly purchase prescription drugs; instead, they reimburse retail pharmacies for covered outpatient prescription drugs dispensed to Medicaid beneficiaries.[2] For some outpatient multiple-source prescription drugs, state Medicaid programs may only receive federal matching funds for reimbursements up to a maximum amount known as a federal upper limit (FUL).[3,4] Required by law as a cost-containment strategy, FULs are calculated as 150 percent of the lowest price for a drug, from among the

---

[1]Medicaid consists of 56 distinct programs created within broad federal guidelines and administered by state Medicaid agencies. The 56 Medicaid programs include one for each of the 50 states; the District of Columbia; Puerto Rico; and the U.S. territories of American Samoa, Guam, Northern Mariana Islands, and the Virgin Islands. Hereafter in this report, we use "state Medicaid programs" to refer to these 56 programs.

[2]Retail pharmacies are licensed nonwholesale pharmacies that are open to the public.

[3]FULs must be established for each multiple source drug for which there are three or more therapeutically equivalent drug products. 42 U.S.C. § 1396r-8(e)(4) (2000). Therapeutically equivalent drug products can be substituted with the full expectation that they will produce the same clinical effect as the prescribed drug.

[4]By regulation, FULs apply to multiple-source prescription drugs that the Food and Drug Administration considers to have at least three therapeutically equivalent versions and at least three manufacturers or suppliers. 42 C.F.R. § 447.301 and 447.332 (2005).

prices published nationally in three drug pricing compendia.[5] State Medicaid programs have the authority to determine their own reimbursements to retail pharmacies[6] for covered outpatient multiple-source prescription drugs, as long as those reimbursements do not exceed established FULs in the aggregate.

The Deficit Reduction Act of 2005 (DRA) included provisions that changed the methodology for calculating FULs.[7] Beginning January 1, 2007, a drug's FUL will be based on the average manufacturer price (AMP). AMP represents the average of prices paid to manufacturers by wholesalers for a drug distributed to the retail pharmacy class of trade, including retail pharmacies, and is typically less than any of a drug's published prices in the three pricing compendia. Each therapeutically equivalent version of a multiple-source drug has an AMP, and beginning January 1, 2007, a drug's FUL will be calculated as 250 percent of the lowest AMP from among a drug's therapeutically equivalent versions. The Congressional Budget Office estimated that when implemented, AMP-based FULs could reduce total Medicaid spending for prescription drugs by $3.6 billion from 2007 to 2010 and by about $11.8 billion from 2007 to 2015.[8]

Though representing a potential cost saving measure for Medicaid, the change in FUL calculation methodology—using AMP instead of the lowest published price—has raised concerns among retail pharmacies serving Medicaid beneficiaries. Drug manufacturers are required to report AMP data on their drugs to CMS. Because these data are not publicly available, retail pharmacies cannot determine what the relationship will be between AMP-based FULs and the prices the pharmacies pay to acquire these drugs.[9]

Because of your interest in the potential effects of the AMP-based FULs on retail pharmacies, you requested information on how AMP-based FULs will compare with retail pharmacy acquisition costs. We estimated what the AMP-based FULs would have been if they had applied in 2006 and compared them with average retail pharmacy acquisition costs from 2006 for frequently used and high expenditure multiple-source outpatient prescription drugs in Medicaid.

---

[5]The Centers for Medicare & Medicaid Services (CMS), the agency that oversees Medicaid, identifies which drugs are subject to FULs. The Deficit Reduction Act of 2005 also included additional provisions relating to Medicaid reimbursement of outpatient prescription drugs.

[6]Many state Medicaid programs require retail pharmacies to dispense the lower cost therapeutically equivalent version of a drug to Medicaid beneficiaries when one is available. Under these mandatory generic substitution policies, the higher cost version of the drug remains available to beneficiaries if the prescribing physician receives prior authorization. In cases when retail pharmacies are authorized to dispense the higher cost version of the drug, the FUL does not apply.

[7]Pub. L. No. 109-171, § 6001, 120 Stat. 4, 54-59 (2006) (to be codified at 42 U.S.C. § 1396r-8).

[8]Congressional Budget Office Cost Estimate. S. 1932, Deficit Reduction Act of 2005. January 27, 2006.

[9]The price a retail pharmacy pays to acquire a drug from a manufacturer or wholesaler is known as a pharmacy's drug acquisition cost.

To estimate the AMP-based FULs and compare them with average retail pharmacy acquisition costs, we used first quarter 2006 Medicaid utilization data[10] to select a sample of multiple-source outpatient prescription drugs subject to Medicaid FULs. To develop our sample, we identified the 50 drugs that were the most frequently used—that is, represented 53 percent of the outpatient prescription drugs subject to FULs and dispensed to Medicaid beneficiaries in the first quarter of 2006—and the 50 drugs that were the highest expenditure—that is, accounted for 56 percent of Medicaid spending on outpatient prescription drugs subject to FULs in the first quarter of 2006,[11] with some drugs overlapping the two categories. Our resulting sample contained 77 multiple-source outpatient prescription drugs, which comprised 27 frequently used prescription drugs in Medicaid, 27 high expenditure prescription drugs in Medicaid, and 23 prescription drugs that overlapped both categories.

We obtained AMP data from the Centers for Medicare & Medicaid Services (CMS), which requires manufacturers to report AMP data within 30 days of the end of every calendar quarter. We obtained the average retail pharmacy acquisition cost data for the first quarter of 2006 from IMS Health, which obtains these data on sales transactions from approximately 100 manufacturers and over 300 distribution centers, including drug wholesalers and chain warehouses. These manufacturers and distribution centers are responsible for over 85 percent of total market dollar volume. IMS Health projects these data to represent national average acquisition costs for each drug in our sample in the first quarter of 2006.[12] The average pharmacy acquisition cost data that we obtained from IMS Health may be greater than actual acquisition costs because these data do not account for rebates that pharmacies may receive from wholesalers or manufacturers.[13]

For each of the 77 drugs in our sample, we estimated what the AMP-based FULs would have been had they applied in 2006. Using AMP data from the first quarter of 2006, we followed DRA provisions and selected the lowest AMP for each group of therapeutically equivalent versions and multiplied those AMPs by 250 percent. We did not exclude any outlier AMP data in order to be consistent with how CMS officials told us they will be implementing DRA provisions beginning January 1, 2007. We

---

[10]Medicaid utilization data reported to CMS include information on the total number of units and dollar amount for which state Medicaid programs reimbursed retail pharmacies for covered drugs dispensed to Medicaid beneficiaries. As of July 2006, when we selected our sample, utilization data from Iowa, Minnesota, New Jersey, and Rhode Island were not included because these states had not reported their Medicaid utilization data for the first quarter of 2006.

[11]In ranking drugs by their share of Medicaid expenditures for multiple-source outpatient prescription drugs in the first quarter of 2006, we excluded any dispensing fees paid to pharmacies as a part of state reimbursement formulas. Each state pays pharmacies, for each prescription dispensed, a professional dispensing fee intended to cover the pharmacy's labor and overhead costs, such as pharmacists' salaries, drug packaging, rent, and utilities.

[12]For any given drug, the acquisition costs of individual pharmacies may be higher or lower than the national average.

[13]These rebates may vary as retail pharmacies negotiate their rebates based on various factors, including the type of drug, manufacturer, and volume of purchases. In addition, they can negotiate rebates on a manufacturer's entire line of products rather than on a per-drug basis.

compared these estimated AMP-based FULs with average retail pharmacy acquisition cost data from the first quarter of 2006 for the 77 drugs in our entire sample and for each of the three categories of drugs our sample comprises—the frequently used drugs, the high expenditure drugs, and the drugs that overlapped both categories.[14] In order to assess the extent to which AMP-based FULs are likely to vary over time, we also examined the variation in lowest AMPs for the drugs in our sample from the third quarter of 2005 through the third quarter of 2006. We determined that the data used were sufficiently reliable for our purposes. For more detail on our scope and methodology, see enclosure I. The list of 77 drugs we reviewed is included in enclosure II. We performed our work from July 2006 through November 2006 in accordance with generally accepted government auditing standards.

## Results in Brief

The AMP-based FULs we estimated using AMP data from first quarter 2006 were lower than average retail pharmacy acquisition costs from the same period for 59 of the 77 drugs in our sample. For our entire sample of 77 multiple-source outpatient prescription drugs, we found that these estimated AMP-based FULs were, on average, 36 percent lower than average retail pharmacy acquisition costs for the first quarter of 2006. The extent to which the AMP-based FULs were lower than average retail pharmacy acquisition costs differed for high expenditure drugs compared with the frequently used drugs and the drugs that overlapped both categories. In particular, the estimated AMP-based FULs were, on average, 65 percent lower than average retail pharmacy acquisition costs for the 27 high expenditure drugs in our sample and 15 percent lower, on average, for the 27 frequently used drugs in our sample. For the 23 drugs that overlapped both categories of drugs, the estimated AMP-based FULs were, on average, 28 percent lower than the average retail pharmacy acquisition costs. In addition, we also found that the lowest AMPs for the 77 drugs in our sample varied notably from quarter to quarter. Despite this variation, when we estimated what the AMP-based FULs would have been using several quarters of historical AMP data, these estimated FULs were also, on average, lower than average retail pharmacy acquisition costs from the first quarter of 2006.

Though the difference between AMP-based FULs and retail pharmacy acquisition costs was in some cases sizable, the extent of this difference may change because of several factors, including the quarter-to-quarter variation in AMPs used to set FULs as well as the presence of rebates that retail pharmacies may obtain from drug manufacturers and wholesalers. To the extent that the utilization of multiple-source outpatient prescription drugs by retail pharmacies remains similar in 2007 and later to the utilization patterns captured in our sample of drugs for the first quarter of 2006, the gap between estimated first quarter 2006 AMP-based FULs and pharmacy acquisition costs could persist, once the AMP-based FULs are implemented in 2007. However, to the extent that the cost-containment measures of the AMP-based FULs influence pharmacies to acquire lower cost therapeutically equivalent versions of drugs or negotiate lower prices from manufacturers and wholesalers, the gap between AMP-based FULs and acquisition costs could be narrowed or offset.

---

[14]In our comparison of the AMP-based FULs and retail pharmacy acquisition costs, we did not consider dispensing fees.

In reviewing a draft of this report, CMS disagreed with our finding that the AMP-based FULs were lower than the average retail pharmacy acquisition costs for most of the 77 drugs in our sample. In particular, CMS had significant concerns with our estimates of both pharmacy acquisition costs and AMP-based FULs and stated that our findings had not accounted for changes in these two variables that are likely to take place after DRA provisions are implemented in January 2007. In our view, we used the most complete, accurate data sources available at the time of our analysis for our purposes—to estimate both retail pharmacy acquisition costs and AMP-based FULs, had the latter applied in the first quarter of 2006. Furthermore, in our draft report we identified the limitations of the data sources used in our estimates and acknowledged that the difference between retail pharmacy acquisition costs and AMP-based FULs could change following implementation of DRA provisions in 2007. Only after AMP-based FULs are implemented in 2007 will there be an opportunity to determine the extent to which these FULs facilitate both cost-effective Medicaid drug expenditures and adequate reimbursement for retail pharmacies.

## Background

Medicaid is a joint federal-state entitlement program that finances medical services for certain low-income adults and children.[15] While federal guidelines require that all state Medicaid programs offer certain basic benefits, each state Medicaid program determines the extent to which it will cover optional benefits. Outpatient prescription drug coverage is an optional benefit that all state Medicaid programs have elected to include in their Medicaid benefit packages. State Medicaid programs do not directly purchase drugs; instead they reimburse retail pharmacies for covered outpatient prescription drugs dispensed to Medicaid beneficiaries. For some outpatient multiple-source prescription drugs, state Medicaid programs may only receive federal matching funds for reimbursements up to a maximum amount known as a FUL.

Medicaid Federal Upper Limits

FULs were first established in 1987 as a cost-containment strategy in an effort to limit the amount that Medicaid could reimburse retail pharmacies for certain multiple-source outpatient prescription drugs.[16] FULs have been established for multiple-source drugs that have at least three manufacturers or suppliers and CMS publishes a list of drugs that have FULs in the State Medicaid Manual.[17] FULs are expressed on a

---

[15]Within guidelines established by federal statutes, regulations, and policies, each state (1) establishes its own eligibility standards; (2) determines the type, amount, duration, and scope of services; (3) sets the rate of payment for services; and (4) administers its own program.

[16]52 *Fed. Reg.* 28,648 (July 31, 1987). Legislation was enacted in 1990 making the application of FULs a statutory requirement. (Pub. L. No. 101-508, sec. 4401(a)(3), § 1927(f)(2), 104 Stat. 1388, 1388-143 (to be codified, as amended by DRA § 6001(a)(1)–(2), 120 Stat. 54-55, at 42 U.S.C. § 1396r-8(e)(4)).

[17]In addition, FULs are only established when multiple-source drugs are listed as "A" rated-drug products—that is, that the Food and Drug Administration (FDA) considers to be therapeutically equivalent to other pharmaceutically equivalent products—in FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*. This list is commonly known as the Orange Book and identifies drug products approved on the basis of safety and effectiveness by FDA.

per-unit basis—for example, per tablet. As of first quarter 2006, the list included more than 500 multiple-source drugs.[18]

CMS determines the FUL for a multiple-source outpatient prescription drug by grouping a drug's therapeutically equivalent versions together and setting a FUL for each group. Each of a drug's therapeutically equivalent versions has several published prices associated with it, including the average wholesale price (AWP),[19] wholesale acquisition cost (WAC),[20] and direct price (DP).[21] All of these prices are published in each of the three national drug pricing compendia—First DataBank, Medi-Span, and Red Book—which use different methods for determining these published prices. The lowest published price for a FUL group—that is, a drug—may be any one of these three prices, and this can vary depending on the FUL group. Until provisions in DRA take effect January 1, 2007, CMS sets a FUL by identifying a drug's therapeutic equivalent with the lowest price—either AWP, WAC, or DP—in any of the three national drug pricing compendia, and multiplying that price by 150 percent.

A state's total reimbursements for Medicaid prescription drugs subject to FULs must not exceed, in the aggregate, the payment levels established by the FULs over a year. States may exceed the FUL for an individual prescription drug as long as their aggregate expenditures for all prescription drugs subject to FULs do not exceed the amounts that are calculated using the rate established by the FUL.

State Medicaid programs consider several methods for reimbursing pharmacies for multiple-source prescription drugs. In general, states base their Medicaid reimbursements to a retail pharmacy for a covered outpatient prescription drug on the lowest of the following: a state's best estimate of retail pharmacies' acquisition costs for the drug;[22] the usual and customary charge of the retail pharmacy that dispensed the drug;[23] the FUL for the drug, if applicable; or the state's maximum allowable cost (MAC) for the drug,[24] if applicable. When the FUL for a drug is not the

---

[18]Transmittal No. 37, Federal Upper Limit Drug List, November 20, 2001. Federal Upper Limit (FUL) Changes to Transmittal No. 37, June 23, 2006.

[19]AWP is the average of the list prices that the manufacturer suggests wholesalers charge pharmacies.

[20]WAC is the manufacturer's list price for wholesalers or other direct purchasers before any rebates, discounts, allowances, or other price concessions.

[21]DP as published by First DataBank represents the manufacturer's published catalog or list price for a drug product to nonwholesalers. DP does not represent actual transaction prices and does not include prompt pay or other discounts, rebates, or reductions.

[22]States may establish their own methodologies for estimating retail pharmacies' drug acquisition costs. Most states in the first quarter of 2006 chose to estimate these costs by taking a percentage discount from the AWP.

[23]The usual and customary charge for a drug is the full retail price that individuals without prescription drug coverage pay when purchasing drugs at a retail pharmacy.

[24]States that administer MACs publish lists of selected multiple-source drugs with the maximum price at which the state will reimburse for those medications. Pharmacies generally do not receive payments that are higher than the MAC price. The MAC lists differ from the FUL list, as states have more

lowest of these four amounts, Medicaid typically reimburses pharmacies at a rate lower than the FUL.

Deficit Reduction Act of 2005 and Medicaid FULs

DRA modified the methodology used to set FULs for certain multiple-source outpatient prescription drugs for Medicaid.[25] Rather than 150 percent of the lowest published price of the therapeutically equivalent versions, starting January 1, 2007, DRA required that CMS calculate FULs as 250 percent of the lowest AMP among a drug's therapeutically equivalent versions. AMP data are collected by CMS and are not publicly available. (Fig. 1 illustrates how Medicaid FULs are calculated before and after DRA provisions take effect January 1, 2007.)

---

discretion in determining what drugs to include on their MAC lists. Generally, state MAC lists include more drugs, and establish lower reimbursement prices, than the FUL list. As of first quarter 2006, 43 states administer MACs.

[25]DRA § 6001,120 Stat. 54-59.

**Figure 1: Illustration of FUL Methodology Before and After January 1, 2007**



Source: GAO.

Note: The drug pricing compendia in fig.1 are published by First DataBank, Medi-Span, and Red Book.

[a]FUL is the federal upper limit for reimbursement of certain Medicaid outpatient prescription drugs.

[b]WAC is the manufacturer's list price for wholesalers or other direct purchasers before any rebates, discounts, allowances, or other price concessions.

[c]DP as published by First DataBank represents the manufacturer's published catalog or list price for a drug product to nonwholesalers. DP does not represent actual transaction prices and does not include prompt pay or other discounts, rebates, or reductions.

[d]AWP is the average of the list prices that the manufacturer suggests wholesalers charge pharmacies.

[e]AMP represents the average of prices paid to manufacturers by wholesalers for a drug distributed to the retail pharmacy class of trade, including retail pharmacies.

[f]CMS is the agency that oversees Medicaid.

DRA included additional provisions relating to prescription drugs. One provision changed the criteria under which FULs must be established. Until January 1, 2007, FULs must be established for multiple-source drugs for which there are three or more therapeutically equivalent products.[26] Beginning on January 1, 2007, the DRA provides that FULs be established for multiple-source drugs for which there are at least two therapeutically equivalent products.[27] DRA also mandated several changes relating to

---

[26]42 U.S.C. § 1396r-8(e)(4) (2000).

[27]DRA § 6001(a)(1), 120 Stat. 54 (to be codified at 42 U.S.C. § 1396r-8(e)(4)).

**GAO-07-239R Medicaid Federal Upper Limits**

the AMP. For example, DRA required that prompt payment discounts be excluded when manufacturers calculate AMP. DRA also required the Secretary of Health and Human Services to make manufacturers' reported AMP data available on a monthly basis to states, and to post those amounts on a Web site accessible to the public beginning July 2006.[28] These requirements were established in order to give states pricing information that was not previously available to consider in setting reimbursement amounts.

## Estimated AMP-Based FULS Were Lower Than Average Pharmacy Acquisition Costs for Most Drugs in our Sample

For most of the 77 drugs in our sample, the AMP-based FULs we estimated using AMP data from the first quarter of 2006 were lower than average retail pharmacy acquisition costs for the same period. In particular, the percentage difference between the estimated AMP-based FULs and average retail pharmacy acquisition costs was more pronounced for high expenditure drugs than it was for frequently used drugs. Though lowest AMPs can vary notably from quarter to quarter, when we estimated what AMP-based FULs would have been using several quarters of AMP data we found that that these estimated FULs were also lower than average retail pharmacy acquisition costs for most of the drugs—and in particular the high expenditure drugs—in our sample. Furthermore, the difference between AMP-based FULs and retail pharmacy acquisition costs could change following the implementation of DRA provisions in January 2007, to the extent that retail pharmacies acquire lower cost therapeutically equivalent versions of drugs or negotiate lower prices from manufacturers and wholesalers.

<u>Based on First Quarter 2006 Data, AMP-Based FULs Were Lower Than Average Acquisition Costs, with Difference Most Pronounced for High Expenditure Drugs</u>

The AMP-based FULs we estimated using first quarter 2006 AMP data were lower than the average retail pharmacy acquisition costs for the same period for most—59 out of 77—of the drugs in our sample. The estimated AMP-based FULs were, on average, 36 percent lower than average retail pharmacy acquisition costs for our entire sample of drugs.[29] Further, for 43 of the 77 drugs, we found that the estimated AMP-based FULs fell below the lowest acquisition cost available to retail pharmacies. While the estimated AMP-based FULs were lower than average retail pharmacy acquisition costs for our entire sample of drugs, this difference was most pronounced for the 27 high expenditure drugs, compared with the 27 frequently used drugs and with the 23 drugs that were both high expenditure and frequently used in our sample.

---

[28]While CMS released AMP data to states starting in July of 2006, the implementation of the provision requiring AMP data to be posted on a publicly available Web site has been delayed until January 1, 2007.

[29]Excluding statistical outliers from our analysis resulted in a less than 1 percent change in the average percent difference between average retail pharmacy acquisition costs and estimate AMP-based FULs.

*High Expenditure Drugs*

For 26 of the 27 high expenditure drugs in our sample, the AMP-based FULs we estimated using first quarter 2006 data were lower than the average retail pharmacy acquisition costs for this period (see fig. 2). The estimated FULs for these 27 drugs were, on average, 65 percent lower than average retail pharmacy acquisition costs.[30] We also found that for 21 of the 27 high expenditure drugs, the estimated AMP-based FULs fell below the lowest acquisition cost available to retail pharmacies.

**Figure 2: Comparison of Estimated AMP-Based FULs and Average Retail Pharmacy Acquisition Costs for 27 High Expenditure Outpatient Drugs in Medicaid, First Quarter 2006**



Source: GAO analysis of AMP data from CMS and average retail pharmacy acquisition cost data from IMS Health.

*Frequently Used Drugs*

For 17 of the 27 frequently used drugs in our sample, the AMP-based FULs we estimated using first quarter 2006 data were lower than the average retail pharmacy acquisition costs for this period (see fig. 3). For these 27 frequently used drugs, the estimated AMP-based FULs were, on average, 15 percent lower than average retail pharmacy acquisition costs.[31] We also found that for 11 of the 27 frequently used drugs, the estimated AMP-based FULs fell below the lowest acquisition cost available to retail pharmacies.

---

[30]In the first quarter of 2006 the average acquisition cost per unit for the 27 high expenditure drugs in our sample was $0.49.

[31]In contrast with the average acquisition cost per unit for the 27 high expenditure drugs in our sample—$0.49—the average acquisition cost per unit for the 27 frequently used drugs was $0.05 in the first quarter of 2006.

**Figure 3: Comparison of Estimated AMP-Based FULs and Average Retail Pharmacy Acquisition Costs for 27 Frequently Used Outpatient Drugs in Medicaid, First Quarter 2006**



Source: GAO analysis of AMP data from CMS and average retail pharmacy acquisition cost data from IMS Health.

[a]One drug had an estimated AMP-based FUL the same as the average retail pharmacy acquisition cost.

### High Expenditure and Frequently Used Drugs

For 16 of the 23 drugs that were both high expenditure as well as frequently used, the AMP-based FULs we estimated using first quarter 2006 AMP data were lower than the average retail pharmacy acquisition costs for this period (see fig. 4). Further, the estimated AMP-based FULs for the 23 drugs were, on average, 28 percent lower than average retail pharmacy acquisition costs.[32] We also found that for 11 of these 23 drugs the estimated AMP-based FULs fell below the lowest acquisition costs available to retail pharmacies.

---

[32]For the 23 high expenditure and frequently used drugs, the average acquisition cost per unit was $0.08.

**Figure 4: Comparison of AMP-Based FULs and Average Retail Pharmacy Acquisition Costs for 23 Outpatient Drugs That Were Both High Expenditure and Frequently Used in Medicaid, First Quarter 2006**



Source: GAO analysis of AMP data from CMS and average retail pharmacy acquisition cost data from IMS Health.

<u>Though Lowest AMPs Can Vary Over Time, AMP-Based FULs Estimated for Several Quarters Were Also Lower Than Acquisition Costs</u>

Our comparison of estimated AMP-based FULs and average retail pharmacy acquisition costs involves AMP data that can vary notably from quarter to quarter. In particular, we found variation in the lowest AMPs—which will set AMP-based FULs, beginning January 1, 2007—for the 77 drugs in our sample. For example, from the first of quarter 2006 through the second quarter of 2006,

- 36 of the 77 drugs had a median increase of 33 percent in their lowest AMPs;

- 11 of the 77 drugs had no change in their lowest AMPs; and

- 30 of the 77 drugs had a median decrease of 33 percent in their lowest AMPs.

Similarly, the lowest AMPs for the 77 drugs in our sample varied from quarter to quarter over the period covering the third quarter of 2005 through the third quarter of 2006. Despite this variation in lowest AMP values, when we estimated what AMP-based FULs would have been in each of several quarters—namely, the fourth quarter of 2005 through the second quarter of 2006—we found that the estimated FULs for each of these quarters were also lower, on average, than average retail pharmacy acquisition costs from the first quarter of 2006.[33] Even if we made the comparison using the quarter—from among the fourth quarter of 2005 through the second quarter of 2006—in which each drug's estimated AMP-based FUL was the highest, the

---

[33]This analysis assumes that first quarter 2006 acquisition costs are a valid proxy for acquisition costs in the fourth quarter of 2005 and the second quarter of 2006.

estimated AMP-based FULs for 49 of the 77 drugs remained lower than first quarter 2006 average retail pharmacy acquisition costs. Across our entire sample of 77 prescription drugs, the estimated AMP-based FULs were 12 percent lower, on average, than the average retail pharmacy acquisition costs from the first quarter of 2006. This analysis also showed differences across the three groups of drugs in our sample:

- For the high expenditure drugs, AMP-based FULs for 24 out of 27 drugs remained lower than average retail pharmacy acquisition costs. Across this group of drugs, the estimated AMP-based FULs were 41 percent lower, on average, than the average retail pharmacy acquisition costs from the first quarter of 2006.

- For frequently used drugs, AMP-based FULs for 10 out of 27 drugs remained lower than average retail pharmacy acquisition costs. Across this group of drugs, the estimated AMP-based FULs were 11 percent higher, on average, than the average retail pharmacy acquisition costs from the first quarter of 2006.

- For the high expenditure and frequently used drugs, AMP-based FULs for 15 out of 27 drugs remained lower than average retail pharmacy acquisition costs. Across this group of drugs, the estimated AMP-based FULs were 4 percent lower, on average, than the average retail pharmacy acquisition costs from the first quarter of 2006.

<u>Difference between AMP-Based FULs and Retail Pharmacy Acquisition Costs Could Change Following Implementation of DRA Provisions in 2007</u>

Though the difference between AMP-based FULs and retail pharmacy acquisition costs in the first quarter of 2006 was in some cases sizable—on average 65 percent for the high expenditure drugs in our sample—it is important to recognize that the extent of this difference may change, because of several factors. These factors include the quarter-to-quarter variation in the AMPs used to set FULs, the DRA-required change in the definition of AMP that excludes prompt payment discounts from the calculation of AMPs, which may increase AMPs, and the presence of rebates that retail pharmacies may obtain from drug manufacturers and wholesalers that may lower retail pharmacy acquisition costs. In addition, because FULs apply to state Medicaid program aggregate expenditures for relevant outpatient multiple-source drugs in a year, states may reimburse for some drugs in excess of the FULs as long as these higher reimbursements are offset by others that are below the FULs.

Furthermore, the difference we found between AMP-based FULs and retail pharmacy acquisition costs also reflects the particular multiple-source outpatient prescription drugs pharmacies purchased and dispensed to Medicaid beneficiaries in the first quarter of 2006. To the extent that in 2007 and in future years this utilization remains similar to the utilization captured in our sample of drugs for the first quarter of 2006, the gap we found could persist. However, to the extent that the cost-containment measures of the AMP-based FULs influence retail pharmacies to acquire lower cost therapeutically equivalent versions of drugs or negotiate lower prices from manufacturers and wholesalers, the gap between AMP-based FULs and acquisition costs could be narrowed or offset. Only after AMP-based FULs are implemented in

2007 will there be an opportunity to determine the extent to which these FULs are facilitating both cost-effective Medicaid drug expenditures and adequate reimbursements for retail pharmacies.

**Agency and Other External Comments**

CMS reviewed a draft of this report and provided written comments, which are reproduced in enclosure III. CMS disagreed with our finding that the AMP-based FULs were lower than the average retail pharmacy acquisition costs for most of the 77 drugs in our sample. In particular, CMS had significant concerns with our estimates of both pharmacy acquisition costs and AMP-based FULs and stated that our findings had not accounted for changes in these two variables that are likely to take place after DRA provisions are implemented in January 2007. In our view, we used the most complete, accurate data sources available at the time of our analysis for our purposes—to estimate both retail pharmacy acquisition costs and AMP-based FULs, had the latter applied in the first quarter of 2006. Furthermore, in our draft report we identified the limitations of the data sources used in our estimates and acknowledged that the difference between retail pharmacy acquisition costs and AMP-based FULs could change following implementation of DRA provisions in 2007.

In its written comments, CMS raised issues regarding our estimates of retail pharmacy acquisition costs, our estimates of AMP-based FULs, and our discussion of the impact of DRA provisions:

*Our Estimates of Retail Pharmacy Acquisition Costs*

CMS stated that our draft report did not provide source documents or evidence of how IMS Health arrived at the acquisition costs used in our comparison. Our draft report explained that IMS Health collects acquisition cost data from actual sales transactions from manufacturers and distribution centers, which represent over 85 percent of total market dollar volume, and projects these data to represent national average acquisition costs. We could not provide CMS with the acquisition cost data used in our analysis because, while they are commercially available, they are proprietary. Specifically, our data use agreement with IMS Health prohibits us from releasing its data to third parties, such as CMS.

CMS also questioned the validity of our estimation of retail pharmacy acquisition costs because we did not account for the rebates retail pharmacies may receive from wholesalers and manufacturers. In our draft report we stated that the IMS Health data did not account for such rebates, and we identified this as a limitation of our analysis. However, as CMS officials acknowledged to us, there are no known data sources of pharmacy acquisition costs of multiple-source outpatient prescription drugs that account for rebates. Identifying rebates is difficult because retail pharmacies negotiate their rebates based on various factors and can negotiate rebates on a manufacturer's entire line of products rather than on a per-drug basis. We have amended our report to clarify these issues.

*Our Estimates of AMP-Based FULs*

CMS stated that in estimating the AMP-based FULs for our analysis we did not exclude outlier AMP data. According to CMS, excluding outlier AMP data could have "significantly" raised our estimates of AMP-based FULs for many multiple-source outpatient prescription drugs. As we stated in our draft report, we did not exclude outlier AMP data from our analysis because, during the course of our work, CMS officials indicated that they would not exclude any outlier AMP data when they begin calculating AMP-based FULs in January 2007. To be consistent with the methodology CMS indicated the agency will use when implementing DRA provisions, we did not exclude outlier data from our estimates of AMP-based FULs. However, in their comments, CMS indicated that they intend to address outlier AMP data, as appropriate, in calculating the AMP-based FULs.

During the course of our work we identified outliers in the AMP data underlying the FULs for several drugs in our analysis. However, excluding these outliers did not significantly reduce the gap we found between the estimated AMP-based FULs and retail pharmacy acquisition costs. We have amended our report to include this information. We agree with CMS's revised approach to publish clear criteria for (1) identifying and excluding outliers from the AMP data that underlie each FUL group and (2) identifying which therapeutically equivalent versions of each drug are nationally available and should thereby be considered when setting the FUL.[34]

*Potential Impact of DRA on Retail Pharmacy Acquisition Costs and AMP-Based FULs*

CMS stated that our analysis did not account for several ways in which DRA may affect retail pharmacy acquisition costs and the AMP-based FULs. CMS suggested that our estimation of retail pharmacy acquisition costs will likely not reflect such costs after the implementation of DRA provisions in January 2007. CMS expects that the AMP-based FULs implemented as a result of DRA will drive retail pharmacies to fill more Medicaid prescriptions with lower cost versions of multiple-source outpatient prescription drugs—thereby reducing these pharmacies' acquisition costs. In CMS's view, our study erroneously assumed that pharmacies' utilization of multiple-source outpatient prescription drugs—and therefore pharmacy acquisition costs—will remain unchanged after the implementation of DRA. While we estimated average pharmacy acquisition costs for the multiple-source outpatient prescription drugs in our sample using utilization and cost data from the first quarter of 2006, we also acknowledged in our draft report that retail pharmacies could change their utilization of multiple-source outpatient prescription drugs in 2007 and later to lower their acquisition costs. Specifically, our draft report stated that "to the extent that the cost-containment measures of the AMP-

---

[34]In a media release dated December 15, 2006, CMS indicated that it will publish in the *Federal Register* a proposed rule to implement provisions of the Deficit Reduction Act of 2005 that highlights proposed changes in the payment for certain drugs in the Medicaid program. See http://www.cms.hhs.gov/apps/media/fact_sheet.asp (December 15, 2006).

based FULs influence pharmacies to acquire lower cost therapeutically equivalent versions of drugs or negotiate lower prices from manufacturers and wholesalers, the gap between AMP-based FULs and acquisition costs could be narrowed or offset."

CMS also pointed out that our study did not include an analysis of how retail pharmacies could mitigate the effects of AMP-based FULs by filling more Medicaid prescriptions with lower cost versions of multiple-source outpatient prescription drugs. However, as part of our analysis, we compared estimated AMP-based FULs to the lowest available acquisition cost for each of the multiple-source outpatient prescription drugs in our sample. As we reported in our draft, for most the drugs in our sample—43 of 77—the estimated AMP-based FUL fell below the lowest acquisition cost available to retail pharmacies.

CMS had concerns that in estimating the AMP-based FULs we used AMP data that included customary prompt payment discounts, even though DRA requires their exclusion from AMP beginning in 2007. According to CMS, prompt payment discounts decrease AMPs, and so using AMP data that include such discounts will decrease AMP-based FULs. In our view, the impact of excluding prompt payment discounts from the AMP data we used to estimate AMP-based FULs is unclear. In our previous work, we have found that prompt payment discounts are, on average, 2 percent of the sales transactions to which they apply.[35] However, we have also reported that manufacturers vary in the purchasers to whom they offer prompt payment discounts and whether they include these discounts in their calculations of AMP. Therefore, attempting to account for prompt payment discounts for all of the multiple-source outpatient prescription drugs in our analysis would have, in some cases, overstated the impact of these discounts on our estimates of AMP-based FULs. We agree with CMS that the changes in the definition of AMP as required by DRA will likely increase AMP-based FULs. However, our previous work suggests that excluding prompt payment discounts from the calculation of AMP-based FULs would not have offset the gap we reported between retail pharmacy acquisition costs and estimated AMP-based FULs. In our report, we have clarified the issue of prompt payment discounts and its impact on our analysis.

In addition to their concerns related to the estimates used in our draft report, CMS noted that our analysis did not address existing state cost containment efforts, such as MAC programs, to reduce Medicaid reimbursements for outpatient prescriptions drugs. While the relationship between AMP-based FULs and state Medicaid cost containment efforts is a valid comparison, the issue was beyond the scope of our report, which compared estimated AMP-based FULs to retail pharmacy acquisition costs.

---

[35]See GAO, *Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States*, GAO-05-102 (Washington, D.C.: Feb. 4, 2005).

Finally, we agree with CMS that changing the basis of the FUL from the AWP to the AMP was a step in the right direction towards achieving savings for the federal government on Medicaid expenditures for multiple-source outpatient prescription drugs. However, these savings should be achieved while ensuring that reimbursements to retail pharmacies are adequate to provide Medicaid beneficiaries access to multiple-source outpatient prescription drugs. As we stated in our draft report, only after AMP-based FULs are implemented in 2007 will there be an opportunity to determine the extent to which these FULs facilitate both cost effective Medicaid drug expenditures and adequate reimbursement for retail pharmacies.

CMS also provided technical comments that we incorporated as appropriate.

- - - - -

As agreed with your office, unless you publicly announce its contents earlier, we plan no further distribution of this report until 30 days after its date. We will then send copies of this report to the Administrator of CMS and other interested parties. The report will also be available at no charge on GAO's Web site at http://www.gao.gov. If you or your staff have any questions about this report, please contact me at (202) 512-7119 or dickenj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs can be found on the last page of this report. GAO staff who made major contributions to this report are listed in enclosure IV.

Sincerely yours,

John E. Dicken
Director, Health Care

Enclosures—4

Enclosure I                                                                                     Enclosure I

## Scope and Methodology

To examine the relationship between the Medicaid federal upper limits (FUL) estimated using first quarter 2006 average manufacturer price (AMP) data and the average retail pharmacy acquisition cost for frequently used and high expenditure drugs in Medicaid, we used first quarter 2006 Medicaid utilization data from the Centers for Medicare & Medicaid Services (CMS)[36] to select the 50 most frequently used and the 50 highest expenditure multiple-source outpatient prescription drugs in Medicaid subject to FULs.[37] Combined, these two lists comprised a sample of 77 unique drugs representing 53 percent of Medicaid prescriptions and 56 percent of Medicaid expenditures for drugs subject to the FUL in the first quarter of 2006.[38] We obtained the list of drugs subject to the FUL from CMS and, because the AMP-based FULs were not available during the course of our work, estimated what the AMP-based FULs would have been using AMP data from the first quarter of 2006 for each of the 77 drugs.

Our analyses are limited to multiple-source outpatient prescription drugs that were subject to FULs for the first quarter of 2006 and do not include those drugs that may be added to the FUL list beginning January 1, 2007, per the expanded multiple-source definition in the Deficit Reduction Act of 2005 (DRA). Additionally, we compared corresponding AMP data with retail pharmacy acquisition cost data for each drug in our sample by National Drug Codes (NDC).[39]

To estimate FULs under the AMP-based methodology, we first extracted AMP data for the first quarter of 2006 for each of the 77 drugs in our sample from CMS's Medicaid Drug Rebate Initiative (MDRI) system. CMS requires manufacturers to report AMP data within 30 days of the end of every calendar quarter. We then selected the lowest AMP for the first quarter of 2006 for each group of therapeutically equivalent drugs and multiplied it by 250 percent. These AMP data do not account for the impact of the DRA-required change in the definition of AMP which excludes

---

[36]Medicaid utilization data reported to CMS include information on the total number of units and dollar amounts reimbursed for each drug. As of August 2006 when we selected our sample, Iowa, Minnesota, New Jersey, and Rhode Island had not reported their Medicaid utilization data for the first quarter of 2006.

[37]For drugs subject to the FUL, Medicaid covered 32.9 million prescriptions that were dispensed to Medicaid beneficiaries at retail pharmacies in the first quarter of 2006.

[38]Drugs with the same name but different strengths, forms (such as capsules or tablets), or package sizes were counted separately as unique drugs.

[39]NDCs are the universal product identifiers for drugs for human use. The Food and Drug Administration assigns the first segment of the NDC, which identifies the firm that manufacturers, repackages, or distributes a drug; the second segment identifies a specific strength, dosage form, and formulation for a particular firm; and the third segment identifies package size. A single drug can have multiple NDCs associated with it. For example, a drug made by one manufacturer, in one form or strength, but in three package sizes would have three NDCs. Three-segment NDCs are denoted by 11 digits while two-segment NDCs are denoted by 9 digits, and do not account for package size.

Enclosure I                                                                Enclosure I

prompt payment discounts.[40] In addition, in estimating the AMP-based FULs, we did not exclude any outlier AMP data in order to be consistent with how CMS officials told us they will be implementing DRA provisions beginning January 1, 2007. Nonetheless, during the course of our work, we examined the AMP data underlying each FUL group for the presence of statistical outliers.

To determine retail pharmacies' acquisition costs for the 77 drugs, we purchased national average retail pharmacy acquisition cost data from IMS Health for the first quarter of 2006. IMS Health obtains these data on sales transactions from approximately 100 manufacturers and over 300 distribution centers, including drug wholesalers and chain warehouses. These manufacturers and distribution centers are responsible for over 85 percent of total market dollar volume. IMS Health projects these data to represent national average acquisition costs for each drug in our sample in the first quarter of 2006.[41] The average pharmacy acquisition cost data that we obtained from IMS Health may be greater than actual average acquisition costs because these data do not account for rebates that pharmacies may receive from wholesalers or manufacturers.[42] We calculated an average acquisition cost for each drug by weighting the acquisition cost for each therapeutically equivalent drug by its Medicaid expenditure for first quarter 2006.[43]

To compare the estimated AMP-based FULs to the average retail pharmacy acquisition costs for each of the 77 drug groups in our analysis, we calculated the percentage difference between the AMP-based FUL and (1) the average of acquisition costs for all therapeutically equivalent drugs within a group and (2) the average acquisition cost for the lowest cost therapeutically equivalent drug within a group. We also calculated the percentage difference of the AMP-based FUL to the average acquisition cost and minimum acquisition cost separately for the 27 high expenditure drugs, 27 frequently used drugs, and 23 drugs that were considered both high expenditure and frequently used.

---

[40]In our previous work we found that prompt payment discounts are, on average, 2 percent of the sales transactions to which they apply. However, we have also reported that manufacturers vary in the purchasers to whom they offer prompt payment discounts and whether they include these discounts in their calculations of AMP. Therefore, attempting to account for prompt payment discounts for all of the multiple-source outpatient prescription drugs in our analysis would have, in some cases, overstated the impact of these discounts on our estimates of AMP-based FULs. See GAO, *Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States*, GAO-05-102 (Washington, D.C.: Feb. 4, 2005).

[41]For any given drug, the acquisition costs of individual pharmacies may be higher or lower than the national average.

[42]These rebates may vary as retail pharmacies negotiate their rebates based on various factors, including the type of drug, manufacturer, and volume of purchases. In addition, they can negotiate rebates on a manufacturer's entire line of products rather than on a per-drug basis.

[43]We calculated a weighted average acquisition cost to account for Medicaid prescription drug utilization patterns.

Enclosure I                                                    Enclosure I

We also assessed the extent to which AMP-based FULs are likely to vary over time by examining the variation of the lowest AMPs that would be used to set the estimated FULs for each of the 77 drugs in our sample from the third quarter of 2005 through the third quarter of 2006. Additionally, we compared the highest estimated AMP-based FUL from the fourth quarter of 2005 through the second quarter of 2006 to the average retail pharmacy acquisition cost for the first quarter of 2006 for each of the 77 drugs. We also performed this comparison separately for the 27 high expenditure drugs, 27 frequently used drugs, and 23 drugs that were considered both high expenditure and frequently used.

To assess the reliability of the AMP data, we reviewed relevant documentation regarding the construction and reporting of data extracted from CMS's MDRI system. To assess the reliability of the IMS Health average retail pharmacy acquisition cost data, we reviewed relevant documentation regarding the construction and reporting of the data supplied. We determined that the data used were sufficiently reliable for our purposes.

We performed our work from July 2006 through November 2006 in accordance with generally accepted government auditing standards.

Enclosure II                                                    Enclosure II

**Percentage of Medicaid Prescriptions and Expenditures for 77 Medicaid Outpatient Prescription Drugs GAO Reviewed, First Quarter 2006**

| Drug name and strength | Dosage form | Percentage of Medicaid prescriptions | Ranking by Medicaid prescriptions | Percentage of Medicaid expenditures | Ranking by Medicaid expenditures |
|---|---|---|---|---|---|
| Acetaminophen Codeine Phosphate 300-30mg | Tablet | 1.2 | 14 | 0.5 | 49 |
| Acetaminophen Hydrocodone Bitartrate 500-5mg | Tablet | 3.2 | 2 | 0.5 | 47 |
| Acetaminophen Hydrocodone Bitartrate 500-7.5mg | Tablet | 0.9 | 27 | N/A | N/A |
| Acetaminophen Hydrocodone Bitartrate 500-10mg | Tablet | 0.6 | 43 | 1.1 | 17 |
| Acetaminophen Hydrocodone Bitartrate 750-7.5mg | Tablet | 0.6 | 45 | N/A | N/A |
| Acetaminophen Oxycodone HCl 325-5mg | Tablet | 1.2 | 17 | N/A | N/A |
| Acetaminophen Propoxyphene Napsylate 650-100mg | Tablet | 1.1 | 19 | 0.6 | 42 |
| Albuterol 0.9mg/inh | Aerosol | 3.7 | 1 | 1.8 | 9 |
| Albuterol Sulfate 0.083mg/ml | Solution | 1.8 | 4 | 2.0 | 6 |
| Alprazolam 0.25mg | Tablet | 0.6 | 38 | N/A | N/A |
| Alprazolam 0.5mg | Tablet | 0.9 | 26 | N/A | N/A |
| Alprazolam 1mg | Tablet | 0.8 | 29 | N/A | N/A |
| Amoxicillin 125/5mg/ml | Suspension | 1.9 | 3 | 0.5 | 50 |
| Amoxicillin 500mg | Capsule | 1.6 | 5 | N/A | N/A |
| Amoxicillin Clavulanic Acid 400/5mg/ml-57/5mg/ml | Suspension | N/A | N/A | 1.9 | 7 |
| Atenolol 25mg | Tablet | 0.6 | 40 | N/A | N/A |

Enclosure II                                              Enclosure II

| Drug name and strength | Dosage form | Percentage of Medicaid prescriptions | Ranking by Medicaid prescriptions | Percentage of Medicaid expenditures | Ranking by Medicaid expenditures |
|---|---|---|---|---|---|
| Atenolol 50mg | Tablet | 0.8 | 33 | N/A | N/A |
| Baclofen 10mg | Tablet | N/A | N/A | 0.7 | 30 |
| Baclofen 20mg | Tablet | N/A | N/A | 0.6 | 41 |
| Betamethasone Dipropionate Clotrimazole 0.05-1% | Cream | N/A | N/A | 0.8 | 23 |
| Carbamazepine 200mg | Tablet | N/A | N/A | 0.6 | 45 |
| Carisoprodol 350mg | Tablet | 0.6 | 44 | 0.8 | 24 |
| Cephalexin 500mg | Capsule | 1.0 | 22 | 0.7 | 36 |
| Ciprofloxacin HCl 500mg | Tablet | 0.5 | 49 | N/A | N/A |
| Clonazepam 0.5mg | Tablet | 1.3 | 11 | 0.7 | 29 |
| Clonazepam 1mg | Tablet | 1.1 | 18 | 0.9 | 21 |
| Clonidine HCl 0.1mg | Tablet | 1.0 | 24 | N/A | N/A |
| Cyclobenzaprine HCl 10mg | Tablet | 1.0 | 23 | 0.7 | 34 |
| Diazepam 5mg | Tablet | 0.6 | 42 | N/A | N/A |
| Fluoxetine HCl 20mg | Capsule | 1.0 | 21 | 0.7 | 33 |
| Fluoxetine HCl 40mg | Capsule | N/A | N/A | 1.2 | 16 |
| Folic Acid 1mg | Tablet | 1.2 | 15 | N/A | N/A |
| Furosemide 20mg | Tablet | 0.9 | 28 | N/A | N/A |
| Furosemide 40mg | Tablet | 1.4 | 7 | N/A | N/A |
| Gabapentin 100mg | Capsule | N/A | N/A | 0.7 | 32 |
| Gabapentin 300mg | Capsule | 0.7 | 36 | 5.1 | 1 |
| Gabapentin 400mg | Capsule | N/A | N/A | 1.3 | 12 |
| Gabapentin 600mg | Tablet | N/A | N/A | 4.2 | 2 |
| Gabapentin 800mg | Tablet | N/A | N/A | 2.0 | 5 |
| Glimepiride 4mg | Tablet | N/A | N/A | 0.5 | 46 |

Enclosure II                                                          Enclosure II

| Drug name and strength | Dosage form | Percentage of Medicaid prescriptions | Ranking by Medicaid prescriptions | Percentage of Medicaid expenditures | Ranking by Medicaid expenditures |
|---|---|---|---|---|---|
| Glyburide 5mg | Tablet | N/A | N/A | 0.8 | 26 |
| Glyburide Metformin HCl 5mg | Tablet | N/A | N/A | 1.1 | 18 |
| Hydrochlorothiazide 25mg | Tablet | 1.5 | 6 | N/A | N/A |
| Hydroxyzine HCl 25mg | Tablet | N/A | N/A | 0.8 | 27 |
| Ibuprofen 400mg | Tablet | 0.6 | 46 | N/A | N/A |
| Ibuprofen 600mg | Tablet | 1.1 | 20 | N/A | N/A |
| Ibuprofen 800mg | Tablet | 1.4 | 8 | N/A | N/A |
| Levothyroxine Sodium 0.05mg | Tablet | 0.6 | 47 | N/A | N/A |
| Lisinopril 10mg | Tablet | 0.8 | 32 | 0.6 | 44 |
| Lisinopril 20mg | Tablet | 0.7 | 37 | 0.6 | 39 |
| Lisinopril 40mg | Tablet | N/A | N/A | 0.6 | 40 |
| Lorazepam 0.5mg | Tablet | 1.3 | 10 | 0.9 | 20 |
| Lorazepam 1mg | Tablet | 1.2 | 16 | 1.3 | 13 |
| Lorazepam 2mg | Tablet | N/A | N/A | 0.6 | 43 |
| Lovastatin 40mg | Tablet | N/A | N/A | 0.7 | 35 |
| Metformin HCl 500mg | Tablet | 1.2 | 12 | 1.8 | 8 |
| Metformin HCl 1000mg | Tablet | 0.6 | 41 | 1.0 | 19 |
| Metoprolol Tartrate 50mg | Tablet | 0.8 | 30 | N/A | N/A |
| Metronidazole 500mg | Tablet | 0.5 | 50 | N/A | N/A |
| Mirtazapine 15mg | Tablet | N/A | N/A | 0.8 | 28 |
| Mirtazapine 30mg | Tablet | N/A | N/A | 0.7 | 37 |
| Mupirocin 2% | Ointment | N/A | N/A | 1.2 | 15 |
| Naproxen 500mg | Tablet | 0.8 | 31 | N/A | N/A |
| Omeprazole 20mg | Capsule | N/A | N/A | 1.4 | 10 |

Enclosure II                                                                                    Enclosure II

| Drug name and strength | Dosage form | Percentage of Medicaid prescriptions | Ranking by Medicaid prescriptions | Percentage of Medicaid expenditures | Ranking by Medicaid expenditures |
|---|---|---|---|---|---|
| Paroxetine HCl 10mg | Tablet | N/A | N/A | 0.6 | 38 |
| Paroxetine HCl 20mg | Tablet | N/A | N/A | 2.3 | 3 |
| Paroxetine HCl 30mg | Tablet | N/A | N/A | 0.8 | 22 |
| Paroxetine HCl 40mg | Tablet | N/A | N/A | 1.2 | 14 |
| Penicillin V Potassium 500mg | Tablet | 0.5 | 48 | N/A | N/A |
| Potassium Chloride 20mEq | Tablet | 0.8 | 34 | 0.8 | 25 |
| Ranitidine HCl 150mg | Tablet | 1.3 | 9 | 0.5 | 48 |
| Ribavirin 200mg | Capsule | N/A | N/A | 2.1 | 4 |
| Sulfamethoxazole Trimethoprim 800-160mg | Tablet | 1.0 | 25 | N/A | N/A |
| Tizanidine HCl 4mg | Tablet | N/A | N/A | 0.7 | 31 |
| Tramadol HCl 50mg | Tablet | 1.2 | 13 | 1.3 | 11 |
| Trazodone HCl 50mg | Tablet | 0.8 | 35 | N/A | N/A |
| Trazodone HCl 100mg | Tablet | 0.6 | 39 | N/A | N/A |

Source: GAO analysis of CMS Medicaid state drug utilization data.

Note: Our sample contained 77 multiple-source outpatient prescription drugs in Medicaid for the first quarter of 2006, which comprised 27 frequently used prescription drugs, 27 high expenditure prescription drugs, and 23 prescription drugs that overlapped both categories. N/A appears in the table for drugs that were not in the overlap category.

Enclosure III                                                                   Enclosure III

# CMS Comments



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                        Centers for Medicare & Medicaid Services

DEC - 6 2006                                         *Administrator*
                                                     Washington, DC 20201

**TO:**          John Dicken
                 Director, Health Care
                 Government Accountability Office

**FROM:**        Leslie V. Norwalk, Esq.
                 Acting Administrator
                 Centers for Medicare & Medicaid Services

**SUBJECT:**     Government Accountability Office (GAO) Draft Report: "Medicaid
                 Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for
                 Reimbursement Compared with Retail Pharmacy Acquisition Costs" (GAO-
                 07-239R)

Thank you for the opportunity for the Centers for Medicare & Medicaid Services (CMS)
to comment on the proposed report on Federal Upper Limit (FUL) reimbursement and
retail pharmacy acquisition cost. This report examines the potential effects on retail
pharmacies of the provision of the Deficit Reduction Act of 2005 (DRA) that requires
CMS to set the FUL at 250 percent of the lowest average manufacturer price (AMP)
(computed without regard to customary prompt pay extended to wholesalers) in a FUL
group.

Section 1927(e)(4) of the Social Security Act requires the Secretary to establish a Federal
upper reimbursement limit for certain multiple source drugs. By regulation, this limit has
been set as 150 percent of the least costly therapeutically equivalent drug as listed in
published compendia of cost information for drugs for sale nationally.

It has been routinely reported that, over time, the FUL was increasingly less effective in
assuring that the Medicaid program paid appropriately for multiple source drugs. This
fact had been documented by studies of the Inspector General of the Department of
Health and Human Service (HHS), by the bi-partisan Medicaid Commission, and in
testimony before the House Energy and Commerce Committee. Over time, the reported
prices used to set the FUL in published compendia have become less reliable as estimates
of the true acquisition cost of drugs. As long as States must rely on prices that are not
based on verifiable data, reimbursement is inflated, increasing the cost to Medicaid. In
mandating the use of AMP, Congress required that the reimbursement system be based
on reliable data and not on self-reported manufacturer's or distributor's data that is
subject to bias. The DRA changes are intend to make transparent accurate pricing data to
assure that the Federal government and state Medicaid programs are paying appropriately
for multiple source drugs.

Page 2 - John Dicken

This GAO study responds to concerns of the retail pharmacy industry that establishing a FUL reimbursement based on 250 percent of AMP will be insufficient to cover retail pharmacists' costs of purchasing drugs. If this were true, the actual AMP of a drug, as reported by manufacturers, multiplied by 2.5 would be less than a pharmacy's purchase price, meaning that the handling costs and profits in the distribution chain far exceed the actual cost of the drug product.

This GAO study purports to document that the AMP-based FULs are lower than average retail pharmacy acquisition cost for the 77 FUL drug groups reviewed. We find GAO's conclusion premature and unsupported by the report. This study cannot be thoroughly analyzed or replicated because the GAO will not release the data on which it is based. It admittedly uses incomplete and misleading information, as well as nondisclosed pricing data. We believe a more thorough analysis of pharmacy acquisition costs is necessary, based on verifiable and complete data, before any report is released.

## GAO Findings

Using first quarter 2006 Medicaid data, 50 drugs that were identified as the most frequently used drugs, and 50 drugs that accounted for the highest Medicaid expenditures were selected for the study. With some drugs overlapping the two categories, the resulting sample contained 77 multiple source drugs groups.

The GAO determined that for 59 of the 77 multiple source drug groups analyzed in the study, the AMP-based FUL was lower than average retail pharmacy acquisition cost. On average, GAO estimated that the AMP-based FUL was 36 percent lower than average retail pharmacy acquisition cost. For high expenditure drugs, GAO estimated that the AMP-based FUL was 65 percent lower, and it was 15 percent lower for the frequently used drugs. For the drugs that overlapped both categories, the estimated AMP-based FUL was 28 percent lower than average retail pharmacy acquisition cost.

## CMS Response

Based on the methodological flaws discussed below, we do not concur with the GAO findings that the AMP-based FUL would be lower than average retail pharmacy acquisition cost. The GAO study fails to credibly document this finding and we believe the release of the report would mislead the public.

The CMS has significant concerns with the validity of the estimate GAO used to approximate pharmacist acquisition costs. The CMS is unable to validate the findings of the GAO related to average retail pharmacy acquisition cost. The report does not provide source documents or evidence of how IMS Health arrived at the acquisition cost used in the comparison study other than to state that data on sales transactions were collected. Specifically, IMS cost and utilization data by national drug code (NDC) was not provided to CMS. This brings into question the overall validity of this self-reported data. Further, the GAO states in their report that "the average pharmacy acquisition cost data that we obtained from IMS Health may be greater than actual average acquisition cost,

Page 3 – John Dicken

because these data do not account for rebates that pharmacies may receive from wholesalers or manufacturers." Thus, even were the GAO to supply this data, we cannot determine the accuracy of the ingredient cost actually incurred by the pharmacy. Therefore, CMS has no confidence that the estimates used in this analysis adequately measure pharmacy acquisition costs.

The CMS has concerns that GAO failed to account for the differences in the definitions of AMP. The AMP data from first quarter 2006 used in this study is not a true reflection of the AMP data which will be submitted starting in January 2007. The DRA revises the definition of AMP, effective January 1, 2007, to exclude customary prompt pay discounts to wholesalers and requires drug manufacturers to include sales of authorized generics when they report their AMP. Since prompt pay discounts decrease AMPs, their exclusion would have the effect of increasing AMPs, and subsequently increasing the FULs. The absence of this factor in the analysis further calls into question the validity of GAO's findings.

The GAO also did not report on the effect that excluding outlier data would have on AMP-based FULs. The regulations, modified by the DRA, provide that FULs be set on drugs that are nationally available. We expect to address the elimination of outlier AMP data from use in calculating the FUL, as may be appropriate, before applying these new AMP-based FULs. Excluding outlier AMPs may significantly raise the FULs of many FUL groups and would further invalidate the GAO's findings.

The CMS has concerns that GAO's findings do not take into account the impact of existing state cost-containment mechanisms such as Maximum Allowable Cost (MAC) programs. While this report notes that States have MAC programs that further reduce the reimbursement used by States for multiple source drugs below the FULs, it fails to evaluate this effect on the GAO's overall comparison between acquisition costs and FULs. While we continue to disagree with the GAO's use of the average retail pharmacy acquisition cost, the report should at least compare the pharmacy acquisition cost to current State MACs instead of just the FUL.

The GAO study assumed that prescribing and filling practices will remain the same following the DRA change. In light of the DRA , we believe that assuming the same utilization of drugs within each of the 77 drug groups is incorrect. The GAO study provided no analysis of how States and pharmacies can mitigate the effect of the lower FULs by filling prescriptions with low cost generic equivalent drugs. We expect, with the implementation of the DRA provisions, that utilization will be driven to lower-priced generic versions of drugs, which will decrease costs in the overall. In addition, the GAO report fails to acknowledge that the FUL is not applied to brand name drugs when a physician certifies that these are medically necessary.

Prior Office of Inspector General reports have outlined the need for reform in Medicaid pharmacy reimbursement. The FUL amounts prior to DRA often exceeded pharmacy acquisition costs, and thus, increased cost to the States and the Federal Government. Using 250 percent of the lowest reported AMP rather than the current methodology of

Enclosure III                                                    Enclosure III

Page 4 – John Dicken

150 percent of the lowest price published in national compendia will reduce Medicaid
expenditures for multiple source drugs and thus, result in billions of dollars of savings to
States and the Federal Government.

Attachment

Enclosure IV                                                    Enclosure IV

## GAO Contact and Staff Acknowledgments

<u>GAO Contact</u>

John E. Dicken, (202) 512-7119 or dickenj@gao.gov

<u>Acknowledgments</u>

In addition to the contact named above, Martha Kelly, Assistant Director; Rashmi Agarwal; Shamonda Braithwaite; Krister Friday; Yung Park; and Daniel Ries made key contributions to this report.

(290556)

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| GAO's Mission | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |

Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone:  Voice:    (202) 512-6000
                     TDD:      (202) 512-2537
                     Fax:      (202) 512-6061

| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
|---|---|
| Congressional Relations | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| Public Affairs | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♺ RECYCLED PAPER

# EXHIBIT F

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# DEFICIT REDUCTION ACT OF 2005: IMPACT ON THE MEDICAID FEDERAL UPPER LIMIT PROGRAM



Daniel R. Levinson
Inspector General

June 2007
OEI-03-06-00400

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

 E X E C U T I V E   S U M M A R Y

## OBJECTIVES

1. To compare Federal upper limit amounts under the previous calculation method to estimated pharmacy acquisition costs for selected high-expenditure drugs.

2. To estimate how previous Medicaid Federal upper limit amounts may change under the new calculation method requiring payment limits for a drug to be set at 250 percent of the lowest average manufacturer price (AMP).

3. To compare Federal upper limit amounts under the new calculation method to estimated pharmacy acquisition costs for selected high-expenditure drugs.

4. To compare the lowest AMP to other AMPs for Federal upper limit drugs.

5. To determine whether the relationship between the lowest AMP and other AMPs for selected high-expenditure drugs could help identify instances in which pharmacy acquisition costs may exceed the new Federal upper limit amounts.

## BACKGROUND

Previous Office of Inspector General (OIG) work consistently found that the published prices that were used to set Medicaid Federal upper limit amounts often greatly exceeded prices available in the marketplace. Based in part on this work, the Deficit Reduction Act of 2005 (DRA) required that, beginning January 1, 2007, Medicaid Federal upper limits be based on 250 percent of the lowest AMP rather than on 150 percent of the lowest price published in the national compendia. The Congressional Budget Office estimates that this will reduce Medicaid expenditures for Federal upper limit drugs by $3.6 billion over 5 years.

In response to these changes, industry groups have expressed concerns that pharmacies will not be able to acquire drugs for prices at or below the new Federal upper limit amounts. In an effort to ensure that Medicaid providers are reimbursed appropriately and, in turn, that Medicaid beneficiaries continue to have access to needed drugs, this study provides a preliminary assessment of the expected impact of the DRA reductions.

We identified all drugs on the Federal upper limit list in the second quarter of 2006. To estimate Federal upper limit amounts for these 521 drugs under the new methodology set forth in the DRA, we obtained AMP data from the second quarter of 2006. We then multiplied the lowest AMP for each drug by 250 percent and compared the result to the actual Federal upper limit amounts from the second quarter of 2006, which were based on 150 percent of the lowest published prices.

To estimate pharmacy acquisition costs, we collected second-quarter 2006 sales and pricing data from five distributors for the 25 selected drugs with the highest total Medicaid expenditures in 2005 included on the Federal upper limit list. We then compared our estimate of pharmacy acquisition costs to the previous and new Federal upper limit amounts for each of the 25 selected high-expenditure drugs.

To determine whether the lowest AMPs used to set the new Federal upper limit amounts were representative of other AMPs for the same drugs, we determined whether the lowest AMP was more than 60 percent below the second-lowest AMP and/or volume-weighted AMP (weighted by the number of units reimbursed by Medicaid in 2005). In a recently issued proposed regulation, the Centers for Medicare & Medicaid Services (CMS) announced plans to use a similar threshold (70 percent) involving the second-lowest AMP to identify potential issues. We chose to use 60 percent in our analysis because whenever the lowest AMP exceeds this threshold relative to the second-lowest AMP, then the second-lowest AMP (and all other AMPs) for a drug would be higher than the new Federal upper limit amount.

For any of the 25 selected high-expenditure drugs for which the second-lowest AMP and/or volume-weighted AMP exceeded our 60-percent threshold, we determined whether the estimated average pharmacy acquisition cost exceeded the new Federal upper limit amount. We repeated this analysis for drugs that did not exceed the 60-percent threshold. This analysis enabled us to determine whether, for these 25 drugs, exceeding the 60-percent threshold was linked to a drug's average acquisition cost being higher than new Federal upper limit amount.

## FINDINGS

**For 23 of the 25 drugs under review, Federal upper limit amounts set under the previous calculation method were more than double the average pharmacy acquisition costs.**  Pre-DRA Federal upper limit amounts substantially exceeded our estimate of average pharmacy acquisition costs for the 25 selected high-expenditure drugs in the second quarter of 2006.  For 23 of these 25 drugs, Federal upper limit amounts based on 150 percent of the lowest published price were more than double the average pharmacy acquisition costs.  For 13 drugs, the second-quarter 2006 Federal upper limit amounts were at least 5 times higher.

**As intended by the Deficit Reduction Act of 2005, Federal upper limit amounts are likely to decrease under the new calculation method.**  We estimate that Federal upper limit amounts will decrease by a median of 61 percent under the new calculation method set forth in the DRA.  Based on AMP data from the second quarter of 2006, we determined that Federal upper limit amounts for 492 of the 521 drugs (94 percent) under review would be reduced under the new DRA requirements, with 334 (64 percent) decreasing by at least half.  Federal upper limit amounts for 90 of the 521 drugs would be at least 90 percent below the second-quarter 2006 amounts.

**Six of twenty-five selected high-expenditure drugs had estimated average pharmacy acquisition costs that would be below the new Federal upper limit amounts.**  Based on pricing and sales data provided by distributors, we determined that, on average, pharmacies would have been able to purchase only 6 of 25 selected high-expenditure drugs for less than the new Federal upper limit amounts during the second quarter of 2006.  For the remaining 19 drugs, the average pharmacy acquisition costs would have been higher than the new Federal upper limit amounts that quarter.  We estimate that 12 of these 19 drugs had average pharmacy acquisition costs that would have been more than double the new reimbursement limit.  For 13 of the 25 selected high-expenditure drugs, at least one individual drug product was available for a price at or below the new Federal upper limit amount.

**The average manufacturer price used to set a new Federal upper limit amount may be substantially lower than other average manufacturer prices associated with a drug.**  For 14 percent of the drugs on the Federal upper limit list, the lowest AMP was more than

60 percent below the second-lowest AMP.  In addition, for 29 percent of reviewed drugs, the lowest AMP was more than 60 percent less than the volume-weighted AMP.

**Among the 25 selected high-expenditure drugs, examining the volume-weighted AMPs helped identify instances in which pharmacy acquisition costs may exceed the new Federal upper limit amounts.**  In the second quarter of 2006, the lowest AMP was more than 60 percent below the volume-weighted AMP for 20 of the 25 selected high-expenditure drugs under review.  For all but one of these drugs, the estimated average pharmacy acquisition cost exceeded the new Federal upper limit amount.  Likewise, for the five drugs for which the lowest AMP did not exceed the 60-percent threshold compared to the volume-weighted AMP, the average pharmacy acquisition costs were below the new Federal upper limit amount.  In other words, in all but one case, determining whether or not the lowest AMP for any of the 25 selected high-expenditure drugs exceeded the 60-percent threshold compared to the volume-weighted AMP would have accurately determined whether or not its average acquisition cost was higher than the new Federal upper limit amount.

Examining the second-lowest AMP, rather than the volume-weighted AMP, was not as effective in identifying instances in which pharmacy acquisition costs exceeded the new Federal upper limit amount for the 25 selected high-expenditure drugs.

## RECOMMENDATIONS

The findings of this report again illustrate why changes to the previous calculation method were needed, as this method (based on published prices) led to inflated Medicaid payments for many high-dollar generic drugs.  However, we have concerns that, at least initially, the new formula mandated by the DRA (based on lowest AMPs) may result in some Federal upper limit amounts that are below pharmacy acquisition costs.  This could occur because for certain drugs the lowest AMPs may not reflect prices generally available in the marketplace.

As part of the proposed Federal upper limit regulation, CMS announced plans to identify potential reimbursement issues by removing the lowest AMP if it appears to be an outlier.  The proposed regulation defines an outlier as a lowest AMP that is more than 70 percent below the second-lowest AMP.  We support CMS's attempts to proactively resolve potential problems with the new formula.  However, our analysis

E X E C U T I V E    S U M M A R Y

(applying a more limited 60-percent threshold) indicates that using the second-lowest AMP may not alleviate all reimbursement issues.

In addition to CMS's efforts, drug manufacturers and pharmacies also have important roles in helping to ensure that the new Federal upper limit amounts are appropriate.  Manufacturers of generic drugs should make certain that the AMPs they are reporting to CMS are accurate.  In turn, pharmacies should inform CMS if the new Federal upper limit amounts are lower than the prices at which they can purchase certain drugs.

We recognize that for various reasons (e.g., definitional changes in AMP, market forces, etc.), the relative relationship between the Federal upper limit amounts and other price points presented in this report may change once the new method of calculation is implemented.  However, new Federal upper limit amounts should be monitored closely to help ensure that reimbursement changes do not lead to access problems for Medicaid beneficiaries.  Specifically, we recommend that:

**CMS should take steps to identify when a new Federal upper limit amount may not be representative of a drug's acquisition cost to pharmacies. These steps could include:**

- issuing a final regulation that would remove the lowest AMP from the Federal upper limit calculation when it is significantly lower than the volume-weighted AMP (rather than the second-lowest AMP) for a drug,

- contacting manufacturers to verify reported data in situations for which the lowest AMP appears to be significantly lower than other AMPs for a drug,

- examining Medicaid utilization data to ensure that the product on which the Federal upper limit is based is actually utilized in the marketplace, and

- providing an opportunity for pharmacies to alert the States and CMS when they can demonstrate an inability to purchase a drug at prices at or below the new Federal upper limit amount.

**In situations where 250 percent of the lowest AMP may not be sufficient to cover pharmacy acquisition costs, CMS should determine the proper course of action (working with Congress, if necessary).**

## AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

CMS concurred with our recommendation that the new Federal upper limit amount should be monitored closely during initial implementation and agreed that manufacturers play an important role in this regard. However, CMS strongly disagreed with our findings concerning the effect of the DRA-related changes to the Federal upper limit calculation. CMS suggested that OIG should have waited until the final AMP regulation is promulgated before completing its study, stating "it is only after a final definition of AMP has been issued that an accurate analysis of the impact of DRA can be conducted." Once that occurs, CMS believes that an analysis based on actual AMPs would yield substantially different results. CMS stated that the analysis in OIG's report is deficient in numerous ways and such deficiencies lead to flawed results and misleading conclusions. Therefore, CMS requested that we (1) revise our analysis to address these flaws and (2) delay issuing this report while considering earlier discussions and working collaboratively with the agency.

OIG will continue to work collaboratively with CMS in an effort to address any potential issues with the new calculation method for Federal upper limits. However, issuing this report prior to CMS's publication of its final regulation provides the agency with the opportunity to consider our findings and incorporate our recommendations. The data presented in this report are the best available for the timeframe, and any limitations have marginal impact and do not change the overall findings and conclusions. We note that a similar report by the Government Accountability Office identified the same issues and reached similar conclusions.

▶ T A B L E   O F   C O N T E N T S

E X E C U T I V E   S U M M A R Y ......................................... i

I N T R O D U C T I O N ............................................. 1

F I N D I N G S .................................................. 9

    For 23 of 25 drugs, previous limit was double acquisition cost .... 9

    Federal upper limits are likely to decrease substantially ....... 10

    Acquisition costs are below new limit for 6 of 25 drugs......... 11

    Lowest AMP may be substantially lower than other AMPs ..... 12

    Examining volume-weighted AMPs may help identify issues.... 13

R E C O M M E N D A T I O N S ..................................... 15

    Agency Comments and Office of Inspector General Response ... 16

A P P E N D I X E S ............................................. 21

    A.  Detailed Methodology .............................. 21

    B.  Agency Comments................................. 25

A C K N O W L E D G M E N T S .................................... 33

▶ I N T R O D U C T I O N

## OBJECTIVES

1. To compare Federal upper limit amounts under the previous calculation method to estimated pharmacy acquisition costs for selected high-expenditure drugs.

2. To estimate how previous Medicaid Federal upper limit amounts may change under the new calculation method requiring payment limits for a drug to be set at 250 percent of the lowest average manufacturer price (AMP).

3. To compare Federal upper limit amounts under the new calculation method to estimated pharmacy acquisition costs for selected high-expenditure drugs.

4. To compare the lowest AMP to other AMPs for Federal upper limit drugs.

5. To determine whether the relationship between the lowest AMP and other AMPs for selected high-expenditure drugs could help identify instances in which pharmacy acquisition costs may exceed the new Federal upper limit amounts.

## BACKGROUND

Previous Office of Inspector General (OIG) work consistently found that the published prices that were used to set Medicaid Federal upper limit amounts often greatly exceeded prices available in the marketplace. Based in part on this work, the Deficit Reduction Act of 2005 (DRA), Public Law 109-171, made substantial changes to the way Federal upper limit amounts are to be calculated. Beginning January 1, 2007, Federal upper limits are to be based on 250 percent of the lowest reported AMP for each drug rather than 150 percent of the lowest price published in the national compendia. The Congressional Budget Office estimates that this new methodology will reduce Medicaid expenditures for Federal upper limit drugs by $3.6 billion over 5 years.

In response to these changes, industry groups have expressed concerns that pharmacies will not be able to acquire drugs for prices at or below the new Federal upper limit amounts.[1] In an effort to ensure that

---

[1] An example includes "Implications of Federal Medicaid Generic Drug Payment Reduction for State Policymakers." National Association of Chain Drug Stores, February 2006.

Medicaid providers are reimbursed appropriately and, in turn, that Medicaid beneficiaries continue to have access to needed drugs, this study provides a preliminary assessment of the expected impact of the DRA reductions.

**Medicaid Reimbursement for Prescription Drugs**
Currently, all 50 States and the District of Columbia offer prescription drug coverage under Medicaid. Medicaid beneficiaries typically obtain covered drugs from pharmacies. Pharmacies bill State Medicaid agencies using national drug codes (NDC), which are 11-digit identifiers that indicate a drug's manufacturer, product dosage form, and package size. Pharmacies are then reimbursed for these drugs by State Medicaid agencies. In calendar year (CY) 2005, Medicaid payments for prescription drugs totaled over $41 billion.[2]

Federal regulations require, with certain exceptions, that each State Medicaid agency's reimbursement for covered outpatient drugs not exceed (in the aggregate) the lower of their estimated acquisition cost plus a reasonable dispensing fee or the provider's usual and customary charge to the public for the drugs.[3] The Centers for Medicare & Medicaid Services (CMS) allows States the flexibility to define estimated acquisition cost, with most States basing their calculation on list prices published in the national compendia. For certain drugs, States also use the Federal upper limit and/or State maximum allowable cost programs in setting reimbursement amounts.[4]

**Medicaid Federal Upper Limit Requirements Prior to January 1, 2007**
According to CMS's Web site, the Federal upper limit program was created to ensure that the Federal Government acts as a prudent buyer by taking advantage of current market prices for multiple-source drugs.[5]

---

[2] Calculated using national summary data for 2005. This amount includes both Federal and State payments. Rebates collected by States under the Medicaid drug rebate program (section 1927 of the Social Security Act) were not subtracted from this figure. Available online at http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp. Accessed on October 30, 2006.

[3] 42 CFR § 447.331(b). On December 22, 2006, CMS issued a proposed regulation that would remove 42 CFR § 447.331 but include the unchanged substance of this section in a new section, 42 CFR § 447.512.

[4] Many States have implemented maximum allowable cost programs to limit reimbursement amounts for certain drugs. Individual States determine the types of drugs that are included in their maximum allowable cost programs and the methods by which the maximum allowable cost for a drug is calculated.

[5] Available online at http://www.cms.hhs.gov/FederalUpperLimits. Accessed on September 8, 2006.

For purposes of the time covered by our review, pursuant to section 1927(e)(4) of the Social Security Act and 42 CFR § 447.332, CMS is generally to establish a Federal upper limit amount for a drug when three or more formulations of a drug have been rated as therapeutically equivalent by the Food and Drug Administration and at least three suppliers of the drug are listed in current editions (or updates) of the published compendia of cost information for drugs available for sale nationally (e.g., Micromedex "RedBook").

Prior to January 1, 2007, Federal regulations (42 CFR § 447.332) set the Federal upper limit amount at 150 percent of the lowest price published in the national compendia for therapeutically equivalent products that can be purchased by pharmacists in quantities of 100 tablets or capsules, plus a reasonable dispensing fee.[6]  If the drug is not typically available in quantities of 100 or if the drug is a liquid, then the Federal upper limit amount is based on the price for a commonly listed size of the product.

CMS publishes the Federal upper limit list in the "State Medicaid Manual" and on its Web site.  Revisions to the list are typically noted on the Web site.  CMS establishes a Federal upper limit for specific forms and strengths for each multiple-source drug on the list.  As of June 30, 2006, CMS had set Federal upper limit amounts for 530 drugs.  According to CMS data, generic drugs included on the Federal upper limit list account for approximately 8 percent of total Medicaid expenditures for all prescription drugs.

**New Federal Upper Limit Requirements in Effect January 1, 2007**

Section 6001(a) of the DRA makes significant changes to the Federal upper limit program.  As of January 1, 2007, a drug needs only two therapeutically equivalent versions to be included on the Federal upper limit list.[7]  Beginning that same date, Federal upper limit amounts are to be based on 250 percent of the lowest reported AMP for each drug rather than 150 percent of the lowest price published in the national compendia.[8]

---

[6] States are required to meet Federal upper limit requirements only in the aggregate, i.e., a State can pay more than the Federal upper limit amount for certain products as long as these payments are balanced out by lower payments for other products.

[7] Section 6001(a)(1)(B) of the DRA.

[8] Section 6001(a)(2) of the DRA.

For the period of time covered by this review, section 1927(k)(1) of the Social Security Act defines the AMP as the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade after deducting customary prompt pay discounts. Pursuant to sections 6001(c)(1) and 6001(c)(2) of the DRA, as of January 1, 2007, the AMP is required to be determined without regard to customary prompt pay discounts extended to wholesalers, and such discounts shall be reported separately to CMS.

On December 22, 2006, CMS issued a proposed regulation to implement certain provisions of the DRA.[9] For example, 42 CFR § 447.504 of the proposed regulation outlines the manner in which the AMP is to be determined, and 42 CFR § 447.514 addresses the new criteria for the establishment of Federal upper limit amounts. The latter section (447.514(b)) implements the use of 250 percent of the AMP for the least costly therapeutically equivalent drug as the basis for Federal upper limit amounts. Section 447.514(c) of the proposed regulation establishes an alternative methodology to be used in setting Federal upper limit amounts if the lowest AMP is significantly below the next highest AMP for a drug. As further explained in the background to the proposed regulation, CMS will use the AMP of the lowest-priced therapeutically equivalent drug "except in cases where this AMP is more than 70 percent below the second lowest AMP."[10] CMS is currently soliciting public comment on the proposed regulation. Section 6001(c) of the DRA requires CMS to publish a final regulation by July 1, 2007.

In addition, prior to the enactment of the DRA, section 1927(b)(3)(D) of the Social Security Act prohibited the disclosure of AMP data except in certain narrow circumstances. At that time, AMP data were used primarily by CMS for purposes of the Medicaid drug rebate program. However, pursuant to sections 6001(a) and 6001(b) of the DRA, AMP data will also be used to calculate Federal upper limit amounts and will be made available to State Medicaid agencies and the public. These changes allow States to use AMP data in their determination of estimated acquisition costs for drugs covered under Medicaid.[11]

---

[9] Proposed Rule, "Medicaid Program; Prescription Drugs," 71 Federal Register 77174.

[10] Ibid at 77188.

[11] OIG examines AMP-based reimbursement issues in "States' Use of New Drug Pricing Data To Establish Medicaid Reimbursement for Prescription Drugs" (OEI-03-06-00490) and "Examining Fluctuations in Average Manufacturer Prices" (OEI-03-06-00350).

**Previous OIG Work Regarding the Federal Upper Limit Program**
In the past 3 years, OIG has issued four reports detailing potential problems with the Federal upper limit program.[12]  These reports focused on two main concerns:  (1) qualified drugs were not being included on the Federal upper limit list in a timely manner and (2) Federal upper limit amounts often greatly exceeded pharmacy acquisition costs.  For example, we found that Federal upper limit amounts were five times higher than average AMPs (a figure that we used as an estimate of pharmacy acquisition costs) in the third quarter of 2004.  At that time, we recommended that CMS work with Congress to set Federal upper limit amounts that more closely approximate pharmacy acquisition costs.

The findings and recommendations from all four reports were presented at several congressional hearings, with the most recent testimony delivered before the Senate Finance Committee in June 2005.[13]

## METHODOLOGY
Please see Appendix A for a detailed methodology.

**Data Sources**
Using Federal upper limit data from CMS's Web site and the national drug compendium "Redbook," we identified the 530 drugs included on the Federal upper limit list in the second quarter of 2006. [14]  We obtained Medicaid drug reimbursement and utilization data from CMS's Web site and then identified the 25 drugs on the Federal upper limit list with the highest total Medicaid expenditures in CY 2005.

For the 25 selected drugs with the highest total Medicaid expenditures in 2005, we collected second-quarter 2006 pricing and sales data from the three largest national distributors and two smaller regional

---

[12] "Omission of Drugs From the Federal Upper Limit List in 2001" (OEI-03-02-00670, February 2004); "Addition of Qualified Drugs to the Federal Upper Limit List" (OEI-03-04-00320, December 2004); "Comparison of Medicaid Federal Upper Limit Amounts to Average Manufacturer Prices" (OEI-03-05-00110, June 2005); and "How Inflated Published Prices Affect Drugs Considered for the Federal Upper Limit List" (OEI-03-05-00350, September 2005).

[13] Available online at http://www.oig.hhs.gov/testimony/docs/2005/50629-vito-fin.pdf. Accessed on September 8, 2006.

[14] In this report, "drug" refers to the specific drug name/dosage size/product form combination that is used as the basis for setting Federal upper limit amounts (e.g., Gabapentin 400 mg tablets).

distributors.  According to industry sales reports, these three national companies account for the vast majority of market share among drug distributors.  We obtained second-quarter 2006 AMP data from CMS.

**Data Analysis**

Estimating Pharmacy Acquisition Costs for Selected Drugs.  To estimate average pharmacy acquisition costs for each of the 25 selected high-expenditure drugs, we totaled the dollar amount sold (net of any discounts or rebates, when provided) by the five distributors and divided this amount by the total number of units sold.  For the purpose of this report, these estimates will hereinafter be referred to as "average pharmacy acquisition costs."  We also determined the lowest price reported to OIG by the distributors for any NDC associated with the 25 drugs.

Estimating Federal Upper Limit Amounts Under New Calculation Method.  We determined the lowest AMP reported by manufacturers for each of the 530 drugs on the Federal upper limit list in the second quarter of 2006.  Of the 530 drugs on the list that quarter, 9 did not have AMP data for any nonterminated, therapeutically equivalent NDCs of a commonly listed size.  Therefore, we did not include these nine drugs in our analysis.  For the remaining 521 drugs, we multiplied the lowest AMP by 250 percent to estimate the new Federal upper limit amounts under the methodology mandated by the DRA.  For the purpose of this report, these estimates will hereinafter be referred to as "new Federal upper limit amounts."  We calculated the difference between the new Federal upper limit amounts and the second-quarter 2006 Federal upper limit amounts for each of the 521 drugs.

Comparing Pharmacy Acquisition Costs to Federal Upper Limit Amounts.  We calculated the percentage difference between the second-quarter 2006 Federal upper limit amounts and the average pharmacy acquisition costs for each of the 25 selected high expenditure drugs.  We then calculated the difference between the new Federal upper limit amounts and the average pharmacy acquisition costs.  We also compared the lowest price reported to OIG by the distributors for each drug with the new Federal upper limit amounts.

Comparing the Lowest AMP to Other AMPs.  To determine whether the lowest AMPs used to set the new Federal upper limit amounts were representative of other AMPs, we determined the second-lowest and

volume-weighted AMPs for each of the 521 drugs under review.[15]  We then compared the lowest AMP to both the second-lowest and volume-weighted AMPs for each of the 521 drugs and identified instances when the lowest AMP was more than 60 percent below either of these two figures.[16]  We subset out the results for the 25 selected high-expenditure drugs for further analysis.

Determining Whether Other AMPs Could Help Identify Potential Issues. Among the 25 selected high-expenditure drugs, we identified any instances in which the lowest AMP was more than 60 percent below the second-lowest and/or volume-weighted AMP.  For any of the 25 drugs that met this threshold, we determined whether the average pharmacy acquisition cost exceeded the new Federal upper limit amount.  We repeated this analysis for any of the 25 drugs that did not meet the 60-percent threshold.  This enabled us to determine whether, for these 25 drugs, exceeding the 60-percent threshold (compared to either the second-lowest or volume-weighted AMP) was linked to a drug's average acquisition cost being higher than the new Federal upper limit amount.

**Limitations**
This study uses AMP data from the second quarter of 2006 to estimate Federal upper limit amounts under the new methodology mandated by the DRA.  For some drugs, the lowest AMP may have increased or decreased by the time the changes took effect in January 2007.

Furthermore, although sections 6001(a) and 6001(c)(1) of the DRA provide that new Federal upper limit amounts will be based on AMPs as computed without regard to customary prompt pay discounts, AMPs used in this study did reflect the customary prompt pay discounts offered by manufacturers, because this is how AMPs were reported at the time of our analysis.  After January 1, 2007, AMPs that are used to

---

[15] We calculated the volume-weighted AMP among all NDCs for the drug by weighting the AMP for each individual NDC by the number of units of the NDC reimbursed by Medicaid in the second quarter of 2006.

[16] In its proposed regulation, CMS uses a 70-percent rather than a 60-percent threshold in comparing the lowest AMP to the second-lowest AMP.  We chose to use 60 percent in our analysis because whenever the lowest AMP exceeds this threshold relative to the second-lowest AMP, then the second-lowest AMP (and all other AMPs) for a drug would be higher than the new Federal upper limit amount.  For example, a drug with a lowest AMP of $0.40 would have a new Federal upper limit amount of $1.00 ($0.40 times 250 percent).  If the second-lowest AMP is higher than this new Federal upper limit amount (e.g., $1.01), then the lowest AMP would be at least 60 percent below the second-lowest AMP ($0.40 is 60.4 percent below $1.01).

calculate Federal upper limit amounts may be higher than earlier AMPs because customary prompt pay discounts should no longer be included.

As mentioned previously, we asked distributors for the amount of discounts and rebates provided to purchasers. Two of the five distributors provided these data, which were then used in our acquisition cost calculations. However, the three remaining distributors did not provide discount and rebate data. Therefore, pharmacies' bottom-line costs for some drugs may be lower than our estimates in instances for which discounts and rebates were not captured in our data collection. Two of the distributors that did not provide this information stated that discounts and rebates are not captured on a quarterly basis and are negotiated on a customer-by-customer basis, making it extremely difficult to supply these data. One distributor did not provide an explanation for the lack of discount and rebate data. In addition, we did not determine whether the prices reported by the distributors were nationally available to all pharmacies.

Because many States use maximum allowable cost programs to further reduce drug expenditures, States may actually be reimbursing less than the Federal upper limit amount for certain drugs. Therefore, the differences between the pre-DRA Federal upper limit amount and the new Federal upper limit amount may overstate the actual changes to pharmacy reimbursement in these cases.

This study examines only drugs that were on the Federal upper limit list as of the second quarter of 2006. Our review did not include any drugs that may be added to the list based on the expanded criteria set forth in the DRA (i.e., the establishment of Federal upper limits based on two rather than three therapeutically equivalent products).

Finally, this study addresses Federal upper limit amounts and not dispensing fees paid to pharmacies for providing drugs to Medicaid beneficiaries. Both components of reimbursement are important to ensure that Medicaid reimburses pharmacies appropriately for prescription drugs.

**Standards**
This study was conducted in accordance with the "Quality Standards for Inspections" issued by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency.

 **F I N D I N G S**

**For 23 of the 25 drugs under review, Federal upper limit amounts set under the previous calculation method were more than double the average pharmacy acquisition costs**

As in previous studies that found Federal upper limit amounts to be excessive, we estimate that Federal upper limit amounts under the pre-DRA methodology exceeded average pharmacy acquisition costs for each of the 25 selected high-expenditure drugs in the second quarter of 2006.  For 23 of these 25 drugs, second-quarter 2006 Federal upper limit amounts (based on 150 percent of the lowest published price) were more than two times higher than the average pharmacy acquisition costs.  In 13 cases, second-quarter 2006 Federal upper limit amounts were at least five times higher.  Table 1 illustrates the percentage difference between the actual Federal upper limit amounts and the pharmacy acquisition costs for the 25 selected drugs in the second quarter of 2006.

| Table 1:  Comparison of Estimated Pharmacy Acquisition Costs to Previous Federal Upper Limit Amounts | | | |
|---|---|---|---|
| **Drug** | **Average Pharmacy Acquisition Cost** | **Second-Quarter 2006 Federal Upper Limit Amount** | **Difference** |
| Lorazepam, 1MG, Tablet | $0.040 | $0.572 | -93.0% |
| Ranitidine Hydrochloride, 150MG, Tablet | $0.030 | $0.341 | -91.2% |
| Gabapentin, 300MG, Capsule | $0.157 | $1.308 | -88.0% |
| Gabapentin, 400MG, Capsule | $0.203 | $1.570 | -87.1% |
| Glyburide/Meformin Hydrochloride, 5MG-500MG, Tablet | $0.142 | $1.003 | -85.8% |
| Metformin Hydrochloride, 500MG, Tablet | $0.055 | $0.356 | -84.5% |
| Omeprazole, 20MG, Enteric Coated Tablet | $0.638 | $3.979 | -84.0% |
| Tramadol Hydrochloride, 50MG, Tablet | $0.049 | $0.307 | -84.0% |
| Paroxetine Hydrochloride, 20MG, Tablet | $0.445 | $2.520 | -82.3% |
| Gabapentin, 600MG, Tablet | $0.447 | $2.470 | -81.9% |
| Paroxetine Hydrochloride, 40MG, Tablet | $0.517 | $2.700 | -80.9% |
| Gabapentin, 800MG, Tablet | $0.573 | $2.959 | -80.6% |
| Metformin Hydrochloride, 1000MG, Tablet | $0.091 | $0.460 | -80.2% |
| Glimepiride, 4MG, Tablet | $0.084 | $0.410 | -79.5% |
| Glyburide, 5MG, Tablet | $0.069 | $0.283 | -75.6% |
| Potassium Chloride, 20MEQ, Tablet Extended Release | $0.121 | $0.463 | -73.8% |
| Acetaminophen/Propoxyphene Napsylate, 650MG-100MG, Tablet | $0.049 | $0.180 | -72.8% |
| Ribavirin, 200MG, Capsule | $2.304 | $7.576 | -69.6% |
| Albuterol Sulfate, 0.83%, Solution | $0.041 | $0.115 | -64.3% |
| Acetaminophen/Hydrocodone Bitartrate, 500MG-5MG, Tablet | $0.032 | $0.083 | -61.6% |
| Oxycodone Hydrochloride, 80MG, Tablet Extended Release | $2.633 | $6.118 | -57.0% |
| Oxycodone Hydrochloride, 40MG, Tablet Extended Release | $1.445 | $3.260 | -55.7% |
| Oxycodone Hydrochloride, 20MG, Tablet Extended Release | $0.875 | $1.837 | -52.4% |
| Zonisamide, 100MG, Capsule | $0.657 | $1.174 | -44.0% |
| Albuterol, 0.09MG/Actuation, Aerosol Solid (Inhaler) | $0.335 | $0.437 | -23.3% |

Source: OIG analysis of second-quarter 2006 Federal upper limit amounts and drug distributor data, 2006.

FINDINGS

**As intended by the Deficit Reduction Act of 2005, Federal upper limit amounts are likely to decrease under the new calculation method**

In an effort to lower inflated Federal upper limit amounts and bring Medicaid reimbursement for generic drugs more in line with actual costs, the DRA established a new method for determining Federal upper limit amounts. Using data from the second quarter of 2006 to assess the impact of the DRA changes, we estimate that Federal upper limit amounts will decrease by a median of 61 percent under the new calculation method. Overall, based on second-quarter 2006 data, we determined that Federal upper limit amounts for 492 of the 521 (94 percent) drugs under review would be reduced under the new DRA requirements, with 334 (64 percent) expected to decrease by at least half. Federal upper limit amounts for 90 of the 521 drugs would be at least 90 percent below the second-quarter 2006 amounts.

Although our analysis indicates Federal upper limit amounts for the vast majority of included drugs may be substantially reduced as a result of the new law, we estimate that Federal upper limits for 29 drugs (6 percent) would increase. Table 2 describes the estimated changes to the 521 Federal upper limit drugs that were included in this part of our review. As mentioned previously, it is important to note that because of State maximum allowable cost programs, these percentage differences may not reflect the actual changes to pharmacy reimbursement for all drugs on the Federal upper limit list.

| Table 2:  Estimated Changes to Federal Upper Limit Amounts Under the DRA | | |
|---|---|---|
| **Difference Between New and Second Quarter 2006 Federal Upper Limit Amount** | **Number of Drugs** | **Percentage of Drugs** |
| -99.9% to -90% | 90 | 17.3 |
| -89.9% to -80% | 59 | 11.3 |
| -79.9% to -50% | 185 | 35.5 |
| -49.9% to -20% | 129 | 24.8 |
| -19.9% to 0% | 29 | 5.6 |
| 0.1% to 19.9% | 16 | 3.1 |
| 20% to 49.9% | 4 | 0.8 |
| 50% to 79.9% | 4 | 0.8 |
| 80% and above | 5 | 1.0 |
| **Total** | **521** | **100 \*** |

Source:  OIG analysis of second-quarter 2006 AMP data, 2006.
\*Note:  Percentages do not add to 100 because of rounding.

F I N D I N G S

**Six of twenty-five selected high-expenditure drugs had estimated average pharmacy acquisition costs that would be below the new Federal upper limit amounts**

Based on pricing and sales data provided by distributors, we determined that, on average, pharmacies would have been able to purchase 6 of the 25 selected high-expenditure drugs for less than the new Federal upper limit amount in the second quarter of 2006.  For the remaining 19 drugs, average pharmacy acquisition costs would have been higher than the new Federal upper limit amounts.  Twelve of these nineteen drugs had average pharmacy acquisition costs that would have been more than double the new limits.  For one drug, the average acquisition cost would have been 18 times higher than the new Federal upper limit amount.  Table 3 illustrates the percentage difference between the new Federal upper limit amounts and the pharmacy acquisition costs for the 25 selected drugs in the second quarter of 2006.

| Table 3:  Comparison of Estimated Pharmacy Acquisition Costs to New Federal Upper Limit Amounts | | | |
|---|---|---|---|
| Drug | Average Pharmacy Acquisition Cost | New Federal Upper Limit Amount | Difference |
| Albuterol, 0.09MG/Actuation, Aerosol Solid (Inhaler) | $0.335 | $0.767 | -56% |
| Ranitidine Hydrochloride, 150MG, Tablet | $0.030 | $0.042 | -29% |
| Acetaminophen/Hydrocodone Bitartrate, 500MG-5MG, Tablet | $0.032 | $0.039 | -18% |
| Gabapentin, 800MG, Tablet | $0.573 | $0.669 | -14% |
| Gabapentin, 600MG, Tablet | $0.447 | $0.476 | -6% |
| Oxycodone Hydrochloride, 80MG, Tablet Extended Release | $2.633 | $2.719 | -3% |
| Glimepiride, 4MG, Tablet | $0.084 | $0.077 | 9% |
| Lorazepam, 1MG, Tablet | $0.040 | $0.033 | 21% |
| Glyburide/Meformin Hydrochloride, 5MG-500MG, Tablet | $0.142 | $0.105 | 35% |
| Potassium Chloride, 20MEQ, Tablet Extended Release | $0.121 | $0.086 | 41% |
| Gabapentin, 300MG, Capsule | $0.157 | $0.108 | 45% |
| Zonisamide, 100MG, Capsule | $0.657 | $0.405 | 62% |
| Tramadol Hydrochloride, 50MG, Tablet | $0.049 | $0.027 | 82% |
| Acetaminophen/Propoxyphene Napsylate, 650MG-100MG, Tablet | $0.049 | $0.024 | 104% |
| Metformin Hydrochloride, 500MG, Tablet | $0.055 | $0.026 | 112% |
| Omeprazole, 20MG, Enteric Coated Tablet | $0.638 | $0.299 | 113% |
| Glyburide, 5MG, Tablet | $0.069 | $0.031 | 123% |
| Paroxetine Hydrochloride, 40MG, Tablet | $0.517 | $0.158 | 227% |
| Albuterol Sulfate, 0.83%, Solution | $0.041 | $0.011 | 273% |
| Ribavirin, 200MG, Capsule | $2.304 | $0.400 | 476% |
| Gabapentin, 400MG, Capsule | $0.203 | $0.030 | 577% |
| Oxycodone Hydrochloride, 40MG, Tablet Extended Release | $1.445 | $0.191 | 657% |
| Oxycodone Hydrochloride, 20MG, Tablet Extended Release | $0.875 | $0.080 | 994% |
| Paroxetine Hydrochloride, 20MG, Tablet | $0.445 | $0.025 | 1,680% |
| Metformin Hydrochloride, 1000MG, Tablet | $0.091 | $0.005 | 1,720% |

Source: OIG analysis of second-quarter 2006 AMP data and drug distributor data, 2006.

F I N D I N G S

**For 13 of the 25 selected high-expenditure drugs, at least one individual drug product was available for a price at or below the new Federal upper limit amount**.  In the second quarter of 2006, 13 of the 25 selected high-expenditure drugs had at least one associated NDC with an average price from a distributor that would have been at or below the new Federal upper limit amount.  Of the remaining 12, there were 6 drugs for which even the lowest price would be at least double the new Federal upper limit amount.  We did not determine whether the lowest-priced NDCs were nationally available to all pharmacies.

**The average manufacturer price used to set a new Federal upper limit amount may be substantially lower than other average manufacturer prices associated with a drug**    In the second quarter of 2006, the lowest AMP was more than 60 percent below the second-lowest AMP (among therapeutically equivalent products in a commonly-listed size) for 72 of the 521 listed drugs (14 percent).  In other words, the second-lowest AMPs (and all other AMPs associated with the drug) for these drugs would be higher than the new Federal upper limit amount.[17]  That same quarter, the lowest AMP for 149 of the 521 listed drugs (29 percent) was more than 60 percent below the volume-weighted AMP.[18]

Volume-weighted AMPs sometimes differed from the lowest AMPs by a large margin because NDCs associated with the lowest AMPs often accounted for a small portion of Medicaid utilization.  For 109 of the 521 drugs (21 percent) on the Federal upper limit list, the NDC with the lowest AMP was responsible for less than 2 percent of all units of the drug reimbursed by Medicaid in the second quarter of 2006.  For 23 of these drugs, NDCs whose AMPs would be used to set the Federal upper limit accounted for less than 0.01 percent of the utilization, with 14 having no utilization at all in the second quarter of 2006.

---

[17]  For example, a drug with a lowest AMP of $0.40 would have a new Federal upper limit amount of $1.00 ($0.40 times 250 percent).  If the second-lowest AMP is higher than this new Federal upper limit amount (e.g., $1.01), then the lowest AMP would be at least 60 percent below the second-lowest AMP ($0.40 is 60.4 percent below $1.01).  In its proposed regulation, CMS uses a 70-percent rather than 60-percent threshold in comparing the lowest AMP to the second-lowest AMP.

[18] We calculated the volume-weighted AMP among all NDCs for the drug by weighting the AMP for each individual NDC by the number of units of the NDC reimbursed by Medicaid in the second quarter of 2006.

FINDINGS

**Among the 25 selected high-expenditure drugs, examining the volume-weighted AMPs helped identify instances in which pharmacy acquisition costs may exceed the new Federal upper limit amounts**

In the second quarter of 2006, the lowest AMP was more than 60 percent below the volume-weighted AMP for 20 of the 25 selected high-expenditure drugs under review. In all but one of these cases, the average pharmacy acquisition costs exceeded the new Federal upper limit amount. Likewise, for the five drugs for which the lowest AMP did not exceed the 60-percent threshold compared to the volume-weighted AMP, the average pharmacy acquisition costs were below the new Federal upper limit amount. In other words, in all but one case, determining whether or not the lowest AMP for any of the 25 selected high-expenditure drugs exceeded the 60-percent threshold compared to the volume-weighted AMP would have accurately determined whether or not its average acquisition cost was higher than the new Federal upper limit amount.

**Examining the second-lowest AMP was not as effective in identifying instances in which pharmacy acquisition costs may exceed the new Federal upper limit amounts.** In the second quarter of 2006, the lowest AMP was more than 60 percent below the second-lowest AMP for 5 of the 25 selected high-expenditure drugs under review. In each of these cases, the average pharmacy acquisition cost was at least double the new Federal upper limit amount.

However, 14 of the 20 high-expenditure drugs for which the lowest AMP did not exceed the 60-percent threshold compared to the second-lowest AMP also had pharmacy acquisition costs that were higher than the new Federal upper limit amount. In fact, for 6 of these 14 drugs, the lowest AMP was no more than 10 percent below the second-lowest AMP. Therefore, potential reimbursement issues for these 14 drugs would not have been identified by using the second-lowest AMP as a point of comparison during the second quarter of 2006.

Table 4 on the following page illustrates the relationship between the new Federal upper limit amounts, average acquisition costs, second-lowest AMPs, and volume-weighted AMPs for the 25 selected high-expenditure drugs.

| Table 4:  Relationship Between New Federal Upper Limit Amounts, Estimated Acquisition Costs, and Other AMPs | | | |
|---|---|---|---|
| Drug | Average Acquisition Cost Exceeds New Federal Upper Limit | Lowest AMP More Than 60 Percent Below Second Lowest AMP | Lowest AMP More Than 60 Percent Below Volume-Weighted AMP |
| Albuterol, 0.09MG/Actuation, Aerosol Solid (Inhaler) | | | |
| Ranitidine Hydrochloride, 150MG, Tablet | | | |
| Acetaminophen/Hydrocodone Bitartrate, 500MG-5MG, Tablet | | | |
| Gabapentin, 800MG, Tablet | | | |
| Gabapentin, 600MG, Tablet | | | |
| Oxycodone Hydrochloride, 80MG, Tablet Extended Release | | | X |
| Glimepiride, 4MG, Tablet | X | | X |
| Lorazepam, 1MG, Tablet | X | | X |
| Glyburide/Metformin Hydrochloride, 5MG-500MG, Tablet | X | | X |
| Potassium Chloride, 20MEQ, Tablet Extended Release | X | | X |
| Gabapentin, 300MG, Capsule | X | | X |
| Zonisamide, 100MG, Capsule | X | | X |
| Tramadol Hydrochloride, 50MG, Tablet | X | | X |
| Acetaminophen/Propoxyphene Napsylate, 650MG-100MG, Tablet | X | | X |
| Metformin Hydrochloride, 500MG, Tablet | X | | X |
| Omeprazole, 20MG, Enteric Coated Tablet | X | | X |
| Glyburide, 5MG, Tablet | X | X | X |
| Paroxetine Hydrochloride, 40MG, Tablet | X | X | X |
| Albuterol Sulfate, 0.83%, Solution | X | | X |
| Ribavirin, 200MG, Capsule | X | | X |
| Gabapentin, 400MG, Capsule | X | | X |
| Oxycodone Hydrochloride, 40MG, Tablet Extended Release | X | X | X |
| Oxycodone Hydrochloride, 20MG, Tablet Extended Release | X | X | X |
| Paroxetine Hydrochloride, 20MG, Tablet | X | | X |
| Metformin Hydrochloride, 1000MG, Tablet | X | X | X |

Source: OIG analysis of second-quarter 2006 AMP data and drug distributor data, 2006.

◤  R E C O M M E N D A T I O N S

Based in part on OIG work that consistently found that the published prices used to set Federal upper limit amounts often greatly exceed prices available in the marketplace, the DRA has substantially changed the way Medicaid Federal upper limit amounts are calculated.  As of January 1, 2007, Federal upper limits are based on 250 percent of the lowest reported AMP rather than 150 percent of the lowest price published in the national compendia.

The findings of this report again illustrate why changes to the previous calculation method were needed, as this method led to inflated Medicaid payments for many high-dollar generic drugs.  Furthermore, using actual sales data (such as AMP) rather than published prices to calculate Federal upper limit amounts present several additional advantages, i.e., they are defined by statute, are based on real-world transactions, and can be audited.  However, we have concerns that, at least initially, the new formula may result in some Federal upper limit amounts that are below pharmacy acquisition costs.  This could occur because for certain drugs the lowest AMPs may not reflect prices generally available in the marketplace.

As part of the proposed Federal upper limit regulation, CMS announced plans to identify potential reimbursement issues by removing the lowest AMP if it appears to be an outlier.  The proposed regulation defines an outlier as a lowest AMP that is more than 70 percent below the second-lowest AMP.  We support CMS's attempts to proactively resolve potential problems with the new formula.  However, our analysis (applying a more limited 60-percent threshold) indicates that using the second-lowest AMP may not alleviate all reimbursement issues.

In addition to CMS's efforts, drug manufacturers and pharmacies also have important roles in helping to ensure that the new Federal upper limit amounts are appropriate.  Manufacturers of generic drugs should make certain that the AMPs they are reporting to CMS are accurate.  In turn, pharmacies should inform CMS if the new Federal upper limit amounts are lower than the prices at which they can purchase certain drugs.

We recognize that for various reasons (e.g., definitional changes in AMP, market forces, etc.) the relative relationship between the Federal upper limit amounts and other price points presented in this report may change once the new method of calculation is implemented.  However, new Federal upper limit amounts should be monitored closely to help

ensure that reimbursement changes do not lead to access problems for Medicaid beneficiaries. Specifically, we recommend that:

**CMS should take steps to identify when a new Federal upper limit amount may not be representative of a drug's acquisition cost to pharmacies. These steps could include:**

- issuing a final regulation that would remove the lowest AMP from the Federal upper limit calculation when it is significantly lower than the volume-weighted AMP (rather than the second-lowest AMP) for a drug,

- contacting manufacturers to verify reported data in situations for which the lowest AMP appears to be significantly lower than other AMPs for a drug,

- examining Medicaid utilization data to ensure that the product on which the Federal upper limit is based is actually utilized in the marketplace, and

- providing an opportunity for pharmacies to alert the States and CMS when they can demonstrate an inability to purchase a drug at prices at or below the new Federal upper limit amount.

**In situations where 250 percent of the lowest AMP may not be sufficient to cover pharmacy acquisition costs, CMS should determine the proper course of action (working with Congress, if necessary).**

## AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

CMS concurred with our recommendation that the new Federal upper limit amount should be monitored closely during initial implementation and agreed that manufacturers play an important role in this regard. However, CMS strongly disagreed with our findings concerning the effect of the DRA-related changes to the Federal upper limit calculation. CMS suggested that OIG should have waited until the final AMP regulation is promulgated before completing its study, stating "it is only after a final definition of AMP has been issued that an accurate analysis of the impact of DRA can be conducted." Once that occurs, CMS believes that that an analysis based on actual AMPs would yield substantially different results. CMS stated that the analysis in the OIG report is deficient in numerous ways and such deficiencies lead to flawed results and misleading conclusions. Therefore, CMS requested that we (1) revise our analysis to address these flaws and (2) delay

issuing this report while considering earlier discussions and working collaboratively with the agency.

OIG will continue to work collaboratively with CMS in an effort to address any potential issues with the new calculation method for Federal upper limits. However, issuing this report prior to CMS's publication of its final regulation provides the agency with the opportunity to consider our findings and incorporate our recommendations. The data presented in this report are the best available for the timeframe, and any limitations have marginal impact and do not change the overall findings and conclusions. We note that a similar report by the Government Accountability Office (GAO) identified the same issues and reached similar conclusions.[19]

A detailed discussion of CMS's specific comments is presented below. The full text of CMS's comments is presented in Appendix B.

**Detailed Discussion of CMS Comments**

AMP-related issues: CMS stated that AMPs used in OIG's analysis are lower than appropriate, noting that we did not account for the exclusion of prompt pay discounts from AMP starting in 2007 or other changes to AMP that may occur under the new AMP regulation. Therefore, OIG should have waited until this regulation takes effect before conducting this study. CMS also stated that it will not calculate Federal upper limit amounts based on AMPs for terminated products and that our analysis does not address this. Furthermore, CMS disagreed with our use of volume-weighted average AMPs in part of our analysis. The agency stated that current market volume is not indicative of a drug product's national availability because of the incentives in the previous system that may have lead pharmacies to purchase drugs with the most inflated price.

OIG addresses several of these issues in the report. While OIG does plan to undertake similar work once the new regulation goes into effect, it was also important to conduct a pre-implementation study to identify any potential issues with the new calculation method so that CMS could consider them in the development of its final regulation.

---

[19] "Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs," (GAO-07-239R, December 2006). Available online at http://www.gao.gov/new.items/d07239r.pdf. Accessed January 22, 2007.

R E C O M M E N D A T I O N S

We agree with CMS that the AMPs we used may have increased since the time of our analysis, as prompt-pay discounts are no longer included in manufacturers' calculations. However, in previous studies, we found that prompt-pay discounts typically range from 1 percent to 3 percent— not a substantial enough margin to change the overall impact of the data presented in this report. In regard to terminated products, AMPs for terminated NDCs were excluded from our analysis and therefore were not a factor in our calculations. Finally, the lowest AMP, second-lowest AMP, and volume-weighted AMP were all important comparison points we used in our analysis. The advantages of using volume-weighted AMP are that (1) it reflects the products actually used in the marketplace; (2) it is very similar to the average sales prices used as the basis for Medicare drug reimbursement; and (3) based on our analysis of 25 drugs, it was a more accurate predictor of drugs for which acquisition costs may exceed the Federal upper limit amount than was the second-lowest AMP.

<u>Acquisition cost-related issues</u>. CMS stated that the acquisition costs presented in our report are higher than appropriate because (1) our analysis does not fully account for discounts and rebates, and (2) our analysis should have focused on the lowest acquisition costs available to pharmacies rather than the average acquisition costs.

Overall, the data provided in this report are the best available for the timeframe. We note that CMS has also used these data to perform its own analysis. In this report, OIG states that we asked distributors to provide information on discounts and rebates, but only two of the five respondents did so. The other three distributors described the difficulty in capturing these data on a drug-by-drug basis. However, given the magnitude of the difference between the new Federal upper limit amount and pharmacy acquisition cost for a number of drugs, this limitation does not negate our underlying concerns.

With respect to the lowest acquisition costs, numerous pricing points could have been used in our analysis. The lowest price reported by distributors is one important pricing point, and the report includes a subfinding that addresses how the new Federal upper limit amounts compare to these figures. Even when using the lowest price reported by distributors, potential reimbursement issues would still exist, as we found that the lowest acquisition costs for half of the drugs exceeded the new Federal upper limit amount. We chose the volume-weighted average acquisition cost for the primary analysis because it reflects the

prices of the drugs that pharmacies actually purchased and because we could not determine whether the lowest prices reported by distributors were readily available to most purchasers.

<u>Aggregate cost-related issues</u>.  Under current law, Federal upper limits apply in the aggregate.  In other words, States may set reimbursement for some drugs at amounts above the Federal upper limit if other drugs are reimbursed at amounts that are below (as long as a State's overall spending is below the aggregate spending that would occur at the CMS-determined Federal upper limit amounts).  CMS stated that our analysis does not address the mitigating effects of applying Federal upper limits in the aggregate.

OIG recognizes the importance of the aggregate concept and agrees with CMS that States should continue to use this flexibility when appropriate.  However, balancing reimbursements above and below the Federal upper limit amounts while meeting the aggregate spending limit was easier when Federal upper limit amounts were highly inflated.  Before the DRA-related changes, Federal upper limit amounts for most drugs exceeded acquisition costs (often by a large margin), meaning that few drugs would warrant an increase in their reimbursement amounts.  Furthermore, the many drugs with Federal upper limit amounts above acquisition costs provided States with numerous choices for balancing out these price increases.

With the move to AMPs as the basis for calculating Federal upper limit amounts, OIG anticipates that it will be more difficult to apply the flexibility afforded by an aggregate limit.  Using our findings in this report as an example, reimbursement amounts for the 6 drugs with average acquisition costs below the Federal upper limit amount would need to be decreased sufficiently to balance out an increase in the reimbursement amounts for the 19 drugs with average acquisition costs above the new Federal upper limit amount.

<u>State maximum allowable cost programs</u>.  CMS stated that the comparison between pre- and post-DRA Federal upper limit amounts is improper because it does not account for the impact of State maximum allowable cost programs (i.e., States often pay less than the Federal upper limit amount for many drugs).

OIG discusses the relevance of State maximum allowable cost to our findings in this report.  The objective of this report was to determine how Federal upper limits were impacted under the DRA methodology, and we focused our analysis on that objective.

R E C O M M E N D A T I O N S

<u>Attached chart containing CMS analysis</u>.  CMS attached a chart with its
comments showing that, based on (1) February 2007 AMPs,
(2) application of an outlier policy, and (3) the lowest reported
acquisition costs, 20 of 25 drugs would be available at or below the new
Federal upper limit amount.  CMS also used the chart to conclude that,
in the aggregate, pharmacies would not have been underreimbursed in
the second quarter of 2006 if they all purchased drugs at the lowest
price reported by distributors (but not at the average price).

Even if OIG accepts CMS's assumptions regarding the data presented in
its chart (including the assumption that all pharmacies could have
purchased the drug for the lowest report acquisition cost, discussed on
pages 18 and 19), we continue to have concerns about the potential
impact of the new Federal upper limit amounts for certain drugs.
According to CMS's aggregate calculations, pharmacies would have
made up for a $3 million total quarterly loss on 24 of the 25 drugs in the
second quarter of 2006 by receiving $11 million in excessive
reimbursement for one drug, albuterol aerosol (a drug for which the new
Federal upper limit amount was well above acquisition cost).  In other
words, pharmacies could make up (in the aggregate) for losses on most
other drugs by filling albuterol prescriptions.  However, pharmacies
that do not sell a large volume of albuterol would find it difficult to
receive adequate reimbursement for the entire group of drugs.
Therefore, while OIG acknowledges the aggregate application of the
Federal upper limit program, we also see important advantages to
striving to set reimbursement for all drugs at appropriate levels, with
cross-subsidies being limited whenever possible.

 A P P E N D I X ~ A

## DETAILED METHODOLOGY

**Data Sources**

Identifying Drugs for Review.  Using data from CMS's Web site and the national drug compendium "Redbook," we identified all drugs included on the Federal upper limit list in the second quarter of 2006.  Federal upper limit amounts for these drugs were based on 150 percent of the lowest price published in the national compendia.  During that quarter, CMS had established Federal upper limits for 530 drugs.

We then obtained calendar year (CY) 2005 Medicaid drug reimbursement and utilization data from CMS's Web site and identified the 25 drugs (of the 530) on the Federal upper limit list with the highest total Medicaid expenditures that year.[20]

Acquisition Cost Data.  For the 25 listed drugs with the highest total Medicaid expenditures in 2005, we collected second-quarter 2006 pricing and sales data from the three largest national distributors (AmerisourceBergen, McKesson, and Cardinal Health)[21] and two smaller regional distributors (Mutual Drug Company and Burlington Drug Company).  Each distributor was asked to provide the total dollar amount sold, the amount of discounts and rebates paid to purchasers, the net dollar amount sold, the total number of units sold, and the average selling price during the second quarter of 2006 for all NDCs associated with the top 25 Federal upper limit drugs.

AMP Data.  We obtained AMP data for the second quarter of 2006 from CMS.

**Data Analysis**

Estimating Pharmacy Acquisition Costs for Selected Drugs.  Among the five distributors, we totaled the dollar amount sold (net of reported discounts and rebates, when possible) for all NDCs associated with each of the 25 selected high-expenditure drugs, and divided this amount by the total number of units of each NDC sold.  We also determined the

---

[20] CY 2005 reimbursement and utilization data were the most current available at the time of our sample selection.

[21] According to industry sales reports, these three national companies account for the vast majority of market share among drug distributors.

lowest price reported to OIG by the distributors for any NDC associated with the 25 drugs. [22]

Estimating Federal Upper Limit Amounts Under New Calculation Method. To estimate what Federal upper limit amounts would be under the new methodology set forth in section 6001(a) of the DRA, we determined the lowest AMP reported by manufacturers among NDCs associated with the 530 drugs on the Federal upper limit list in that quarter.

Under 42 CFR 447.332 (in effect during the time of our review), a Federal upper limit amount should be based on the least costly therapeutically equivalent drug that can be purchased by pharmacists in quantities of 100 (or if the drug is not commonly available in quantities of 100, a commonly listed package size). In determining the lowest AMP for any given Federal upper limit drug, we examined only NDCs in a commonly listed size that were identified as therapeutically equivalent in either CMS's drug product file[23] or the national drug compendium "Redbook." For the purpose of this study, AMPs for terminated NDCs were not used to estimate new Federal upper limit amounts.[24]

Of the 530 drugs included on the Federal upper limit list in the second quarter of 2006, 9 did not have AMP data for any nonterminated, therapeutically equivalent NDCs of a commonly listed size. Therefore, we did not include these drugs in our analysis. For the remaining 521 drugs, we multiplied the lowest AMP by 250 percent to estimate the new Federal upper limit amounts under the methodology mandated by the DRA.

Comparing New and Second-Quarter 2006 Federal Upper Limit Amounts. For each of the 521 drugs included in our review, we calculated the percentage difference between the new Federal upper limit amounts (based on 250 percent of AMP) and the second-quarter 2006 Federal upper limit amounts (based on 150 percent of the lowest published

---

[22] One of the five distributors did not provide sales and utilization data broken down by the NDC. Therefore, this distributor's data were not included in the determination of the lowest price for a drug.

[23] Available online at http://www.cms.hhs.gov/MedicaidDrugRebateProgram/09_DrugProdData.asp. Accessed on September 8, 2006.

[24] As reported in the national drug compendium "RedBook," a terminated NDC is one assigned to a product that has been deactivated by a manufacturer.

A P P E N D I X ~ A

price).  We categorized the drugs into ranges based on the percentage increases or decreases in their Federal upper limit amounts.

<u>Comparing Federal Upper Limit Amounts to Pharmacy Acquisition Costs</u>. We calculated the percentage difference between the second-quarter 2006 Federal upper limit amounts and the average pharmacy acquisition costs for each of the 25 selected high-expenditure drugs.  We then calculated the difference between the new Federal upper limit amounts (based on 250 percent of the lowest AMP) and the average pharmacy acquisition costs.  For each of the 25 drugs, we also compared the lowest price reported by any of the distributors for any associated NDC to the new Federal upper limit amount.

<u>Comparing the Lowest AMP to the Other AMPs</u>.  To assess whether the lowest AMPs used to set the new Federal upper limit amounts were representative of other AMPs for the same drug, we determined the second-lowest and volume-weighted AMPs for each of the 521 drugs under review.  In identifying the second-lowest AMPs, we limited our analysis to nonterminated, therapeutically equivalent NDCs of a commonly listed size.  We calculated the volume-weighted AMP among all NDCs for the drug by weighting the AMP for each individual NDC by the number of units of the NDC reimbursed by Medicaid in the second quarter of 2006.  We then compared the lowest AMP to the second-lowest and volume-weighted AMPs for each of the 521 drugs and identified instances in which the lowest AMP was more than 60 percent below either of these other two figures. [25]  We subset out the results for the 25 selected high-expenditure drugs for further analysis.

<u>Determining if Other AMPs Could Help Identify Potential Issues</u>.  Among the 25 selected high-expenditure drugs, we identified any instances in which the lowest AMP was more than 60 percent below the second-lowest and/or volume-weighted AMP.  For any drugs that exceeded this threshold, we determined whether the average pharmacy acquisition costs exceeded the new Federal upper limit amount.  We repeated this

---

[25] In its proposed regulation, CMS uses a 70 percent rather than a 60-percent threshold in comparing the lowest AMP to the second-lowest AMP.  We chose to use 60 percent in our analysis because whenever the lowest AMP exceeds this threshold relative to the second-lowest AMP, then the second-lowest AMP (and all other AMPs) for a drug would be higher than the new Federal upper limit amount.  For example, a drug with a lowest AMP of $0.40 would have a new Federal upper limit amount of $1.00 ($0.40 times 250 percent).  If the second-lowest AMP is higher than this new Federal upper limit amount (e.g., $1.01), then the lowest AMP would be at least 60 percent below the second-lowest AMP ($0.40 is 60.4 percent below $1.01).

A P P E N D I X ~ A

analysis for drugs that did not meet the 60-percent threshold.  This analysis allowed us to determine whether exceeding the 60-percent threshold (compared to either the second-lowest or volume-weighted AMP) was linked to a drug's average acquisition cost being higher than the new Federal upper limit amount for these 25 drugs.

➤ **A P P E N D I X ~ B**

### Agency Comments



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

**DATE:**    APR 2 5 2007

**TO:**    Daniel R. Levinson
Inspector General

**FROM:**    Leslie V. Norwalk, Esq.
Acting Administrator

**SUBJECT:**    Office of Inspector General's (OIG) Draft Report: "Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program," (OEI-03-06-00400)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to review and comment on the OIG draft report entitled, *"Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program."* This report provides a preliminary assessment of how the change in methodology for calculating the Medicaid Federal Upper Limit (FUL) under the Deficit Reduction Act (DRA) of 2005 may change reimbursement to pharmacy providers.

As we further explain below, CMS strongly disagrees with the OIG's findings and recommendations on the effect of the change to set FULs on average manufacturer prices (AMPs). We find that the analysis is deficient in numerous ways and such deficiencies lead to flawed results and misleading conclusions. Specifically, we find that the analysis is deficient in the following ways:

- The AMPs used in the OIG's analysis are lower than appropriate because they fail to account for the deletion of customary prompt pay discounts required under the DRA. Our most current analysis based on the use of the monthly AMP data shows that adequate reimbursement may be achieved with FULs based on AMP.
- The acquisition costs used in the OIG's analysis are higher than appropriate because they do not fully account for discounts provided to pharmacies.
- The comparison, between pre-DRA FULs and the DRA FULs, is improper because the pre-DRA FULs are often inflated such that nearly all States (43) have maximum allowable cost (MAC) programs that pay far less than the FUL.
- The weighted average AMP used in the OIG's analysis as the benchmark to set the FUL is inconsistent with the legal requirement to use the lowest AMP and reflects the current incentive for pharmacies to purchase drugs which yield the greatest profit, rather than the most cost-effective drug.
- The mitigating effects of applying the FULs in the aggregate are ignored.

APPENDIX ~ B

Page 2 – Daniel R. Levinson

Each of these flaws has the effect of exaggerating the reduction in pharmacy payment and collectively results in a severe distortion of the effects of the DRA revisions. We requested that the OIG revise its analysis to address these issues. While the OIG acknowledged the merit of these concerns, we understand that time pressures made further analyses impossible. We consider this "rush to report" harmful to the policy debate and regret that the OIG, which had been so instrumental in raising the policy concern of Medicaid's high drug reimbursement rates, would issue this report in light of its inadequacies and misleading conclusions.

Our analysis, and that of several State Medicaid agencies, shows that adequate reimbursement can be achieved with FULs based on AMP. We suggest that the OIG wait until the final regulation which defines AMP is promulgated, before trying to assess its impact. It is only after a final definition of AMP has been issued that an accurate analysis of the impact of DRA can be conducted. We believe that an analysis that considers the actual AMPs used to determine the FULs, rather than a flawed proxy, would yield substantially different results from those presented in this report.

A fuller discussion of the OIG findings and recommendations and the CMS responses is attached.

**Office of Inspector General's Draft Report: "Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program," (OEI-03-06-00400)**

This report provides a preliminary assessment of how the change in methodology for calculating the Medicaid Federal Upper Limit under the Deficit Reduction Act of 2005 may change reimbursement to pharmacy providers. The DRA requires the FUL to be set at 250 percent of the lowest average manufacturer price (computed without regard to customary prompt pay discounts extended to wholesalers). The previous FUL, or pre-DRA FUL, was calculated at 150 percent of the lowest published compendia price for the least costly therapeutically equivalent drug within an ingredient group.

To analyze the effect of the draft FUL, the OIG compared the draft FUL to the pre-DRA FUL for all drugs in FUL groups and also the draft FUL of 25 high-expenditure drugs to estimates of average acquisition cost. Five drug distributors provided pricing data for these 25 drugs to the OIG.

**OIG Findings**

The OIG estimates, using second quarter 2006 drug pricing data for all drugs with a FUL during that quarter, that FUL reimbursement amounts will decrease by a median of 61 percent under the new criteria. Overall, FUL amounts for 94 percent of such drugs will be reduced.

According to the OIG study, for 19 out of 25 high-expenditure drugs that were reviewed, the OIG found that average pharmacy acquisition cost would have exceeded the draft FUL. In other

A  P  P  E  N  D  I  X  ~  B

Page 3 - Daniel R. Levinson

words, according to this study, only 6 of the 25 drugs reviewed would have an estimated average pharmacy acquisition cost below the estimated draft FUL.

Further, for 14 percent of the drugs on the FUL list, the lowest AMP was more than 60 percent below the second-lowest AMP. And, for 29 percent of reviewed drugs, the lowest AMP was more than 60 percent less than the volume-weighted AMP.

**CMS Follow-up with the OIG**

At CMS' request, the OIG provided us the raw data from the five distributors which identified the individual prices of these drugs. The OIG also met with us in response to our further analysis of this data and agreed to make certain changes in their final report. We requested that they conduct further analysis, in particular, to compare the average prices paid by Medicaid for the drugs in the quarter to the estimated acquisition cost. We also asked that they compare the draft FUL to the lowest acquisition cost. Due to time and data constraints, the OIG did not agree to these further analyses, but did agree to revise the draft report to provide more context to their findings. In particular, the OIG agreed to:

- State that drugs subject to a FUL account for a limited subset of Medicaid drug expenditures. For example, 4Q2005 data showed that only about 8.3 percent of Medicaid drug expenditures were for drugs subject to a FUL;

- Highlight the comparison of FULs calculated using the pre-DRA method to pharmacy acquisition costs to show the extent to which Medicaid may have overpaid for these drugs with the pre-DRA FUL and to add a chart to illustrate this point;

- Make note of the fact that the reduction in FUL amounts was directed by the DRA in order to save money; and,

- Rephrase parts of the recommendation to note that the FUL needed to be changed so that Medicaid did not overpay for drugs, note that most of the AMPs that resulted in the draft FULs being lower than the estimated acquisition cost were caused by "outlier" AMPs (AMPs with very low values that appear questionable as to their accuracy), and add information to stress that accurate manufacturer reporting of AMPs is critical for FULs when used for payment.

**CMS Response**

Based on the information provided and the methodology used, we do not concur with the OIG findings that the AMP-based FULs will be less than acquisition costs under the draft criteria established by the DRA.

As this report prominently notes, numerous prior OIG reports found that the published prices used to set FUL amounts often greatly exceeded prices available in the marketplace. The OIG

A P P E N D I X   ~   B

Page 4 - Daniel R. Levinson

outlined the need for reform in Medicaid pharmacy reimbursement and recognized that the DRA changes were based in part on their work. The pre-DRA FUL amounts often greatly exceeded pharmacy acquisition costs, and thus, may have resulted in increased costs to the States and Federal Government. This study acknowledges that pre-DRA FULs often far exceeded acquisition costs. Specifically, the OIG found that for 23 of the 25 high-expenditure drugs reviewed in this study, pre-DRA FUL amounts were more than double the average pharmacy acquisition cost. In 13 cases, the pre-DRA FUL amounts were at least 5 times higher than average acquisition costs.

Further, when the lowest pharmacy acquisition cost is used as the point of comparison, the pre-DRA FUL amounts were from one and one-half times to more than 52 times higher than that cost. In fact, the pre-DRA FUL was more than 13 times higher than the lowest pharmacy acquisition cost on average. These findings bolster OIG's previous findings that reiterate the need for reform in Medicaid pharmacy reimbursement.

However, we believe that the OIG's analysis is flawed in analyzing the draft FULs in several important ways and that each of these flaws exaggerates the impact of the draft FULs on pharmacies.

We believe the purpose of revising the FULs is to provide an incentive for pharmacies to buy the lowest price drug among competing generics. Therefore, the OIG's use of the average acquisition cost as the comparison point to the draft FULs does not recognize that pharmacies may seek out the lowest cost drugs to the extent that Medicaid reimbursement is reduced.

Accordingly, we believe that OIG's findings would represent a more accurate evaluation if the lowest price were used as a point of comparison for the DRA FUL. See Attachment A for a comparison by drug. Our analysis shows that by using the lowest pharmacy acquisition cost as the price comparison, using the OIG reported second quarter 2006 quarterly AMP basis for the DRA FUL, 15 (rather than 6) of the 25 drugs reviewed would have an estimated pharmacy acquisition cost below or equal to the estimated draft FUL. Using the February 2007 monthly AMP as the basis for the DRA FUL, 20 of the 25 drugs reviewed would have an estimated pharmacy acquisition cost below the estimated draft FUL.

Further, the majority of wholesalers/distributors (three of five) did not report prices net of rebates or price concessions that lower provider acquisition costs. This failure to include rebates or concessions inflates the estimated pharmacy acquisition costs used in the OIG's analysis. If the lowest distributor price is not net of discounts or rebates, we believe that the OIG should have imputed a discount and subtracted it from the price reported to estimate the true acquisition cost to the pharmacy.

We believe that the OIG's use of current market volume is also not indicative of a drug product's national availability. In volume weighting both the AMPs and the average pharmacy acquisition costs, the OIG implies that a lower priced drug with a low market volume in the data reviewed may be an indication that this drug is not nationally available. The OIG presents no evidence to

A P P E N D I X  ~  B

Page 5 - Daniel R. Levinson

substantiate this premise. We believe that it is important to understand that pharmacies benefited substantially by buying the generic drug with the greatest spread between actual acquisition cost and reported price. The market incentive was not to purchase the least costly drug, but rather the drug with the most inflated price. The intent of the DRA was to restore an efficient market incentive that would make purchase of the lowest price drug the most financially rewarding. Further analysis needs to be done to determine the influence this spread had on purchasing choices.

The FULs have been so high in the past that many States use State Maximum Allowable Cost programs that reimburse pharmacies far below the current FUL. Currently, 43 States have established MAC programs. CMS believes that the impact of these existing State cost-containment programs should have been included in the OIG analysis. The decreased FUL reimbursement amounts will not impact actual reimbursement to providers where current reimbursement amounts are based on lower State MAC reimbursement amounts in the vast majority of States.

This study also fails to note that Medicaid policy allows States to pay above the FUL as long as total expenditures for FUL drugs do not exceed the aggregate FUL amount. We have proposed to continue the policy that States have the ability to make payment at levels above the specific FUL for some drugs, provided that the State pays below the FUL for other drugs. In fact, CMS' analysis (see attachment A) shows that if the lowest pharmacy acquisition cost were used, the second quarter 2006 quarterly AMP based DRA FULs would exceed that pharmacy acquisition cost by nearly $8 million for these drugs. If the February 2007 AMP DRA FULs are used, that FUL would exceed that pharmacy acquisition cost by nearly $39 million. In fact, the February 2007 AMP based FULs exceed even the average pharmacy acquisition cost by over $21 million. (We note that while the February 2007 AMPs are for a different time period than the acquisition cost data the OIG obtained, this was the only comparison we could make based on the available OIG data. As noted elsewhere in this report, we believe the OIG should delay this report until it can re-examine not only the more current monthly AMPs, but the effect of the final regulation.)

If Medicaid expenditures for these drugs using the old FULs of $212 million are compared to the cost using the lowest pharmacy acquisition cost of $37 million, States would overpay pharmacies by nearly $175 million, or nearly **six** times the cost of the lowest pharmacy acquisition cost.

Additionally, this analysis did not address dispensing fees that Medicaid pays to pharmacies in addition to reimbursing for drug product costs. CMS recognizes that these fees are an important part of pharmacy reimbursement. We encourage States to review these fees in conjunction with changes States may consider for drug reimbursement.

As noted in this report, the OIG study uses a different AMP from what will be used to set the draft FULs, thereby underestimating the FULs. The DRA revises the definition of AMP, effective January 1, 2007, to exclude customary prompt pay discounts to wholesalers and requires drug manufacturers to include sales of authorized generics when they report their

A P P E N D I X  ~  B

Page 6 - Daniel R. Levinson

AMPs. Because prompt pay discounts decrease AMPs, their exclusion would increase the AMP and subsequently increase the FULs. Further, the proposed changes in the AMP calculation in the CMS proposed regulation, yet to be finalized, may also have an effect on the manufacturer submitted price. CMS has also proposed that the AMP of a terminated national drug code will not be used to set the FUL, beginning with the first day of the month after the actual termination date reported by the manufacturer to CMS. The OIG report does not address this proposed exclusion of AMPs in its analysis.

Since the release of the draft report, CMS has had the opportunity to analyze the monthly AMP data, submitted by the manufacturers per the provisions of the DRA, and the subsequent FUL calculations for the 25 high expenditure drugs in the OIG study. We have found that, using the February 2007 monthly AMP data, and applying the proposed outlier policy of eliminating the AMP of the lowest priced therapeutically and pharmaceutically equivalent drug that is not less than 30 percent of the next highest AMP, there are only 5 ingredient groups out of the 25 high expenditure ingredient groups in the review, whose lowest acquisition cost exceeds the draft FUL. (See attachment A)

**OIG Recommendation**

The OIG recommends that the CMS should monitor the new FUL amounts closely during initial implementation of the DRA provisions to ensure pharmacies receive adequate reimbursement. It also recommends that the CMS should take steps to identify when a new FUL amount may not be representative of a drug's true cost to pharmacies. These recommendations include issuing a final regulation that would focus on situations when the lowest AMP is significantly lower than the volume-weighted AMP for a drug, contacting manufacturers to validate reported data, examining utilization data to determine that the product on which the FUL is based is commonly prescribed in the marketplace, and providing pharmacists an opportunity to communicate when a drug is not available nationally at the FUL price. The OIG notes that the drug manufacturers are duly responsible to report accurate and verified AMPs.

Finally, the OIG recommends that the CMS work with the Congress to determine the proper course of action in situations in which 250 percent of the AMP may not be sufficient to cover pharmacy costs.

**CMS Response**

In our proposed rule, we invited comments from the public on how to implement the new FUL and invited suggestions on how to accomplish the goal of ensuring that the use of AMP in calculating the FUL will ensure that a drug is available nationally at the FUL price. CMS is evaluating the comments submitted on the proposed rule, CMS-2238-P, to ensure that all reasonable options are considered. CMS expects to issue this rule by July 1, 2007, as required by the DRA.

Page 7 - Daniel R. Levinson

We concur with the OIG recommendation that new FUL amounts should be monitored closely to ensure that reimbursement to pharmacies is adequate to cover acquisition costs. We also strongly agree with the OIG that the drug manufacturers have an important role to play in this regard.  For a FUL based on AMP to work as intended, drug manufacturers must accurately report the AMPs for their drugs.  The OIG is well positioned to evaluate the accuracy of manufacturers' submitted AMPs and to advise us of policies that might effect the proper reporting of such AMPs under the law.

We note that the Congress provided the OIG a role in advising CMS on how to clarify AMP. We appreciate the previous and ongoing OIG work in this area and we will give every consideration to the OIG's comments in the future as we did with the comments they provided prior to our development of our notice of proposed rulemaking. We hope to continue to work collaboratively with the OIG to ensure that the new methodology for FULs will be more than adequate to cover pharmacies' acquisition costs.

We appreciate the OIG analysis of how low AMPs may result in FULs that are lower than average acquisition cost.  We agree with the OIG that the FULs in aggregate must be sufficient to cover the cost of the lowest priced drug that a pharmacy can obtain.  To that end, we will continue to closely analyze the AMPs that are reported under the DRA and OIG's suggested approaches to monitoring the FULs.  However, contrary to the OIG's recommendation for further legislation in this area, we believe the current law provides sufficient flexibility to provide supportable FULs.

In conclusion, the use of AMP to set FUL reimbursement for multiple source drugs, and making these AMPs available to the public, provides transparency in drug pricing.  The prior lack of transparency leads to Medicaid paying too much for drugs.  The AMPs are specific prices for individual drugs received by manufacturers from sales in the marketplace.  Drug manufacturers submit AMPs to CMS under penalty of law for false reporting.  We believe these changes will help capture the most accurate pricing data possible to assure that the Federal Government and State Medicaid programs are paying appropriately for generic drugs.  We believe that this drug pricing transparency will lead to more equitable and appropriate reimbursement for prescription drugs as States will be more aware about the true market price of prescription drugs.

We appreciate the OIG follow-up information and that the OIG could not provide further analyses due to time and data constraints.  Because we believe that setting the FULs appropriately is an important part of the Medicaid drug program and the DRA AMPS are, we request that the OIG consider our earlier discussions and review this response to work collaboratively with us and delay issuing this report in final.

APPENDIX ~ B

**Attachment A**

| Drug | A. OIG Q2 Units Reimbursed | B. CMS Current FUL | C. Q2 Expenditure using Current FUL | D. Lowest Pharmacy Acquisition Cost | E. Q2 Expenditure using Lowest Pharmacy Acquisition Cost | F. OIG Reported Average Pharmacy Acquisition Cost | G. Q2 Expenditure using Average Pharmacy Acquisition Cost | H. OIG Reported Q2/06 New FUL | I. Q2 Expenditure using Q2 New FUL | J. February 2007 Monthly Expenditure using February FUL | K. Q2 Expenditure using February 2007 FUL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acetaminophen/Hydrocodone Bitartrate 500MG-5MG Tablet | 35,572,197 | $0.0833 | $2,963,164.04 | 0.030 | $1,067,165.92 | $0.032 | $1,138,310.32 | $0.039 | $1,387,315.70 | 0.065 | $2,312,192.83 |
| Acetaminophen/Propoxyphene Napsylate 650MG-100MG Tablet | 15,578,413 | $0.1800 | $2,804,114.34 | 0.030 | $467,352.39 | $0.049 | $763,342.24 | $0.024 | $373,881.91 | 0.066 | $1,028,175.28 |
| Albuterol .09MG/Actuation Aerosol Solid (Inhaler) | 22,689,434 | $0.4367 | $9,908,475.92 | 0.280 | $6,353,041.58 | $0.335 | $7,600,960.46 | $0.767 | $17,402,796.04 | 0.713 | $16,177,566.59 |
| Albuterol Sulfate 0.83% Solution | 86,002,930 | $0.1150 | $9,890,336.93 | 0.030 | $2,580,087.90 | $0.041 | $3,526,120.12 | $0.011 | $946,032.23 | 0.111 | $9,546,325.21 |
| Gabapentin 300MG Capsule | 19,704,055 | $1.3083 | $25,778,814.88 | 0.100 | $1,970,405.48 | $0.157 | $3,093,536.60 | $0.108 | $2,128,037.92 | 0.053 | $1,044,314.90 |
| Gabapentin 400MG Capsule | 4,107,344 | $1.5696 | $6,446,887.79 | 0.030 | $123,220.33 | $0.203 | $833,790.92 | $0.030 | $123,220.33 | 0.044 | $180,723.15 |
| Gabapentin 600MG Tablet | 9,880,423 | $2.4704 | $24,408,597.10 | 0.360 | $3,556,952.30 | $0.447 | $4,416,549.10 | $0.476 | $4,703,081.37 | 0.258 | $2,549,149.15 |
| Gabapentin 800MG Tablet | 2,830,053 | $2.9586 | $8,372,995.35 | 0.430 | $1,216,922.87 | $0.573 | $1,621,620.48 | $0.669 | $1,893,305.58 | 0.172 | $486,769.15 |
| Glimepiride 4MG Tablet | 2,366,105 | $0.4100 | $970,103.05 | 0.080 | $189,288.40 | $0.083 | $196,386.72 | $0.077 | $182,190.09 | 0.029 | $68,617.05 |
| Glyburide 5MG Tablet | 8,645,285 | $0.2831 | $2,447,482.88 | 0.040 | $345,811.78 | $0.069 | $596,525.32 | $0.031 | $268,004.13 | 0.064 | $553,298.85 |
| Glyburide/Metformin Hydrochloride 5MG-500MG Tablet | 4,826,816 | $1.0026 | $4,839,365.72 | 0.110 | $530,949.76 | $0.142 | $685,407.87 | $0.105 | $506,815.68 | 0.166 | $801,251.46 |
| Lorazepam 1MG Tablet | 23,463,599 | $0.5718 | $13,416,479.95 | 0.030 | $703,907.66 | $0.040 | $938,543.54 | $0.033 | $774,298.42 | 0.061 | $1,431,278.90 |
| Metformin Hydrochloride 1000MG Tablet | 11,434,045 | $0.4597 | $5,256,230.54 | 0.020 | $228,680.90 | $0.091 | $1,040,498.11 | $0.005 | $57,170.23 | 0.013 | $148,642.59 |
| Metformin Hydrochloride 500MG Tablet | 25,923,915 | $0.3557 | $9,221,136.56 | 0.010 | $259,239.15 | $0.055 | $1,425,815.32 | $0.026 | $674,021.79 | 0.034 | $881,413.11 |
| Omeprazole 20MG Enteric Coated Tablet | 1,701,502 | $3.9790 | $6,770,275.91 | 0.430 | $731,645.80 | $0.638 | $1,085,558.19 | $0.299 | $508,749.06 | 0.643 | $1,094,066.70 |
| Oxycodone Hydrochloride 20MG Tablet Extended Release | 2,468,706 | $1.8374 | $4,536,000.40 | 0.730 | $1,802,155.38 | $0.875 | $2,160,117.75 | $0.080 | $197,496.48 | 1.857 | $4,584,387.04 |
| Oxycodone Hydrochloride 40MG Tablet Extended Release | 3,151,038 | $3.2601 | $10,272,700.35 | 1.290 | $4,064,839.56 | $1.445 | $4,553,250.52 | $0.191 | $601,848.34 | 1.439 | $4,534,344.29 |
| Oxycodone Hydrochloride 80MG Tablet Extended Release | 2,649,281 | $6.1175 | $16,206,854.17 | 2.470 | $6,543,674.67 | $2.633 | $6,975,504.21 | $2.719 | $7,203,340.66 | 8.211 | $21,753,082.07 |
| Paroxetine Hydrochloride 20MG Tablet | 5,087,333 | $2.5200 | $12,820,078.91 | 0.200 | $1,017,466.58 | $0.445 | $2,263,863.14 | $0.025 | $127,183.32 | 0.281 | $1,429,540.55 |
| Paroxetine Hydrochloride 40MG Tablet | 2,678,903 | $2.7000 | $7,233,038.72 | 0.330 | $884,038.07 | $0.517 | $1,384,992.97 | $0.158 | $423,266.71 | 0.434 | $1,162,644.00 |
| Potassium Chloride 20MEQ Tablet Extended Release | 8,480,955 | $0.4625 | $3,922,261.16 | 0.010 | $84,809.55 | $0.121 | $1,026,148.33 | $0.086 | $729,328.56 | 0.045 | $381,625.41 |
| Ranitidine Hydrochloride 150MG Tablet | 19,023,740 | $0.1088 | $2,069,782.91 | 0.010 | $190,237.40 | $0.030 | $570,712.20 | $0.042 | $798,997.08 | 0.021 | $399,498.54 |
| Riboxin 2000MG Capsule | 1,228,663 | $7.5764 | $9,308,838.57 | 0.400 | $491,465.00 | $2.304 | $2,830,838.40 | $0.400 | $491,465.00 | 1.813 | $2,227,565.11 |
| Tramadol Hydrochloride 50MG Tablet | 26,970,114 | $0.3068 | $8,274,430.82 | 0.010 | $269,701.14 | $0.049 | $1,321,535.56 | $0.027 | $728,193.06 | 0.031 | $836,073.52 |
| Zonisamide 100MG Capsule | 3,704,845 | $1.1742 | $4,350,229.27 | 0.350 | $1,296,696.83 | $0.657 | $2,434,083.32 | $0.405 | $1,500,462.32 | 0.045 | $166,718.04 |
| TOTAL | | | $211,486,676 | | $36,969,751 | | $54,484,012 | | $44,730,562 | | $75,779,262 |

◤    A C K N O W L E D G M E N T S

This report was prepared under the direction of Robert A. Vito, Regional Inspector General for Evaluation and Inspections in the Philadelphia regional office, and David E. Tawes, Director of the Medicare and Medicaid Prescription Drug Unit.

Other principal Office of Evaluation and Inspections staff from the Philadelphia regional office who contributed include Lauren McNulty and Jessica Demko.  Central office staff who contributed include Sarah Craren, Cynthia Thomas, and Gina Maree.

# EXHIBIT G

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Health Resources and Services Administration

Healthcare Systems Bureau

**MAY  9 2007**

Rockville MD 20857

Dear Pharmaceutical Manufacturer:

The Office of Pharmacy Affairs (OPA) within the Healthcare Systems Bureau of the Health Resources and Services Administration issued a letter to pharmaceutical manufacturers dated January 30, 2007, in which it stated that "(M)anufacturers that have signed pharmaceutical pricing agreements (PPAs) must continue to calculate 340B ceiling prices so that the calculated price continues to reflect a reduction for any prompt payment discounts."

In this January 30, 2007, letter, OPA requested comments from interested parties regarding this policy. OPA has reviewed the comment letters, and in light of the comments received and the long standing practices of the 340B program, OPA has determined that the issues raised require more analysis and consideration. Accordingly, until further notice, manufacturers should calculate their ceiling prices according to CMS requirements.

OPA plans to continue to give careful consideration to the implications of changes to the Average Manufacturer Price calculation and other potential changes to the 340B Drug Pricing Program.

OPA very much appreciates your continued participation in the 340B Drug Pricing Program and looks forward to working with all involved parties in this process.

Sincerely,

Jimmy R. Mitchell, R.Ph, MPH, MS
Director
Office of Pharmacy Affairs

# EXHIBIT H

**NEWS**

**MEDICAID DRUG REBATE PROGRAM Release No. 29**


**\* \* \* IMMEDIATE ATTENTION REQUIRED \* \* \***


**NOTE TO:  All Participating Drug Manufacturers**



<u>**NOTE:**</u>  **The following item clarifies the information on the BP and AMP for PBMs provided in the Medicaid Drug Rebate Program Release No. 28.**

<u>Best Price (BP) and Average Manufacturer Price (AMP) Calculations For Pharmacy Benefit Managers (PBMs)</u>

Previously, PBMs were instrumental in establishing and managing drug formularies for third party customers.  Now, manufacturers have developed a myriad of arrangements whereby specific discounts and other chargebacks or rebates are paid to the PBM which, in turn, passes these on to the purchaser.  Where PBM's subsequently adjust drug prices by applying discounts, chargebacks or rebates,  these price adjustments should be included within the best price calculations.  In other words, where the effect on the manufacturer for using the PBM is to adjust actual drug prices at the wholesale or retail level of trade, such adjustments need to be recognized in best price calculations.

**Page 2  -  Medicaid Drug Rebate Program          Release Number 29**


To the extent manufacturers are offering PBMs lower drug prices at the wholesale or retail level of trade, these lower prices should be recognized in the best price calculations.  Best price

is generally based on the lowest price available <u>to any entity except those excluded under the statute or rebate agreement.</u> Therefore, where the use of the PBM by manufacturers establishes lower prices, these lower prices should be reflected in best price calculations.  However, we do acknowledge that there are many PBM/manufacturer arrangements and that only those that adjust actual drug prices will be captured in best price calculations.

We generally consider drug prices to PBMs as having no effect on the AMP calculations unless the PBM is acting as a wholesaler as defined in the rebate agreement.

## ADDITIONAL GUIDANCE ON AVERAGE MANUFACTURER PRICE (AMP) CALCULATIONS

On occasion, manufacturers advise us that revisions or recalculations to their pricing data are necessary.  Most often, these situations occur when a manufacturer discovers that the pricing data reported to us may have been incorrectly calculated based on the improper inclusion or exclusion of certain sales. To assist manufacturers in determining the appropriateness of the AMP calculations or proposed recalculations, we are providing the attached chart as a supplement to previous instructions on the calculation of AMP.  This additional information does not impose any new requirements on manufacturers and no action is necessary by manufacturers that are not revising or recalculating pricing data.  Essentially, the information on the chart is a compilation of instructions previously provided in earlier releases. Further, the information on the chart does not supersede requirements in the rebate agreement or in section 1927 of the Social Security Act.

In Manufacturer Release Number 14, dated December 21, 1994, we advised all manufacturers of the proper procedure to follow in submitting revised or recalculated AMPs.  As a reminder, all proposed recalculations based on revised methodologies of AMPs must **<u>first</u>** be submitted to us for our review, along with the

**Page 3 - Medicaid Drug Rebate Program          Release Number 29**

methodologies used to originally calculate the reported AMPs and the revised methodologies used for the proposed recalculations. Additionally, where possible, we request the manufacturer to provide an estimate of the magnitude of the proposed changes.  Of course, adequate documentation must be maintained to support the calculations and be made available to us upon our request.  The

Department of Health and Human Services' Office of Inspector General has begun reviews of manufacturer pricing data and documentation must be maintained by manufacturers to support the pricing data.

In no case should a manufacturer report recalculated URAs to states or adjust rebate payments based on recalculated AMPs without our prior approval.  Again, we ask those manufacturers that are contemplating revisions to their pricing data to refer to manufacturer release number 14.

## T-BILL RATES  - NEW FORMAT

With this release, please note that the T-Bill rates are listed on three pages, 3 columns per page and include rates from the first week of January, 1991 through the present.  We have been emphasizing the fact that, where possible, every attempt should be made to resolve 1991 and 1992 disputes as quickly as possible. To this end, we thought it would be helpful to have every T-Bill rate from the start of the drug rebate program to the present available for quick reference when resolving these disputes and calculating interest.  Beginning with the next release, only page 3 will be included.  When that is filled up, only page 4 will be included, etc.  All T-Bill rates will continue to be included on the Medicaid Drug Rebate portion of the HCFA home page.

## OTHER ATTACHMENTS

Copies of the topic index and the complete listing of the 90-day treasury bill auction rates for the period of January 7, 1991 through the present are attached.

**Page 4  -  Medicaid Drug Rebate Program          Release Number 29**

Please remember to direct your drug rebate questions to a staff member on the listing we provided with release number 18 or section "O" of the operations guide.

Judith D. Moore
Acting Director
Medicaid Bureau

3 Attachments

cc:
All Regional Administrators
All Associate Regional Administrators, Division of Medicaid

**TOPICAL INDEX - DRUG MANUFACTURER RELEASES 1 - 29**

**TOPIC**                                                          **RELEASE #**

50% Rebate Cap - Technical Amendment Passed                07
Adding New Package Sizes to Existing Products              09
Additional Rebate Calculation Revision                     10
Adjustment Code for HCFA-304 & HCFA-304a                   21
Adjustments that Cause Rebate Corrections                  26
Administrative Fees' Effect on AMP & BP                    14
Average Manufacturer Price (AMP)
     BP/UPPS Clarification                                  03
     Additional Guidance - AMP calculation                 29
     Calculation Methodology Revision                       14
     For Terminated Drugs                                   07
     Hemophilic Drugs Clarification                         11
AMP/BP Calculations-Pharmacy Benefit Managers (PBMs)      28-29
Baseline Change Resulting from OBRA of 1993               13-15
Best Price (BP)
     Calculation (VHCA)                                     06
     DSH Covered Entities                                   11
     Exclusions                                             07
     TennCare                                               11
     Versus Average Manufacturers Price                     15
 Buying Innovator Products for Resale                       26
Calculating AMP/BP for Different Quarters                   07
Changes in Ownership or Contact Information               06-21
Closure During Federal Furloughs                            21
Common Data Errors                                          02
Contact Information Updates                                04-17
Contact Name Changes                                        21
CPI-U Values                                                22
Data Definition Update                                      04
Data File Update                                            02
Data Reporting Requirements                                 07
Depot Prices                                                03
DESI -
     Codes                                                  09
     Field Changes                                          15
     Indicator Change                                      03-04
     Program Overview                                        04
Desktop Operations Training Guide                           25
Discounts/Price Arrangements                                02
Diskette Users                                              07
Diskette Users - WINDOWS Version Only                       27

**TOPIC**                                                          **RELEASE #**

Dispute Resolution Issues                              11-14-19-24-26
     Workgroup Survey Results                            13
     Meetings in Denver                                  27
Drug Category Change                                     23
Drug Product Deletions/Reporting Requirements            04
Drug Product Information Changes                         03

Drug Rebate Data Definitions                                    10
Drug Rebate Operations Guide - Hands-On Training                22
Drug Rebate Operations Guide - Updates                          26
Duplicate Payment Prevention (VHCA)                             06
Failure of Manufacturers to Notify States of
    Disputes or Pay Rebates                                     24
Failure to Pay Interest                                         26
FDA Approval Date                                               09
FDA Date Submission for OTC Drugs                               10
Hands-On Training                                               23
Hotline                                                         11-18
Individual Co-Payments or Insurance Payments                    06
Information Sharing                                             21
Interest Calculation under Section V(b)                         07
Invoice/Remittance Advice Report Survey                         10
Labeler Codes - Addition Procedures                            13
Labeler Use of ROSI/PQAS Forms                                 27
Late Data Submissions                                           04-09
Mailing Pricing Data\Other Correspondence to HCFA              06-17-21
Market Date                                                     09
MDRI Diskette System - Windows Version                          25
Minimum Rebate Percentage & Rebate Cap (VHCA)                   06-07
New Diskette Program/Data File                                  05
Omnibus Budget Reconciliation Act of 1993                      09
Parenteral/Enteral Products                                     02
Partial Drug Rebate Payments                                    19
Powder-Filled Vials, Ampules, & Syringes                        11
Prior Authorization                                             19
Prior Period Adjustment Processing                             19
Prior Quarter Adjustment Statement (PQAS) Approval             22
Proposed Discount Equal Access Legislation                      16
Publication of Drug Rebate Regulations MB-46-P                 19
Public Health Service Drug Pricing Program                     13
Quarterly Pricing Data                                          03-08
Questions and Answers                                           26
Rebate Percentages for 1994                                     12
Rebates on OTC Drug Product                                     06

**TOPIC**                                                       **RELEASE #**

Rebate/Reimbursement Issues                                     25
Reconciliation of State Invoice (ROSI) Approval                 22-26
Remittance Advice Report (RAR)                                  07-15-16-20
Remittance Advice Report Implementation Workgroup               17-18
Reporting NDCs for Generic Products                            04
Reporting Requirements                                          02-12
Separate Rebate Agreements with States                          11
Shelf Life                                                      03
Staff Relocation                                                16
State Issues
    Hearing Process                                             13
    Rebate Payments                                             03
    Remittance Advice Contacts                                  09
State/R.O. Drug Rebate Contact Persons                          06-08-17

```
Termination From Program                              19
Termination Appeal Process                            11
Therapeutic Equivalency Code                          25-26
Tolerance Threshold for Interest                      15
Training Guide                                        18
Unique Medicaid Factors & Rebate Disputes             14
Unit-Dose Packaging                                   04
Unit Rebate Calculation (URA) Modification            02
    New HCFA Edits                                    13
    Recalculations                                    24
Unit Type
    Convert to NCPDP 7 plus add "EACH"(EA)            13
    Conversion Date Change                            09
    Specification Changes                             06-08
Utilization Adjustments                               22
VA Appropriations Act                                 03
Vermont Rebate Invoices                               23
Veterans Health Care Act of 1992 (VHCA)               06
Virus Transmission Via Diskette                       16-18
```

**(Revised 02 June 1997)**

**AVERAGE MANUFACTURER PRICE/BEST PRICE CALCULATIONS**

| SALES | INCLUDED IN AMP | INCLUDED IN BP | REBATES DUE | ADDITIONAL INFORMATION |
|---|---|---|---|---|
| Direct Hospital Sales | No | Yes | Note 1 | Sales discussed in this chart may be affected by subsequent sales to an excluded/included entity for AMP/BP purposes. |
| HMOs (Drugs Dispensed Under Capitated Rate) | No | Yes | No | |
| HMOs (Drugs Dispensed Under Fee-for-Service) | No | Yes | Yes | |
| Mail Order Pharmacy | Yes | Yes | Yes | Note 1 - Yes, if the drug is used in the outpatient pharmacy and the Hospital bills Medicaid for reimbursement for dispensing the outpatient drug.  Otherwise, no. |
| Retail Pharmacy | Yes | Yes | Yes | |
| PHS Covered Entities | No | No | No | |
| State-Funded Only - Pharmacy Assistance Programs | No | No | No | Note 2 - Yes, except for sales to wholesalers which can be identified with adequate documentation as being subsequently sold to any of the excluded sales categories. |
| VA/DOD Excluded Sales | No | No | No | |
| Federal Supply Schedule Sales | No | No | No | |
| Nursing Home Primary/Contract Pharmacy Sales | Yes | Yes | Yes | |
| Sales to Other Manufacturers Who Repackage/Relabel Under the Purchaser's NDC | No | No | No | Additional note -  All pricing adjustments affecting the price of any sales must be taken into account if the sales were included in the calculation of AMP/BP. |
| Sales to Other Manufacturers Who Act as Wholesalers and Do Not Repackage/Relabel Under the Purchaser's NDC | Yes | Yes | Yes | |
| Wholesalers | Note 2 | Note 2 | Note 2 | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF CHAIN DRUG STORES *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Civil Action No. 1:07cv02017 (RCL) |
| v. | ) ) |
| MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES *et al.*, | ) ) ) |
| Defendants. | ) |

<u>**ORDER**</u>

Upon consideration of Plaintiffs' Motion for Preliminary Injunction and Request for

Expedited Hearing, it is hereby ORDERED that Plaintiffs' motion is DENIED.

Dated: _____

_____
ROYCE C. LAMBERTH
United States District Court Judge