**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION OF CHAIN DRUG STORES and NATIONAL COMMUNITY PHARMACISTS ASSOCIATION,** | ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. 1:07-cv-02017 (RCL) |
| v. | ) ) | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**, *et al.,* | ) ) ) | |
| Defendants. | ) | |

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO EXTEND BRIEFING AND HEARING SCHEDULE REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

Defendants made crucial errors, involving misstatements of both law and fact, in their Opposition To Plaintiffs' Motion for Preliminary Injunction ("Opposition"). Critically, Defendants' errors were not the result of recent changes in the law or newly developed facts. Rather, they were mistakes with no good cause and none has been offered by the Defendants. Those errors go to the heart of three of the principal arguments Defendants raised in their Opposition. Incredibly, Defendants made essentially the same incorrect statements in the past and this Court rejected their arguments.

Plaintiffs discovered what they viewed as Defendants' obvious errors upon reading their Opposition. Plaintiffs then, as a professional courtesy, alerted Defendants to the errors to allow Defendants to withdraw them. Thereafter, Defendants could have identified their misstatements to the Court, and could have withdrawn them. Instead, Defendants filed their Emergency Motion.

The Emergency Motion fails to identify the inaccurate statements that Defendants made to the Court.  As a result, the Court does not know what misinformation it has received and currently exists in the record.  Defendants also fail to ask the court to excuse and ignore the incorrect portions of their Opposition.  Defendants further failed to withdraw their erroneous Opposition, either in part or full.  Instead, Defendants' Emergency Motion asks the court for another delay, including postponement of a mutually-agreed scheduled preliminary injunction hearing in this multi-billion dollar case, to allow Defendants additional time to file a second Opposition to Plaintiffs' Motion for a Preliminary Injunction.

A second delay and a second Opposition brief are unnecessary, and would be inequitable.  Instead, Defendants should have simply identified the specific misstatements of law and fact that they made to the Court, and asked the court to ignore the portions of Defendants' Opposition that are based on factually and legally incorrect arguments.

## I.  Current Schedule

Plaintiffs filed their Motion For Preliminary Injunction on November 15, 2007. Pursuant to Rule 65.1(c), Defendants' Opposition was due on November 26, 2007.  At Defendants' request, Plaintiffs consented to an extension of the deadline for filing Defendants' Opposition until December 6, 2007.  The Court granted that extension by Order dated November 20, 2007.  The Court's Order also requires Plaintiffs to file their Reply Brief by tomorrow, December 11, 2007, and schedules a hearing on the Motion For Preliminary Injunction on Friday, December 14, 2007.

## II.     Plaintiffs Alerted Defendants To Crucial Errors Of Fact And Law Contained In Defendants' Opposition

Defendants filed their Opposition near midnight on December 6, 2007. On the following morning of December 7, 2007, counsel for Plaintiffs informed counsel for Defendants of major errors of fact and law contained in the Opposition. Those errors formed the substantive basis for Defendants' claims that Plaintiffs lack standing, that Plaintiffs' claims are not ripe, and that Plaintiffs do not face an imminent threat of irreparable injury.

Defendants assert in their Opposition that retail pharmacies are not injured by the AMP Rule, and Plaintiffs' claims are not ripe, because the AMP Rule does not cut Medicaid reimbursement for retail pharmacies. As examples, despite the language of the Social Security Act and the AMP Rule itself, Defendants claimed that "State pharmacy payment rates are not regulated by the federal government under Medicaid." Defendants' Opposition, p. 18. And they claimed that the federal government "does not prescribe limits on state payments to pharmacies." *Id.* at 13. Defendants argued that States will decide whether to abide by the Federal Upper Limits established by the AMP Rule. *Id.* Defendants also asserted that States will have to amend their Medicaid State Plans and obtain Defendants' approval before they can implement the new Federal Upper Limits set by the AMP Rule. *Id. at 20.* Defendants further asserted that States must submit additional amendments to their Medicaid State Plans for review and approval by CMS whenever the Federal Upper Limits are revised in the future. *Id.* As discussed below, none of these assertions is true.

### A.  Incorrect Legal And Factual Statements In Defendants' Opposition

Defendants make numerous incorrect statements of law and fact in their

Opposition.  Misstatements in the introductory and background sections of the

Opposition include, but are not limited to, the following:

- Defendants argue that Plaintiffs lack standing and Plaintiffs' claims are not ripe "[b]ecause states, not the federal government, determine the rate at which they will pay pharmacies for providing Medicaid-covered drugs, and because it is entirely speculative at this point how, if at all, states might change their own payment systems in response to the AMP data…."  Defendants' Opposition at 2.

- Defendants assert that Plaintiffs' claim of irreparable injury "is, on its face, not credible" because "Plaintiffs can point to no instance of a state reducing its Medicaid payment for prescription drugs as a result of the AMP rule…."  *Id.* at 3.

- Defendants assert that "States – not the federal government – set the rate at which they pay pharmacies and other healthcare providers for Medicaid-covered products and services…."  *Id.* at 4.

Misstatements in the section of the Opposition on standing include, but are not

limited to, the following:

- Defendants assert that "State pharmacy payment rates are not regulated by the federal government under Medicaid…."  *Id.* at 18.

- Defendants claim that "states may pay pharmacies a rate that exceeds both the AMPs and the FUL. The FUL merely establishes the rate above which states will no longer receive federal matching funds. *See, e.g.*, 42 C.F.R. §§ 447.304(a), 447.514(b).  As such, the FUL cannot affect Plaintiffs unless states change their payment systems."  *Id.* at 15.

- Defendants claim that "the injury Plaintiffs assert – reduction in payment rates – cannot possibly occur unless those who actually pay the pharmacies (*i.e.*, the states) decide to change their payment rates." *Id.*

- Defendants assert that the federal government "does not prescribe limits on state payments to pharmacies." *Id.* at 13.

- Defendants claim that "Importantly, neither the DRA nor the AMP rule dictates, or even affects, the way that *states* determine the rates at which they pay pharmacies for providing Medicaid-covered drugs. The states, subject to CMS's approval, will continue to set their own pharmacy payment rates.  Unless the

states change their payment systems, Plaintiffs' Medicaid payments will not change." *Id.*

- Defendants assert that "no harm will occur unless the states take some independent, discretionary action that harms Plaintiffs." *Id.* at 14-15.

Misstatements in the section of the Opposition on ripeness include, but are not limited to, the following:

- "Plaintiffs' Medicaid payment rates will not change unless and until states amend their State Plans and obtain CMS approval of those Plan amendments." *Id.* at 20.

- Defendants argue that Plaintiffs "might" be able to assert a claim only "[i]f a state seeks approval to change its system, and if Plaintiffs could demonstrate that they would be injured under the particular (as yet unknown) details of that proposed system…." *Id.*

Misstatements in the section of the Opposition on irreparable injury include, but are not limited to, the following:

- "The Medicaid payments rates to pharmacies *cannot* change, and Plaintiffs therefore cannot suffer an injury as a result of reduced Medicaid payments, unless the states submit State Plan amendments to CMS and CMS approves those amendments.  How states may decide to change their State Plans in response to the AMP data, and whether those changes will affect Plaintiffs at all, is entirely speculative." *Id.* at 40.

- "In sum, Plaintiffs have failed to offer any evidence that pharmacies will suffer losses so great as to cause pharmacy closure at all – which is the irreparable harm Plaintiffs have claimed – much less that the predicted closures will be a result of the allegedly improper AMP rule instead of as a result of some as yet unknown, independent decision of the states to reduce their payment rates to pharmacies and/or as a result of the congressional decision to set FULs at 250% of the AMPs." *Id.* at 41 (footnote omitted).

**B.    Defendants' Legal And Factual Assertions Are Not True**

The federal government does in fact regulate pharmacy payment rates in the Medicaid program.  State Medicaid agencies must abide by the aggregate Federal Upper Limits and the other reimbursement standards established by the AMP Rule and other federal regulations.  Implementation of the Federal Upper Limits and other requirements

of the AMP Rule are not contingent on decisions or actions by the States. Amendments to the Medicaid State Plans are unnecessary because the State Plans already provide that the State Medicaid programs must pay pharmacies in accordance with federal regulations such as the AMP Rule.

The Social Security Act plainly provides that the defendant Secretary must establish "federal" upper limits on reimbursement payments for multiple source drugs. 42 U.S.C. § 1396r-8(e)(4), (5). That statute is the basis for the AMP Rule.

The AMP Rule itself provides that State Medicaid agencies must submit findings and assurances that the States abide by the Federal Upper Limits and comply with the other reimbursement provisions of the AMP Rule. *See* AMP Rule § 447.518(b). The AMP Rule also provides that the State Medicaid agencies must not pay pharmacies, in the aggregate, more than the Federal Upper Limits plus a "reasonable" dispensing fee. *Id.* at §§ 447.512(a), 447.514(b).[1] Indeed, CMS recognized, in its own AMP Rule Preamble, that "States may need to adjust payments to stay below the FUL in the aggregate." AMP Rule Preamble at 39236; *see also id.* at 39196, 39213-14, 39214-15; 39236 (commenting multiple times on the requirement that State Medicaid reimbursement rates must remain below the Federal Upper Limits in the aggregate).

No decisions or actions by States are necessary before the Federal Upper Limits established by the AMP Rule begin harming retail pharmacies. Current State Plans, which have already been approved by the Defendants, provide that States must abide by federal regulations such as the AMP Rule. In particular, the State Plans already provide that states cannot pay pharmacies more than the aggregate of the Federal Upper Limits established by Defendants. *See* Attachment 4.19-B to each State Medicaid Plan.

---

[1] The "agency" referred to in these sections of the AMP Rule is each State Medicaid agency.

The Federal Upper Limits have existed for many years, and throughout those years they have been revised by Defendants on numerous occasions. To Plaintiffs' knowledge, Defendants have never required States to submit amendments to their Medicaid State Plans each time the Federal Upper Limits are revised. Nothing in the statute, the AMP Rule, the Preamble, or any other regulatory pronouncement suggests that States must now submit amendments to their Medicaid State Plans for CMS approval before the Federal Upper Limits established by the AMP Rule may be implemented.

In sum, the Social Security Act, the AMP Rule itself and the Medicaid State Plans require States to abide by the Federal Upper Limits that will be established next month pursuant to the AMP Rule. All substantive State reimbursement standards in the Medicaid State Plans are subject to review and approval – or rejection – by Defendants. *See* 42 C.F.R. §§ 430.10 – 430.18. Defendants do not allow States to pay reimbursement rates that do not comply with federal rules such as the AMP Rule. *See* AMP Rule § 447.418. No discretionary State actions are necessary preconditions to implementing the reimbursement cuts imposed by the AMP Rule. Indeed, given that the State Plans already require States to abide by the Federal Upper Limits established by Defendants, it would take concerted action by the State Medicaid agencies and Defendants to *avoid* the automatic implementation of the AMP Rule. All this was known to Defendants at the time their erroneous arguments were filed, as it comes from their own regulations and AMP Rule itself.

### III.    Defendants Have Made These Erroneous Arguments Before and Lost

Incredibly, Defendants have unsuccessfully attempted to make essentially the same incorrect arguments in the past, in a lawsuit also involving Plaintiff NACDS.  *See NACDS v. Bowen,* Civ. A. No. 87-2911, 1989 WL 43948 at *6 n. 1 (D.D.C. April 12, 1989) (attached hereto as Exhibit A).  As here, the *NACDS v. Bowen* case involved a challenge to rules establishing Federal Upper Limits on Medicaid reimbursement.  Defendants filed a motion to dismiss, claiming that NACDS lacked standing:

> Defendants argue that states, not defendants, determine the amount of the reimbursement to providers of prescription drugs, and so long as states stay below the aggregate limits, they may not have to change their compensation methodologies at all. "Plaintiff has not shown, therefore, that the regulations at issue have resulted, or will necessarily result, in any change in methodology by any state or that such a change has injured any of plaintiff's members." Defendants' Reply at 6.  Finally, the government argues that NACDS does not have standing because the relief sought (setting aside the challenged regulation) would only result in the reinstatement of the former regulations, which also grant states the discretion to establish reimbursement levels, subject to federal ceilings.

*Id*. at *3.  This Court denied the Defendants' motion to dismiss and held that NACDS had standing to challenge the Federal Upper Limits rule:

> The Court finds that NACDS does have standing to bring this suit. NACDS, as an organization representing pharmacies, is more than a "concerned bystander[ ]" with regard to the challenged rulemaking. *United States v. SCRAP,* 412 U.S. 669, 687 (1973). The members of NACDS have "a direct stake in the controversy" involving the regulation. *Id.* They, in fact, will be harmed if it is true that the rule's aggregate limits do not adequately compensate efficient private providers of prescription drugs.
>
> While the challenged rule may not require states to change their reimbursement methodologies, the rule does establish upper limits for reimbursement, and these upper limits affect the compensation that providers receive. Further, the rule may affect a provider's decision whether to participate in Medicaid and, thus, the accessibility of Medicaid services. This implicates important statutory objectives. Finally, if, as plaintiff alleges, HCFA failed to explain its decision to promulgate the proposed rule, this action by the agency affected important interests of

> NACDS and its members in participating in a program regulated by fair and reasonable regulations. For these reasons, the Court finds that plaintiff has standing in this case, and defendants' motion to dismiss should be denied.

*Id*. at *4.  As a result, before filing their Opposition, Defendants had at least constructive notice via case law that their arguments were wrong.  Unfortunately, Defendants did not note the existence of the *NACDS v. Bowen* case in their Opposition.  As recently as 2002, the United States District Court for the Eastern District of Arkansas, relying on *NACDS v. Bowen*, rejected these same arguments in a similar case.  *Ashley County Med. Ctr. v. Thompson*, 205 F.2d 1026, 1047 n. 25 (E.D. Ark. 2002) (stating *NACDS v. Bowen* "soundly rejected" these arguments).

## IV.    Defendants Should Not Be Rewarded With Another Delay And Another Opportunity To File A New Opposition Brief

A second delay and a second Opposition brief are simply unnecessary.  Instead, all Defendants needed to do was identify the incorrect statements they made to the Court, and ask the Court to excuse and ignore their incorrect factual and legal arguments.  At the very least, Defendants owe the Court a detailed description of the misstatements they made to the Court.  Defendants also owe an explanation to the Medicaid patients, the pharmaceutical industry participants and the members of the public who are following this important case so closely.  Alternatively, if Defendants do not wish to identify their errors, then the Court may wish to accept Sections II(B) and III above as correct statements of the facts and the law.  Either way, another delay and another Opposition brief are not necessary.  There is simply no justification to grant Defendants' Emergency Motion to file a second non-erroneous opposition.

Moreover, there are six other reasons why it would be inequitable to give the Defendants another delay and another Opposition.

First, the 55,000 retail pharmacies represented by plaintiffs, the many national drug wholesalers represented by amicus HDMA, millions of Medicaid patients and the public at large are waiting on a resolution of this multi-billion dollar preliminary injunction motion. 10,000 to 12,000 retail pharmacies may close as a result of the AMP Rule. Millions of patients who rely on those retail pharmacies to supply their medication needs will lose access. A further delay, to give Defendants additional time to correct errors they have not yet identified nor provided good cause for to the Court, is not justified.

Second, Plaintiffs already consented to one extension of time for Defendants to file their Opposition. The fact that Defendants made inaccurate statements, of which they had constructive notice, in their Opposition does not justify another extension of time to file another Opposition.

Third, Defendants' failure to identify their errors to the Court, and failure to ask the Court to ignore the erroneous portions of Defendants' Opposition, have caused Plaintiffs to incur substantial additional costs. Because Defendants failed to identify their own admitted errors, Plaintiffs had to incur the time and expense of drafting this memorandum. And because Defendants failed to withdraw Defendants' Opposition, or at least the erroneous portions thereof, Defendants are in the process of incurring the time and expense of drafting a Reply Brief that addresses those arguments for filing tomorrow, December 11, 2007.

Fourth, Defendants claim that Plaintiffs waited too long to pursue their claims and that "Plaintiffs should not be permitted to benefit from their own inexcusable delay." Defendants' Opposition at 3, 42-44. Plaintiffs disagree, and note that in the same brief Defendants also make the diametrically opposite argument that plaintiffs have not delayed long enough before pursuing their claims. *See id.* at 19-20 (asserting that Plaintiffs' claims are not ripe for adjudication). Nevertheless, Defendants' assertion that the lawsuit has been delayed too long argues against further delay.

Fifth, Plaintiffs should not be penalized for attempting to practice courteous and collegial litigation. Plaintiffs could have identified Defendants' errors for the first time in the Reply Brief which Plaintiffs are scheduled to file on December 11, 2007. Instead, Plaintiffs immediately alerted counsel for Defendants of the errors, allowing Defendants an opportunity to inform the court about the errors and withdraw the incorrect arguments in Defendants' Opposition. Unfortunately, Defendants decided not to reveal their misstatements to the Court, and instead have used their errors as an opportunity to seek additional time to revise their arguments. These actions should not be rewarded with a delay.

Sixth, as will be discussed in Plaintiffs' reply Brief, when the Defendants' crucial errors are removed from Defendants' Opposition it is apparent that nothing substantive remains of Defendants' standing, ripeness and irreparable injury arguments, as reflected by *Bowen*. It is unnecessary, and unfair, to allow Defendants to file another brief with revised standing, ripeness and irreparable injury arguments.

**V.    Defendants' Errors Illustrate Why Deference To Their "Expertise" Is
Unwarranted**

Defendants argue that the Court should defer to their agency "expertise" in the
Medicaid program.  *See* Defendants' Opposition at 11, 32.  Defendants should exhibit
expertise before they demand deference to it.  The major and repeated fundamental errors
made by Defendants, which involve basic elements of the Medicaid program and the
method of establishing Medicaid reimbursement rates, do not exhibit expertise.  On the
contrary, the mistakes in Defendants' Opposition reflect a fundamental misunderstanding
of the Medicaid program and the roles of the federal and State governments in setting
Medicaid reimbursement rates.  This episode strongly cautions against granting
Defendants substantial deference in this case.

For the reasons stated above, Defendants' Emergency Motion To Extend Briefing
Schedule should be denied.

Respectfully submitted,


/s/ Don L. Bell, II                              /s/ Christopher W. Mahoney
Don L. Bell, II                                  Christopher W. Mahoney
General Counsel                                  D.C. Bar No. 394416
D.C. Bar No. 443149                              Duane Morris LLP
Mary Ellen Kleiman                               1667 K Street, N.W.
Associate General Counsel                        Suite 700
DC Bar No. 458400                                Washington, DC 20006-1608
National Association of Chain Drug               (202) 776-7867 (telephone)
Stores                                           (202) 776-7801 (fax)
413 North Lee Street                             Email:  CMahoney@duanemorris.com
Alexandria, VA 22313-1480
P: 703-549-3001
F: 703-684-6747
Email:  DBell@nacds.org

/s/ John M. Rector
John M. Rector
General Counsel
National Community Pharmacists
Association
100 Daingerfield Road
Alexandria, VA  22314-2885
P:  703-683-8200
F:  703-683-3619
Email:  john.rector@ncpanet.org

/s/ Frederick R. Ball
Nicholas J. Lynn
Frederick R. Ball
Duane Morris LLP
227 West Monroe Street
Suite 3400
Chicago, Illinois 60606
(312) 499-6700 (telephone)
(312) 499-6701 (fax)
Email:  NJLynn@duanemorris.com
Email:  FRBall@duanemorris.com

Attorneys for National Association Of
Chain Drug Stores And National
Community Pharmacists Association

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of December, 2007, a true copy of the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO EXTEND BRIEFING AND HEARING SCHEDULE REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION was served via email to the persons listed on the Court's ECF service list.

/s/ Christopher W. Mahoney
Christopher W. Mahoney

DM1\1251765.1

14

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871
**(Cite as: Not Reported in F.Supp.)**

C National Ass'n of Chain Drug Stores, Inc. v. Bowen
D.D.C.,1989.

United States District Court, District of Columbia.
NATIONAL ASSOCIATION OF CHAIN DRUG STORES, INC., Plaintiff,
v.
Otis R. BOWEN, M.D., Secretary of Health and Human Services, et al., Defendants.
**CIV. A. No. 87-2911.**

April 12, 1989.

*ORDER AND JUDGMENT*
NORMA HOLLOWAY JOHNSON, District Judge.
*1 Upon consideration of the motion of defendants to dismiss, the cross motions for summary judgment, the March 31, 1989, hearing on these motions, and the entire record in this case, and consistent with the accompanying Memorandum Opinion, it is this 12th day of April, 1989,

ORDERED that the motion of plaintiff for summary judgment be, and hereby is, denied; it is further

ORDERED that the motion of defendants to dismiss be, and hereby is, denied; it is further

ORDERED that the motion of defendants for summary judgment be, and hereby is, granted; and it is further

ORDERED that judgment be, and hereby is, entered in favor of defendants.

*MEMORANDUM OPINION*

This is an action for injunctive and declaratory relief brought by the National Association of Chain Drug Stores, Inc. (NACDS), on behalf of its members, who own and operate pharmacies in the United States. NACDS is challenging the promulgation of prescription drug reimbursement regulations under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396et seq., commonly known as Medicaid. The challenged regulations, that went into effect on October 29, 1987, revise the manner in which the upper limits for drug reimbursement are set. 52 Fed.Reg. 28648et seq. (July 31, 1987). The regulations were promulgated by the Health Care Finance Administration (HCFA), an agency of the Department of Health and Human Services (HHS).

*BACKGROUND*

The Medicaid program provides medical assistance to individuals whose economic resources are not sufficient to cover the cost of necessary medical care and services. Medicaid is funded jointly by the federal government and the states. State participation is voluntary. However, if a state does participate, its plan must comply with the requirements of the federal statute and HHS implementing regulations.[FN1]

Currently all state Medicaid plans, except Alaska and Wyoming, include coverage for prescription drug services. Federal and state governments do not themselves supply prescription drugs. Rather, Congress chose to utilize private sector providers. *See* H.R.Rep. No. 213, 89th Cong., 1st Sess. 63 (1965). Under this system, a Medicaid recipient presents his or her prescription to any participating pharmacy, pays a percentage of the price, and receives the prescribed medicine. The pharmacy then seeks reimbursement from the state Medicaid agency, which in turn is reimbursed in part by HCFA.

State plans for implementing Medicaid must "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary .. to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30). To implement this statutory objective, HHS has promulgated regulations, including those at issue in this case, establishing a limit for payments by states for prescription drugs.

In 1975, HHS revised the regulations to provide that the upper limit for payment for prescription drugs was "the lower of ingredient cost plus a reasonable dispensing fee or the provider's usual and customary charge to the general public." 42 C.F.R. § 447.331(a) (1986). To encourage the use of lower-cost multiple-source drugs, commonly known as generic drugs, HHS required that ingredient costs for such drugs

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871
**(Cite as: Not Reported in F.Supp.)**

was to be the lower of the maximum allowable cost (MAC) or the estimated acquisition cost (EAC). 42 C.F.R. §§ 447.331(b), 447.332(a) (1986). In addition, the 1975 regulations required the states to conduct periodic surveys of pharmacy operations to obtain data that could be used in establishing appropriate dispensing fees. *Id.* at § 447.333(a).

**\*2** In 1986, HCFA proposed further revisions to the regulations governing the establishment of upper limits for prescription drug reimbursement. HCFA solicited comments on three alternatives. The first alternative, the Pharmacists' Incentive Program, provided that the upper limit for drug reimbursement would be set at a certain percentage (e.g. 150 percent) of the lowest cost of a particular multiple-source drug. The second alternative suggested ways in which the process for establishing the MAC of drugs would be streamlined. The third alternative, the Competitive Incentive Program (CIP), generally provided that the upper limit for drug reimbursement would be the price charged by a pharmacy to its retail customers, less a specified discount.

HCFA received approximately 123 comments from trade associations, including NACDS, manufacturers, state agencies, and drug stores. In general, NACDS objected to HCFA's proposed alternatives because they concentrated solely on saving money. Rather, NACDS emphasized, the agency also had to comply with the statutory "mandate" that efficient pharmacies be able to make a reasonable profit. NACDS submitted a legal analysis by Professor Paul Bator, which concludes that affording efficient providers a reasonable profit is the central means of attaining Congress' goal of equal access to medical services.

On July 31, 1987, HCFA published the final rule on Medicaid reimbursement for prescription drugs. The rule became effective on October 29, 1987. The final rule does not adopt any of the three alternatives on which the HCFA sought comments. Instead, the final rule adopts an "aggregate" approach. This approach establishes an upper limit for the total amount of money a state Medicaid agency may spend for drug reimbursement during a given time period. The HCFA explained:

[B]ecause we are implementing aggregate upper limit standards on the State's Medicaid payments (expenditures) for drugs, a State will have the ability to make payment at levels above the specific standard

for certain drugs, provided that the agency makes the payment at levels below the specific standard for other drug products.

52 Fed.Reg. 28651. HCFA also eliminated the requirement that states conduct periodic surveys of pharmacy operations for possible use in setting dispensing fees, although states are still required to include reasonable dispensing fees in their calculations to show that they are within the upper limit standard.

NACDS is challenging the final rule on the grounds that it violates the Medicaid provisions of the Social Security Act and the requirements of the Administrative Procedure Act (APA). NACDS is seeking an order declaring the final rule unlawful and an injunction prohibiting defendants from implementing the rule. Specifically, NACDS asserts that the statement of basis and purpose accompanying the final rule is inadequate because HCFA did not respond adequately to certain comments and because HCFA did not explain how the final rule fulfills the statutory requirements of the Medicaid program. Second, NACDS alleges that the final regulations are inconsistent with Medicaid's statutory requirements. Third, NACDS argues that the final regulations constitute an unlawful delegation of authority by the HCFA to the states. NACDS has moved for summary judgment.

**\*3** Defendants have moved to dismiss and, in the alternative, for summary judgment. The motion to dismiss is based on defendants' argument that NACDS lacks standing to bring this suit, in part, because NACDS has failed to show that its members would have standing to pursue this suit on their own. Regarding their cross motion for summary judgment, defendants argue that the adoption of the final rule comports with the requirements of the APA and that the rule is consistent with the Medicaid statute.

*DISCUSSION*

*A. Standing*

As a trade association representing chain drug stores, NACDS must meet the requirements for organizational standing in order to pursue this suit. Thus, NACDS must show that:

(1) its members would have standing to pursue this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871
**(Cite as: Not Reported in F.Supp.)**

action in their own right;

(2) the interests which NACDS seeks to protect are germane to the organization's purpose; and

(3) neither the claims asserted nor the relief requested requires the participation of the individual members.

*Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 342 (1977). In order to have standing to sue under APA § 702, a plaintiff must demonstrate that it has suffered "injury in fact" and that " 'the interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Clarke v. Securities Indus. Assn.,* 107 S.Ct. 750, 755 (1987) (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153 (1970) ).[FN2]

The question of standing in this action turns on whether NACDS has demonstrated that its members have suffered injury in fact and, therefore, would have standing to bring this suit in their own right. Plaintiff maintains that the challenged rule purports to change the manner in which states may set reimbursement rates, and that these rates determine whether a pharmacy will be fully compensated for its participation in the Medicaid program. "Therefore, the economic interests of NACDS' members are necessarily affected by the promulgation of the challenged rule." Plaintiff's Reply at 4. NACDS also argues that the injury is traceable to the HCFA's rule because HCFA has established the upper limits for reimbursement, which NACDS argues are too low to compensate efficient providers.

On the other hand, defendants point out that NACDS' complaint alleges no facts to support its assertion that its members "have suffered economic harm." Amended Complaint at para. 7. Defendants argue that states, not defendants, determine the amount of the reimbursement to providers of prescription drugs, and so long as states stay below the aggregate limits, they may not have to change their compensation methodologies at all. "Plaintiff has not shown, therefore, that the regulations at issue have resulted, or will necessarily result, in any change in methodology by any state or that such a change has injured any of plaintiff's members." Defendants' Reply at 6. Finally, the government argues that NACDS does not have standing because the relief

sought (setting aside the challenged regulation) would only result in the reinstatement of the former regulations, which also grant states the discretion to establish reimbursement levels, subject to federal ceilings.

*4 The Court finds that NACDS does have standing to bring this suit. NACDS, as an organization representing pharmacies, is more than a "concerned bystander[ ]" with regard to the challenged rulemaking. *United States v. SCRAP,* 412 U.S. 669, 687 (1973). The members of NACDS have "a direct stake in the controversy" involving the regulation. *Id.* They, in fact, will be harmed if it is true that the rule's aggregate limits do not adequately compensate efficient private providers of prescription drugs.

While the challenged rule may not require states to change their reimbursement methodologies, the rule does establish upper limits for reimbursement, and these upper limits affect the compensation that providers receive. Further, the rule may affect a provider's decision whether to participate in Medicaid and, thus, the accessibility of Medicaid services. This implicates important statutory objectives. Finally, if, as plaintiff alleges, HCFA failed to explain its decision to promulgate the proposed rule, this action by the agency affected important interests of NACDS and its members in participating in a program regulated by fair and reasonable regulations. For these reasons, the Court finds that plaintiff has standing in this case, and defendants' motion to dismiss should be denied.

*B. Summary Judgment*

The parties have filed cross motions for summary judgment. The material facts are not in dispute. Plaintiff's allegations involve solely questions of law; therefore, disposition by summary judgment is appropriate. Fed.R.Civ.P. 56(c).

On the merits of this case, plaintiff makes three general allegations: (1) HCFA failed to respond in a reasoned manner to the comments raised by NACDS and others; (2) HCFA failed to explain how the final rule is consistent with important statutory objectives, and the final rule is inconsistent with statutory objectives; and (3) HCFA improperly delegated to the states authority to set reimbursement formulas. The Court will address these allegations in turn.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 4
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871
(Cite as: Not Reported in F.Supp.)

First, as NACDS points out, the APA requires an agency to respond to material comments in a reasoned manner. *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986) ("[A]n agency action accompanied by an inadequate explanation constitutes arbitrary and capricious conduct."). Comments are material if they "raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule...." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n. 58 (D.C.Cir.)*cert. denied,*434 U.S. 829 (1977). Moreover, agency judgments as to what issues are significant are reviewed under the arbitrary and capricious standard. *Id.*

NACDS has alleged that HCFA failed to fulfill its obligations under the APA in promulgating the proposed rule. The agency did not respond adequately to material comments or explain how its rule could be reconciled with statutory objectives, according to NACDS.[FN3] In general, NACDS argues that HCFA focused on the role of state governments in administering the drug reimbursement program and virtually ignored the importance of assuring providers a reasonable profit.

**\*5** The government, in opposition, asserts that the rule's statement of basis and purpose responded to the major issues raised by the numerous comments submitted on the proposed regulations. Thus, according to defendants, NACDS has failed to show that HCFA's determination of which comments merited a specific response, or HCFA's responses to those comments, was arbitrary or capricious. The government also points out that HCFA addressed the issue of pharmacy profits in the regulatory impact statement, set forth as Part V of the statement of basis and purpose.

After reviewing plaintiff's argument and the agency's statement of basis and purpose, the Court finds that HCFA's responses to comments and explanation of the final rule were adequate under the APA. First, the agency clearly met its obligation to respond to comments on whether the rule would allow efficient providers a reasonable profit. The Regulatory Impact Statement, part V of the statement of basis and purpose, addressed the issue of provider profits, while recognizing that a general lack of data made it difficult to predict the precise affect of the final rule.[FN4] Moreover, while the agency's comments are somewhat conclusory, the Court recognizes that it is the states, and not the HCFA, that set actual reimbursement levels for providers. Therefore, the

question of provider profits was not the main issue in the rulemaking, which was primarily concerned with increasing state flexibility to take advantage of savings available from generic drugs.

Second, NACDS' argues that the agency did not address the adequacy of dispensing fees. This position, however, also misses the point of the rulemaking. HCFA did not propose any change to the existing regulatory requirement that states include a reasonable dispensing fee in their reimbursement. The final rule did eliminate certain federal procedural requirements as to how state agencies establish dispensing fees, but the rule explicitly requires that states determine reasonable dispensing fees. 52 Fed.Reg. 28651.

Finally, NACDS alleges that HFCA failed to respond to other comments submitted by NACDS and failed to explain why the NACDS alternative was rejected. The Court agrees with HFCA-and the case law is clear on this point [FN5]-that the APA does not require the agency to respond to every comment submitted on a proposed rule. Plaintiff has not shown, and the record does not indicate, that HFCA's failure to respond to NACDS' cost-shifting comments was arbitrary or capricious. Moreover, there was no compelling reason for HFCA to respond to plaintiff's proposed alternative methodology. HFCA decided not to implement the CIP methodology, and plaintiff's proposal was merely a variation on the CIP method. Thus, the statement of basis and purpose accompanying the final rule addressed the major issues involved in the rulemaking and fully comported with APA requirements.

NACDS' next allegation raises the question of whether the final rule is consistent with the Medicaid statute. NACDS argues that because HCFA focuses entirely on cost-saving in adopting the rule, the effect of the rule will be to discourage pharmacy participation in the prescription drug program. As a result, Medicaid beneficiaries will not receive service equal to that of the general public. Defendants, however, point out that the final rule has not changed the requirement in 42 C.F.R. § 447.204 (1986) that states must set payments at a level sufficient to enlist enough providers to assure Medicaid recipients equal access to services.

**\*6** The statement of basis and purpose demonstrates that HFCA considered and addressed the significance of the final rule in light of the objectives of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871
**(Cite as: Not Reported in F.Supp.)**

Medicaid statute, Title XIX. Specifically, under the subheading "Availability and Quality of Drugs," HFCA stated: "the 150 percent upper limit standard that we are adopting for certain multiple source drugs will yield a payment level that will be great enough to assure widespread availability of drug products." 52 Fed.Reg. 28651. Further, HCFA noted that the rule "is intended to balance the interests of both pharmacists and the government in achieving efficiency, economy, and quality of care as specified" in the statute. *Id.* at 28653. These comments indicate that the agency did indeed consider the relationship between the final rule and statutory objectives.

Moreover, the final rule is not inconsistent with the statutory objective of ensuring equal access to medical care for both Medicaid and non-Medicaid patients. Under existing regulations, states are still required to determine whether reimbursement to providers is adequate to create incentives for pharmacies to participate in Medicaid. 42 C.F.R. § 447.204 (1986) (The [state] agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population."). Also, the Secretary of HHS must still exercise oversight of state plans to ensure compliance with statutory objectives. 42 U.S.C. § 1396c.

Finally, NACDS' third allegation is that the challenged rule is an impermissible delegation of authority to the states. According to NACDS, the final rule grants unlimited discretion to the states to choose any reimbursement methodology. While the new rule does increase state flexibility in determining reimbursement, this flexibility is entirely consistent with the Medicaid statute and congressional intent. *American Medical Assn. v. Mathews,* 429 F.2d at 1195. Moreover, under the challenged rule, the discretion of the states is limited. States have the same responsibility as before to set reimbursement levels high enough to encourage provider participation and to assure quality care for Medicaid beneficiaries.

*CONCLUSION*

For the reasons stated above, the Court finds that NACDS has standing to bring this action and that defendants are entitled to summary judgment. An order consistent with this Memorandum Opinion will issue.

FN1. In *American Medical Association v. Mathews,* 429 F.Supp. 1179 (N.D.Ill.1977), the court described Medicaid as
a federal-state cooperative program that enables participating states to furnish medical assistance to individuals whose economic resources are insufficient to meet the costs of necessary medical care. States electing to participate in the program must submit a plan for approval by the Secretary. Upon approval, the state becomes entitled to federal matching funds to finance the program. Each state has considerable discretion in designing the contours of its program within the guidelines established by 42 U.S.C. § 1396a.... Under 42 U.S.C. § 1396d(a)(12), state Medicaid plans may include the costs of all "prescribed drugs," including those furnished in health care institutions and those purchased at pharmacies....
*Id.* at 1192.

FN2. It is clear that NACDS satisfies the **"zone of interests"** element of the test for standing under the APA. The interests of **pharmacies** participating in **Medicaid** are directly regulated by the statute and by the rule under challenge.

FN3. NACDS makes the following specific allegations regarding the inadequacy of HCFA's statement of basis and purpose in adopting the final rule:
(1) HCFA failed to respond to comments arguing that its rule must set reimbursement levels high enough to allow efficient providers a reasonable profit.
(2) HCFA failed to respond to comments of NACDS and others about the adequacy of dispensing fees.
(3) HCFA failed to respond to comments by NACDS and others raising the cost-shifting issue.
(4) HCFA failed to explain why it rejected NACDS significant alternative to the proposed methodologies.

FN4. The HCFA "expressed the hope that States would recognize the advantage of providing pharmacists with an incentive to participate in the Medicaid program and to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 6
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871
**(Cite as: Not Reported in F.Supp.)**

stimulate pharmacists to engage in prudent purchasing practices and the substitution of lower cost therapeutically equivalent products." 52 Fed.Reg. 28656.

FN5.*See American Medical Assn. v. Mathews,* 429 F.Supp. 1179, 1204 (N.D.Ill.1977).

D.D.C.,1989.
National Ass'n. of Chain Drug Stores, Inc. v. Bowen
Not Reported in F.Supp., 1989 WL 43948 (D.D.C.), Med & Med GD (CCH) P 37,871

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF CHAIN** ) | |
| **DRUG STORES and NATIONAL** ) | |
| **COMMUNITY PHARMACISTS** ) | |
| **ASSOCIATION,** ) | |
| ) | Civil Action No. 1:07-cv-02017 (RCL) |
| Plaintiffs, ) | |
| v.  ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **HEALTH AND HUMAN SERVICES**, *et al.,* ) | |
| ) | |
| Defendants. ) | |

**ORDER**

Upon consideration of Defendants' Emergency Motion to Extend Briefing and Hearing

Schedule Regarding Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs' Opposition

thereto,

It is hereby ORDERED that Defendants' motion is DENIED.

_____

Royce C. Lamberth
United States District Judge

COPIES TO:

Christopher W. Mahoney
cmahoney@duanemorris.com

Nicholas J. Lynn
Njlynn@duanemorris.com

Frederick R. Ball
frball@duanemorris.com

Wendy M. Ertmer
Wendy.ertmer@usdoj.gov

Arthur Y. Tsien
atsien@ofwlaw.com, bschochet@ofwlaw.com

DM1\1251828.1

John M. Rector
john.rector@ncpanet.org

Don L. Bell, II
DBell@nacds.org

DM1\1251828.1