IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF CHAIN          )
DRUG STORES and NATIONAL               )
COMMUNITY PHARMACISTS                  )
ASSOCIATION,                           )
                                       )   Civil Action No. 1:07-cv-02017 (RCL)
                        Plaintiffs,    )
            v.                         )
                                       )
UNITED STATES DEPARTMENT OF            )
HEALTH AND HUMAN SERVICES, *et al.,*   )
                                       )
                        Defendants.    )


**REPLY OF THE NATIONAL ASSOCIATION OF CHAIN DRUG STORES
AND THE NATIONAL COMMUNITY PHARMACISTS ASSOCIATION
<u>IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION</u>[1]**

---

[1] NACDS and NCPA's motion for an expedited hearing was mooted by agreement of the parties that this matter be heard by the Court on December 14, 2007.

# TABLE OF CONTENTS

**Page**

I.     Introduction.................................................................................................1

II.    Plaintiffs Do Not Lack Standing, And This Case Is Ripe For Adjudication. .....................3

    A.     Plaintiffs Have Standing Because The AMP Rule Automatically Cuts Reimbursement Rates for Retail Pharmacies............................................................ 4

    B.     Plaintiffs Have Standing Pursuant to Previous Case Law. ..................................... 5

    C.     Plaintiffs Undisputed Expert, And Defendants Themselves, Substantiate The Injuries To Plaintiffs Caused by the AMP Rule. ............................................. 6

    D.     Defendants' "Prudential" Standing Argument Lacks Merit. ................................. 7

    E.     Plaintiffs' Claims are Ripe for Adjudication. ......................................................... 8

III.   Defendants' Errors Illustrate Why Deference To Their "Expertise" Is Unwarranted...............................................................................................8

IV.    Many Transactions Included In The Calculation Of Average Manufacturer Price Under The AMP Rule Fail To Conform To The Statute. .....................................9

    A.     Defendants' Prior Guidance, Not The Plain Language Of The Statute, Is the Reason Congress Required Defendants To Issue "Clarifying" Regulations. ...................................................................................................... 10

    B.     A Mandate To Issue "Clarifying" Regulations Is Not A License To Ignore The Requirements Of The Statute.......................................................................... 13

    C.     Defendants Do Not Adequately Address The Inclusion of Particular Transactions In AMP Calculations. ...................................................................... 15

V.     Defendants' Definition Of "Multiple Source Drug" Is Not Consistent With The Social Security Act. ...............................................................................................17

VI.    The AMP Rule Improperly Applies Federal Upper Limits to Non-Equivalent Drugs.......................................................................................................19

VII.   NACDS and NCPA Have Demonstrated Irreparable Harm. .............................................20

VIII.  Plaintiffs Have Not Improperly Delayed. ........................................................................21

IX.    A Preliminary Injunction Helps, Not Harms, the Public Interest. .....................................22

X.     Conclusion. ....................................................................................................23

i

## TABLE OF AUTHORITIES

**Page**

*Action on Smoking and Health v. Civil Aeronautics Bd.*
  699 F.2d 1209 (D.C. Cir. 1983)..................................................................15

*Advanced Commun. Design, Inc. v. Premier Retail Networks, Inc.,*
  46 Fed. Appx. 964 (Fed. Cir. 2002).............................................................21

*Ashley Cty. Med. Ctr. v. Thompson*
  205 F. Supp.2d 1026, (E.D. Ark. 2002)..........................................................6

*Atlantic City Elec. v. FERC,*
  295 F.3d 1 (D.C. Cir. 2002) ...................................................................13, 14

*Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837 (1984) ..............................3, 12, 14

*International Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983) ....................................................................15

*Leather Indus. of Am. v. EPA,* 40 F.3d 392 (D.C. Cir. 1994) ...........................14

*Massachusetts v. EPA,*
  ___ U.S. ___, 127 S. Ct. 1438  (2007) .......................................................13

*MCI Telecomms. Corp. v. AT & T Co.*, 512 U.S. 218 (1994) ....................19, 20

*Nat'l Ass'n of Chain Drug Stores, Inc.  v. Bowen,*
  1989 WL 43948  (D.D.C., Apr. 12, 1989) .................................................5, 6

*Sierra Club v. EPA,* 129 F.3d 137 (D.C. Cir. 1997) ..........................................13

*Southern Cal. Edison Co. v. FERC,* 195 F3d 17 (D.C. Cir. 1998) ....................13

*Strickland v. Comm.'r Me. Dep't of Human Servs.,*  48 F.3d 12 (1st Cir. 1995) .............14

*United States v. McNeil,* 434 F.2d 502 (D.C. Cir. 1970)................................2, 18

## STATUES AND REGULATIONS

21 U.S.C. § 353(e)(2)(B) ...............................................................................1

42 U.S.C. § 1396r-8(b)(3)(A) .......................................................................19

42 U.S.C. § 1396r-8(e)(4) .............................................................................19

42. U.S.C. § 1396r-8(f)(4) ...............................................................................4

42 U.S.C. § 1396r-8(k)(1) ...............................................................................9

42 U.S.C. § 1396r-8(k)(3) .............................................................................17

42 U.S.C. § 1396r-8(k)(7) .........................................................................17, 19

42 U.S.C. § 1396r-8(k)(7)(C)(iii) ....................................................................1

21 C.F.R. § 203.3(cc) ......................................................................................1

42 C.F.R. § 423.100 ....................................................................................1, 12

42 C.F.R. § 447.504(f)(AMP Rule) ...............................................................15

42 C.F.R. § 447.504(g)(1)(AMP Rule)..........................................................16

42 C.F.R. § 447.504(h)(13)(AMP Rule)........................................................16

42 C.F.R. § 447.512(a) (AMP Rule)................................................................4

42 C.F.R. § 447.514(b) (AMP Rule) ...........................................................4, 8

42 C.F.R. § 447.518 (AMP Rule) ....................................................................8

42 C.F.R. § 447.518(b) (AMP Rule) ...............................................................4

## OTHER

72 Fed. Reg. 39142, et seq. (July 17, 2007) ........................................... passim

ADAP Manual (2003 Version) .......................................................................12

GAO, "Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns About Rebates Paid to States (June 22, 2005) ...................................................................10, 11

HHS, OIG, "Medicaid Drug Rebates:  The Health Care Financing Administration Needs to Provide Additional Guidance to Drug Manufacturers to Better Implement the Program" (Nov. 1992) ..................................................................................................................................11

Pharmaceutical Pricing Agreement Between The Secretary of HHS and The Manufacturer at ftp://ftp.hrsa.gov/bphc/pdf/opa/pricingagreement.pdf .....................................................12

## I.     Introduction.

On December 6, 2007, Defendants filed their Opposition To Plaintiffs' Motion for Preliminary Injunction And Request For Expedited Hearing ("Defendants' Opposition" or "Opp.").[2]  Like the AMP Rule, Defendants' Opposition ignores inconvenient arguments and facts.  For example, like the AMP Rule, Defendants' Opposition ignores the requirement that a drug product does not qualify as a  multiple source drug unless it appears in a "published national listing of average wholesale prices selected by the Secretary."  42 U.S.C. § 1396r-8(k)(7)(C)(iii).  Defendants ignore the fact that their own definition of "retail pharmacy" in the Medicare program includes only licensed pharmacies and specifically excludes mail order pharmacies and other providers that Defendants now include in the AMP Rule's definition of "retail pharmacy class of trade."  42 C.F.R. § 423.100.  Defendants ignore the fact that the Food, Drug and Cosmetic Act and the FDA, an agency of Defendant HHS, define drug wholesalers as entities who are licensed as wholesalers by States and who engage in specific activities defined as  "wholesale distribution."  21 U.S.C. § 353(e)(2)(B); 21 C.F.R. § 203.3(cc).  Defendants ignore the fact that they eviscerated the statutory definition of AMP by requiring drug manufacturers to include virtually all sales in AMP calculations, by default, whenever manufacturers lack "adequate documentation" to prove a negative – that the drugs were not distributed to retail pharmacies.  Defendants ignore the Schondelmeyer Report and fail to rebut any of its findings, even though Dr. Schondelmeyer has served as Defendant CMS's own expert on several occasions.  By doing so, Defendants forego any opportunity to challenge the findings

---

[2] NACDS and NCPA use the same abbreviations in this memorandum as they used in their opening memorandum.

in the Schondelmeyer Report.[3]  Defendants' failure to address these arguments in their

Opposition should, by itself, provide a sufficient basis for this Court to grant the motion for

preliminary injunction.

In addition, this Court should grant the motion for preliminary injunction because:

- Defendants' standing and ripeness arguments lack merit because they are systemically flawed.[4]  The AMP Rule, as well as State reimbursement plans, demonstrate that the federal government requires that States not pay more, in the aggregate, than the Federal Upper Limits.  The same standing argument was "soundly rejected" by this Court before.  Defendants' standing and ripeness arguments are also belied by their own economic analysis in the AMP Rule as well as the Schondelmeyer Report, and are inconsistent with their argument that Plaintiffs have "waited too long" to file for a preliminary injunction;

- Defendants' "prudential" standing argument lacks merit.  NACDS and NCPA are not suing to stop implementation of the DRA nor to enforce the DRA.  Rather, NACDS and NCPA are suing under the Administrative Procedure Act ("APA") to prevent Defendants from promulgating a rule that harms retail pharmacies because it is contrary to the Social Security Act;

- Defendants' argument that the statute is ambiguous because Congress instructed them to "clarify" the method of calculating AMP lacks merit.  Congress did not instruct Defendants to ignore the plain meaning of  terms such as "wholesaler" and "retail pharmacy" in the statute.  Congress did not require Defendants to clarify the statute at all.  Rather, Congress instructed Defendants to clarify the inconsistent guidance regarding AMP that Defendants issued over the preceeding 16 years.  The OIG and GAO reports that are exhibits to Defendants' Opposition repeatedly state that it was Defendants' inconsistent guidance and inadequate oversight that needs clarification, not the statute.  In any event, the AMP Rule

---

[3] "Where uncontradicted expert testimony is provided with an adequate foundation, the trier of fact may not simply pick and choose among the experts' opinions, accepting some and rejecting others according to his own personal views."  *United States v. McNeil*, 434 F.2d 502, 515 (D.C. Cir. 1970) (internal citations omitted).

[4] Plaintiffs address these faulty arguments at length in their Opposition to Defendants' Emergency Motion to Extend Briefing Schedule and Hearing Regarding Plaintiffs' Motion for Preliminary Injunction.  This Court denied Defendants' Emergency Motion by Order dated December 10, 2007.  Less than twelve hours after this Court denied Defendants' Emergency Motion, Defendants filed a second motion for leave to amend.  *See* Defendants' Motion for Leave to Amend Their Opposition to Plaintiffs' Motion for Preliminary Injunction and Request for Hearing.  In that Motion, Defendants state they are withdrawing their jurisdictional arguments.  *Id* at 2.

must be consistent with the plain meaning of the statute under *Chevron* Step I, must be rationale under *Chevron* Step II, and cannot be arbitrary and capricious under the APA;

- Defendants' definition of multiple source drug ignores the plain language of the Social Security Act;

- Defendants' application of Federal Upper Limits to non-equivalent drug formulations directly conflicts with the language of the Social Security Act;

- Defendants provide no evidence to rebut the Schondelmeyer Report's showing of irreparable harm; and

- NACDS and NCPA did not inexcusably delay in filing this action.

## II.     Plaintiffs Do Not Lack Standing, And This Case Is Ripe For Adjudication.

Defendants argue that Plaintiffs do not have standing and that their claims are not ripe for review.  *See* Opp. at 11-20.[5]  The basis of Defendants' arguments is factually and legally incorrect.  Indeed, Defendants have recognized as much, in part, as they attempted to file a revised opposition to correct their erroneous arguments.  *See* Defendants' Emergency Motion to Extend Briefing Schedule Regarding Plaintiffs' Motion for Preliminary Injunction ("Emergency Motion"), filed December 7, 2007 and Defendants' Motion for Leave to Amend Their Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief and Request for Expedited Hearing filed on December 10, 2007.  This Court rejected the first attempt, *see* Order dated December 10, 2007, and has yet to rule on the second.  Therefore, Defendants' erroneous arguments remain on the record, and Plaintiffs provide the following responses to those arguments.

Defendants assert in their Opposition that retail pharmacies are not injured by the AMP Rule, and that Plaintiffs' claims are not ripe, because the AMP Rule does not cut Medicaid

---

[5] Citations to Defendants' Opposition are to the original brief filed by Defendants on December 6, 2007.

reimbursement for retail pharmacies.  As examples, despite the language of the Social Security

Act and the AMP Rule itself, Defendants claim that "State pharmacy payment rates are not

regulated by the federal government under Medicaid" and the federal government "does not

prescribe limits on state payments to pharmacies."  Opp. at 13, 18.  Defendants argue that States

will decide whether to abide by the Federal Upper Limits established by the AMP Rule.  *Id.*

Defendants also assert that States will have to amend their State Medicaid Plans and obtain

Defendants' approval before they can implement the new Federal Upper Limits set by the AMP

Rule.  *Id.* at 20.  Defendants further assert that States must submit additional amendments to their

State Medicaid Plans for review and approval by CMS whenever the Federal Upper Limits are

revised in the future.  *Id.*  Defendants argue that Plaintiffs have no standing to bring their claims

until after the States amend their State Medicaid Plans.  *Id.*   As discussed below, none of these

assertions and arguments is true.

> **A.** **Plaintiffs Have Standing Because The AMP Rule Automatically Cuts Reimbursement Rates for Retail Pharmacies.**

The Social Security Act provides that the Defendant Secretary must establish "federal"

upper limits on reimbursement payments for multiple source drugs.  42 U.S.C. § 1396r-8(f)(4).

That statute is the basis for the AMP Rule.

The AMP Rule provides that State Medicaid agencies must submit findings and

assurances that the States abide by the Federal Upper Limits and comply with the other

reimbursement provisions of the AMP Rule.  *See* AMP Rule § 447.518(b).  The AMP Rule also

provides that the State Medicaid agencies must not pay pharmacies, in the aggregate, more than

the Federal Upper Limits plus a "reasonable" dispensing fee.  *Id.* at §§ 447.512(a); 447.514(b).[6]

---

[6] The "agency" referred to in these Sections of the AMP Rule is each State Medicaid agency.

Indeed, CMS recognized, in its AMP Rule Preamble, that "States may need to adjust payments to stay below the FUL in the aggregate."  AMP Rule Preamble at 39236; *see also id.* at 39196, 39213-14, 39214-15; 39236 (commenting multiple times on the requirement that State Medicaid reimbursement rates must remain below the Federal Upper Limits in the aggregate).

No decisions or actions by States are necessary before the Federal Upper Limits established by the AMP Rule begin harming retail pharmacies.  Current State Plans, which have already been approved by the Defendants, require that States abide by federal regulations such as the AMP Rule.  In particular, the State Plans already provide that States cannot pay pharmacies more than the aggregate of the Federal Upper Limits established by Defendants.  *See* Attachment 4.19-B to each State Medicaid Plan.

The Federal Upper Limits have existed for many years, and throughout those years they have been revised by Defendants on numerous occasions.  To Plaintiffs' knowledge, Defendants have never required States to submit amendments to their State Medicaid Plans each time the Federal Upper Limits are revised.  Nothing in the statute, the AMP Rule, the Preamble, or any other regulatory pronouncement suggests that States must now submit amendments to their State Medicaid Plans for CMS approval before the Federal Upper Limits established by the AMP Rule may be implemented.

### B.    Plaintiffs Have Standing Pursuant to Previous Case Law.

Though Defendants fail to point it out, they have made these exact same arguments in the past, and their arguments have been rejected "soundly."  In 1989, Plaintiff NACDS filed suit against HHS, challenging another Medicaid pharmacy reimbursement rule that established Federal Upper Limits.  Defendant HHS made essentially the same standing argument as it does in the present case, but this Court rejected that argument and found "that plaintiff [NACDS] has standing in [that] case . . ." *Nat'l Ass'n of Chain Drug Stores, Inc. v. Bowen*, 1989 WL 43948 at

*3-4 (D.D.C., Apr. 12, 1989)(denying HHS's motion to dismiss for lack of standing).  In 2002, Defendant HHS resurrected the same arguments in another lawsuit.  Like the *Bowen* Court, the Court in *Ashley Cty. Med. Ctr. v. Thompson,* 205 F. Supp. 2d 1026 (E.D. Ark. 2002) rejected these arguments in full.  *Id.* at 1047 n. 25 (relying on the *Bowen* decision which "soundly reject[ed]" these arguments).

### C.   Plaintiffs Undisputed Expert, And Defendants Themselves, Substantiate The Injuries To Plaintiffs Caused by the AMP Rule.

There is no question that the AMP Rule will significantly harm retail pharmacies that are Plaintiffs' members.  Defendants concluded that the AMP Rule is a "major rule" with an "economically significant effect" because it cuts pharmacy reimbursement by more than $8 billion over five years.  72 Fed. Reg. at 39230-31.  Dr. Schondelmeyer concludes that the AMP Rule will reduce reimbursement for multiple source drugs by over 78 percent.  Schondelmeyer Report at ¶¶ 221-22.  As a result, his expert opinion is that 10,000 to 12,000 retail pharmacies can be expected to close as a result of the AMP Rule.  *Id.* at ¶¶ 226-28.  Dr. Schondelmeyer also concludes that retail pharmacies will be harmed when Defendants post the flawed and misleading AMP data on a public website.  *Id.* at ¶¶ 206-10.  These injuries constitute sufficient "injury in fact" to support standing.

Defendants assert that these injuries are caused by the DRA, not the AMP Rule.  *See* Opp. at 41.  That assertion is made without any economic analysis or support.  In contrast, Dr. Schondelmeyer concludes that the AMP Rule harms retail pharmacies more than the DRA.  For example, because the AMP Rule includes many transactions that should not be included in AMP calculations, Dr. Schondelmeyer opines that the AMP Rule will significantly reduce reimbursement rates for retail pharmacies in an amount greater than that contemplated by the DRA.  *Id.* at ¶¶ 217, 218.  Dr. Schondelmeyer concludes that:

> the reduction in pharmacy payments resulting from the [AMP] final rule is
> expected to have a substantial incremental impact on cuts in pharmacy payments
> above and beyond the cuts that would have been expected had CMS used the
> plain language or pharmaceutical market definitions of the "retail pharmacy class
> of trade" rather than their own greatly expanded interpretation of the statutes.

*Id.* at ¶ 234.

Defendants do not rebut Dr. Schondelmeyer's conclusion. Therefore, the Court should accept

Dr. Schondelmeyer's Report and opinions.

### D. Defendants' "Prudential" Standing Argument Lacks Merit.

Defendants' prudential standing argument appears to be based on a claim that Congress

intended the DRA to cut reimbursement rates to pharmacies and, therefore, Plaintiffs cannot

complain. *See* Opp. at 17-19. Plaintiffs recognize the DRA will cut reimbursement rates. Those

reductions, however, would have been much less had Defendants complied with the plain

language of the statute. As Dr. Schondelmeyer explains in his Report, the pharmaceutical

industry has statutory impediments to free trade. *See* Schondelmeyer Report, ¶¶ 51-54. These

impediments prevent certain classes of trade, such as retail pharmacists, from taking advantage

of lower pricing available to purchasers in other classes of trade, such as hospitals, physicians,

clinics, or mail order pharmacies. *Id.* at 51-54, 233. Inclusion of prices paid by these other

entities artificially decreases AMP, and thus artificially reduces reimbursement rates for the retail

pharmacies that are Plaintiffs' members. *Id.* at 234.

It is not sufficient for Defendants to say that the cuts are the result of the DRA. As Dr.

Schondelmeyer points out, and Defendants never rebut, the cuts implemented by the AMP Rule

are greater than those contemplated by the DRA because the transactions included in the AMP

Rule greatly exceed those that would be included if Defendants complied with the statutory

definition of AMP. *See Id.* ¶¶ 217, 218, 234.

### E.     Plaintiffs' Claims are Ripe for Adjudication.

In like manner, Defendants' argument that Plaintiffs' claims are not ripe fails.  This argument also rests on the position that Defendants will not be harmed unless and until States amend their State Plans.  *See* Opp. at  20.  As demonstrated above, and in Plaintiffs' Opposition to Defendants' Emergency Motion, there is no requirement that States amend their State Medicaid Plans prior to implementing the new Federal Upper Limits set by the AMP Rule. Moreover, States must not pay more in the aggregate than the Federal Upper Limits set pursuant to the AMP Rule.  *See* AMP Rule §§447.514(b), 447.518.  The Defendants' own economic assessment states that the impact of the AMP Rule will be significant to retail pharmacies.  *See* 72 Fed. Reg. at 39230-32.  Finally, the Schondelmeyer Report, to which Defendants make no reference and do not attempt to counter, demonstrates that 10,000 to 12,000 retail pharmacies will go out of business if the AMP Rule is implemented as currently contemplated by Defendants.  *See* Schondelmeyer Report, ¶226.

## III.     Defendants' Errors Illustrate Why Deference To Their "Expertise" Is Unwarranted.

Defendants argue that the Court should defer to their agency "expertise" in the Medicaid program.  *See* Opp. at 11, 32.  Defendants should exhibit expertise before they demand deference to it.  The major and repeated fundamental errors made by Defendants described in Plaintiffs' Opposition to Defendants' Motion to Extend Briefing and Hearing Schedule Regarding Plaintiffs' Motion for Preliminary Injunction, which involve basic elements of the Medicaid program and the method of establishing Medicaid reimbursement rates, do not exhibit expertise. To the contrary, the mistakes in Defendants' Opposition reflect a fundamental misunderstanding of the Medicaid program and the roles of the federal and State governments in setting Medicaid reimbursement rates.  Moreover, Defendants cannot claim the factual errors contained in their

Opposition resulted from a misunderstanding by their lawyers.  Defendants make clear it was

CMS's error.

> After consulting with CMS, CMS informed defense counsel that
> despite the agency's prior statements, it was in fact not the case
> that before any state could reduce payments in response to the new
> FULs, the state would be required to submit to the Secretary for
> approval a State Plan amendment altering the states' payment
> methodology.

Defendants' Motion for Leave to Amend Their Opposition to Plaintiffs' Motion for Preliminary

Injunction and Expedited Hearing, p. 1.  These fundamental errors strongly caution against

granting Defendants substantial, if any, deference in this case.

## IV.    Many Transactions Included In The Calculation Of Average Manufacturer Price Under The AMP Rule Fail To Conform To The Statute.

Plaintiffs assert that the AMP Rule violates the plain meaning of the Social Security Act,

and is arbitrary and capricious, because the AMP Rule includes many sales transactions that are

not "prices paid to manufacturers" by "wholesalers" for "covered outpatient drugs" that are

distributed to the "retail pharmacy class of trade."  *See* 42 U.S.C. §1396r-8(k)(1) (statutory

definition of AMP).  As examples, Plaintiffs submit that prices paid by physicians, patients,

dialysis centers, hospitals, surgical centers, home health providers and many other individuals

and entities are not prices paid by "wholesalers" for drugs distributed to "retail pharmacies."

Defendants do not deny that the AMP Rule treats physicians, clinics, ambulatory care

centers, and many other disparate individuals and entities as "wholesalers" and "retail

pharmacies."  *See* Opp. at 20-33.  Instead, Defendants' appear to believe that the mandate in the

DRA requiring Defendants to issue regulations "clarifying" the methods of calculating AMP

gives Defendants free reign to issue almost any regulatory provisions they please.  *See id*. at 20.

Defendants cite this DRA mandate as proof that the statutory definition of AMP is ambiguous,

and agree that the Court must defer to their resulting regulations, even if the regulations include

patently absurd conclusions such that, for example, physicians are "wholesalers" and "retail pharmacies," or that rebates and fees paid by manufacturers are "prices paid to manufacturers." Defendants appear to claim that they are free to consider anyone and everyone to be a "wholesaler" or a "retail pharmacy", and they are free to consider any payment by manufacturers to be prices "paid to manufacturers."  In short, Defendants appear to take a 'because we say so' approach to implementing the Social Security Act's statutory definition of AMP.

A.    **Defendants' Prior Guidance, Not The Plain Language Of The Statute, Is the Reason Congress Required Defendants To Issue "Clarifying" Regulations.**

Defendants' reliance on the DRA's mandate to issue "clarifying" regulations is a fundamental error.  Congress did not require Defendants to issue "clarifying" regulations because the statute is unclear.  The Schondelmeyer Report and common sense convincingly demonstrate that the statutory definition of AMP uses clear and plain language that is consistent with both the common understanding and the longstanding industry usage of terms such as "wholesaler" and "retail pharmacy."  Rather, Congress ordered the Defendants to issue clarifying regulations because the Defendants' prior agency guidance and oversight was unclear and contradictory, and because Defendants' existing rules were not consistent with the statutory changes made by the DRA.

Defendants cannot deny that their own guidance and oversight regarding AMP has been unclear, inconsistent, and in fact contradictory, for many years.  The OIG and GAO reports attached as exhibits to Defendants' Opposition demonstrate a consistent pattern, over many years, of Defendants' failure to issue clear guidance and failure to enforce the statutory standards regarding AMP.

For example, the title of the 2005 GAO statement dramatically illustrates that "inadequate oversight" by Defendants is the real problem, not the statute.  *See Medicaid Drug*

*Rebate Program:  Inadequate Oversight Raises Concerns About Rebates Paid to States,*

Testimony before the Subcommittee on Health, Committee on Energy and Commerce, House of

Representatives, GAO-05-850T, June 22, 2005 (Statement of Kathleen King, Director Health

Care) (the "GAO Report")**,** attached to Defendants' Opposition as Exhibit C.  Virtually every

page of the GAO Report repeatedly faults Defendant CMS for failing to issue "clear" guidance

on AMP, and recommends that CMS issue "clear, updated guidance."  *See, e.g., id.* at 3 (stating

review of calculation of AMP hampered by "unclear CMS guidance on how manufacturers are to

determine AMP").  CMS itself admits that its own program releases, not the statute, caused

confusion regarding the proper treatment of pharmacy benefit managers.  *Id*. at 14.

The other OIG and GAO reports cited by Defendants similarly indicate that Defendants,

not Congress, were and remain the source of the confusion and ambiguity.  For example, in

1992, the HHS OIG issued a report finding that manufacturers' calculations of AMP were

"inconsistent."  *Medicaid Drug Rebates:  The Health Care Financing Administration Needs to*

*Provide Additional Guidance to Drug Manufacturers to Better Implement the Program*, HHS,

Office of OIG, A-06-91-00092 (Nov. 1992), p. 1 (attached as Exhibit B to Defendants'

Opposition) ("OIG Report").  In response, CMS (then known as HCFA) stated that the "drug

rebate law and the rebate agreement" were clear as to how to calculate AMP.  *Id.* at 13.

Defendants fail to explain how a law, clear in 1992, and which has not changed, is now unclear

in 2007.  The answer to this question is clear:  It suits Defendants' purposes to now claim the

statute is ambiguous.

Moreover, confusion was created by CMS's lack of consistency with other agencies of

HHS regarding the definition of "retail pharmacy" and "wholesaler."  CMS's definition of "retail

pharmacy" conflicts with the definition taken by the OIG.  *See, e.g.,* OIG Report at 10 ("In the

11

absence of guidance from CMS, OIG defined retail pharmacy class of trade for this audit to include only independent and chain pharmacies that sold drugs directly to the public.  Therefore, OIG recommended that CMS ask the manufacturer to exclude from the calculation of AMP transactions that OIG determined were to nonretail entities such as mail-order pharmacies, nursing home pharmacies, independent practice associations, and clinics.")

Defendants' definition of "retail pharmacy" is completely contradicted by the definition of that same term in their Medicare rules.  42 CFR § 423.100.  Similarly, CMS's definition of "wholesaler" has long conflicted, and continues to conflict, with the definition of the Health Resources Services Administration ("HRSA") of  HHS which defines "wholesaler," as used in the definition of AMP, to include only licensed wholesalers.  *See* Pharmaceutical Pricing Agreement Between The Secretary of HHS and The Manufacturer (available at ftp://ftp.hrsa.gov/bphc/pdf/opa/pricingagreement.pdf ; copy attached to original brief as Exhibit E) (defining "wholesaler" for purposes of AMP as an entity "having a wholesale distributor's license . . . ").[7]

Defendants acknowledge that the AMP Rule's definition of "wholesaler" is substantively different from their HRSA definition of "wholesaler."  They respond that *Chevron* allows them to adopt different definitions of the same term when those definitions are used "in different contexts."  Opp. at 27.  However, in the present situation the contexts for these conflicting definitions of "wholesaler" are identical.  Both the AMP Rule and HRSA are applying

---

[7] Similarly, HHS adopts this same definition of "wholesaler" in its AIDS Drug Assistance Program  ("ADAP").  The ADAP program, which like the Medicaid program receives rebates from drug manufacturers based on AMP, defines "wholesaler" to include only entities "having a wholesale distributor's license, to which a manufacturer sells the covered outpatient drug…."  *See* ADAP Manual (2003 Version), available at http://hab.hrsa.gov/tools/adap/adapSecIChap1.htm.

"wholesaler" in the context of collecting rebates from drug manufacturers under the exact same statutory definition of AMP.[8]

In summary, there is no reason to believe that Congress thought that the long-standing statutory definition of AMP was ambiguous.  On the contrary, there is every reason to believe that Congress knew Defendants' own regulatory guidance needed "clarifying."  Defendants, not the statute, are the source of the confusion.

### B.    A Mandate To Issue "Clarifying" Regulations Is Not A License To Ignore The Requirements Of The Statute.

Even if Congress had intended to give Defendants discretion in issuing regulations, that discretion is not boundless.  Agencies must promulgate regulations that implement, not ignore, statutes.  *See Sierra Club v. EPA*, 129 F.3d 137, 140 (D.C. Cir. 1997); *Atlantic City Elec. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002) (ruling that an agency "cannot rely on one of its own regulations to trump the plain meaning of the statute.")  In *Southern Cal. Edison Co. v. FERC*, the D.C. Circuit rejected an agency's broad claim of authority to interpret the words of a statute beyond their common and normal meaning, in such a way as to ignore the statutory limits placed by Congress.  195 F.3d 17, 24 (D.C. Cir. 1999).  The Court rejected  the agency's claims as an attempt by the agency for "virtually limitless hegemony."  *Id.*   This basic limitation on agency discretion was recently reinforced by the Supreme Court.  *See Massachusetts v. EPA,* ___ U.S. ___, 127 S. Ct. 1438, 1462 (2007) (concluding that when a statute leaves a matter to agency "judgment" that is "not a roving license to ignore the statutory text.")

---

[8]  The fact that HRSA has apparently now issued a letter instructing manufacturers to use AMP as reported to CMS is irrelevant.  First, that letter does not alter the HRSA definition of "wholesaler" currently in place.  Second, the letter was issued prior to the promulgation of the AMP Rule and, therefore, could not have been a reasoned analysis based on the AMP Rule.  *See* Exhibit E to Defendants' Opposition.

Defendants' argument that they have traditionally included certain transactions in the calculation of AMP via the rebate agreement is irrelevant under *Chevron* Step I. As demonstrated in NACDS and NCPA's opening memorandum, and never rebutted by Defendants, under *Chevron* Step I, the agency receives no deference. *Chevron,* 467 U.S. at 843. If the rules promulgated by the agency do not conform to the plain meaning of the statute, the agency's past actions do not confer legitimacy on the agency's rule. *Atlantic City Elec.*, 295 F.3d at 11.

Even assuming that the AMP Rule can withstand a *Chevron* Step I analysis, which it cannot, under *Chevron* Step II, the definitions of "wholesaler," "retail pharmacy class of trade," and other terms must be rational. *See Strickland v. Comm.'r Me. Dep't of Human Servs.,* 48 F.3d 12, 17-18 (1st Cir. 1995); *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 405 (D.C. Cir. 1994) (noting that while agency may be entitled to deference it must supply a reasoned rational basis for its decision.) It is not rational to disregard federal and State statutes, Congress' clear intent, and the Defendants' own prior application to statutory language, longstanding industry practice, and common sense.

Moreover, Defendants admit that they have received over 1,600 comments on the proposed AMP rules. To Plaintiffs' knowledge, not one of those comments supported Defendants' definitions of "wholesaler" or "retail pharmacy class of trade." Ignoring the comments of all stakeholders is not "rational."

Finally, Defendants' suggestion that they can include certain transactions in the calculation of AMP simply because of a "determination" that Defendants made that they should be included, is arbitrary and capricious. *See*, *e.g.*, Opp. at 29. An agency must provide a *reasoned* basis for its decision-making. *See Leather Indus. of Am.,* 40 F.3d at 405. Failure to do so will vitiate its action under the APA. *Id.* A reasoned decision means providing an analytical

basis for that decision.  *Id.*  Simply stating in either the Opposition brief or the AMP Rule that CMS "considered" the comments does not provide a reasoned analysis.  An agency is required to provide definitive reasons as to why it rejected certain positions.  CMS utterly fails to do this.

Courts have rejected exactly these types of simplistic agency reasoning.  For example, in *Action on Smoking and Health v. Civil Aeronautics Bd.*, the D.C. Circuit rejected the explanation that the agency "considered" alternatives, when no evidence existed that any consideration had actually been given.  699 F.2d 1209, 1217 (D.C. Cir. 1983); *see also, International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 817-18 (D.C. Cir. 1983).

### C.     Defendants Do Not Adequately Address The Inclusion of Particular Transactions In AMP Calculations.

Defendants must recognize the lack of support for certain of their arguments.  For example, Defendants claim that they "defined the term wholesaler to encompass" the distributors that help manufacturers make "direct sales to patients".  Opp. at 30.  This is not true.  The AMP Rule defines "wholesaler" as an entity "to which the manufacturer sells the covered outpatient drugs . . . ."  AMP Rule § 447.504(f).  In contrast, Defendants acknowledge that the distributors involved in these "direct sales to patients" do not purchase the drugs from manufacturers.  *See* 72 Fed. Reg. at 39172; Opp. at 29.

With regard to sales to medical outpatient facilities, Defendants argue that "CMS clarified that sales to these centers should be included in the AMP calculation because they provide drugs to the general public and therefore function like a retail pharmacy."  Opp. at 29, 30 (also applying this same argument to physicians, hospitals, pharmacies, clinics, affiliated entities, infusion providers, home health providers and specialty pharmacies); *see id.* at 30 (stating but failing to distinguish how some of these entities serve the "general public" even if not the "entire

public").  In fact, medical outpatient facilities and several other CMS-included entities do not

serve the general public as demonstrated by the Schondelmeyer Report:

> The general public cannot obtain prescription drugs from these entities.  Sale of
> drugs provided at the lower prices for these classes of trade is limited to patients
> who meet the "own use" criteria for the facility – that is, the patient is one who is
> being treated by providers affiliated with the facility.  A person from the general
> public being treated by a provider not affiliated with the entity is not allowed to
> receive drugs from these facilities.  Consequently, these entities do not serve the
> "general public," but rather only those persons being treated by providers
> affiliated with the facility.

See Schondelmeyer Report, ¶ 135; see also id. at ¶¶ 135-36 (making the same assessment for

hospitals, pharmacies, clinics, and affiliated entities).  Defendants offer no basis to define these

same entities as wholesalers.

Moreover, the statute says manufacturers are not wholesalers, see Prelim. Inj. Memo at

21, to which Defendants respond, basically, unless they act as one.  See Opp. at 30 (failing to

identify any such exception in the law).  Further, mail order pharmacies are not part of the retail

pharmacy class of trade because they do not serve the general public, see Prelim. Inj. Memo at

24, regardless of Defendants' unsubstantiated position otherwise.  See Opp. at 31.

Finally, Defendants' argument that the AMP Rule contains an express exclusion for sales

of drugs distributed in the "non-retail pharmacy class of trade" does not ameliorate the defects in

the AMP Rule.  Opp. at 29.  The AMP Rule does not require any manufacturer to follow the

requirements of 42 C.F.R. § 447.504(h)(13).  Instead, the AMP Rule requires that manufacturers

must include all sales in AMP calculations – even sales of drugs that are distributed to the non-

retail class of trade – unless the manufacturers can prove with "adequate documentation" that the

drugs were distributed to the non-retail pharmacy class of trade.  AMP Rule § 447.504(g)(1).  In

other words, the AMP Rule provides that manufacturers must include in AMP calculations sales

of drugs distributed to the non-retail pharmacy class of trade, so long as the manufacturer closes

its eyes and does not collect documentation proving that the drugs were distributed to the non-retail class of trade.  There is no requirement for manufacturers to collect or maintain that adequate documentation.  As Defendants themselves recognize, manufacturers have a vested interest in including lower priced transactions in the calculation of AMP so that they can reduce the rebates the manufacturers pay.  *See* 72 Fed. Reg. at 39146; Opp. at 28; *see also* Schondelmeyer Report, ¶¶ 197-199.  Therefore, it is inevitable that numerous transactions having nothing to do with the retail pharmacy class of trade will be included in the AMPs calculated by manufacturers.  Defendants never address this fact.

Defendants appear to agree with Plaintiffs' position that at least some transactions included in the AMP Rule should not be included because they are not transactions involving "covered outpatient drugs."  Opp. at 33.  Defendants explicitly recognize that the Medicaid statute excludes from the definition of "covered outpatient drugs" any drug that is "provided as part of, or incident to and in the same setting as . . . physician services, outpatient hospital services, . . . or renal dialysis."  *Id.*; *see also* 42 U.S.C. § 1396r-8(k)(3).  Despite this plain statutory language, Defendants include *all* sales to physicians, outpatient hospital facilities and renal dialysis centers in the calculation of AMP.  Because Defendants now appear to agree that at least some of those drug sales should not be included in the calculation of AMP, that in and of itself, is a reason to enjoin the AMP Rule.

## V.    Defendants' Definition Of "Multiple Source Drug" Is Not Consistent With The Social Security Act.

The AMP Rule purports to establish Federal Upper Limits for multiple source drugs, but the Defendants fail to follow the statutory definition of "multiple source drug."  The statute provides that a drug qualifies as a multiple source drug only if it is "sold or marketed in the State…"  42 U.S.C. § 1396r-8(k)(7).  A drug is not "sold or marketed in the State" unless it (1)

17

"appears in a published national listing of average wholesale prices selected by the Secretary",
and (2) "is generally available to the public through retail pharmacies in that state."  *Id.*

Defendants initially assert that this claim is not ripe and that Plaintiffs lack standing to
assert it.  As discussed previously, these arguments are baseless.  In addition, Defendants'
assertion that Plaintiffs failed to establish any injury resulting from the AMP Rule's improper
definition of "multiple source drug" totally disregards the Schondelmeyer Report, which directly
and convincingly addresses this issue.  *See* Schondelmeyer Report, ¶¶ 200-205.  Defendants have
not provided any expert report or other evidence to refute Dr. Schondelmeyer's conclusions, and
his opinions may not simply be rejected.  *McNeil*, 434 F.2d at 515.[9]

Defendants ignore the "published national listing" requirement in their Opposition, just as
they ignore it in the AMP Rule.  Defendants do not deny that the statute requires a "published
national listing," nor do they deny that the AMP Rule does not comply with this statutory
requirement.  Opp. at 35-36.  Instead, Defendants simply ignore this statutory requirement.  For
20 years Defendants recognized the importance of this requirement, but now they consciously
decide to ignore it.  *See* Prelim. Inj. Memo. at 31-32.  Defendants cannot simply ignore a
statutory provision.  This action alone justifies an injunction against the AMP Rule.

For decades, Defendants and Congress repeatedly recognized the importance of State-
availability when applying upper limits on reimbursement for "multiple source drugs."  *See*
Prelim. Inj. Memo. at 32-35.   Now, Defendants argue that "in the United States" means the same
as "in the State" and "in that State."  Opp. at 36-37.  However, "in the United States" is not the

---

[9] Defendants also suggest that "this issue was not raised for public comment, suggesting possible
administrative waiver."  Opp. at 35 n. 9.  This is not true.  Defendants' own Preamble mentions relevant
comments.  *See* 72 Fed. Reg. 39215-16.  The National Association of State Medicaid Directors submitted
comments that are directly on point, questioning Defendants' failure to apply a State-based approach.  *See*
Prelim. Inj. Memo. at 35-36.

language Congress used.  Defendants cannot simply alter it for their convenience or because they believe it is better policy.  *See MCI Telecomms. Corp. v. AT & T Co.,* 512 U.S. 218, 234 (1994) ("estimations . . . of desirable policy cannot alter the meaning" of federal statutes).

Defendants claim that a statutory "conflict" exists because AMPs are calculated based on prices paid to manufacturers "in the United States" (as opposed to foreign prices).  *See* Opp. at 36.  No statutory conflict exists.  The issue is whether a drug qualifies as a multiple source drug, not how an AMP is calculated.  AMPs are calculated for all covered outpatient drugs (brands and generics), not just for multiple source drugs.  42 U.S.C. §1396r-8(b)(3)(A).

Finally, Defendants misconstrue Plaintiffs' argument when they assert that applying the State-availability requirement would result in "50 different FULs…."  Opp. at 37.  Defendants can create a single set of Federal Upper Limits.  The precise issue is whether a particular Federal Upper Limit will apply in a particular State.  If a drug product qualifies as a multiple source drug in a State, the Federal Upper Limit for that drug will apply in that State.  Otherwise, a Federal Upper Limit will not apply to that drug in that State.  Either way, only one set of Federal Upper Limits is necessary.

## VI.    The AMP Rule Improperly Applies Federal Upper Limits to Non-Equivalent Drugs.

All of the relevant statutory provisions discuss only therapeutically "equivalent" drug products.  Only "equivalent" drug products are mentioned in the definition of "multiple source drugs."  42 U.S.C. § 1396 r-8(k)(7).  Only "equivalent" drugs are mentioned in the provision that requires the Secretary to establish Federal Upper Limits.  42 U.S.C. § 1396 r-8(e)(4).  Therefore, Plaintiffs argue that Congress intended Federal Upper Limits to apply only to "equivalent" multiple source drugs.  *See* Prelim. Inj. Memo. at 36-39.

Despite Congress' focus on "equivalent" multiple source drugs, Defendants wish to apply Federal Upper Limits to non-equivalent drugs.  Defendants point out that they have done so for

years.  *See* Opp. at 36-37.  But long-term noncompliance with a statute is not justification for

continued noncompliance.

Defendants justify their approach for policy reasons.  *See id.*  Policy reasons are not a

legitimate basis for ignoring a statute.  *See MCI Telecomms. Corp. v. AT & T Co.,* 512 U.S. 218,

234 (1994) ("estimations . . . of desirable policy cannot alter the meaning" of federal statutes).

In any event, Defendants' policy at best involves "discouraging … behavior" that is already

illegal under State statutory and common laws.  *See* Prelim. Inj. Memo. at 39.

## VII.    NACDS and NCPA Have Demonstrated Irreparable Harm.

Plaintiffs have established irreparable harm through the uncontroverted Schondelmeyer

Report which documents the pharmacy closings and non-recoverable economic loss to

pharmacies under the AMP Rule.  *See* Prelim. Inj. Memo at 38-40.  Defendants attempt to

challenge Plaintiffs irreparable harm claim by using the same argument that they used to

challenge Plaintiffs' standing.  *See* Opp. at 40.  As discussed above, that argument must fail.

Defendants also allege that the only harm shown by Plaintiffs stems from the DRA itself,

not the AMP Rule.  *See* Opp. at 41.  Defendants have not challenged the conclusions in the

Schondelmeyer Report that retail pharmacies risk irreparable harm if the AMP Rule goes into

effect as currently drafted.  *See* Schondelmeyer Report, ¶ 234.  In fact, Defendants concede that

the Schondelmeyer Report can be used for the purposes of showing irreparable harm in this case.

*See* Defendants' Opposition to Plaintiffs' Motion to Supplement Administrative Record, filed

November 29, 2007, at 4.  Dr. Schondelmeyer specifically opines that the AMP Rule, because it

includes many transactions that do not properly fall within the common understanding of the

words used in the definition of "average manufacturing price," will significantly reduce

reimbursement rates for retail pharmacies in an amount greater than that contemplated by the

DRA.  *See* Schondelmeyer Report, ¶¶ 217, 218, 234.  Defendants do not rebut this opinion.

Therefore, the Court should accept Dr. Schondelmeyer's Report and opinion. Moreover, as described above, CMS, in its economic analysis of the impact of the AMP Rule, describes the "significant" economic impact the AMP Rule will have on retail pharmacies. AMP Rule Preamble at 39231.

In addition, Defendants do not rebut Dr. Schondelmeyer's opinion that posting misleading AMP data on a website will cause irreparable harm to retail pharmacies, as well as consumers and third party payers. *See* Prelim. Inj. Motion at 28-29.

Finally, contrary to Defendants' assertions, *see* Opp. at 41-42, it is clear what Plaintiffs seek to gain by a preliminary injunction. Plaintiffs seek to halt unlawful agency action. This hardly constitutes a request for the Court to come up with its own AMP Rule. *See* Opp. at 42. Rather, if this Court chooses to remand the AMP rule to the agency to be properly promulgated in accordance with the statute, Defendants respectfully request that the Court provide guidance to Defendants regarding the statutory requirements.

## VIII. Plaintiffs Have Not Improperly Delayed.

Defendants repeatedly claim that Plaintiff's claims are not ripe and that Plaintiffs must wait before asserting their claims. *See* Opp. at . 19-20. Ironically, Defendants also assert that Plaintiffs engaged in "inexcusable delay" by waiting too long to file their claims. *See id.* at 42-44.

As stated in Plaintiffs' opening memorandum, Plaintiffs sought a legislative solution to this problem from the very beginning. *See* Prelim. Inj. Memo at 6, n.2. It was not until CMS changed its publication date for the AMP website, from some time in January 2008 to some time in December 2007, that Plaintiffs felt that they had no choice but to file this action. This type of "good explanation" justifies the timing of Plaintiffs' filing. *See Advanced Commun. Design, Inc. v. Premier Retail Networks, Inc.*, 46 Fed. Appx. 964, 984 (Fed. Cir. 2002).

Plaintiffs believe litigation should be a last resort. In contrast, Defendants seem to argue that a potential plaintiff should rush into court to seek a preliminary injunction or temporary restraining order at the first possible instant, without first seeking to resolve the issue with the agency or legislatively. Adopting the Defendants' position would only punish Plaintiffs for first seeking to avoid litigation and resolve this problem by other means. Potential litigants should not be required to litigate first and seek legislation later.

**IX.    A Preliminary Injunction Helps, Not Harms, the Public Interest.**

Plaintiffs make a clear showing that public interest and lack of harm to Defendants supports their motion. *See* Prelim. Inj. Memo at 40-43. In response, Defendants assert that because the Medicaid program is suffering financial hardship, pharmacists should not prevail. *See* Opp. at 44-45. In making this argument, Defendants imply that even if cuts are imposed on pharmacies pursuant to an illegal AMP Rule, pharmacies must suffer because the program is struggling. Apparently, because the AMP Rule is meant to generate cost savings to the government, its legality is irrelevant. Not surprisingly, Defendants offer no legal support for their position.

Lastly, Defendants offer no factual or expert contradiction to the Schondelmeyer Report which supports Plaintiffs' position that posting the AMP data generated under the AMP Rule will be misleading and confusing to the public. *Compare* Opp. at 45 *with* Schondelmeyer Report, ¶¶ 206-10.

**X.    Conclusion.**

For all of these reasons and those identified in the opening memorandum of NACDS and

NCPA, this Court should grant the motion for preliminary injunction.

Respectfully submitted,

/s/ Don L. Bell, II
Don L. Bell, II
General Counsel
D.C. Bar No. 443149
Mary Ellen Kleiman
Associate General Counsel
DC Bar No. 458400
National Association of Chain Drug Stores
413 North Lee Street
Alexandria, VA 22313-1480
P: 703-549-3001
F: 703-684-6747
Email:  DBell@nacds.org

/s/ Christopher W. Mahoney
Christopher W. Mahoney
D.C. Bar No. 394416
Duane Morris LLP
1667 K Street, N.W.
Suite 700
Washington, DC 20006-1608
(202) 776-7867 (telephone)
(202) 776-7801 (fax)
Email:  CMahoney@duanemorris.com

/s/ John M. Rector
John M. Rector
General Counsel
National Community Pharmacists Association
100 Daingerfield Road
Alexandria, VA  22314-2885
P:  703-683-8200
F:  703-683-3619
Email:  john.rector@ncpanet.org

/s/ Frederick R. Ball
Nicholas J. Lynn
Frederick R. Ball
Duane Morris LLP
227 West Monroe Street
Suite 3400
Chicago, Illinois 60606
(312) 499-6700 (telephone)
(312) 499-6701 (fax)
Email:  NJLynn@duanemorris.com
Email:  FRBall@duanemorris.com

Attorneys for National Association Of Chain
Drug Stores And National Community
Pharmacists Association

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of December, 2007, true copies of the foregoing

Reply In Support Of Motion For Preliminary Injunction were served via e-mail and via ECF

service on the following:

Wendy M. Ertmer
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

/s/ Frederick R. Ball
Frederick R. Ball

DM1\1250387.2

24