**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF CHAIN | ) | |
| DRUG STORES *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:07cv02017 (RCL) |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, SECRETARY OF | ) | |
| HEALTH AND HUMAN SERVICES *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**DEFENDANTS' AMENDED OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED HEARING[1]**
_____

---

[1] All exhibits referenced in this memorandum are the same as those filed on December 6, 2007, with Document 23, and are therefore not re-attached to this Amended Opposition.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

   I.    THE MEDICAID PAYMENT FRAMEWORK PRIOR TO THE DEFICIT
       REDUCTION ACT OF 2005 ....................................................................... 3

   II.   THE DEFICIT REDUCTION ACT OF 2005 ................................................ 6

ARGUMENT....................................................................................................................... 9

   I.    LEGAL STANDARDS .................................................................................. 9

       A.   Preliminary Injunction Standard ......................................................... 9

       B.   Standard of Review of Agency Action ................................................. 9

   II.   PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS. ............... 11

       A.   The AMP Definition Is Consistent with the DRA............................... 11

            1.    *"Price Paid to the Manufacturer"* ..................................... 12

            2.    *Definition of "Wholesaler"* ............................................. 16

            3.    *Definition of "Retail Pharmacy Class of Trade"* ............................. 18

            4.    *"Covered Outpatient Drugs"* ......................................... 23

       B.   The CMS Definition of "Multiple Source Drug" Is Consistent With the DRA..... 24

       C.   The Final Rule Properly Applies Federal Upper Limits to All Formulations of a
          Multiple Source Drug............................................................. 27

   III.  THERE IS NO IMMINENT THREAT OF IRREPARABLE INJURY TO
       PLAINTIFFS IN THE ABSENCE OF THE REQUESTED INJUNCTION.................. 29

       A.   The "Irreparable Harm" Plaintiffs Have Alleged Is the Result Not of the AMP
          Rule but of the DRA Itself. ............................................................. 30

       B.   Plaintiffs' Inexcusable Delay Proves That Any Harm They Might Suffer Is Not
          "Irreparable."..................................................................... 31

   IV.  A PRELIMINARY INJUNCTION WOULD SUBSTANTIALLY INJURE OTHER
       INTERESTED PARTIES, INCLUDING MEDICAID BENEFICIARIES, AND IS
       ADVERSE TO THE PUBLIC INTEREST ................................................. 33

# <u>TABLE OF AUTHORITIES</u>

## Federal Cases

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)...........................................................25

*Am. Coastal Line Joint Venture, Inc. v. U.S. Lines, Inc.*, 580 F. Supp. 932 (D.D.C. 1983)......................29

*Arent v. Shalala*, 70 F.3d 610 (D.C. Cir. 1995) ............................................................9

*Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236 (D.D.C. 2001) ...............................................9

*Biovail Corp. v. U.S. Food & Drug Admin.*, -- F. Supp. 2d --, 2007 WL 891365 (D.D.C. Mar. 22, 2007) ........................................................................................31

*Califano v. Sanders*, 430 U.S. 99 (1977)....................................................................25

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ...............................29

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)...............................9,10,17

*County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999)............................................31

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969).........................................................33

*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975)................................................32

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993) ......................................................10

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005).......................................................11

*Katz v. Georgetown Univ.*, 246 F.3d 685 (D.C. Cir. 2001)....................................................9,11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)........................................................24

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)..................................................................9

*Motor Vehicles Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...........................10

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000).............................................32

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ......................................14

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) .........................................................32

*Pharm. Research & Mfrs. Ass'n of Am. v. Thompson*, 259 F. Supp. 2d 39 (D.D.C. 2003).........................34

*Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081 (10th Cir. 2003).................................29

*Schweiker v. Gray Panthers*, 453 U.S. 34 (1981) ..................................................................... 11

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952)............................................ 25

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................................... 10

*Wash. Area Metro. Transit Comm'n v. Holiday Tours*, 559 F.2d 841 (D.C. Cir. 1977)............................ 9

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ........................... 29,30

**Federal Statutes**

5 U.S.C. § 706.................................................................................................................... 10

42 U.S.C. § 1396................................................................................................................. 3

42 U.S.C. § 1396a.............................................................................................................. 3,4

42 U.S.C. § 1396b................................................................................................................ 4

42 U.S.C. § 1396c................................................................................................................ 3

42 U.S.C. § 1396r-8(a)........................................................................................................ 5

42 U.S.C. § 1396r-8(b)................................................................................................. passim

42 U.S.C. § 1396r-8(c)........................................................................................................ 5

42 U.S.C. § 1396r-8(e) ........................................................................................... 4,5,26,27,28

42 U.S.C. § 1396r-8(f)....................................................................................................... 27

42 U.S.C. § 1396r-8(k)................................................................................................. passim

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 § 6001 (2006). ...........................passim

**Federal Regulations**

21 C.F.R. § 203.3 ............................................................................................................... 15

42 C.F.R. § 447.502 ........................................................................................................... 26

42 C.F.R. § 447.504 .................................................................................................... passim

42 C.F.R. § 447.514 ........................................................................................................... 4,5

56 Fed. Reg. 7,049-02 (Feb. 21, 1991)..............................................................................13,15,16

72 Fed. Reg. 39,142 (July 17, 2007)..................................................................................passim

**Other Authorities**

H.R. Rep. No. 109-276 (Nov. 7, 2005)...................................................................................... 7,34

S. 1932, 109th Cong. § 6001 (1990).......................................................................................... 13

Statement by George W. Bush Upon Signing S. 1932, *reprinted in* 2006 U.S.C.C.A.N. S3, S5 (Feb. 8, 2006). ..................................................................................................................................... 7

GAO, "Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns About Rebates Paid to States" (June 22, 2005)............................................................................................. 6

GAO, "Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs" (Dec. 22, 2006) .................... 30

HHS, OIG, "Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program" (June 2007) ........................................................................................................ 30

HHS, OIG, "Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005" (May 2006) ...............................................................................passim

HHS, OIG, "Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices" (June 2005) ...................................................................................................................4,6,11

HHS, OIG, "Medicaid Drug Rebates: The Health Care Financing Administration Needs to Provide Additional Guidance to Drug Manufacturers to Better Implement the Program" (Nov. 1992)............ 5

Medicaid Drug Rebate Program Release No. 29 (rev. June 2, 1997)........................................ 22

## INTRODUCTION

In the Deficit Reduction Act of 2005 (DRA), Congress substantially revised the manner in which the Centers for Medicare & Medicaid Services (CMS) calculates the upper limit at which the federal government will pay a portion of states' expenditures for certain Medicaid-covered drugs. Congress did so in part based on a report of the Office of Inspector General (OIG) that the amount state governments had been paying pharmacies for Medicaid-covered drugs far exceeded pharmacies' actual acquisition costs. It has been estimated that this aspect of the DRA will, over the course of the next five years, save the federal government nearly $5 billion in federal financial participation (FFP) provided to the states under the Medicaid program.

In the DRA, Congress also instructed CMS to issue a regulation establishing the manner in which manufacturers should calculate the "average manufacturer price" (AMP) upon which the federal upper payment limit (FUL) for certain drugs would now be based. That final rule, known as the "AMP rule," was published on July 17, 2007, and became effective on October 1, 2007. Manufacturers have already transitioned their sales tracking and data reporting systems to comply with the new rule and have been required to submit their first set of AMP data to CMS pursuant to that rule. The DRA also requires that CMS publish the data on a website accessible to the public. CMS is now processing the first set of AMP data submitted by manufacturers and is preparing to publish those data on or after December 21, 2007.

Four months after the publication of the final regulation and one month after its implementation date, Plaintiffs – two associations representing traditional retail pharmacies – filed this lawsuit and motion for preliminary injunction to stop CMS from continuing to implement the regulation. They claim in principal part that the AMP calculation criteria established by CMS in the July 17, 2007, AMP rule are inconsistent with the statutory definition of AMP, and they claim imminent injury as a result of

CMS's intended publication of AMPs calculated by manufacturers pursuant to the new rule. Plaintiffs have failed to satisfy the criteria for issuance of a preliminary injunction.

Plaintiffs have demonstrated no likelihood of success on the merits. In 1990, Congress established a definition of the term "AMP" that has, in the ensuing seventeen years, resulted in inconsistencies among drug manufacturers required to apply that definition. Because of this inconsistency, in the DRA Congress expressly delegated to the agency the authority to define components of the AMP definition such as "wholesaler" and "retail pharmacy class of trade." The agency exercised this broad delegation of authority in a manner that is consistent with the agency's longstanding interpretations of relevant statutory terminology and with the congressional intent to establish an AMP that reflects an average of actual drug prices so that the federal government does not continue to pay artificial, inflated prices for drugs provided to Medicaid beneficiaries.

Plaintiffs also argue that CMS will, contrary to the Medicaid statute, establish federal upper limits for drugs that do not qualify as "multiple source drugs," as the Medicaid statute requires. But Plaintiffs have failed to demonstrate that this claim is ripe for review, that they have standing to assert it, or that CMS's interpretation of the term "multiple source drug" is inconsistent with the statute. And, although Plaintiffs argue that CMS improperly applies FULs to all formulations of "multiple source drugs," application of FULs to all formulations of multiple source drugs is mandated by the Medicaid statute.

Finally, Plaintiffs' claims of imminent harm are substantially weakened, if not wholly eliminated, by the fact that they waited *four months* after publication of the rule to challenge it. Importantly, Plaintiffs do not challenge the manner in which CMS has *applied* the rule since its effective date on October 1; instead, Plaintiffs have launched a *facial* challenge to the rule. This challenge was just as ripe on July 17 as it is now. Nonetheless, Plaintiffs waited to file this lawsuit until

now and, in so doing, created their own purported emergency. Plaintiffs should not be permitted to benefit from their own inexcusable delay.

Furthermore, Plaintiffs have failed to allege any harm redressible by the relief they seek. Plaintiffs cannot show that AMPs calculated pursuant to the former system, as opposed to the new AMP rule, will result in lower FULs. While Plaintiffs will not be harmed if this Court declines to issue the requested injunction, Defendants, the States, Medicaid beneficiaries, and the taxpaying public, among others, will be harmed by a preliminary injunction that disrupts the status quo by requiring manufacturers to revert their systems back to the former manner of calculating AMPs, by requiring manufacturers to recalculate and resubmit their AMP data pursuant to that former system, by requiring CMS to publish AMPs calculated in an inconsistent manner, and by requiring CMS to calculate and apply federal payment limits using these unreliable data. These harms substantially outweigh the harms Plaintiffs have asserted, which are undermined in any event by their own unreasonable delay.

For these reasons, this Court should deny Plaintiffs' request for a preliminary injunction.

## BACKGROUND

### I.     THE MEDICAID PAYMENT FRAMEWORK PRIOR TO THE DEFICIT REDUCTION ACT OF 2005

Established by the Social Security Act of 1965, Medicaid is a federal/state cooperative program designed to furnish medical assistance to persons "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. The program is administered by the states but jointly financed by the federal and state governments. *See id.* Each state is required to establish a medical assistance plan (known as the "State Plan") that is approved by CMS and which describes, *inter alia*, eligibility standards, the scope of benefits, and payment methodologies of that state's Medicaid program. *Id.* § 1396a(a). CMS reviews the various State Plans and subsequent plan amendments to ensure compliance with federal requirements. *See id.* §§ 1396a(b), 1396c. For

example, the states' payment levels must be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." *Id.* § 1396a(a)(30)(A). Within federal parameters, states set the specific amounts they pay pharmacies and other healthcare providers for Medicaid-covered products and services, and the federal government provides federal financial participation (FFP) to states to cover a portion of those costs. *Id.* § 1396b.

Most states currently pay pharmacies for prescription drugs at the lower of estimated acquisition cost (EAC) plus a dispensing fee or the pharmacy's usual and customary charge to the public. *See* Department of Health and Human Services (HHS), Office of Inspector General (OIG), "Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices" (June 2005) ("June 2005 OIG Report") at 2, attached as Ex. A. CMS does not prescribe a particular method for calculating EAC; instead, each state establishes and specifies its own EAC formula in its State Plan. *Id.* Prior to the DRA, however, states generally lacked access to drug pricing data based on actual sales prices and instead would estimate pharmacy acquisition costs using published prices – *e.g.*, "average wholesale prices" ("AWPs") or "wholesale acquisition costs" ("WACs"). *Id.* Neither AWPs nor WACs are based on *actual* sales data and, in enacting the DRA, Congress recognized that they are unreliable. *See id.*

For certain "multiple source" drugs – *i.e.*, drugs with different formulations of which at least two are therapeutically and pharmaceutically equivalent (loosely referred to as "generics"), 42 U.S.C. § 1396r-8(k)(7)(i) – the Medicaid statute sets aggregate limits on the amount the federal government will pay the states in federal financial participation (FFP). These limits are called "Federal Upper Limits" (FULs). *See id.* § 1396r-8(e)(4), (5); 42 C.F.R. § 447.514(b). Prior to the DRA, the Medicaid statute set the FUL for a multiple source drug at 150 percent of the lowest published price, plus a

reasonable dispensing fee established by the state agency. *See* 42 U.S.C. § 1396r-8(e)(5); 42 C.F.R. §
447.514(b).

Since 1990, for FFP to be made available to the states for coverage of a particular drug, the
manufacturer of that drug must have entered into a "Rebate Agreement" with CMS. 42 U.S.C.
§ 1396r-8(a)(1). Pursuant to the Rebate Agreement, the manufacturer pays a rebate directly to each
state based on all of the manufacturer's drugs paid by that state under the state's Medicaid plan during a
period. *Id.* § 1396r-8(b)(1)(A). Rebate amounts for each drug are calculated based on the "average
manufacturer price" (AMP) for that drug. *Id.* § 1396r-8(c). Prior to the DRA, AMP was defined to
mean:

> [W]ith respect to a covered outpatient drug of a manufacturer for a rebate period, the average
> price paid to the manufacturer for the drug in the United States by wholesalers for drugs
> distributed to the retail pharmacy class of trade, after deducting customary prompt pay
> discounts.

*Id.* § 1396r-8(k)(1) (pre-DRA). Unlike AWPs and WACs, which are highly subjective and unreliable,
AMPs are based on *actual* sales price data. Drug manufacturers must calculate AMPs for each of their
drugs and report them to CMS periodically so that CMS may determine rebate amounts. *Id.* § 1396r-
8(b)(3)(A)(i). Prior to the DRA, any information provided by a manufacturer to CMS for purposes of
calculating the rebate was to remain confidential subject to limited exceptions.

The broad definition of AMP Congress established for purposes of the Medicaid rebate
program has created substantial confusion among manufacturers required to apply that definition. As a
result, significant inconsistencies have existed in the AMP calculation process. *See, e.g.*, HHS, OIG,
"Medicaid Drug Rebates: The Health Care Financing Administration Needs to Provide Additional
Guidance to Drug Manufacturers to Better Implement the Program (Nov. 1992) at 2, attached as Ex. B
("The [OBRA] and rebate agreements defined AMP in very broad terms but did not provide a specific
methodology which ensured uniform and accurate calculations of AMP by the manufacturers. . . .

[T]he AMP definition is subject to considerable interpretation and [CMS] needs to establish specific written policies for computing AMP."); Government Accountability Office (GAO), "Medicaid Drug Rebate Program:  Inadequate Oversight Raises Concerns About Rebates Paid to States" (June 22, 2005) at i, attached as Ex. C ("GAO also found considerable variation in the methods that manufacturers used to determine . . . AMP."); HHS, OIG, "Determining Average Manufacturer Prices for Prescription Drugs Under the [DRA]" (May 2006) ("May 2006 OIG Report") at i, attached as Ex. D ("Existing requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent.").

## II.    THE DEFICIT REDUCTION ACT OF 2005

In June 2005, the OIG reported that "Medicaid expenditures for prescription drugs continue to be a major concern to the Administration, Congress, and States" and that "Congress ha[s] expressed interest in changing Medicaid drug reimbursement to align more closely with pharmacy acquisition cost by using prices based on actual sales rather than the published prices currently used."  Ex. A, June 2005 OIG Report, at 1, 15.  In its report, the OIG evaluated the difference between the published prices upon which the federal government's payment rates had long been based and prices calculated based on actual sales transactions.  *Id.* at 1.  The OIG concluded, in relevant part, that the actual prices for generic drugs were *seventy percent* lower than the published prices for the same drugs.  *Id.* at 11. Because federal upper payment limits to states, and state payments to pharmacies, had been based on these artificial and inflated AWP data, rather than on the AMP data that reflects an average of the actual prices paid to the manufacturer, states were paying pharmacies for generic drugs at rates that far exceeded pharmacies' actual acquisition costs.  *Id.* at 1.  OIG therefore recommended that federal payments to states (FFP) be based on averages of actual sales data (*i.e.*, AMPs) rather than on published price listings (*i.e.*, AWPs).  *Id.*

Congress implemented this recommendation as part of the Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, 120 Stat. 4, § 6001 (2006).  Effective January 1, 2007, the DRA set the FUL at 250 percent of the AMP for the least costly equivalent formulation of the drug, plus a reasonable dispensing fee.  *Id.* § 6001(a)(2), *codified at* 42 U.S.C. § 1396r-8(e)(5).  Congress contemplated substantial savings as a result of this and other changes to the Medicaid program.  A report of the House Committee on the Budget stated that the House version of this DRA, "by limit[ing] payments for outpatient prescription drugs," "would reduce Medicaid spending by $1.9 billion over the 2006 [to] 2010 period and by $7.2 billion over the 2006 [to] 2015 period."  H.R. Rep. No. 109-276 (Nov. 7, 2005).  Those savings would be realized, *inter alia*, "by lowering payments for outpatient prescription drugs."  *Id.*  The Presidential signing statement anticipated that the relevant provision of the DRA would realize federal Medicaid savings of $5 billion over the next five years by "reducing Federal overpayment for prescription drugs."  Statement by President George W. Bush Upon Signing S. 1932, *reprinted in* 2006 U.S.C.C.A.N. S3, S5 (Feb. 8, 2006).  The President noted that "[t]axpayers should not have to pay inflated markups for the medicine that the people on Medicaid depend."  *Id.*

The DRA modified the existing statutory definition of AMP to specifically exclude from its calculation the "customary prompt pay discounts" that had previously been included in AMP calculations.[2]  *See* DRA § 6001(c)(1), *codified at* 42 U.S.C. § 1396r-8(k)(1).  The AMP definition remained essentially the same and reads, in relevant part:

> The term 'average manufacturer price' means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade.

42 U.S.C. § 1396r-8(k)(1)(A).  Because AMPs would now be used not only to set manufacturers' rebate amounts but also to set the federal government's upper payment limits, Congress instructed the

---

[2] This limited change would tend to increase the AMPs when compared to AMPs calculated prior to this modification.

OIG to "review the requirements for, and manner in which, average manufacturer prices are determined under section 1927 of the Social Security Act, as amended by this section" and to "submit to the Secretary of [HHS] and Congress such recommendations for changes in such requirements or manner as the [OIG] determines to be appropriate." DRA § 6001(c)(3)(A). Congress also mandated that the HHS Secretary "promulgate a regulation that clarifies the requirements for, and manner in which, average manufacturer prices are determined under section 1927 of the Social Security Act, taking into consideration the [OIG] recommendations." *Id.* § 6001(c)(3)(B). Thus, Congress explicitly directed the Secretary to clarify the ambiguous statutory definition of AMP through a regulation.

The OIG published its report on May 30, 2006. *See* Ex. D, May 2006 OIG Report. In that report, the OIG concurred that "[e]xisting requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent." *Id.* at 4. On July 17, 2007, after considering the OIG's recommendations, as Congress instructed, issuing a proposed rule, and considering the 1,600 sets of filed public comments, CMS promulgated a final rule detailing the manner in which AMPs will be calculated. 72 Fed. Reg. 39,142, 39,145-46, 39,157 (July 17, 2007).

The DRA also required CMS to provide AMP data to the states on a monthly basis beginning July 1, 2006, 42 U.S.C. § 1396r-8(b)(3)(A)(iii), and to make those data publicly available on a website, *id.* § 1396r-8(b)(3)(D)(v). CMS has been providing AMP data to states since July 1, 2006, 72 Fed. Reg. at 39,143, and will begin publishing AMP data on its website on or after December 21, 2007.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Preliminary Injunction Standard

A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotations omitted).  To prevail in a request for a preliminary injunction, the plaintiff "must demonstrate (1) a substantial likelihood of success on the merits, (2) that [it] would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quotations omitted).  These four factors are evaluated on a sliding scale.  *See Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843-44 (D.C. Cir. 1977).  "It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001).

### B.    Standard of Review of Agency Action

Plaintiffs' challenge to the AMP rule is analyzed under the Administrative Procedure Act (APA) and the standard of review established by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, the central question for the reviewing court "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'"  *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843).  If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S.

at 843.  Where Congress has left a gap for the agency, "the court does not simply impose its own

construction on the statute" and "need not conclude that the agency construction was the only one it

permissibly could have adopted to uphold the construction, or even the reading the court would have

reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 & n.11.  Accordingly,

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the *wisdom* of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, *the challenge must fail*.  In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do.  The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones:  Our Constitution vests such responsibilities in the political branches.

*Id.* at 866 (quotations omitted) (emphases added).  *Chevron* deference is at its highest in the context of

"express congressional authorizations to engage in the process of rulemaking . . . that produces

regulations . . . for which deference is claimed."  *United States v. Mead Corp.*, 533 U.S. 218, 229-30

(2001).

Chevron interprets the review standard set forth in the APA, under which a court may set aside

agency actions, findings, or conclusions only when they are arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and

capricious only if the agency has "relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise."  *Motor Vehicle Mfrs.' Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In applying this standard, a reviewing judge need not agree that

the agency's choice is optimal or even preferable; so long as the decision is rational and has support in

the record, the court may not substitute its own judgment for that of the agency.  *See Good Samaritan*

*Hosp. v. Shalala*, 508 U.S. 402, 418-419 (1993).  "Especially in complex, technical areas, there is a

strong presumption in favor of upholding agency decisions." *Hammond v. Norton*, 370 F. Supp. 2d 226, 238 (D.D.C. 2005).

## II.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.

To obtain a preliminary injunction, Plaintiffs must show, *inter alia*, "a substantial likelihood of success on the merits." *Katz*, 246 F.3d at 687. Plaintiffs have demonstrated no likelihood of success on the merits.

### A.    The AMP Definition Is Consistent with the DRA.

Plaintiffs state: "The statutory definition of AMP is clear and simple. AMP is the average price paid to manufacturers by wholesalers for drugs distributed to retail pharmacies." Pls.' PI Memo. at 9. The definition Plaintiffs call "clear and simple," however, has resulted in repeated recommendations from the GAO and the OIG advising CMS to clarify the calculation criteria for AMPs because manufacturers' calculation criteria were inconsistent. *See, e.g.*, Ex. D, May 2006 OIG Report, at 5 (noting inconsistent treatment of PBMs as part of "retail pharmacy class of trade"); *see also* discussion *supra* Background I. For this reason, Congress mandated that OIG evaluate the manner in which manufacturers calculate AMPs and that CMS issue a regulation clarifying the elements of that calculation. DRA §§ 6001(c)(3)(A), (B). It would have made no sense for Congress to impose a duty to clarify if the statutory terms were "clear and simple," as Plaintiffs claim. In light of this express delegation of authority to fill a gap left by Congress, the agency's interpretation should be accorded substantial deference. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981).

Before addressing the details of Plaintiffs' challenge, that challenge must be placed in context. Plaintiffs' basic argument is that CMS has required the inclusion of too many sales transactions in its AMP calculation. Congress enacted the relevant positions of the DRA, however, for the express purpose of providing an FUL that reflects *actual drug prices*. *See* Ex. A, June 2005 OIG Report, at iii

("Congress ha[s] expressed interest in aligning Medicaid drug reimbursement more closely with pharmacy acquisition cost by using prices based on actual sales rather than published prices."). There is simply no reason to believe that Congress would have intended the AMP, upon which the FUL is based, to exclude pricing data for substantial segments of the retail market for prescription drugs. Furthermore, the AMP is, by definition, intended to represent an *average* price. The AMP-based FULs will apply not only to the limited sales Plaintiffs advocate should be included in the AMP, but to *every* Medicaid-covered sale of that drug in this country. As such, there is no reason to believe that Congress would have intended the AMP, upon which those universal FULs are based, to represent a wholly *unrepresentative* fraction of prescription drug sales. CMS approached its development of the AMP rule – which adopts inclusive definitions of the statutory terms and phrases – with this understanding of congressional intent.

1.    *"Price Paid to the Manufacturer"*

Plaintiffs first object to CMS's interpretation of the phrase "price paid to the manufacturer" to include direct and indirect price discounts provided by the manufacturer. *See* Pls.' PI Memo. at 10-11. In particular, they claim that indirect discounts – *i.e.*, discounts by manufacturers to non-purchasers such as group purchasing organizations ("GPOs") – are improperly included in the AMP calculation. *Id.*

Except for prompt pay discounts (which Congress expressly excluded from the AMP calculation), the statute does not specify to what extent discounts should be included in determining the "price paid to the manufacturer." *See* 42 U.S.C. § 1396r-8(k)(1). Congress did not legislate on a blank slate, however. Congress had, in 1990, broadly defined the term "AMP" for purposes of the manufacturer rebate program. As discussed above, the pre-DRA AMP definition is, in relevant part, identical to the current AMP definition that Plaintiffs challenge. In implementing the manufacturer

rebate program in 1991, CMS drafted the "Rebate Agreement" into which all manufacturers of covered drugs would be required to enter. The Rebate Agreement provides additional direction to manufacturers with respect to calculating the AMPs for their drugs. *See* 56 Fed. Reg. 7,049-02 (Feb. 21, 1991). In relevant part, the Rebate Agreement broadly interprets AMP to include "cash discounts allowed and *all other price reductions* (other than rebates under section 1927 of the Act), which reduce the actual price paid." *Id.* at 7,050 (emphasis added). Under the Rebate Agreement, manufacturers are required to adjust the AMP "if cumulative discounts or other arrangements subsequently adjust the prices actually realized." *Id.* This definition is effectively the same as the principal portion of the rule about which Plaintiffs complain here, which specifies inclusion of "[r]ebates, discounts, or other price concessions (other than rebates under section 1927 of the Act or as otherwise specified in the statute or regulations) associated with sales of drugs provided to the retail pharmacy class of trade." 42 C.F.R. § 447.504(g)(14).

In enacting the DRA, Congress is presumed to have known how CMS had previously treated discounts and rebates for purposes of the statutory AMP definition. Congress extensively considered the definition of AMP when it amended the Medicaid statute with the DRA and determined (with the exception of excluding prompt pay discounts) not to change it but instead to instruct CMS to clarify it. *See, e.g.*, S. 1932, 109th Cong. § 6001(a)(1)(C) (2005) (proposing inclusion of AMP calculation details that were not ultimately adopted). Courts accord great persuasive value to an agency's longstanding interpretation of a statute that has been re-enacted without change to the agency's interpretation:

> [A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974).  Because the agency's broad inclusion of essentially *all price concessions* (with the exception of prompt pay discounts) in the AMP calculation is consistent with longstanding agency practice and was unchanged by the DRA, this Court should accord great weight to the agency's interpretation.

Plaintiffs complain in particular of the following rebates and discounts that CMS determined should be included in the AMP calculation.  None of Plaintiffs' complaints has merit.

(1) *Rebates to pharmacy benefit managers ("PBMs").*[3]  Plaintiffs complain that rebates paid to PBMs are not part of the price paid to the manufacturer because rebates are paid for PBM services, not for price discounts.  Pls.' PI Memo. at 24.  First, the AMP rule expressly *excludes* any rebates paid to PBMs except rebates paid for their mail order pharmacy purchases, 42 C.F.R. §§ 447.504(g)(6), (h)(22), which CMS reasonably determined should be included because, "in their role as mail order pharmacies . . . PBMs participate directly in the purchase or delivery of prescription drugs."  72 Fed. Reg. at 39,192.  Second, the regulation expressly excludes any fee paid for bona fide services.  42 C.F.R. § 447.504(h)(19).  Plaintiffs' concern that manufacturers will include payments to PBMs that represent service fees instead of price concessions is therefore misguided.  Finally, the OIG has long recognized inconsistencies in the treatment of PBMs for the purposes of calculating AMPs.  *See* Ex. D, May 2006 OIG Report, at 5 (concluding that two of four manufacturers included all PBM rebates in their AMP calculations, one included those it  considered "retail," and one included none).  Any suggestion that PBM rebates have never been included in AMP calculations, and that Congress (which instructed the Secretary to consider the OIG's findings) legislated with that faulty knowledge, is therefore meritless.  CMS reasonably resolved pre-existing ambiguity by concluding that rebates paid to a PBM's mail order pharmacy that impact the price paid to the manufacturer for the drug should be

---

[3] Health plans and third-party payers may hire PBMs to help manage the drug benefits paid by those plans.  *See, e.g.*, Ex. D, May 2006 OIG Report, at 5.

included in the AMP calculation.  *See* 72 Fed. Reg. at 39,146-47, 39,192 (considering whether PBM

sales/rebates should be included in AMP calculation).

        (2) *Group Purchasing Organization ("GPO")*[4] *Fees.*  Plaintiffs complain that GPO fees are

actually service fees and should not be included in the price calculation.  Pls.' PI Memo. at 25.  In

response to similar comments, CMS clarified the rule to ensure that fees paid to any entity that meet the

definition of bona fide services, which do not reduce the price paid to the manufacturer for drugs, are

excluded from the AMP calculation.  72 Fed. Reg. at 39,183; *see also* 42 C.F.R. § 447.504(i)(1)

(including only those fees that "reduce the price received by the manufacturer").  Some GPO fees paid

by manufacturers, however, are passed on to GPO members or customers.  72 Fed. Reg. at 39,183.

Because these "fees" are tantamount to drug price concessions, CMS determined that the AMP should

include them.  *See id.*

        (3) *Rebates and Discounts Associated with Sales*.  Plaintiffs also object that "[r]ebates,

discounts, and other price concessions . . . associated with sales of drugs," 42 C.F.R. § 447.504(g)(14),

also do not fall within the statutory AMP definition because they, too, represent fees for services.  Pls.'

PI Memo. at 26.  First, as with GPOs, nothing in this regulatory provision requires inclusion of

payment for services.  42 C.F.R. § 447.504(g)(14).  Indeed, another provision requires that for

discounts and rebates to be included in the AMP calculation, they must "reduce the price received by

the manufacturer for the drug."  *Id.* § 447.504(i)(1).  And, as with GPOs, another provision specifically

excludes from the AMP calculation any fee paid by a manufacturer for bona fide services.  *Id.*

§ 447.504(h)(19).  Finally, as discussed above, this provision closely tracks the definition of AMP

prices that has long existed in the Rebate Agreement, *see* 56 Fed. Reg. at 7,050, and Congress did not

---

[4] A GPO is an entity that purchases prescription drugs for distribution exclusively to its members, typically hospitals and health care entities bound by written contract with the GPO.  *E.g.*, 21 C.F.R. § 203.3(o) (FDA definition).

indicate that CMS's longstanding direction to manufacturers to include these discounts and rebates was improper.

### 2.  *Definition of "Wholesaler"*

Plaintiffs also complain that CMS's definition of "wholesaler" is too broad.  *See* Pls.' PI Mot. at 11-14.  In particular, Plaintiffs would incorporate a state licensing requirement into the definition.  *Id.* at 11.  The Medicaid statute does not define the term "wholesaler," imposes no licensing requirement, and provides no other indication how that term should be understood.  *See* 42 U.S.C. § 1396r-8(k)(1).  Because Congress expressly delegated to CMS the authority to define this term, and because CMS's definition is reasonable and consistent with its longstanding interpretation of the term for purposes of Medicaid AMP calculations, the agency's interpretation must be accorded deference.

In implementing the manufacturer rebate program in 1991, CMS defined the term "wholesaler" so that manufacturers could more accurately determine their AMPs.  56 Fed. Reg. at 7,052.  In the Rebate Agreement, CMS defined the term "wholesaler" as follows:  "'Wholesaler' means any entity (including a pharmacy or chain of pharmacies) to which the manufacturer sells the Covered Outpatient Drug, but that does not relabel or repackage the Covered Outpatient Drug."  *Id.*  That definition – which, like the Medicaid statute itself, has never referenced state licensure – has remained unchanged over the course of the last sixteen years, and the definition of "wholesaler" in the AMP rule is virtually identical in all relevant respects to CMS's longstanding definition of "wholesaler" in the Rebate Agreement.  The AMP Rule provides:  "*Wholesaler* means any entity (including those entities in the retail pharmacy class of trade) to which the manufacturer sells the covered outpatient drugs, but that does not relabel or repackage the covered outpatient drugs."  42 C.F.R. § 447.504(f).  CMS adopted this definition as the one most consistent with current law and with the recommendations of the OIG.  72 Fed. Reg. at 39,164-65.

Again, Congress is presumed to have known how CMS had been defining the term "wholesaler" since 1991 for purposes of the statutory AMP definition, and courts accord great persuasive value to an agency's longstanding interpretation of a statute that has been re-enacted without change to the agency's interpretation. *See* discussion *supra* Section II.A.1. Given the absence of any other expression of congressional intent with respect to the term "wholesaler," this longstanding agency interpretation should be accorded deference.

Consistent with many of the comments that CMS considered and rejected, *see* 72 Fed. Reg. at 39,164-66, Plaintiffs and their *amicus* argue that CMS's definition of the term "wholesaler" is flawed because it differs from other HHS definitions of the term. *See* Pls.' PI Memo. at 11-12. Their argument is meritless because, as just explained, CMS has long defined the term "wholesaler" in precisely the same way *for the very purpose of AMP calculations under the Medicaid Act* since 1991. In light of this longstanding and directly relevant agency definition of the term, that this definition may conflict with other substantially less relevant definitions of the term is not helpful to Plaintiffs. CMS's decision to maintain its longstanding definition rather than change it to parallel its definition of the term for purposes of the Food, Drug, and Cosmetic Act, administered by the Food and Drug Administration, or some other statute was not only a *reasonable* interpretation but the *best* interpretation of the Medicaid statute.

Nor are Plaintiffs helped by the fact that another HHS component has defined the term "wholesaler" differently than CMS in the context of a different program. *See* Pls.' PI Memo. at 12-13. An agency may attribute different meanings to the same statutory language when applied in different contexts. *See, e.g.*, *Chevron*, 467 U.S. at 863-64 (approving agency adoption of different definitions of same statutory term in different contexts). That is particularly the case where, as here, the agency has long applied an effectively identical definition of the term "wholesaler" in the Medicaid context and

17

where the agency was attempting, in clarifying the AMP definition, to effect the congressional intent to establish an AMP that would accurately reflect actual sales prices. A definition of wholesaler (*e.g.*, one that imposes a state licensing requirement as Plaintiffs suggest) could arbitrarily remove a substantial number of transactions from the price calculation and result in an artificial AMP.[5]

All of the entities Plaintiffs claim should not be considered "wholesalers," *see* Pls.' PI Memo. at 18-26, indisputably fall within CMS's definition ("entit[ies] . . . to which the manufacturer sells the covered outpatient drugs, but that does not relabel or repackage [the drug]"). Because the agency's definition of the term "wholesaler" is consistent with the longstanding agency definition of the term in the context of Medicaid AMP calculations, and because its inclusive definition of the term serves the congressional purpose to calculate an AMP that accurately reflects actual drug prices, CMS's definition of that term is reasonable.

### 3. *Definition of "Retail Pharmacy Class of Trade"*

Plaintiffs argue that CMS has improperly defined "retail pharmacy class of trade" as "any independent pharmacy, chain pharmacy, mail order pharmacy, or other outlet that purchases drugs from a manufacturer, wholesaler, distributor, or other licensed entity and subsequently sells or provides the drugs to the general public." 42 C.F.R. § 447.504(e). They argue specifically that CMS improperly failed to impose a state licensure requirement and a requirement that a licensed pharmacist work at the "retail pharmacy." Pls.' PI Memo. at 15.

The Medicaid statute does not define the phrase "retail pharmacy class of trade." *See* 42 U.S.C. § 1396r-8(k)(1)(A). It certainly includes no licensure or pharmacist requirement, as Plaintiffs claim. And, unlike CMS's longstanding definition of "wholesaler," prior to the AMP rule, CMS had not

---

[5] In any event, the Health Resources and Services Administration (HRSA) has instructed manufacturers to calculate their AMPs for purposes of the "340B program" according to CMS requirements. *See* Letter from Jimmy R. Mitchell (HHS) to Manufacturers (May 9, 2007), attached as Ex. G. The AMP definition employed in the two programs are therefore congruent.

established a precise definition of the term "retail pharmacy class of trade" for purposes of manufacturers' AMP calculations. Based on its May 2006 review of the manner in which manufacturers had been defining the statutory term "retail pharmacy class of trade," the OIG said that "our findings demonstrate the need to clarify the definition of retail class of trade." Ex. D, May 2006 OIG Report, at i.

In promulgating the final rule, CMS considered various possible approaches to its definition of "retail pharmacy class of trade." 72 Fed. Reg. at 39,146. It noted that certain pharmacies may benefit from a narrow definition, which would limit the AMP to certain higher-priced pharmacy sales and therefore raise the FUL, while manufacturers would benefit from a broad definition which would reduce their rebate payments. *Id.* Broadly speaking, CMS's ultimate approach to the term "retail pharmacy class of trade" reflects its determination that a manufacturers' sale of drugs intended for purposes of ultimate distribution to the public (instead of, for example, for institutional use in serving specific admitted patients) should be considered part of the "retail pharmacy class of trade."

Importantly, the AMP rule contains an express exclusion for any sales of drugs distributed to the "non-retail pharmacy class of trade." 42 C.F.R. § 447.504(h)(13). Accordingly, if certain sales to entities listed in § 447.504(g) are not for distribution to the general public, then they should not be included in the AMP calculation. Many of Plaintiffs' arguments, as discussed in more detail below, are predicated on the fact that *some* sales to those entities may not be for purposes of distribution to the general public. However, the exclusion in § 447.504(h)(13) is intended to resolve that issue. Only those sales for public distribution, as opposed to inpatient or some other "non-retail" use, are included in the AMP calculation.

CMS specifically considered whether sales to every entity Plaintiffs claim are not part of the "retail pharmacy class of trade" should be included in the AMP calculation:

(1) *Sales to physicians.* Pls.' Memo at 18-19. CMS determined that, to the extent that physicians are providing drugs to the general public, they should be considered part of the "retail pharmacy class of trade" because they function in the same manner as a retail pharmacy. 72 Fed. Reg. at 39,172.

(2) *Sales to patients.* Pls.' Memo. at 19. In response to comments, CMS clarified that so-called "direct" sales to patients generally occur through a distributor which is acting like a wholesaler. 72 Fed. Reg. at 39,185. The patient pays the distributor for the drug, and the distributor pays that amount to the manufacturer, less a service fee. *See id.* Plaintiffs would exclude these sales from the AMP calculation because the manufacturer provides the drug to the distributor without technically transferring ownership to the distributor. Because such an exclusion would elevate form over substance, CMS defined the term "wholesaler" to encompass these distributors and, because the manufacturer/distributor transaction is for the purpose of providing drugs to the general public, that transaction is part of the "retail pharmacy class of trade." *See id.*

(3) *Sales to medical outpatient facilities.* Pls.' Memo. at 19-20. CMS clarified that sales to these centers should be included in the AMP calculation because they provide drugs to the general public and therefore function like a retail pharmacy. 72 Fed. Reg. at 39,173.

(4) *Sales to hospital pharmacies, clinics, and "affiliated entities."* Pls.' PI Memo. at 20. CMS determined that outpatient hospital pharmacies distribute drugs to the general public and, in that respect, function like retail pharmacies. *See* 72 Fed. Reg. at 39,172-73. CMS clarified, however, that to the extent a manufacturer cannot distinguish between sales for inpatient and outpatient use, the manufacturer should exclude all sales from the calculation. *Id.* at 39,173. To the extent sales to hospitals have previously been excluded in their entirety, CMS has provided a reasoned explanation of the more nuanced approach it has taken in the AMP rule.

(5) *Sales to manufacturers.* Pls.' PI Memo. at 21. Under the rule, sales to other manufacturers are included in the AMP *only* if those manufacturers act like wholesalers and distribute drugs to the retail pharmacy class of trade. 42 C.F.R. § 447.504(g)(2). If "manufacturers" are acting not as manufacturers (*i.e.*, those who repackage or relabel the drug) but as wholesalers, and are distributing products to the retail pharmacy class of trade, those sales are properly included in the AMP definition.

(6) *Sales to home infusion providers, home health providers, and specialty pharmacies.* Pls.' PI Memo. at 22-23. CMS determined that the fact that each of these entities serves specific patient populations does not take them out of the "retail" class of trade. *See* 72 Fed. Reg. at 39,176 ("[T]he drugs from these [home infusion therapy] pharmacies are sold in the retail marketplace and are available to the general public."); *id.* at 39,172 ("[U]nlike nursing facilities, home health care providers operate to provide drugs to the general public."); *id.* at 39,176 ("[D]rugs supplied through specialty pharmacies are within the regular retail marketplace. The fact that the pharmacies serve a client population characterized by specific medical conditions does not mean that their drugs are not sold to the general public, nor does it take them out of the retail pharmacy class of trade."). The statute, of course, contains no requirement that, to be part of the "retail pharmacy class of trade," an entity must offer products serving the *entire* public.

(7) *Mail order pharmacies.* Pls.' PI Memo. at 23. CMS extensively considered comments that mail order pharmacies should not be included in the definition of "retail pharmacy class of trade." 72 Fed. Reg. at 39,173-76. Because mail order pharmacies indisputably sell drugs to the general public, however, they easily fall within the definition of "retail" sale. *Id.* at 39,173 ("[W]e continue to believe that mail order pharmacies are part of the retail pharmacy class of trade inasmuch as they are accessible and dispense prescriptions to the general public."). In addition, CMS determined that removal of mail order pharmacies from the calculation would be inconsistent with past policy, as reflected in

Manufacturers Releases 28 and 29. *Id.* at 39,146. Manufacturer Release 29, for example, confirms longstanding agency policy to require manufacturers to include sales to mail order pharmacies in their AMP calculations. *See* Medicaid Drug Rebate Program Release No. 29 (rev. June 2, 1997) (in chart on final page, indicating that sales to mail order pharmacies are included in AMP calculation), attached as Ex. H. Congress's decision not to change this aspect of the AMP definition is highly persuasive evidence that inclusion of such pharmacies was consistent with congressional intent. *See* discussion *supra* Section II.A.1.

(8) *Sales at nominal prices.* Pls.' PI Memo. at 25. Plaintiffs' apparent dispute with CMS's inclusion of nominal price sales is that their inclusion will reduce the AMP. The Medicaid statute, of course, is designed to represent an *average* price paid for the drug and in no way indicates that "nominal" prices (or, for that matter, extremely high prices) should be excluded from that "average." To the extent the entities who pay these "nominal" prices are not wholesalers that distribute to the retail pharmacy class of trade, then those prices are not included in the AMP calculation. 42 C.F.R. § 447.504(h)(13) (excluding "[s]ales to wholesalers where the drug is distributed to the non-retail pharmacy class of trade"). There is certainly no statutory basis, however, for Plaintiffs' argument that all nominal sales should be excluded from the definition simply because in some cases those prices may not be paid by wholesalers that distribute to the retail pharmacy class of trade.

(9) *Low income patient programs.* Pls.' PI Memo. at 25-26. To the extent drugs are provided to low-income individuals free of charge, they are not included in the AMP. *See* 42 C.F.R. § 447.504(h)(18). Coupons for "free" products, however, may come with purchase requirements. *See* 72 Fed. Reg. at 39,187-89. In that context, the drug is not provided free of charge and is instead a sale that should properly be accounted for in the AMP calculation. *Id.*

In short, in light of the gap Congress left in the Medicaid statute with respect to the definition of "retail pharmacy class of trade" and the presumed congressional acquiescence to longstanding agency policy including entities such as mail order pharmacies within the calculation, Plaintiffs' arguments fail. There is no relevant "licensure" or "pharmacist" requirement anywhere in the Medicaid statute. *See* Pls.' PI Memo. at 14-15. Instead, Congress left it to the agency with the expertise in Medicaid to decide what definition of "retail pharmacy class of trade" best serves the purposes of that program and will result in the most accurate AMP. CMS's careful consideration of this issue reflects a consistent approach to distinguish between those entities that serve the general public, and are therefore part of the same market as traditional walk-in pharmacies, and those entities that serve only institutionalized patients, and therefore are part of a separate market. In so doing, the agency sought to achieve an AMP that most accurately reflects the actual price of drugs distributed in the retail market, which was precisely the intent of Congress.

### 4. *"Covered Outpatient Drugs"*

Plaintiffs argue that the AMP rule improperly includes in the AMP calculation sales of drugs that are not "covered outpatient drugs." Pls.' PI Memo. at 17-18. Plaintiffs have misinterpreted the statute and/or the rule.

Broadly speaking, the Medicaid statute defines the term "covered outpatient drug" based on the drug's status as an FDA-approved prescription drug. *See* 42 U.S.C. § 1396r-8(k)(2). It then excludes from that definition certain uses of that drug – *i.e.*, use in conjunction with a covered service and paid as part of that service. *See id.* § 1396r-8(k)(3). Importantly, the same drug that is paid for as part of a covered service (and therefore not within the definition of "covered outpatient drugs") is in other circumstances paid for directly (and therefore within the definition of "covered outpatient drugs"). Neither the identity of the entity to which the drug is sold (*e.g.*, to a hospital, a physician, or a dialysis

center) nor the method of administration (*e.g.*, "incident to" a service) ultimately determines whether that drug is a "covered outpatient drug." Instead, its *payment* methodology dictates whether it is a "covered outpatient drug." *See id.* (exclusion applies only to drugs for which payment is made as part of payment for a service). Plaintiffs' argument that sales to those entities should be wholly excluded – based solely on the identity of the entity and/or the method of administration – is therefore meritless.

Furthermore, the AMP is intended to reflect the average price of "the drug" as a whole, not the average price of drugs ultimately paid for by Medicaid, which is the approach Plaintiffs suggest. *See* Pls.' PI Memo. at 17 (arguing that "'[c]overed' means paid by the Medicaid program"). Plaintiffs' interpretation would exclude most drug sales from the AMP calculation to the extent those sales are not made to Medicaid beneficiaries.

>    B.    The CMS Definition of "Multiple Source Drug" Is Consistent With the DRA.

Plaintiffs also challenge CMS's definition of "multiple source drug" and the various components of the "availability" requirement incorporated in that definition. Pls.' PI Memo. at 29-35. In particular, they argue that some of the drugs for which CMS might establish an FUL might not be "multiple source drugs," as that term is defined in the Medicaid statute, because they are not "sold or marketed in the State." *See id.*

>    1.    *Plaintiffs Have Failed to Establish That These Claims Are Ripe or That They Have Standing to Assert Them.*

As discussed above, to establish standing, Plaintiffs must demonstrate that they have suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And, pursuant to the ripeness doctrine, courts may not "entangl[e] themselves in abstract disagreements over administrative policies" but should wait to interfere "until an administrative decision has been formalized and its effects felt in a

concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Plaintiffs have failed to establish an injury resulting from CMS's allegedly improper definition of the term "multiple source drug."  They have not identified any drug for which CMS has established an FUL but that is not "sold or marketed in the State."  *See* 42 U.S.C. § 1396r-8(k)(7)(A)(i)(III). Plaintiffs instead offer unsupported speculation that some generic drugs *might* not be sold or marketed in some states in two or more formulations and are therefore not "multiple source drugs."  *See* Pls.' PI Memo. at 34.  Plaintiffs have therefore failed to demonstrate that they will ever suffer an injury as a result of CMS's interpretation of "multiple source drug."  For the same reason, Plaintiffs have failed to demonstrate that they have felt adverse effects from CMS's policy "in a concrete way," as required for challenges to administrative action to be considered ripe for review.  *Abbott Laboratories*, 387 U.S. at 148-49.[6]

### 2.  *Plaintiffs' Claims Fail on the Merits.*

Even if Plaintiffs had alleged facts that would establish the necessary judicial prerequisites for this Court's  jurisdiction over their Complaint, the claim would nonetheless fail on the merits.  The three sub-parts of Plaintiffs' argument all address the statutory definition of "multiple source drug" to require the existence of at least two equivalent formulations of that drug that are "sold or marketed in the State."  42 U.S.C. § 1396r-8(k)(7)(A)(i)(III).  The statute defines "sold or marketed in the State" to mean that the drug is included in a published national listing and is "generally available" to the public in retail pharmacies in the state.  *Id.* § 1396r-8(k)(7)(C)(iii).

---

[6] Furthermore, Defendants' preliminary review of the record indicates that this issue was not raised in public comment, suggesting possible administrative waiver.  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

Plaintiffs argue that CMS has ignored this statutory "state availability" requirement.  It has not done so.  Instead, CMS made a determination that generic drug products, when they become FDA-approved as therapeutically equivalent and are available for sale in the United States, are "generally available" in retail pharmacies in the states.  *See* 42 C.F.R. § 447.502 (defining multiple source drug to require FDA approval of therapeutic equivalence and sale in the United States).  The Medicaid statute does not require this *absolute* or *universal* availability.  It requires *general* availability.  42 U.S.C. § 1396r-8(k)(7)(C).  CMS reasonably determined that drugs the FDA has approved as therapeutically and pharmaceutically equivalent and which are sold in the United States are "generally available" in retail pharmacies in the various states, particularly given that CMS has defined the term "retail pharmacy class of trade" to include more than traditional walk-in pharmacies.  *See* 42 C.F.R. § 447.504(e).  A mail order pharmacy serving the patients of a particular state, for example, is a retail pharmacy in that state.  *See id.*

Plaintiffs' reading of the Medicaid statute would conflict with another provision of the drug rebate statutory provisions.  Under the Medicaid statute, CMS must establish and apply an FUL upon determining that a drug is a "multiple source drug" based on AMP which, in accordance with the statute, must be calculated based on prices paid "in the United States."  42 U.S.C. § 1396r-8(e)(4), (k)(1)(A).  This statutory directive assumes that a drug either is or is not a multiple source drug.  Plaintiffs' argument, however, would render drugs "multiple source drugs" in some states but not in others.  This result cannot be reconciled with this statutory provision which (because it assumes a drug either is or is not a "multiple source drug") does not indicate whether CMS should establish and apply a FUL to a drug that both is and is not a "multiple source drug."  Relatedly, the statute dictates the establishment of *one* FUL per multiple source drug, not one FUL per multiple source drug per state.,

based presumably on CMS's continuous examination of all the pharmacies in each state.[7]  *See id.*

(instructing CMS to establish "*a* federal upper reimbursement limit for each multiple source drug").

Consistent with this statutory mandate, CMS has consistently calculated a single national FUL for each

multiple source drug.[8]  Plaintiffs' argument, on the contrary, could result in 50 different FULs, a result

that is neither consistent with the Medicaid statute nor with CMS's longstanding application of that

statute.

      In sum, if Plaintiffs had presented evidence that even one of its member pharmacies had been –

or is about to be – injured by this portion of the CMS regulation because that pharmacy operates in a

state in which a FUL will be established for a multiple source drug for which only one formulation is

"generally available" in the state or for which only one formulation is included in a published national

listing, then perhaps Plaintiffs could challenge this CMS determination.  But Plaintiffs have failed to do

so, and (in CMS's experience) they would not be able to make such a showing.

      C.    <u>The Final Rule Properly Applies Federal Upper Limits to All Formulations of a</u>
                <u>Multiple Source Drug.</u>

      Plaintiffs also argue that the Medicaid statute allows CMS to apply the FUL only to

therapeutically equivalent formulations of a multiple source drug.  *See* Pls.' PI Memo at 35-38.

Plaintiffs have misconstrued the Medicaid statute.

      Under the Medicaid statute, "the Secretary shall establish a Federal upper reimbursement limit

for each multiple source drug for which the FDA has rated . . . two or more[] products therapeutically

and pharmaceutically equivalent, regardless of whether all such additional formulations are rated as

such and shall use only such formulations when determining any such upper limit."  42 U.S.C. § 1396r-

8(e)(4).  A "multiple source drug" is one with multiple formulations, so long as at least two of its

---

[7] Also, in the specific section of the Medicaid statute discussing the establishment of FULs, Congress refers only to a requirement of "general availability."  *See id.* §§ 1396r-8(f)(1)(A)(ii), (B) (suggesting that different formulations of multiple source drugs should be "generally available" before applying a FUL).

[8] This calculation was explicitly referenced by Congress when it established the FUL mandate.  *Id.* § 1396r-8(e)(5).

formulations are therapeutically, pharmaceutically, and biologically equivalent. *See id*; *see also id.* § 1396r-8(k)(7)(A)(i). While § 1396r-8(e)(4) precludes CMS from *calculating* the FUL for a multiple source drug based on non-equivalent formulations of that drug (which CMS has not done), that provision plainly directs CMS to *apply* the FUL to the "multiple source drug," which includes all formulations of that drug.

Not only is CMS's interpretation consistent with (and probably mandated by) the plain language of § 1396r-8(e)(4), but its interpretation is also consistent with longstanding agency policy. CMS has, since the 1990 amendments to the Medicaid statute, *calculated* a multiple source drug's FUL based on the therapeutically equivalent formulations of that drug but *applied* that FUL to all formulations of the multiple source drug. *See* 72 Fed. Reg. at 39,155 (noting that rule simply continues CMS's current practice of applying the FUL to all drug formulations). In the DRA, Congress substantially changed the manner in which FULs are calculated for multiple source drugs, but it did nothing to change the relevant language of § 1396r-8(e)(4) to specify that the FUL should apply only to those formulations of the drug whose AMPs are used to calculate the FUL.

The agency's interpretation also represents good policy. Non-equivalent (or "B-rated") formulations of drugs have not yet satisfied FDA equivalence standards.[9] As such, they may not be an effective substitute for the innovator drug. CMS determined that failure to establish an FUL that would cover these formulations could encourage improper substitution of B-rated drugs when their A-rated counterparts have been prescribed. 72 Fed. Reg. at 39,155. That such substitution is "almost always illegal under state law," as Plaintiffs argue, certainly does not preclude Congress and CMS from discouraging such behavior by removing the financial incentives. There is simply no policy reason to

---

[9] For an overview of the A- and B-rating system, see Food & Drug Administration, Centers for Drug Evaluation and Research, "Approved Drug Products with Therapeutic Equivalence Evaluations," *available online at* http://www.fda.gov/cder/ob/docs/preface/ecpreface.htm.

exclude from application of the FUL formulations of multiple source drugs that have not been proven

by the FDA to be as effective as their A-rated counterparts.

In sum, the agency's decision to continue to apply FULs to multiple source drugs, regardless of

formulation, is not only consistent with, but is mandated by, the Medicaid statute.

## III.   THERE IS NO IMMINENT THREAT OF IRREPARABLE INJURY TO PLAINTIFFS IN THE ABSENCE OF THE REQUESTED INJUNCTION.

"Irreparability of injury is a very high standard." *Am. Coastal Line Joint Venture, Inc. v. U.S.*

*Lines, Inc.*, 580 F. Supp. 932, 936 (D.D.C. 1983). To establish a substantial threat of irreparable injury,

a plaintiff must meet two requirements. First, the injury "must be both certain and great; it must be

actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.

Cir. 2006) (quotations omitted). To that end, a plaintiff seeking injunctive and declaratory relief must

demonstrate "that the injury complained of is of such *imminence* that there is a clear and present need

for equitable relief to prevent irreparable harm." *Id.* (quotations omitted, emphasis in original). In

order to show that the harm is "certain," a party may not rely on "bare allegations of what is likely to

occur." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)

(quotations omitted). "The movant must provide proof that the harm has occurred in the past and is

likely to occur again, or proof indicating that the harm *is certain to occur* in the near future." *Id.*

(emphasis added). Second, the injury must be "beyond remediation." *Chaplaincy*, 454 F.3d at 297.

Insofar as the injury alleged is self-inflicted, it cannot be irreparable. *Salt Lake Tribune Publ'g Co. v.*

*AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003). Plaintiffs have satisfied neither requirement for

showing a substantial threat of irreparable injury.

A.    The "Irreparable Harm" Plaintiffs Have  Asserted Is the Result Not of the AMP Rule but of the DRA Itself.

To justify their request for a preliminary injunction, Plaintiffs argue that twenty percent of retail pharmacies will close because the amount of money those pharmacies will receive for Medicaid drugs will not cover their costs.  Pls.' PI Memo at 38-39.

Plaintiffs have failed to demonstrate, however, that these pharmacies will close at all, much less as a result of the AMP rule rather than a result of the DRA itself.  At most, Plaintiffs' evidence demonstrates that they might be harmed by implementation of the DRA's mandate to set FULs based on the AMP – a congressional mandate that Plaintiffs do not claim is unlawful and, importantly, whose implementation Plaintiffs have not sought to enjoin.[10]  Any "harm" allegedly caused by Congress therefore cannot support the preliminary injunction Plaintiffs seek.  *See Wis. Gas Co.*, 758 F.2d at 674 (movant must prove that "the alleged harm will directly result from the action *which the movant seeks to enjoin*") (emphasis added).[11]

For this reason, it remains entirely unclear what Plaintiffs seek to gain through a preliminary injunction or how they expect this Court to afford them any meaningful relief.  CMS must calculate and apply AMP-based FULs under the DRA, and it must continue to administer the AMP-based rebate program.  CMS must therefore have *some* basis for calculating the AMP, even if this Court enjoins the

---

[10] More specifically, Plaintiffs' evidence of harm is based on a GAO report comparing Congress's new AMP-based FUL system to actual retail pharmacy acquisition costs, *see* GAO, "Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs" (Dec. 22, 2006), attached as Ex. E, and an OIG report that conducted a similar analysis, *see* HHS, OIG, "Deficit Reduction Act of 2005:  Impact on the Medicaid Federal Upper Limit Program" (June 2007), attached as Ex. F.  *See* Report of Stephen W. Schondelmeyer, attached as Ex. D to Pls.' PI Memo., ¶¶ 211-34.

 Both studies were designed to evaluate the effects of the DRA *itself* on Medicaid reimbursement rates, not the effects of the AMP rule on Medicaid reimbursement rates.  The AMPs upon which the FULs were calculated in these studies were calculated according to methods that existed and had been utilized long before implementation of the AMP rule, not AMPs calculated under the new rule.  Similarly, the summary of "Effects on Retail Pharmacies" CMS included in its final rule explains that the "savings" to the federal government "reflect the *statutory* change," not the manner in which AMPs are calculated pursuant to the new rule.  72 Fed. Reg. at 39,233 (emphasis added).

[11] And, even if Plaintiffs could sue for harm caused by the DRA itself, the congressionally-imposed harm the allege is expected to result in pharmacy revenue losses of less than one percent.  72 Fed. Reg. at 39,233.

particular AMP calculation process outlined in the AMP rule. Plaintiffs are apparently asking this Court either to require reversion to former methods of calculating AMPs or are asking this Court to establish its own interim AMP calculation procedures pending resolution of this action on the merits. It is unknown, however, whether AMPs calculated pursuant to the former method are higher than the ones that will be calculated under the new AMP rule (and therefore unknown how Plaintiffs would be affected by a reversion to the former system), and it would be inappropriate for this Court (either here or on the merits) to mandate its own set of inclusion and exclusion criteria for the AMP. *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022-1023 (D.C. Cir. 1999) (requiring remand to agency after concluding that record did not support agency action).

In short, because Plaintiffs' evidence of harm is unsupported at all and the extent of any such harm attributable to this regulation is not quantified, Plaintiffs have failed to demonstrate any harm resulting from the action they seek to enjoin.[12]

> **B.**    Plaintiffs' Inexcusable Delay Proves That Any Harm They Might Suffer Is Not "Irreparable."

Plaintiffs' claimed need for a preliminary injunction stems most immediately from CMS's stated intent to publish in mid-December the AMP it calculates for each drug pursuant to the procedures set forth in the final rule. *See* Decl. of Mary Ann Wagner (Nov. 13, 2007) ("Wagner Decl.") ¶ 4, attached as Ex. 1 to Pls.' PI Memo.

Plaintiffs, however, have known since July 17, 2007 – when the final rule was published – exactly how CMS intended to calculate the AMPs. Plaintiffs' lawsuit does not challenge CMS's *application* of those procedures (which still has not occurred); rather, it challenges the procedures on

---

[12] Plaintiffs also claim that they have demonstrated irreparable harm because sovereign immunity will bar subsequent collection of money damages against the federal government. Pls.' PI Memo. at 39-40. To the extent their harm is monetary, however, Plaintiffs' asserted injury does not qualify for injunctive relief despite the government's sovereign immunity. *See Biovail Corp. v. U.S. Food & Drug Admin.*, -- F. Supp. 2d --, 2007 WL 891365, at *8 (D.D.C. Mar. 22, 2007).

their face. Since the DRA became effective on February 8, 2006, CMS has been required to publish its AMP calculations on a public website. 42 U.S.C. § 1396r-8(b)(3)(D)(v). Plaintiffs were therefore on notice as of July 17, 2007, that the AMPs would be (and have been) calculated pursuant to the procedures they now challenge and that those AMPs would be posted to a public website. Nonetheless, they waited *four months* to bring this lawsuit.

Plaintiffs' proffered justification for delay is that, until October 15, 2007, CMS had represented that it did not intend to publish any AMP data until January 2008. Wagner Decl. ¶ 3. Even if CMS had intended to wait until January 2008 to publish these data, however, Plaintiffs still should not have waited until November 15 – only six weeks before the new year – to file this motion seeking to enjoin further implementation of a rule that was published in July and that became effective in October. Plaintiffs' proffered justification for delay only reveals that, regardless of when CMS intended to publish the AMP data, Plaintiffs' plan was to wait until the last possible moment to challenge the rule, thereby creating a needless judicial emergency.

Inexcusable delay militates heavily against denial of a motion for a preliminary injunction. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (plaintiffs had waited 44 days until after final regulations were issued although they had notice of a public comment period; "We find this delay to be inexcusable."); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (drug company's eight-month delay in seeking preliminary relief undercut claim of irreparable harm).

Furthermore, Plaintiffs' latter two challenges – namely, that CMS should establish state-by-state FULs instead of a single national FUL, *see* Pls.' PI Memo. at 29-35, and that CMS should apply FULs

only to certain drug formulations of a multiple source drug, *see id.* at 35-38, are challenges to policies

that were not established by the AMP rule but extend as far back as 1991.  *See* discussion *supra*

Sections II.B., II.C.  Plaintiffs cannot claim irreparable harm warranting a preliminary injunction based

on policies they have waited years to challenge.

This Court should not reward Plaintiffs with preliminary relief in an action that was just as

cognizable four months (or sixteen years) ago as it is now and that could have been resolved, if

cognizable at all, before the rule's effective date.  As a result of their delay, Plaintiffs' purported need for

emergency action is wholly self-inflicted.  For this reason, their motion should be denied.

## IV.    A PRELIMINARY INJUNCTION WOULD SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES, INCLUDING MEDICAID BENEFICIARIES, AND IS ADVERSE TO THE PUBLIC INTEREST

"[E]ven where denial of a preliminary injunction will harm the plaintiff, the injunction should

not be issued where it would work a great and potentially irreparable harm to the party enjoined."

*Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).  Plaintiffs have failed to meet their burden

to show that this injunction will not harm other interested parties or the public.

First, CMS intends to publish the AMP data in mid-December because the comment period for

a related portion of the AMP rule closes on January 2, 2008.  *See* 72 Fed. Reg. at 39,142.  CMS had left

open for comment the provisions of the rule relating to outlier drug prices, and it seeks to give

prospective commenters access to the new AMP data before the close of the comment period.  *Id.* at

39,216-17.  The publication delay Plaintiffs seek would deprive commenters of that opportunity.

Second, a preliminary injunction would harm Defendants and the public by preventing CMS

from implementing a congressionally-mandated program designed both to reduce the federal deficit

beginning January 1, 2007, and to improve the clarity of the AMP calculation.  If this injunction were

issued, manufacturers would presumably begin submitting AMPs calculated pursuant to their old

inconsistent methodologies, and CMS would presumably set FULs based on AMPs calculated pursuant to those methodologies. A preliminary injunction, then, would only restore the confusion that Congress had attempted to eliminate with the DRA. In addition, that Plaintiffs do not agree with CMS's AMP inclusion criteria does not render the resulting data "misleading and confusing," as they claim. *See* Pls.' PI Memo. at 41. States, third party payers, and any other interested persons who may view the AMPs will do so with full knowledge of the criteria that, at CMS's direction, manufacturers now use to compute those AMPs.

Finally, and perhaps most importantly, Plaintiffs argue that they will be harmed monetarily by the implementation of the AMP rule. *See* Pls.' PI Memo. at 38-40. If Plaintiffs are correct, however, the additional money afforded them with this preliminary injunction will come at the expense of the Medicaid program itself. The injunction would simply reallocate money from the Medicaid program to Plaintiffs, and the Medicaid program will be equally unable to recover its costs. States have long been confronting budget crises leading them to consider cutbacks in their Medicaid programs. *See, e.g.*, *Pharm. Research & Mfrs. Ass'n of Am. v. Thompson*, 259 F. Supp. 2d 39, 84 (D.D.C. 2003) ("Michigan . . . is facing a budget crisis and possible cut-backs in its budget for Medicaid and other health care services."); *see also* H.R. Rep. No. 109-276 (Nov. 7, 2005) ("Unreformed, analysts predict Medicaid will bankrupt every state in as little as 20 years absorbing 80 [to] 100% of all state dollars."). If this injunction saves Plaintiffs substantial sums of money, as they claim, it would do so at the expense of an already-struggling Medicaid system and, ultimately, its beneficiaries.

Because Plaintiffs assert only monetary harm, because the taxpaying public would suffer at least the same harm, and because Medicaid beneficiaries could suffer an even greater harm, the balance of harms tips decidedly against Plaintiffs.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs'

Motion for Preliminary Injunction.

<div style="margin-left: 40%;">

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

<u>s/ Wendy M. Ertmer</u>
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

</div>

Dated:  December 10, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2007, a copy of the foregoing pleading, together with

proposed order, was filed electronically via the Court's ECF system, through which a notice of the

filing will be sent to:

Christopher W. Mahoney      cmahoney@duanemorris.com

and was sent by electronic mail to:

| | |
|---|---|
| Frederick R. Ball | frball@duanemorris.com |
| Don L. Bell II | dbell@nacds.org |
| Mary Ellen Kleiman | mkleiman@nacds.org |
| Nicholas J. Lynn | njlynn@duanemorris.com |
| John M. Rector | john.rector@ncpanet.org |

<u>s/ Wendy M. Ertmer</u>
WENDY M. ERTMER