## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION OF CHAIN DRUG STORES** | ) |
| | ) |
| and | ) |
| **NATIONAL COMMUNITY PHARMACISTS ASSOCIATION,** | ) |
| | ) Civil Action No. 1:07-cv-02017 (RCL) |
| Plaintiffs, | ) |
| v. | ) |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,** | ) |
| **MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES,** solely in his official capacity, | ) |
| **CENTERS FOR MEDICARE AND MEDICAID SERVICES,** | ) |
| and | ) |
| **KERRY WEEMS, ACTING ADMINISTRATOR OF THE CENTERS FOR MEDICARE AND MEDICAID SERVICES,** solely in his official capacity | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, the National Association of Chain Drug Stores ("NACDS") and the National Community Pharmacists Association ("NCPA") (collectively, the "Plaintiffs"), complain against the United States Department of Health and Human Services ("HHS"); Michael O. Leavitt ("Leavitt"), solely in his official capacity as Secretary of HHS; the Centers for Medicare and Medicaid Services ("CMS"); and Kerry Weems ("Weems"), solely in his official capacity as Acting Administrator of CMS (collectively, the "Defendants") for injunctive and declaratory relief and state as follows.

## INTRODUCTION

1.      This First Amended Complaint challenges a final rule promulgated by the Defendants regarding Medicaid reimbursement of retail pharmacies. *See* 72 Fed. Reg. 39142 (July 17, 2007) (the "AMP Rule"). The AMP Rule unlawfully changes the methodology by which pharmacies are reimbursed for dispensing prescription drugs to Medicaid patients. The AMP Rule is contrary to the plain language of the Social Security Act, contrary to Congress' clear intent when it enacted that statute, contrary to the Defendants' prior application of that statute, contrary to dozens of other federal and State statutes and regulations, contrary to long-standing industry practices, and contrary to common sense.

2.      The Defendants failed to implement the plain meaning of the Social Security Act because they were motivated to cut billions of dollars from payments to retail pharmacies that serve disadvantaged Americans through the Medicaid program. All of the Defendants' statutory violations result from the Defendants' efforts to cut Medicaid reimbursement to retail pharmacies below levels permitted by the statute.

3.      CMS estimates that the AMP Rule will reduce Medicaid reimbursement to retail pharmacies by more than $8 billion over five years. Studies by the HHS Office of Inspector General and the Government Accountability Office found that reimbursement will be cut well below the prices that retail pharmacies pay for the drugs they dispense to Medicaid patients. *See* OIG, *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program*, OEI-03-06-00400 (June 2007); GAO, *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs,* GAO-07-239R (Dec. 22, 2006).

4.      Medicaid reimbursement rates for retail pharmacies were expected to decline as a result of the Deficit Reduction Act of 2005. However, in their zeal to cut retail pharmacy

2

reimbursement rates even further, the Defendants have slashed reimbursement well below the rates allowed by Congress. Retail pharmacies will suffer even greater losses than they would if the Defendants had faithfully implemented the plain meaning of the statute. Many retail pharmacies, particularly small pharmacies and pharmacies that serve a large number of Medicaid patients, will be forced to reduce hours and services, forced out of the Medicaid program, or forced to close their doors altogether. Medicaid patients will lose access to retail pharmacies they rely on for critical pharmacy and pharmacist care.

5.     This First Amended Complaint seeks to enjoin the Defendants from implementing the unlawful AMP Rule, and seeks to enjoin the Defendants from posting on a public website the flawed data calculated pursuant to the AMP Rule. In addition, this First Amended Complaint seeks declaratory relief that the AMP Rule fails to comply with the Social Security Act.

6.     On December 19, 2007, the United States District Court for the District of Columbia issued a preliminary injunction in this case. The Court found that "Plaintiffs are likely to succeed on the merits of their claims that Defendants violated the Administrative Procedure Act and acted contrary to law and/or arbitrarily and capriciously in creating its Average Manufacturers Price rule, 72 Fed. Reg. 39142 (July 17, 2007) ('AMP Rule') because the AMP Rule does not comply with either the statutory definition of 'average manufacturer price' or the statutory definition of 'multiple source drug' as stated by the Court at the hearing on December 14, 2007". *See* Order at ¶ 1.

7.     The Defendants did not appeal the preliminary injunction order.

8.     On March 14, 2008, the Defendants issued a new rule that purports to amend the definition of "multiple source drug" that was contained in the AMP Rule. *See* 73 Fed. Reg. 13785 *et seq.* (March 14, 2008) (the "MSD Rule").

3

9.    The MSD Rule was issued as an interim final rule with comment. Comments were due on April 14, 2008, the day the MSD Rule was purported to go into effect. Even so, Defendants agree the MSD Rule is subject to the December 19, 2007 Preliminary Injunction. Therefore, Defendants will not implement the MSD Rule pending the outcome of this case.

10.    This First Amended Complaint also challenges the MSD Rule. The Defendants failed to promulgate the MSD Rule in accordance with the notice and comment rulemaking requirements of the Administrative Procedure Act. In addition, the MSD Rule fails to comply with the plain language of the Social Security Act.

11.    This First Amended Complaint seeks to enjoin the Defendants from implementing the unlawful MSD Rule. In addition, this First Amended Complaint seeks declaratory relief that the MSD Rule fails to comply with the Social Security Act and the Administrative Procedure Act.

## PARTIES

12.    Plaintiff NACDS is a tax-exempt, national trade association organized under section 501(c)(6) of the Internal Revenue Code and existing under the laws of the Commonwealth of Virginia. NACDS represents nearly 180 of the nation's leading retail pharmacy chains, including traditional pharmacy chains, supermarket chains that operate pharmacies, and mass merchandisers that operate pharmacies. NACDS' members operate more than 38,000 retail pharmacies, employ approximately 114,000 pharmacists, and dispense more than 2.3 billion prescriptions each year. NACDS' organizational purpose is to represent its members' best interests, including those interests related to federal and State healthcare programs, and to help NACDS' members serve their patients.

13.    Plaintiff NCPA is a national association of independent community retail pharmacies and pharmacists. NCPA is organized and exists under the laws of the

4

Commonwealth of Virginia. Founded in 1898 as the National Association of Retail Druggists, NCPA represents the owners, managers, and employees of 25,000 independent community retail pharmacies (not publicly held) across the United States, including independently owned chains and franchises. The more than 65,000 independent pharmacists nationwide dispense 1.5 billion prescriptions annually. Those prescriptions account, on average, for 92% of their annual sales. The nation's independent community pharmacists are small business entrepreneurs and multifaceted healthcare providers who represent a vital part of the United States' healthcare delivery system. NCPA's members are acknowledged by consumers as committed to high quality patient care and services and to restoring, maintaining, and promoting the health and well-being of the general public, including Medicaid patients. NCPA represents the professional and proprietary interests of independent community pharmacists, and promotes and defends those interests, including those interests pertaining to federal and State healthcare programs.

14.    Together, NACDS and NCPA represent virtually all retail pharmacies in the United States. An important purpose of these associations is to protect and advance their members' interests relating to Medicaid and other federal health programs.

15.    The retail pharmacies that are members of NACDS and NCPA participate as providers in the Medicaid program. According to CMS, retail pharmacies filled over 294 million prescriptions for Medicaid patients in 2006. Beginning in early 2008, the Defendants planned to reimburse retail pharmacies for dispensing prescription drugs to Medicaid patients based on the AMP Rule.

16.    NACDS and NCPA have associational standing under Article III because (a) their members would otherwise have standing to sue in their own right, (b) the interests that NACDS and NCPA seek to protect are germane to their organizational purposes, and (c) neither the

5

claims asserted nor the relief requested require the participation of individual members of NACDS or NCPA in the lawsuit.

17.     Defendant HHS is the cabinet department charged with administration of the Medicaid program.

18.     Defendant Leavitt is sued solely in his official capacity as the Secretary of HHS.

19.     Defendant CMS is the agency within HHS charged with administration of the Medicaid program.

20.     Defendant Weems is sued solely in his official capacity as the Acting Administrator of CMS.

## JURISDICTION AND VENUE

21.     Jurisdiction in this matter rests on 28 U.S.C. § 1331, 5 U.S.C. §§ 553, 702, and 703, and 28 U.S.C. § 2201.

22.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### Pharmacy Reimbursement Under The Medicaid Program

23.     Medicaid is a joint federal and State program that was created by the Social Security Act to provide healthcare to disadvantaged Americans.  Federal and State government agencies share responsibility for funding the Medicaid program.  The Medicaid program is administered by each State in accordance with a Medicaid State Plan that is reviewed and approved by the Defendants.  States must comply with federal requirements applicable to States that are specified in the Social Security Act, as well as the applicable regulations and program guidance issued by the Defendants pursuant to the Social Security Act.

24.     Retail pharmacies dispense prescription drugs to patients who are covered by the Medicaid program.  In return, retail pharmacies receive reimbursement from the Medicaid

DM1\1324611.1

program.  The amount of reimbursement varies, depending in part upon whether a retail pharmacy dispenses a single source drug or a multiple source drug.  Single source drugs are commonly referred to as brand name drugs, and multiple source drugs are commonly referred to as generic drugs.

25.     The Social Security Act requires the Defendants to calculate Federal Upper Limits on Medicaid reimbursement to retail pharmacies that dispense multiple source drugs to Medicaid patients.  The Federal Upper Limits place an overall cap, or ceiling, on the amount that State Medicaid programs may pay retail pharmacies for multiple source drugs that are dispensed to Medicaid patients.  *See* Social Security Act § 1927, codified at 42 U.S.C. § 1396r-8.

26.     Since the early 1990s, drug manufacturers have paid rebates to State Medicaid programs for drugs dispensed to Medicaid patients.  Pursuant to the Social Security Act, these rebates are based on the "Average Manufacturer Price" (or "AMP") paid to the manufacturer by wholesalers for the drugs distributed to the retail pharmacy class of trade.  Drug manufacturers calculate AMPs for each of their drug products, and report the AMPs to the Medicaid program on a regular basis.  *See id.*, originally enacted by the Omnibus Budget Reconciliation Act of 1990, P.L. 101-508.

27.     The Deficit Reduction Act of 2005 ("DRA"), P.L. 109-171, amended the Social Security Act to require the Defendants to use AMP as the basis for setting Federal Upper Limits on reimbursement for multiple source drugs.  The Social Security Act statutorily defines "Average Manufacturer Price" and "multiple source drug."  *See* Social Security Act § 1927 (42 U.S.C. § 1396r-8), as amended by DRA § 6001.

28.     In response to the DRA, the Defendants promulgated the AMP Rule on July 17, 2007.  The AMP Rule substantially revises the method of calculating AMPs and the method of

7

establishing Federal Upper Limits on reimbursement for multiple source drugs. Under the AMP Rule, Federal Upper Limits will ordinarily be set at 250 percent of the AMP for the least costly multiple source drug product. *See* AMP Rule § 447.514(b).

### The AMP Rule Violates The Statutory Definition Of Average Manufacturer Price

29.     The statutory definition of AMP is clear and simple. AMP is the average price paid to a drug manufacturer by wholesalers for drugs distributed to retail pharmacies. Specifically, the Social Security Act provides in relevant part that "the term 'Average Manufacturer Price' means, with respect to a covered outpatient drug of the manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade." *See* Social Security Act § 1927(k)(1) (42 U.S.C. § 1396r-8(k)(1)), as amended by DRA § 6001(c).

30.     The statute establishes a four-part test for determining whether a price may be included in AMP. First, only prices paid to drug manufacturers may be included in AMP. Second, those prices must have been paid by drug wholesalers. Third, the drug must have been distributed to the retail pharmacy class of trade. Fourth, the drug must be a "covered outpatient drug" (*i.e.*, a drug for which Medicaid will pay). A price must satisfy all four parts of the test before it may be included in AMP.

31.     The AMP Rule fails to abide by the statutory definition of AMP.

32.     The Defendants exceeded the plain language of the statute by including in calculations of AMP many transactions that have nothing to do with the prices paid to manufacturers by wholesalers for drugs distributed to retail pharmacies. The following are a few of the many examples of sales that the AMP Rule improperly includes in calculations of AMP:

a.     "Sales directly to patients";

8

b.    "Sales to physicians";

c.    Sales at nominal price to "any entity";

d.    Sales to "surgical centers";

e.    Sales to "dialysis centers";

f.    Sales to "mental health centers";

g.    Sales to "home health care providers";

h.    Sales to "home infusion providers";

i.    Sales to "clinics";

j.    Sales to hospital outpatient pharmacies or a hospital "affiliated entity";

k.    Sales to "pharmacy benefit managers (PBMs) for their mail order pharmacy purchases"; and

l.    "Sales to mail order pharmacies".

*See* AMP Rule § 447.504(g).

33.    These and many other sales prices (and associated discounts and rebates) listed in the AMP Rule should not be included in calculations of AMP. They each fail one or more parts of the statute's test for inclusion in AMP. They are not prices paid to manufacturers, not paid by wholesalers, not related to drugs distributed to retail pharmacies, and/or do not qualify as covered outpatient drugs. In an effort to dramatically reduce Medicaid reimbursement to retail pharmacies, the Defendants have misapplied all four parts of the statutory tests for AMP.

34.    First, the AMP Rule includes in AMP calculations many fees and rebates that are not prices paid to drug manufacturers. These fees and rebates are paid by manufacturers to third parties, usually for services that do not affect the prices that manufacturers are paid for the drug.

The Defendants' inclusion of financial transactions that are not prices paid to manufacturers by wholesalers is contrary to the plain meaning of the statute.

35.    Second, the AMP Rule mischaracterizes "wholesalers" as "any entity" that purchases drugs from manufacturers (except for relabelers and repackagers).  The AMP Rule considers every patient, physician, hospital, pharmacy and virtually "any entity" that buys drugs from a manufacturer to be a "wholesaler".  *See* AMP Rule § 447.504(f).  The Defendants' definition of "wholesaler" is contrary to the plain meaning of the Social Security Act, contrary to other federal statutes, contrary to federal regulations, contrary to the Defendants' own policies, contrary to every relevant State law and regulation, contrary to longstanding industry practices, and contrary to common sense.

36.    Third, although the AMP Rule provides that the "retail pharmacy class of trade" is limited to entities that provide drugs to the "general public", the AMP Rule includes many entities that do not, in fact, serve the general public.  For example, the AMP Rule includes in the "retail pharmacy class of trade" mail order pharmacies that are closed to the general public and serve only beneficiaries of particular health plans.  The Defendants' inclusion in the "retail pharmacy class of trade" of entities that are not retail pharmacies is contrary to the plain meaning of the statute, contrary to the Defendants' own regulations and policies, contrary to longstanding industry practices, and is internally inconsistent with other provisions of the AMP Rule.

37.    Fourth, the AMP Rule includes in AMP calculations many sales of drugs that are not covered outpatient drugs.  The statute's definition of "covered outpatient drugs" specifically excludes drugs that are provided as part of or incident to physician services, outpatient hospital services, or renal dialysis.  *See* Social Security Act § 1927(k)(3), codified at 42 U.S.C. § 1936r-8(k)(3).  Nevertheless, the AMP Rule specifically requires manufacturers to include sales of

those drugs in AMP calculations.  *See* AMP Rule § 447.504(g)(3), (8), (13).  The Defendants'
inclusion of non-covered drugs in AMP calculations is in direct violation of the statute.

38.    Preferential price discounts and rebates available to hospitals, clinics, PBM-
owned mail order pharmacies and many other healthcare entities are not available to retail
pharmacies.  Moreover, federal and State laws prevent the arbitrage of prescription drugs,
thereby preventing retail pharmacies from obtaining the benefit of this preferential pricing.  As a
result, these entities usually pay less for drugs than retail pharmacies.  Including these sales
prices (and associated discounts and rebates) in AMP calculations artificially decreases AMP,
which improperly decreases Medicaid reimbursement to retail pharmacies.

39.    In addition, the AMP Rule completely reverses the statutory test for AMP by
requiring a manufacturer to include prices in AMP unless the manufacturer can "adequately
document" that the price should be excluded.  However, the Social Security Act provides that
drug prices must be *excluded* from AMP unless the evidence shows that the prices were paid by
wholesalers and the drugs were distributed to retail pharmacies.  In contrast, the AMP Rule
provides that virtually all prices paid by almost any entity must be *included* in AMP unless a
manufacturer can prove with "adequate documentation" that the drugs were *not* distributed to
specific "excluded entities."  *See* AMP Rule § 447.504(g)(1).  The Defendants acknowledge that
manufacturers often lack "adequate documentation"; yet the AMP Rule does not require
manufacturers to make any effort to obtain adequate documentation.  Manufacturers have a
financial incentive to avoid obtaining adequate documentation because lower AMP calculations
lead to lower rebate payments by manufacturers to States.  The AMP Rule violates the Social
Security Act by completely reversing the statutory test for determining what prices may be
included in calculations of AMP.

11

40.    The Defendants will post on a public website AMP data calculated pursuant to the AMP Rule. *See* AMP Rule, 72 Fed. Reg. at 39213, 39222-24. States and other payers are expected to use this AMP data as a basis for establishing other reimbursement rates for retail pharmacies. *See id.* at 39146. If the Defendants are allowed to post on a public website the misleading and flawed AMP data calculated pursuant to the unlawful AMP Rule, retail pharmacies will be harmed by the resulting inadequate payment rates and consumer confusion.

### The AMP Rule and The MSD Rule Violate Statutory Provisions Regarding The Availability Of Multiple Source Drugs

41.    The Defendants fail to abide by statutory provisions regarding the availability of multiple source drugs, commonly referred to as generic drugs.

42.    The AMP Rule establishes Federal Upper Limits on reimbursement to pharmacies for dispensing certain drugs to Medicaid patients. *See* AMP Rule §§ 447.512, 447.514.

43.    Under the Social Security Act, the Defendants may establish a Federal Upper Limit on reimbursement for a drug only if the drug qualifies as a "multiple source drug". *See* Social Security Act § 1927(e)(4) (42 U.S.C. § 1396r-8(e)(4)), as amended by DRA § 6001(a).

44.    The Social Security Act includes a State-based definition of "multiple source drug." According to that statutory definition, a drug does not constitute a multiple source drug in a particular State unless two or more equivalent drug products are "sold or marketed in the State." The statute explains that "a drug product is considered to be sold or marketed in a State if it appears in a published national listing of average wholesale prices selected by the Secretary, provided that the listed product is generally available to the public through retail pharmacies in that State." *See* Social Security Act § 1927(k)(7) (42 U.S.C. § 1396r-8(k)(7)), as amended by DRA § 6001(a).

12

45.    The AMP Rule violates these statutory requirements in three principal ways. First, the AMP Rule ignores the statute's requirement that equivalent drug products must be "sold or marketed in the State" and replaced it with a requirement that the drug must be "sold or marketed in the United States...." *See* AMP Rule § 447.502.  The AMP Rule ignores the statute's State-based approach and instead establishes nationwide Federal Upper Limits on reimbursement so long as the drugs are sold or marketed somewhere in the United States.

46.    Second, despite the specific statutory mandate, the AMP Rule fails to ensure that Federal Upper Limits will be established for a drug only if an equivalent drug product "appears in a published national listing of average wholesale prices selected by the Secretary."  The Defendants decided not to identify and use such a listing as part of the process of establishing Federal Upper Limits for multiple source drugs.

47.    Third, the AMP Rule fails to ensure that Federal Upper Limits are applied in each State only to multiple source drug products that are "generally available to the public through retail pharmacies in that State."  The AMP Rule completely ignores this statutory requirement.

48.    The MSD Rule purports to amend the AMP Rule's definition of "multiple source drug" to comply with the statute's State availability standard.  Although the MSD Rule repeats some of the language of the statute, the MSD Rule does not comply with the statute's State availability standard in several important ways.

49.    First, the MSD Rule improperly applies the State availability standard to drugs rather than drug products.

50.    Second, the MSD Rule improperly focuses on whether drugs are unavailable to pharmacies, not whether drug products are generally available to the public.

13

51.     Third, despite the statute's State availability standard, the Defendants stated in the preamble to the MSD Rule that they will continue to assume that all drug products are available nationwide.

52.     Fourth, although the statute requires the Secretary to confirm that the State availability standard has been satisfied before imposing Federal Upper Limits on reimbursement, the MSD Rule improperly attempts to shift that burden to pharmacies and States.

53.     The Defendants fail to ensure that Federal Upper Limits are established only for multiple source drugs, as defined by the statute.  Rather than abide by the statute, the Defendants have opted for a nationalized approach that ignores variations in the availability and prices of drug products in different States.

54.     If allowed to stand, the Defendants' decision to abandon the statute's standards will harm pharmacies.  Because the AMP Rule provides that each Federal Upper Limit will ordinarily be based on the drug product with the "lowest" AMP, if that drug product is not generally available to the public through retail pharmacies in a State, then the retail pharmacies in that State will be reimbursed less than their acquisition cost for the drug.

### The AMP Rule Violates The Statute By Applying Federal Upper Limits To Non-Equivalent Drug Products

55.     The Defendants illegally attempt to apply Federal Upper Limits to drug products that are not therapeutically equivalent to the multiple source drug products used to set the Federal Upper Limits.

56.     The Social Security Act states that a drug product qualifies as a "multiple source drug" product only if there is "at least one other drug product" which is "therapeutically equivalent (under the Food and Drug Administration's ["FDA"] most recent publication of

14

"Approved Drug Products with Therapeutic Equivalence Evaluations"). . . ." *See* Social Security Act § 1927(k)(7) (42 U.S.C. § 1396r-8(k)(7)), as amended by DRA § 6001(a).

57.    The Social Security Act allows the Defendants to establish Federal Upper Limits on Medicaid reimbursement only for "multiple source drugs." Specifically, the statute provides that "the Secretary shall establish a Federal upper reimbursement limit for each multiple source drug for which the FDA has rated three or more (or, effective January 1, 2007, two or more) products therapeutically and pharmaceutically equivalent, regardless of whether all such additional formulations are rated as such and shall use only such formulations when determining any such upper limit." *See* Social Security Act § 1927(e)(4) (42 U.S.C. § 1396r-8(e)(4)), as amended by DRA § 6001(a).

58.    The statutory provisions discussed above clearly limit Federal Upper Limits only to *equivalent* multiple source drug products. Despite this statutory restriction, the Defendants announced in the AMP Rule that they will apply the Federal Upper Limits to *non-equivalent* drug products. *See* AMP Rule, 72 Fed. Reg. at 39215. The Defendants decided to apply the Federal Upper Limits to non-equivalent drug products for purely financial reasons. *Id.*

59.    It is contrary to the plain language of the statute, and arbitrary and capricious, to apply Federal Upper Limits to drug products that are not equivalent to the multiple source drug products that are used to set the Federal Upper Limits.

60.    Applying Federal Upper Limits to non-equivalent drug products will harm retail pharmacies by imposing additional reimbursement limits on retail pharmacies beyond the many reimbursement limits that apply under other provisions of federal and State laws.

## COUNT I

### Declaratory And Injunctive Relief

### The AMP Rule's Method of Calculating Average Manufacturer Price Violates the Administrative Procedure Act Because It Is Contrary to the Plain Language Of The Social Security Act and Is Arbitrary and Capricious (5 U.S.C. § 701-706)

61.    Plaintiffs incorporate paragraphs 1 through 60, as if fully set forth herein.

62.    The AMP Rule fails to comply with the Social Security Act because the method of calculating AMP established by the AMP Rule includes transactions other than prices paid to manufacturers by wholesalers for covered outpatient drugs distributed to the retail pharmacy class of trade.

63.    The AMP Rule's method of calculating AMP is contrary to the plain language of the Social Security Act, is contrary to other federal and State laws and regulations, is contrary to the Defendants' prior interpretations and implementation of federal law, exceeds the Defendants' legislative authority, and is arbitrary and capricious in violation of the Administrative Procedure Act.

## COUNT II

### Declaratory And Injunctive Relief

### The AMP Rule's Method of Establishing Federal Upper Limits for Multiple Source Drugs Violates the Administrative Procedure Act Because It Is Contrary to the Plain Language of the Social Security Act and Is Arbitrary and Capricious (5 U.S.C. § 701-706)

64.    Plaintiffs incorporate paragraphs 1 through 63, as if fully set forth herein.

65.    The AMP Rule fails to comply with the Social Security Act because the AMP Rule ignores the statute's State-based approach which limits multiple source drugs and calculations of Federal Upper Limits to drug products that are generally available to the public through retail pharmacies in each particular State.

DM1\1324611.1

66.    The AMP Rule's method of establishing Federal Upper Limits for multiple source drugs is contrary to the plain language of the Social Security Act, contrary to the Defendants' prior interpretations and implementation of the statute, exceeds the Defendants' legislative authority, and is arbitrary and capricious in violation of the Administrative Procedure Act.

## COUNT III

### Declaratory And Injunctive Relief

**The AMP Rule's Application of Federal Upper Limits to Non-Equivalent Drugs Violates the Administrative Procedure Act Because It Is Contrary to the Plain Language of the Social Security Act and Is Arbitrary and Capricious (5 U.S.C. § 701-706)**

67.    Plaintiffs incorporate paragraphs 1 through 66, as if fully set forth herein.

68.    The AMP Rule fails to comply with the Social Security Act because the AMP Rule applies Federal Upper Limits to non-equivalent drug products.

69.    The AMP Rule's application of Federal Upper Limits to non-equivalent drugs is contrary to the plain language of the Social Security Act, contrary to clearly expressed Congressional intent, and is arbitrary and capricious in violation of the Administrative Procedure Act.

## COUNT IV

### Declaratory And Injunctive Relief

**The MSD Rule Violates the Administrative Procedure Act Because Defendants Failed To Promulgate The MSD Rule In Accordance With Applicable Notice and Comment Rulemaking Requirements (5 U.S.C. § 553(b))**

70.    Plaintiffs incorporate paragraphs 1 through 69, as if fully set forth herein.

71.    The MSD Rule was issued as an interim final rule with comment.  Comments were due on the day the MSD Rule entered into effect.

17

72.    Prior to issuing the MSD Rule, the Defendants did not provide public notice, did not issue a proposed rule, did not provide the public an opportunity to offer comments, and did not consider public comments.  As a result, when the Defendants issued the MSD Rule they did not include a statement of basis and purpose that addresses and responds to public comments. Instead, when the Defendants issued the MSD Rule they acknowledged that the MSD Rule was "not being issued in response to public comments...." 73 Fed. Reg. at 13786.

73.    The MSD Rule is a substantive or legislative rule that is subject to the formal notice and comment rulemaking requirements of the Administrative Procedure Act.  *See* 5 U.S.C. § 553(b).  The MSD Rule is not an interpretive rule, general statement of policy, and/or rule of agency procedure or practice.  Defendants lacked good cause, or any cause, to refuse to follow the formal notice and comment rulemaking requirements of the Administrative Procedure Act.

74.    The MSD Rule violates the Administrative Procedure Act because it was not promulgated in accordance with notice and comment rulemaking requirements, thereby rendering the MSD Rule void and arbitrary and capricious.

## COUNT V

### Declaratory And Injunctive Relief

**The MSD Rule's Method of Establishing Federal Upper Limits for Multiple Source Drugs Violates the Administrative Procedure Act Because It Is Contrary to the Plain Language of the Social Security Act and Is Arbitrary and Capricious (5 U.S.C. § 701-706)**

75.    Plaintiffs incorporate paragraphs 1 through 74, as if fully set forth herein.

76.    The MSD Rule fails to comply with the Social Security Act because the MSD Rule does not properly implement the statute.  The statute requires the Defendants to confirm that equivalent drug products are generally available to the public through retail pharmacies in a

18

State prior to applying Federal Upper Limits on reimbursement in that State. *See* 42 U.S.C. § 1396r-8(e)(4), (k)(7).

77.    In contrast to the statute, the MSD Rule focuses on whether drugs (not drug products) are completely unavailable (not generally available) to pharmacies (not the public).

78.    Despite the language of the statute and even the language of the MSD Rule, the Defendants have announced that they will continue to assume that all drug products are generally available in all States. *See* 73 Fed. Reg. at 13786. The Defendants have no legal or factual basis for that assumption.

79.    The Defendants have stated in the MSD Rule that they will take no steps to ensure that specific drug products are generally available to the public through retail pharmacies in each State. Instead, Defendants have attempted to shift that statutory burden to pharmacies and the States. *See* 73 Fed. Reg. at 13786, 13787-88.

80.    The MSD Rule's definition of multiple source drugs, which will be used as part of the method of establishing Federal Upper Limits, is contrary to the plain language of the Social Security Act, exceeds the Defendants' legislative authority, and is arbitrary and capricious in violation of the Administrative Procedure Act.

## **PRAYER FOR RELIEF**

81.    Substantial, imminent, and irreparable injury will result because the retail pharmacies represented by NACDS and NCPA cannot recover the lost revenue from inadequate Medicaid reimbursement for prescription drug costs. Moreover, many pharmacies which serve Medicaid patients will be forced out of business due to inadequate reimbursement rates. Medicaid patients and the general public will be harmed to the extent that their access to

DM1\1324611.1

prescription drugs and pharmacy services will be limited or eliminated as a result of retail pharmacy closures.

    82.    The balance of equities favors injunctive relief because:

    a.    It is always in the public interest that agencies faithfully fulfill statutory mandates;

    b.    Retail pharmacies, Medicaid patients and the general public will incur substantial, imminent and irreparable harm if the AMP Rule and the MSD Rule go into effect and flawed AMP data are posted on a public website; and

    c.    A delay for CMS to promulgate a final rule that conforms with the Social Security Act and Congressional intent will not harm the Defendants.

WHEREFORE, Plaintiffs pray that this Court: (1) declare the AMP Rule illegal; (2) declare the MSD Rule illegal; (3) preliminarily and permanently enjoin the Defendants from implementing the AMP Rule and the MSD Rule; (4) declare illegal the posting on the Defendants' public website of AMP data calculated pursuant to the AMP Rule; (5) preliminarily and permanently enjoin the Defendants from posting on the Defendants' public website AMP data calculated pursuant to the AMP Rule; and (6) provide such other relief as the Court deems appropriate.

DM1\1324611.1

Respectfully submitted,

/s/ Don L. Bell, II
Don L. Bell, II
General Counsel
D.C. Bar No. 443149
Mary Ellen Kleiman
Associate General Counsel
DC Bar No. 458400
National Association of Chain Drug Stores
413 North Lee Street
Alexandria, VA 22313-1480
P: 703-549-3001
F: 703-684-6747
Email: DBell@nacds.org
Email: MKleiman@nacds.org


/s/ John M. Rector
John M. Rector
General Counsel
National Community Pharmacists Association
100 Daingerfield Road
Alexandria, VA 22314-2885
P: 703-683-8200
F: 703-683-3619
Email: john.rector@ncpanet.org


/s/ Christopher W. Mahoney
Christopher W. Mahoney
D.C. Bar No. 394416
Duane Morris LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
(202) 776-7867 (telephone)
(202) 478-0158
Email: CMahoney@duanemorris.com


/s/ Nicholas J. Lynn
Nicholas J. Lynn
Frederick R. Ball
Duane Morris LLP
190 South LaSalle Street
Suite 3700
Chicago, Illinois 60603
(312) 499-6700 (telephone)
(312) 499-6701 (fax)
Email: NJLynn@duanemorris.com
Email: FRBall@duanemorris.com
Attorneys for National Association Of Chain
Drug Stores And National Community
Pharmacists Association

DM1\1324611.1